Christopher C. Humphrey (CH 9551)
**HUMPHREY LAW, LLC**
7 Lothrop Lane
P.O. Box 608
Cohasset, Massachusetts 02025
Telephone: 908-472-8999
E-Mail: chumphreylaw@gmail.com
Local Counsel for Plaintiff

Peter Strojnik, Arizona Bar No. 6464
**PETER STROJNIK, P.C.**
3030 North Central Avenue, Suite 1401
Phoenix, Arizona 85012
Telephone: 602-524-6602
Facsimile: 602-296-0135
E-mail: Strojnik@aol.com
Attorneys *pro hac vice* for Plaintiff

Peter K. Strojnik, Arizona Bar No. 026082, California Bar No 242728
**THE STROJNIK FIRM LLC**
Suite 1401, 3030 North Central Avenue
Phoenix, Arizona 85012
Telephone: 602-297-3019
e-mail: Strojnik@skplaw.com
Attorneys *pro hac vice* for Plaintiff

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DARE INVESTMENTS, LLC, a Utah limited liability company,<br><br>       Plaintiff,<br><br>   vs.<br><br>CHICAGO TITLE INSURANCE COMPANY, a Missouri domiciled insurer; HORIZON TITLE AGENCY, Inc., a New Jersey domiciled company; CHICAGO TITLE RICO ENTERPRISE, a racketeering enterprise,<br><br>      Defendants. | CIVIL ACTION NO. _____<br><br><br>**<u>Civil Action</u>**<br><br>**COMPLAINT AND JURY DEMAND** |

**INDEX**

| Section | Page |
|---|---|

INDEX…………………………………………………………………....... …3

THE PARTIES, JURISDICTION AND VENUE……………………………..…4

SUMMARY OF THE ACTION………………………………………………... …5

FACTUAL ALLEGATIONS COMMON TO ALL COUNTS………………… …8

    The First Scam – SkyLand……………………………………………..…8

    The Second Scam – Dare Investments………………………..................10

    The Third Scam – Centrum Financial…………………………………16

    The Vermont Bankruptcy Decision……………………………........17

    Dare Investments' Reliance on Chicago Title's Duties and Expertise... ..21

    Chicago Title's Pattern of Racketeering Activity………………………..24

    COUNT ONE – Fraud in the Inducement…………………………………..27

    COUNT TWO – Reformation…………………………………………..…..29

    COUNT THREE – Breach of Contract……………………………………30

    COUNT FOUR – Negligence – Common Law and Per Se………………..31

    COUNT FIVE – Common Law Fraud and Failure to Disclose…………....33

    COUNT SIX – Civil Conspiracy………………………………….......….35

    COUNT SEVEN – Civil Aiding and Abetting…………………………..36

    COUNT EIGHT – Federal RICO and NJRICO…………………………...38

    COUNT NINE – Consumer Fraud…………………………………………40

    COUNT TEN – Breach of Covenant of Good Faith and Fair Dealing……..42

REQUEST FOR A TRIAL BY JURY…………………………………….......44

## THE PARTIES, JURISDICTION AND VENUE

1. Plaintiff Dare Investments, LLC ("Dare Investments") is a Utah limited liability company.

2. Defendant Chicago Title Insurance Company ("Chicago Title") is a Missouri corporation in the business of investigating, reviewing and insuring titles to real property interests in various jurisdictions in the United States.

3. Defendant Horizon Title Insurance Agency, Inc. ("Horizon Title") is a New Jersey domiciled corporation.

4. Horizon Title is Chicago Title's agent.

5. Chicago Title RICO Enterprise is the racketeering enterprise which conducted three (3) virtually identical fraudulent scams to secure loans in excess of $20 million. The Chicago Title RICO Enterprise engaged in carefully planned and highly coordinated activity in three (3) separate but well coordinated loan-fraud scams against three different RICO Victims.  The membership of the Chicago Title RICO Enterprise includes Chicago Title, Horizon Title, Horizon Title's employee and/or principal David Cohn, SWJ Holdings, LLC, William Mournes, Stephen Podell, and Gordon Duval, among others.

6. The amount of controversy exceeds $75,000.00.

7. The United States District Court of the State of New Jersey has jurisdiction over this matter by virtue of 28 U.S.C. § 1331 (federal question) 28 U.S.C. § 1367 (pendent state law claims) and 28 U.S.C. §1332 (diversity of citizenship).

8. Venue is proper pursuant to 28 U.S.C. 1391 for the reason that Chicago Title is subject to personal jurisdiction in this District and Chicago Title caused the events which form the subject matter of this Complaint to occur in New Jersey.

## SUMMARY OF THE ACTION

9. During the years 2005 and 2006, SWJ Holdings, LLC, through its agents and managers William Mournes and one Stephen Podell (collectively "SWJ"), entered into a series of at least three (3) fraudulent loan transactions in which they securitized fraudulent loans with worthless real estate securities.

10. The three (3) fraudulent transactions referenced here are:

    a. a loan from SkyLand Investments to SWJ in the amount of $50,000.00;

    b. a loan from Plaintiff, Dare Investments, to SWJ in the amount of $5,000,000.00; and

    c. a loan from Centrum Financial to SWJ in the amount of $15,000,000.00.

11. SWJ represented to SkyLand, Dare Investments and Centrum that it owned certain real estate interest in various properties previously owned by Peter

and/or Lorraine Mocco, including  (i) the mortgage against the property located on Clark Road in Bernardsville, NJ ("Clark Road Mortgage"); (ii) the mortgage against 158 acre property in Sayerville, NJ ("Sayerville Mortgage") and certain fee simple properties located in Jersey City and North Bergen, New Jersey ("The JC and NB Properties") (Cumulatively "Real Estate Securities")

12. In order to induce SkyLand, Dare Investments and Centrum to part with their hard earned money, SWJ agreed with each of them to secure their respective loans with the Clark Road Mortgage (SkyLand),  the Sayerville Mortgage (Dare Investments) and the JC and NB Properties (Centrum).

13. Each of the investors required that SWJ arrange for title to the Real Estate Securities; therefore, SWJ solicited the aid of Horizon Title, Chicago Title and one David Cohn to insure titles to Real Estate Securities.

14. With respect to each loan transaction, Chicago Title and Horizon Title knew that SkyLand, Dare Investments or Centrum would not enter into the loan transactions absent Chicago Title's agreement to insure title to their Real Estate Security Interests.

15. With respect to each loan transaction, SWJ and Chicago Title knew that the Real Estate Security Interest were worthless because SWJ did not have title to these interests and could not pledge these title interests to secure the loans.

16. Despite their knowledge that neither SWJ, nor its victims had any insurable interest in the Real Estate Security Interests, Chicago Title agreed to insure SkyLand's interest in the Clark Road Mortgage; Dare Investments' interest in the Sayerville Mortgage; and Centrum's interest in the JC and NB Properties.

17. The issuance of title policies by Chicago Title was an integral part of SWJ's fraudulent loan schemes; the entire fraudulent scheme was initiated and controlled by SWJ, Horizon Title and Chicago Title.

18. Chicago Title and Horizon Title agreed to participate in SWJ's scams by, inter alia, (i) misrepresenting the condition of title to the insured real estate securities; (ii) issuing policies of title insurance to uninsurable and unmarketable real estate securities; (iii) failing to advise the victims of their conspiratorial agreement with SWJ; and (iv) knowingly inducing the victims into believing that they would receive title insurance which would, in the event the real estate securities turned out to be fraudulent, protect them from losses.

19. Without the participation of Chicago Title and Horizon Title, the Chicago Title – SWJ fraud would not have occurred. As more fully set forth below, Chicago Title and Horizon Title were the principal players in the fraudulent transactions without whose participation the fraud would not have occurred and the victims would not have lost in excess of $20M. Chicago Title and Horizon Title participated in the loan frauds as principal members of the Chicago Title RICO

Enterprise consisting of the Chicago Title – Horizon Title – David Cohn – SWJ – William Mournes – Stephen Podell enterprise. The term "Chicago Title RICO Victims" refers to SkyLand, Dare Investments and Centrum Financial.

20. Defendants Chicago Title and Horizon Title acquired or maintained an interest in the Chicago Title RICO Enterprise through a pattern of racketeering activity, more fully described below; they were employed by or associated with the Chicago Title RICO Enterprise; they participated in the conduct and the affairs of the Chicago Title RICO Enterprise through a pattern of racketeering activity; and conspired with and participated in the Chicago Title RICO Enterprise.  In addition, Defendants aided and abetted each other and  the co-members of the Chicago Title RICO Enterprise.

21. Defendant Chicago Title is responsible for the acts of Horizon Title and Horizon Title employees under the theory of respondeat superior and master servant. Each member of the Chicago Title RICO Enterprise is responsible for the acts of each other member of the Chicago Title RICO Enterprise under the laws of partnership, conspiracy, RICO and aiding and abetting.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### THE FIRST SCAM – SKYLAND

22. In 2005, SWJ negotiated a loan from SkyLand in the amount of $50,000.00. The loan was secured by the Clark Road Mortgage.

23. At the insistence of and with full participation of Defendants, and pursuant to the scheme of the Chicago Title RICO Enterprise, Chicago Title agreed to issue a title policy to SkyLand insuring title to the Clark Road Mortgage.

24. SWJ arranged for Horizon Title and Chicago Title to insure the Clark Road Mortgage.

25. At the time of the agreement by the Defendants to issue a Title Policy to SkyLand, the members of the Chicago Title RICO Enterprise knew that SWJ did not have title or ownership of the Clark Road Mortgage, and that, consequently, that SkyLand's security interest in the Clark Road Mortgage was worthless.

26. At the time of the agreement by Defendants to issue a Title Policy to SkyLand, the members of the Chicago Title RICO Enterprise knew that neither SWJ nor SkyLand had insurable interest in the Clark Road Mortgage.

27.  On May 25, 2005, Chicago Title issued a policy of title insurance to SkyLand insuring SkyLand's first position in the Clark Road Mortgage under Chicago Title Policy Number 72107-2576598.

28. In the latter part of calendar year 2006, Sky Land attempted to sell, assign and transfer the Clark Road Mortgage.

29. On December 15, 2006, Mr. Michael O'Donnell, Riker, Danzig, Scherer, Hyland & Perretti LLP, as the attorney and agent for Chicago Title, admitted in

a letter of even date that the Clark Road Mortgage was in litigation and, thus, unmarketable.

30. The unmarketability of the Clark Road Mortgage was later confirmed by Vincent J. Sharkey, Jr., Esq., Riker, Danzig, Scherer, Hyland & Perretti LLP in his e-mail dated December 26, 2006.

31. Despite the clear lack of marketability of the Clark Road Mortgage and Chicago Title's duty to indemnify, Chicago Title refused to indemnify and forced SkyLand to file a court action in the US District Court for the District of Arizona, see case number 2:2007-cv-01328 transferred to the NJ District Court under cause number 2:2007-cv-05844.

32. The Arizona District Court found that the Clark Road Mortgage was unmarketable.

### THE SECOND SCAM – DARE INVESTMENTS

33. At all times relevant hereto, David Cohn was an employee of Horizon Title. At all times relevant hereto, Horizon Title held itself out as Chicago Title's agent.

34. Prior to March of 2006, the Chicago Title RICO Enterprise, through SWJ and Mournes, commenced negotiations for a loan from Dare Investments to SWJ.

35. At the time of the negotiations and thereafter, each member of the Chicago Title RICO Enterprise – including Chicago Title, Horizon Title, David Cohn,

SWJ, Mournes and Podell – knew that it had previously insured SkyLand's first position to Clark Road Mortgage to SkyLand.

36. At the time of the negotiations, each of the members of the Chicago Title RICO Enterprise knew that Dare Investment would not fund the $5,000,000.00 loan unless:

    a.  The Loan was sufficiently collateralized by real estate securities; and

    b.  The collateral was insured by title insurance.

37. SWJ arranged for Dare Investments to employ Horizon Title as the producer of the title insurance and Chicago Title as the insurer.

38. On March 13, 2006, SWJ as purchaser/grantor; Dare Investments as creditor/secured party; and the "Licata Group"[1] as sellers/debtors entered into a Security and Intercreditor Agreement. Exhibit 1. ("Security Agreement") Each member of the Chicago Title RICO Enterprise was aware of the Security Agreement and knew its contents.

39. The Security Agreement states that SWJ purchased certain bankruptcy assets listed in Exhibits A through F to the Security Agreement. Id.

40. The Security Agreement purports to securitize Dare Investment's Loan with, inter alia, the following interests:

---

[1] James J. Licata, First Connecticut Consulting Group, Inc.; First Connecticut Holding Group LLCV XXIII and First Connecticut Holding Group LLC XXIV

> (1) FCCG's interest in the mortgage for principal amount of $2 m
> from Lorraine Mocco to FCCG secured by 81 and 41 Clark Road
> in Bernardsville, NJ. and the underlying indebtedness as
> described in Schedule A-1 as the Bernardsville Loan.
>
> (2) FCCG's interest in the mortgage for the principal amount of
> $15 million from Lorraine Mocco to FCCG secured by 158 acres
> in Sayreville, New Jersey and the underlying indebtedness as
> described in Schedule A-1 as the Sayreville Debt.

Id.

41. The Security Agreement represents that on June 21, 2005, the Bankruptcy Court authorized the sale of the assets of the bankruptcy estate, including a $15M Mortgage which is the subject matter of the Title Policy in issue here. Id.

42. The Security Agreement does not disclose, however,

    a. that the insured mortgage was not the property of SWJ and that, consequently, SWJ had no right to pledge it as security; or

    b. that on July 27, 2004, the United States Bankruptcy Court for the District of Vermont (the "Vermont Bankruptcy Court") issued a decision which rendered the Clark Road Mortgage and the Sayerville Mortgages unmarketable; or

    c. That on March 28, 2006, the United States District Court of the District of Vermont affirmed the Vermont Bankruptcy Decision, or

    d. That the Clark Road Mortgage had been fraudulently assigned to SkyLand as part of the SkyLand Scam; or

e. That Chicago Title through Horizon Title previously issued title insurance on the Clark Road Mortgage in favor of SkyLand; or

43. The individual members of the Chicago Title RICO Enterprise also knew that SWJ had no right of assignment of the Clark Road Mortgage to Dare Investments. No member of the Chicago Title RICO Enterprise disclosed this fact to Dare Investments.

44. In addition to executing a security agreement securitizing the $5,000,000 loan with property, the Chicago Title RICO Enterprise promised to and did in fact issue a policy of Title Insurance insuring title to item no (2), the "Sayreville Mortgage". See Chicago Title Policy No, 72107-2834015, Exhibit 2. ("Dare Investments' Policy")

45. The Dare Investments' Policy specifically references the Security Agreement:

1. **Name of Insured:**

Dare Investments, L.L.C,, ISAOA/ATIMA, and James J. Licata, First Connecticut Consulting Group, Inc., First Connecticut Holding Group, L.L.C, XXIII and First Connecticut Holding Group, XXIV, as the insured's interest appears pursuant to a certain Security and Intercreditor Agre
1801 North 1120 West
Provo, UT 84601

46. At the time of the issuance of the Dare Investments Policy, each member of the Chicago Title RICO Enterprise knew the contents of the Security Agreement.

47. At the time of the issuance of the Dare Investments' Policy Chicago Title knew:

a. That the object of the Policy was to provide security to Dare Investments in connection with the fraudulently secured loan to SWJ; and

b. That Dare Investments would not extend a $5,500,000.00 loan to SWJ in the absence of a title policy; and

c. That Chicago Title had no intention of providing coverage of the very asset for which coverage was sought; and

d. That the representation in the Security Agreement regarding the Bankruptcy Court rulings were false; and

e. That it, Chicago Title, harbored a secret intent to deny coverage if a claim were made; and

f. That Sayerville Mortgage did not belong to SWJ, or that the title to the mortgage was in doubt, and that the money lent to SWJ was lent under false pretenses;

g. That neither SWJ nor Dare Investments had an insurable interest in the Sayerville Mortgage.

48. The Dare Investments' Policy disclosed that the insured Sayerville Mortgage had been assigned to SWJ on the same day as the execution of the Security Agreement, Exhibit 1.

4.  **The insured mortgage and assignments thereof, if any, are described as follows:**

Mortgage from Lorraine Mocco to First Connecticut Consulting Group, Inc., dated September 26, 1996, recorded September 26, 1996 in Mortgage Book 5164, Page 55 in the Clerk's Office of the County of Middlesex, in the originally stated amount of $15,000,000.00.

Said Mortgage was assigned to EMP Whole Loan I, L.L.C. by assignment dated September 26, 1996, recorded September 26, 1996 in Assignment Book 658, Page 312.

Said mortgage was further assigned to SWJ Holdings, LLC by assignment dated March 13, 2006, recorded March 30, 2006, in Assignment Book 966, Pages 28, 36 and 40.

Amended and Restated Mortgage from Lorraine Mocco to First Connecticut Consulting Group, Inc. dated September 26, 1996, recorded November 14, 1996 in Mortgage Book 5187, Page 815.

Said Amended and Restated Mortgage was assigned to SWJ Holdings, Inc. by assignment dated March March 13, 2006, recorded March 30, 2006 in Assignment Book 966, Page 32.

With respect to any interest of said EMP Whole Loan I, LLC in and to the subject mortgage hereunder, the Final Title Policy will insure over same.

49. Chicago Title and Horizon Title failed to disclose to Dare Investments that:

    a.  Neither SWJ nor Dare Investments had any ownership interest in the Sayerville Mortgage; and

    b.  Dare Investments was entitled to secure a $15,000,000.00 policy because the value of the Sayerville Mortgage was $15,000,000.

50. Had Dare Investments known that:

    a.  SWJ did not have ownership interest in the Sayerville Mortgage; or

    b.  that title to the Sayerville Mortgage was unmarketable; or

    c.  that Chicago Title did not intend to pay in the event the Sayerville Mortgage were not marketable,

it would not have advanced the $5,000,000.00 to SWJ.

51. Had Dare Investments known that it was entitled to secure a $15,000,000.00 Sayerville Mortgage with a $15,000,000 Title Policy, it would have secured coverage in the amount of $15,000,000.00.

52. In 2007, Dare Investments was sued by the owner of the Sayerville Property, Mr. Mocco, to quiet title. Chicago Title, through counsel Michael O'Donnell of the Riker, Danzig, Sherer, Hyland, Pirretti, LLP lawfirm, and as agent for Chicago Title, denied defense and indemnification, claiming that the Dare Investments Policy provided no coverage. Exhibit 3.

## THE THIRD SCAM – CENTRUM FINANCIAL

53. On May 26, 2006, Centrum loaned to SWJ $15,000,000.00 to purchase commercial and residential properties.

54. Upon information and belief, the loan was to be secured by properties in Jersey City and North Bergen, New Jersey.

55. Centrum required SWJ to provide a policy of title insurance to insure Centrum in the full amount of the loan.

56. SWJ arranged for Centrum to employ Horizon Title as the producer of the title insurance and Chicago Title as the insurer.

57. At the time of the issuance of the Policy, Horizon Title and SWJ knew that the insured properties were unmarketable, and that the Centrum Policy was a sham.

58. Centrum suffered a loss of $15,000,000.00 as a result of the scam perpetrated by the Chicago Title RICO Enterprise.

59. The Centrum scam is subject of a suit currently pending in the United States District Court for the District of New Jersey under cause number 09-330.

### THE VERMONT BANKRUPTCY DECISION

60. In early 1994, Peter and Lorraine Mocco, real estate developers and owners, filed for the protection of a Chapter 11 Bankruptcy.

61. During the bankruptcy proceeding, the Moccos reached an agreement with their principal creditor, First Union Bank, to purchase First Union's claims at a discounted price.

62. The Moccos engaged James and Cynthia Licata of the First Connecticut Consulting Group, Inc. ("FCCG") to arrange for a short term loan to pay off First Union. The Licatas and FCCG agreed to find a short term loan for the Moccos. The agreement provided that the Moccos would retain the ownership of various real estate interests and that the third party investors would receive purchase mortgages.

63. On May 23, 1996, FCCG agreed to lend up to $16M in short term loans to the Moccos to finance the First Union buyout. FCCG, in turn, intended to borrow the $16M from EMP Whole Loan, Inc. However, EMP insisted that it would not lend money to FCCG if the loans were to be secured by real estate

properties owned by persons in bankruptcy (the Moccos). In order to accommodate EMP's concerns, Moccos agreed to transfer ownership of the real property to a limited liability companies owned by FCCG.  The Moccos and Licata agreed that the newly formed First Connecticut Holding Group LLC's would hold title to the Mocco properties, but that Licata would reconvey title to the Mocco properties to Mocco for nominal consideration once the long term financing was secured. The agreement to reconvey was memorialized in a three (3) page agreement drafted by the Moccos on September 25, 1996. (the "09-25-96 Reconveyance Agreement")  The Vermont Bankruptcy Court specifically held that the 09-25-96 Reconveyance Agreement was valid and enforceable under New Jersey law.

64. On September 26, 1996, the EMP to FCCG loan closed, FCCG acquired First Union's claims in bankruptcy, and the Moccos' plan of reorganization was confirmed by the Court.

65. In May of 1997, the Moccos and the Licatas entered into an escrow agreement to provide for the orderly transition of the title to the properties held by the FCHC LLC's as the properties were refinanced and reconveyed to the Moccos. Pursuant to the terms of the escrow agreement, as each property that was refinanced (and the EMP Lien released) would be conveyed back to the Moccos through transfers of LLC interests in various  FCHG LLC's.

66. All properties were refinanced and EMP's liens were released in their entirety in 1997. In December of 1998, Licata and Mocco directed the escrow agent to forward to Mocco the remaining documents necessary to reconvey the FCHG LLC's to Mocco. However, on January 19, 1999, Licata advised Mocco that he would not reconvey the properties.

67. The Moccos brought suit in Essex County Superior Court against FCCG, Licata and the escrow agent to compel the reconveyance as agreed in the 09-25-96 Reconveyance Agreement. See, *Mocco v. Licata*, ESX-C-397-99. In September of 2001, the escrow agent delivered the ownership documents to the Moccos. In order to maintain the status quo, the Court ordered the Moccos to turn the ownership documents to a court appointed receiver, and entered an order enjoining all parties from transferring or encumbering the FCHG LLC's or their property pending a final determination of the ownership.

68. Neither Horizon Title nor Chicago Title disclosed the existence of this order to SkyLand, Dare Investments, or Centrum.

69. In June of 2002 – while the *Mocco v. Licata* action was still pending, the Licatas filed for personal bankruptcy in the District of Connecticut. In September of 2002, Licata caused FCCG and certain FCHG LLC's (First Connecticut Holding Group, LLC II, III, X, XI and XIII to also file for bankruptcy protection) ("Chapter 11 LLC's").

70. The Moccos challenged the bankruptcy filings for the FCGH LLC's. The Vermont Bankruptcy Court found that the Moccos, not the Licatas, were the owners of the Chapter 11 LLC's. See *In Re First Connecticut Consulting Group, Inc.* 340 B.R. 210, 216 (d. Vt. 2006) affirming the Bankruptcy Court decision. The Vermont Bankruptcy Court further found that:

    a.  The Vermont Bankruptcy Court, rather than the New Jersey State Court, would determine ownership of Mocco properties; and

    b.  The injunction against alienation of the properties issued by the New Jersey State Court would remain in effect while the Vermont Bankruptcy Court considered and determined the ownership of the Chapter 11 LLC's; and

    c.  The 09-25-96 Reconveyance Agreement was valid and enforceable; and

    d.  The Chapter 11 LLC's served merely as a conduit into which the Moccos transferred their properties for a later reconveyance.

71. The Vermont Bankruptcy Court findings were subsequently affirmed by the United States District Court for the District of Vermont on March 28, 2006, and by the United States Court of Appeals for the Second Circuit on November 15, 2007.

72. The Vermont Bankruptcy Court Decision is appended hereto as Exhibit 4.

73. On July 27, 2004, the Vermont Bankruptcy Court issued a decision that would render the Clark Road Mortgage; the Sayerville Mortgage and the JC and NB Properties unmarketable. Horizon Title and, consequently, Chicago Title knew of the existence of the Vermont Bankruptcy Decision prior to insuring Dare Investment's interest in the Sayerville Mortgage. The District Court decision is appended hereto as Exhibit 5.

### DARE INVESTMENTS' RELIANCE ON CHICAGO TITLE'S DUTIES AND EXPERTISE

74. At all times relevant hereto, Dare Investments justifiably believed that:

a. Horizon Title and Chicago Title were acting in compliance with the laws, regulations, and the standard of care applicable to title insurers and title insurer producers; and

b. Chicago Title would comply with The Title Insurance Act of 1974, N.J.S.A. 17:46B-1 to -62. N.J.S.A. which prohibits a title insurance company from issuing a title insurance policy unless it has "conducted a reasonable examination of the title... in accordance with sound underwriting practices for title insurance companies." 17:46B-9. ; and

c. That Chicago Title - before issuing the title insurance policy – would discharge its obligation to notify Dare Investments, at least five (5) days before the closing of title, of any "conditions, exceptions [or]

- 21 -

limitations of the insurance liability of the title company" that it proposes to incorporate in the title insurance policy. Ibid.; and

d.  That once Chicago Title issued the Dare Investments' Policy the Policy would "insure, guarantee or indemnify [Dare Investments]... against loss or damage suffered by reason of liens, encumbrances upon, defects in or the unmarketability of the title to said property." N.J.S.A. 17:46B-1(a); and

e.  That by issuing the Policy, Chicago Title "guarantee[d] [and] warrant[ed]... the correctness of searches relating to the title to real property." Ibid.

75. The requirements of the Title Insurance Act apply to Chicago Title.

76. Prior to issuing the SkyLand, Dare Investments and Centrum Financial Policies, Horizon Title and Chicago Title conducted extensive investigations into the insurability of the various mortgages, to wit:

a.  The SkyLand Policy dated May 25, 2005, states on its face that:

> This company has verified, through its due diligence, a) That the amount currently due and owing upon the subject mortgage, herein stated, with respect to the subject premises noted in this commitment is no less than $3,000,000.00; b) that the amount due and owing upon the subject mortgage constitutes a valid and enforceable first lien against the obligation of the mortgagor; and c) that the mortgagor has no apparent, enforceable defenses, offsets and or counterclaims with respect to the obligation secured by the subject mortgage.

b.  In the invoice from Horizon Title to Gordon Duval dated April 17, 2006, Exhibit 6, Horizon Title admits spending 750 hours over a 1½ year period reviewing bankruptcy filings; $44,000 in title searches and

$25,000 in historical due diligence. In total, this translates to 1,477 hours of due diligence – or 5 researchers working full time for 7½ weeks.

c.  Chicago Title, through its agents Horizon Title and David Cohn, contacted one Peter DeJong, Esq. – believed to be the escrow agent facilitating the 09-25-96 Reconveyance Agreement – regarding the ownership of the Mocco Properties. Mr. DeJong was contacted by David Cohn to discuss various parties' interests in various Mocco Properties.  Mr. DeJong explained to Mr. Cohn that "Licata [of First Connecticut Consulting Group] had no ownership interest in …these properties". Mr. De Jong "urged [Mr. Cohn] to contact [Mr. Scarpone, Peter and Lorraine's Attorney] and told [Mr. Cohn] that he should contact [Mr. Scarpone] and find out more about it. [Mr. DeJong] told [Mr. Cohn] that there was litigation pending" relating to the Mocco Mortgages.

d.  Mr. DeJong was also interviewed by attorneys from Riker Danzig, who represented Chicago Title.   With respect to this interview, Mr. DeJong testified:

```
14     Q.    Did they tell you what the purpose of
15  the interview was?
16     A.    Their client was the title company.  The
17  underwriter.  And they said that – that they needed
18  to interview me with respect to property ownership
19  interest and they referred to the First Connecticut
20  properties.
```

## CHICAGO TITLE'S PATTERN OF RACKETEERING ACTIVITY

77. There is a common theme and pattern present in the SkyLand, Dare Investments and Centrum scams, to wit:

   a. Each scam involves the same core members of the Chicago Title RICO Enterprise, to wit: (i) Chicago Title; and (ii) Horizon Title; and (iii) SWJ; and (iv) William Mournes; and (v) Stephen Podell; and (vi) Gordon Duval; and (vii) David Cohn;

   b. In order for each scam to work, the Chicago Title RICO Enterprise steered each Chicago Title RICO Victim to Horizon Title and Chicago Title.

   c. In each case, the Chicago Title policy of title insurance was issued in order to induce individual Chicago Title RICO Victims to separate itself from money as more fully stated above; and

   d. Each Chicago Title Policy arose as a result of security agreements between the Chicago Title RICO Victims and SWJ; and

   e. In each case, money was advanced to SWJ; and

   f. In each case the loans were secured by properties to which SWJ did not have title, or title was unmarketable; and

   g. In each case, Chicago Title insured unmarketable title knowing or having reason to know that the insured title was unmarketable; and

h.  In each case, the members of the Chicago Title RICO Enterprise benefitted financially at the expense of the CT RICO Victims; and

i.  In each case, upon demand for indemnity, Chicago Title hired one Michael O'Donnell of Riker, Danzig, Scherer, Hyland & Perretti LLP in order to unnecessarily delay payment under the policy; and

j.  In each case Chicago Title breached its obligation of good faith and fair dealing by unreasonably, arbitrarily and capriciously denying liability under the policy and declaring coverage unavailing, and interfering with the reasonable expectations of the Chicago Title RICO Victims; and

k.  CT Enterprise's *modus operandi* includes a course of conduct with common external organizing principle including the affairs of the entire CT Enterprise, including without limitation, insuring title to real estate interests knowing that such interests are unmarketable; and

l.  The acts committed by the Chicago Title RICO Enterprise are related in that they have the same or similar purposes, results, participants, victims or methods of commission and are otherwise interrelated by distinguishing characteristics; and

m.  The acts of the Chicago Title RICO Enterprise demonstrate a series of related predicates involving various victims over a substantial period of time; and

n.  The Chicago Title RICO Enterprise conduct, by its very nature, projects into the future with a threat of repetition; and

o.  The Chicago Title RICO Enterprise's actions involve a scheme or artifice to defraud, or for obtaining money, property and/or services by means of false or fraudulent pretenses, representations, or promises, and transmitted or caused to be transmitted by means of communication in interstate or foreign commerce, any writings and/or signs and/or signals and/or pictures and/or sounds for the purpose of executing such scheme or artifice; and

p.  The Chicago Title RICO Enterprise used the United States Mail Service in their scheme, including depositing matters or things to be sent or delivered by the Postal Service, and/or deposited and/or caused to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, and/or took or received therefrom, any such matter or thing, and/or knowingly caused to be delivered by mail or such carrier according to the direction thereon, and/or at the place at which it is directed to be delivered by the person to whom it is addressed; and

q.  The acts of the Chicago Title RICO Enterprise may be indictable pursuant to 18 U.S.C. §1341 relating to mail fraud; and

r.  The acts of the Chicago Title Enterprise may be indictable pursuant to 18 U.S.C. §1343 relating to wire fraud.

## COUNT ONE
### (Fraud in the Inducement)

78. Plaintiff realleges all allegations heretofore set forth as if fully restated herein.

79. The Chicago Title RICO Enterprise fraudulently induced Dare Investments into lending to SWJ the sum of $5,000,000.00 by a promise of a valid and enforceable policy of title insurance on the Sayerville Mortgage and assignments.

80. The inducement was fraudulent for the following non-exclusive reasons:

a. Dare Investments was steered to Horizon Title and Chicago Title as the title insurer because Horizon Title and Chicago Title were members of the already existing Chicago Title RICO Enterprise; and

b. The individual members of the Chicago Title RICO Enterprise held Horizon Title and Chicago Title as reputable insurers capable paying on a claim; and

c. The individual members of the Chicago Title RICO Enterprise did not disclose the existence of the Chicago Title RICO Enterprise to Dare Investments; and

d. Chicago Title and Horizon Title had previously conducted extensive research regarding the title to the mortgages being sold in connection with the SkyLand Transaction and the Centrum Transaction, and knew that the insured Sayerville Mortgage and assignments were not marketable; and

e. All statements and omissions set forth above and below.

81. Dare Investments had the right to rely on Chicago Title RICO Enterprise's statements and omissions.

82. As a direct result of Dare Investments' reliance on Chicago Title RICO Enterprise's false statements and failures to disclose, and upon Dare Investment's justifiable reliance thereon, Dare Investments advanced a $5,000,000.00 loan to a member of the Chicago Title RICO Enterprise, to wit, SWJ, all to its damage.

83. As a direct result of Dare Investments' reliance on Chicago Title RICO Enterprise's false statements and failures to disclose, and upon Dare Investment's justifiable reliance thereon, Dare Investments incurred expenses in addition to the loss of $5,000,000.00, including loss of time, travel and business expenses, loss of use of money, and other expenses to be more fully quantified at the time of trial, but in no event less than $500,000.00.

84. Defendants' conduct was premeditated, wantonly reckless or malicious. Defendants became knowing and willing participants in the Chicago Title RICO Enterprise, and intentionally aided and abetted SWJ in SWJ's fraudulent loan transaction, and intentionally issued a policy of insurance insuring unmarketable title. Defendants' acts were evil minded, and display a wanton and willful disregard of the rights of another. Defendants engaged in deliberate

acts or omissions with knowledge of a high degree of probability of harm and reckless indifference to consequences.

WHEREFORE, Dare Investments prays for judgment against the Defendants and each of them as follows:

A.  For damages in the principal amount of $5,500,000.00; and

B.   For consequential damages, including loss of time, attorney's fees, costs, expenses, loss of use of advanced funds, all in the amount to be proven at trial, but in no event less than $2,500,000.00; and

C.  For punitive damages in an amount to deter these Defendants from engaging in like conduct in the future, and to deter others similarly situated from same; and

D.  For payment of pre-and post judgment interest on all liquidated amounts; and

E.  For such other and further relief as the Court may deem just and proper.

## COUNT TWO
### (Reformation)

85. Plaintiff realleges all allegations heretofore set forth as if fully restated herein.

86. Defendants negligently or intentionally failed to advise Plaintiff that the ostensible value of the real estate securities pledged in the Security Agreement, Exhibit 1, was greatly in excess of the policy amount actually issued.

87. The Dare Investments' Policy contains inadequate coverage.

88. Adequate coverage is $15M.

WHEREFORE, Plaintiff prays for reformation of the Dare Investments Policy from coverage of $5,500,000.00 to coverage of $15,000,000.00.

## COUNT THREE
### (Breach of Contract)

89. Plaintiff realleges all allegations heretofore set forth as if fully restated herein.

90. In 2007, Dare Investments was sued by the owner of the Sayerville Property, Mr. Mocco, to quiet title. Chicago Title, through counsel Michael O'Donnell of the Riker, Danzig, Sherer, Hyland, Pirretti, LLP lawfirm, and as agent for Chicago Title, denied defense and indemnification, claiming that the Dare Investments Policy provided no coverage. Exhibit 3.

91. Chicago Title's refusal to provide defense and indemnity is a breach of the insurance contract.

92. Plaintiff has been damaged by Chicago Title's Breach of its duty to provide a defense and to indemnify by incurring costs and attorney's fees, and other damages the scope of which shall be determined at the time of trial.

93. On November 2, 2010, Plaintiff made another demand on Chicago Title to indemnify Plaintiff for the losses sustained as a direct result of the unmarketability of the Sayerville Mortgage and assignments, but Chicago Title refused.

94. Chicago Title further breached the Dare Investments Policy in two ways: By failing to provide a defense and by failing to indemnify.

WHEREFORE, Plaintiff prays for judgment as follows:

A.  For breach of contract damages for the costs of defense (including attorney's fees), loss of time, loss of business incurred as a result of Chicago Title's unjustified refusal to defend in an amount to be proven at trial; and

B.  For breach of the duty to pay pursuant to the terms of the Policy in the amount of $5,500,000.00; and

C.  For pre-and post judgment interest at the highest legal rate; and

D.  For such other and further relief as the Court may deem just and proper.

### COUNT FOUR
**(Negligence – Common Law And Per Se)**

95. Plaintiff realleges all allegations heretofore set forth as if fully restated herein.

96. The Title Insurance Act of 1974, N.J.S.A. 17:46B-1 to -62. N.J.S.A. prohibits a title insurance company from issuing a title insurance policy unless it has "conducted a reasonable examination of the title... in accordance with sound underwriting practices for title insurance companies." 17:46B-9.

97. Before issuing the title insurance policy, the insurer is obliged to notify the proposed insured, at least five days before the closing of title, of any "conditions, exceptions [or] limitations of the insurance liability of the title company" that it proposes to incorporate in the title insurance policy. Ibid.

98. Once issued, a policy of title insurance "insur[es], guarantee[s] or indemnif[ies] owners of real property... against loss or damage suffered by reason of liens,

encumbrances upon, defects in or the unmarketability of the title to said property." N.J.S.A. 17:46B-1(a).

99. By issuing such a policy, the insurer "guarantee[s] [and] warrant[s]... the correctness of searches relating to the title to real property." Ibid.

100.   Defendants conducted a negligent title search, causing damage to Plaintiff.

101.   Defendants' negligence violates NJ Statutes, rending it negligent per se.

102.   Defendants' investigation of the title was wantonly reckless. Defendants display a wanton and willful disregard of the rights of another, including the Plaintiff herein. Defendants engaged in deliberate acts or omissions with knowledge of a high degree of probability of harm and reckless indifference to consequences.

WHEREFORE, Dare Investments prays for judgment against the defendants and each of them as follows:

A.  For damages in the principal amount of $5,500,000.00; and

B.   For consequential damages, including loss of time, attorney's fees, costs, expenses, loss of use of advanced funds, all in the amount to be proven at trial, but in no event less than $2,500,000.00; and

C.  For punitive damages in an amount to deter these Defendants from engaging in like conduct in the future, and to deter others similarly situated from same; and

D.  For payment of pre-and post judgment interest on all liquidated amounts; and

E.  For such other and further relief as the Court may deem just and proper.

## COUNT FIVE
### (Common Law Fraud and Failure to Disclose)

103.   Plaintiff realleges all allegations heretofore set forth as if fully restated herein.

104.   The Chicago Title RICO Enterprise fraudulently falsely represented to Dare Investments the condition of the title to the Sayerville Mortgage as more fully set forth above.

105.   The Chicago Title RICO Enterprise fraudulently failed to advise Dare Investments of the condition of title to the Sayerville Mortgage as more fully set forth above.

106.   Dare Investments was justified in relying on the representations and omissions, and did so rely on the representations and omissions, all to its damage.

107.   As a direct result of Dare Investments' reliance on Chicago Title RICO Enterprise's false statements and failures to disclose, and upon Dare Investment's justifiable reliance thereon, Dare Investments advanced a $5,000,000.00 loan to a member of the Chicago Title RICO Enterprise, to with, SWJ, all to its damage.

108.   As a direct result of Dare Investments' reliance on Chicago Title RICO Enterprise's false statements and failures to disclose, and upon Dare

Investment's justifiable reliance thereon, Dare Investments incurred expenses in addition to the loss of $5,000,000.00, including loss of time, travel and business expenses, loss of use of money, and other expenses to be more fully quantified at the time of trial, but in no event less than $500,000.00.

109.  As a direct result of Dare Investments' reasonable and justifiable reliance, Dare Investments took out a $5M policy instead of a $15M policy.

110.  Defendants'' conduct was premeditated, wantonly reckless or malicious. Defendants became knowing and willing participants in the Chicago Title RICO Enterprise, and intentionally aided and abetted SWJ in SWJ's fraudulent loan transaction, and intentionally issued a policy of insurance insuring unmarketable title. Defendants' acts were evil minded, and display a wanton and willful disregard of the rights of another. Defendants engaged in deliberate acts or omissions with knowledge of a high degree of probability of harm and reckless indifference to consequences.

WHEREFORE, Dare Investments prays for judgment against the Defendants and each of them as follows:

A.  For damages in the principal amount of $15,500,000.00; and

B.   For consequential damages, including loss of time, attorney's fees, costs, expenses, loss of use of advanced funds, all in the amount to be proven at trial, but in no event less than $2,500,000.00; and

C.  For punitive damages in an amount to deter these Defendants from engaging in

like conduct in the future, and to deter others similarly situated from same; and

D.  For payment of pre-and post judgment interest on all liquidated amounts; and

E.  For such other and further relief as the Court may deem just and proper.

## COUNT SIX
### (Civil Conspiracy)

111.  Plaintiff realleges all allegations heretofore set forth as if fully restated

herein.

112.  The members of the Chicago Title RICO Enterprise are a combination of

two or more persons acting in concert to commit an unlawful act, or to commit

a lawful act by unlawful means, the principal element of which is an agreement

between the parties to inflict a wrong against or injury upon another, and an

overt act that results in damage, all as more fully described above.

113.  The Chicago Title RICO Enterprise acted in a highly coordinated scheme to

defraud innocent victims, including the Plaintiff herein.

114.  Plaintiff has been damaged by the Chicago Title RICO Enterprise and

conspiracy.

115.  Defendants' conduct was premeditated, wantonly reckless or malicious.

Defendants became knowing and willing participants in the Chicago Title

RICO Enterprise, and intentionally aided and abetted SWJ in SWJ's fraudulent

loan transaction, and intentionally issued a policy of insurance insuring

unmarketable title. Defendants' acts were evil minded, and display a wanton and willful disregard of the rights of another. Defendants engaged in deliberate acts or omissions with knowledge of a high degree of probability of harm and reckless indifference to consequences.

WHEREFORE, Dare Investments prays for judgment against the Defendants and each of them as follows:

A.  For damages in the principal amount of $5,500,000.00; and

B.  For consequential damages, including loss of time, attorney's fees, costs, expenses, loss of use of advanced funds, all in the amount to be proven at trial, but in no event less than $2,500,000.00; and

C.  For punitive damages in an amount to deter these Defendants from engaging in like conduct in the future, and to deter others similarly situated from same; and

D.  For payment of pre-and post judgment interest on all liquidated amounts; and

E.  For such other and further relief as the Court may deem just and proper.

## COUNT SEVEN
### (Civil Aiding and Abetting)

116.  Plaintiff realleges all allegations heretofore set forth as if fully restated herein.

117.  The members of the Chicago Title RICO Enterprise are a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement

between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage.

118.   The Chicago Title RICO Enterprise acted in highly coordinated scheme to defraud innocent victims, including the Plaintiff herein.

119.   The members of the Chicago Title RICO Enterprise aided and abetted one another to achieve the fraudulent ends alleged herein.

120.   Plaintiff has been damaged by the Chicago Title RICO Enterprise aiding and abetting.

121.   Defendants'' conduct was premeditated, wantonly reckless or malicious. Defendants became knowing and willing participants in the Chicago Title RICO Enterprise, and intentionally aided and abetted SWJ in SWJ's fraudulent loan transaction, and intentionally issued a policy of insurance insuring unmarketable title. Defendants' acts were evil minded, and display a wanton and willful disregard of the rights of another. Defendants engaged in deliberate acts or omissions with knowledge of a high degree of probability of harm and reckless indifference to consequences.

WHEREFORE, Dare Investments prays for judgment against the Defendants and each of them as follows:

A.  For damages in the principal amount of $5,500,000.00; and

B.   For consequential damages, including loss of time, attorney's fees, costs, expenses, loss of use of advanced funds, all in the amount to be proven at trial, but in no event less than $2,500,000.00; and

C.  For punitive damages in an amount to deter these Defendants from engaging in like conduct in the future, and to deter others similarly situated from same; and

D.  For payment of pre-and post judgment interest on all liquidated amounts; and

E.  For such other and further relief as the Court may deem just and proper.

## COUNT EIGHT
### (Federal RICO and NJRICO)

122.   Plaintiff realleges all allegations heretofore set forth as if fully restated herein.

123.   The individual members of the Chicago Title RICO Enterprise, and the Enterprise itself, engaged in a pattern of racketeering activity as more fully described above.

124.   Defendants maintained an interest in the Chicago Title RICO Enterprise; they were employed and/or associated with it; they conducted their activities through a pattern of racketeering activity; and conspired with the other members to commit acts of racketeering as fully described above.

125.   There is:

  a.   The existence of an enterprise (the Chicago Title RICO Enterprise);

b. The issuance of title policies by Defendants' in association with the Chicago Title RICO Enterprise;

c. The defendants participated in at least two predicate acts of racketeering, to wit, (1) the participation in the SkyLand scam; (2) the participation in the Dare Investments scam and ; and (3) the participation in the Centrum scam; and

d. Defendants' conduct constitutes a pattern of racketeering activity as stated above.

126. Plaintiff has been damaged by Defendants' acts of racketeering, entitling it to treble damages.

127. Plaintiff is entitled to treble actual damages, and to costs and attorney fees incurred in this action.

128. Defendants'' conduct was premeditated, wantonly reckless or malicious. Defendants became knowing and willing participants in the Chicago Title RICO Enterprise, and intentionally aided and abetted SWJ in SWJ's fraudulent loan transaction, and intentionally issued a policy of insurance insuring unmarketable title. Defendants' acts were evil minded, and display a wanton and willful disregard of the rights of another. Defendants engaged in deliberate acts or omissions with knowledge of a high degree of probability of harm and reckless indifference to consequences.

WHEREFORE, Dare Investments prays for judgment against the defendants and each of them as follows:

A.    For damages in the principal amount of $15,000,000.00 trebled to $45,000,000.00; and

B.    For consequential damages, including loss of time, attorney's fees, costs, expenses, loss of use of advanced funds, all in the amount to be proven at trial, but in no event less than $2,500,000.00; and

C.  For punitive damages in an amount to deter these Defendants from engaging in like conduct in the future, and to deter others similarly situated from same; and

D.  For payment of pre-and post judgment interest on all liquidated amounts; and

E.  For Costs and Attorney's Fees incurred in this action.

F. For such other and further relief as the Court may deem just and proper.

<h2 style="text-align:center"><u>COUNT NINE</u><br>(Consumer Fraud)</h2>

129.   Plaintiff realleges all allegations heretofore set forth.

130.   As more fully set forth above, Horizon Title, Chicago Title and the Chicago Title RICO Enterprise knowingly used unconscionable commercial practices, deception, fraud, false pretense, false promise, misrepresentation and/or knowingly concealed, suppressed, or omitted material facts in connection with the sale of the Dare Investments' Policy in violation of the NJ Consumer Fraud Act, N.J.S.A.§56:8-2, in that Defendants, inter alia, (i) concealed, suppressed,

and/or omitted the Vermont Decision, the District Court Decision, the Superior Court Litigation; and (ii) affirmatively misrepresented to Dare Investments the condition of the title to the Sayerville Mortgage; and (iii) concealed, suppressed, and/or omitted the existence of the Chicago Title RICO Enterprise; and (iv) suppressed or misrepresented other material facts as disclosed above.

131. Dare Investments has suffered an ascertainable loss of money or property.

132. Dare Investments' loss was proximately caused by Defendants' unlawful conduct.

133. Each member of the Chicago Title RICO Enterprise is responsible for the acts of each other member of the Chicago Title RICO Enterprise.

134. Defendants' conduct was premeditated, wantonly reckless or malicious. Defendants became knowing and willing participants in the Chicago Title RICO Enterprise, and intentionally aided and abetted SWJ in SWJ's fraudulent loan transaction, and intentionally issued a policy of insurance insuring unmarketable title. Defendants' acts were evil minded, and display a wanton and willful disregard of the rights of another. Defendants engaged in deliberate acts or omissions with knowledge of a high degree of probability of harm and reckless indifference to consequences.

WHEREFORE, Dare Investments prays for judgment against the Defendants and each of them as follows:

A.  For damages in the principal amount of $5,500,000.00; and

B.   For consequential damages, including loss of time, attorney's fees, costs, expenses, loss of use of advanced funds, all in the amount to be proven at trial, but in no event less than $2,500,000.00; and

C.  For punitive damages in an amount to deter these Defendants from engaging in like conduct in the future, and to deter others similarly situated from same; and

D.  For payment of pre-and post judgment interest on all liquidated amounts; and

E.  For such other and further relief as the Court may deem just and proper.

## COUNT TEN
### (Breach of Covenant of Good Faith and Fair Dealing)

135.   Plaintiff realleges all allegations heretofore set forth.

136.   A covenant of good faith and fair dealing is implied in every contract, including the Dare Investments' Policy. Chicago Title owed Dare Investments the duty of good faith and fair dealing in the issuance, the performance and the enforcement of the Dare Investments' Policy.

137.   Chicago Title breached its obligation of good faith and fair dealing by unreasonably, arbitrarily and capriciously denying the tendered defense and indemnity, declaring coverage unavailing, and interfering with the reasonable expectations of Plaintiff.

138.   Defendants'' conduct was premeditated, wantonly reckless or malicious. Defendants became knowing and willing participants in the Chicago Title

RICO Enterprise, and intentionally aided and abetted SWJ in SWJ's fraudulent loan transaction, and intentionally issued a policy of insurance insuring unmarketable title. Defendants' acts were evil minded, and display a wanton and willful disregard of the rights of another. Defendants engaged in deliberate acts or omissions with knowledge of a high degree of probability of harm and reckless indifference to consequences.

WHEREFORE, Dare Investments prays for judgment against the Defendants and each of them as follows:

A.  For damages in the principal amount of $5,500,000.00; and

B.  For consequential damages, including loss of time, attorney's fees, costs, expenses, loss of use of advanced funds, all in the amount to be proven at trial, but in no event less than $2,500,000.00; and

C.  For punitive damages in an amount to deter these Defendants from engaging in like conduct in the future, and to deter others similarly situated from same; and

D.  For payment of pre-and post judgment interest on all liquidated amounts; and

E.  For such other and further relief as the Court may deem just and proper.

## REQUEST FOR TRIAL BY JURY

Plaintiff respectfully requests a trial by jury.

RESPECTFULLY SUBMITTED this 20TH day of November, 2010.

THE LAW FIRM OF PETER STROJNIK, P.C.

_____
Peter Strojnik, Esq.
Attorney *pro hac vice* (pending) for Plaintiff