## SECURITY AND INTERCREDITOR AGREEMENT

Security and Intercreditor Agreement dated as of March 13, 2006 by and among SWJ HOLDINGS, LLC ("Purchaser" or "Grantor"); DARE INVESTMENTS, LLC; and JAMES J. LICATA, FIRST CONNECTICUT CONSULTING GROUP, INC., FIRST CONNECTICUT HOLDING GROUP L.L.C. XXIII and FIRST CONNECTICUT HOLDING GROUP L.L.C. XXIV (collectively, "Sellers" or "Debtors").

WHEREAS, between June 21, 2002 and October 2002, each of the Debtors filed voluntary petitions for relief in the United States Bankruptcy Court for the District of Connecticut, Bridgeport Division (the "Bankruptcy Court") and official committees of unsecured creditors have been appointed with respect to the cases of James J. Licata, First Connecticut Consulting Group Inc., and First Connecticut Holding Group L.L.C. XXIII (the "Committees");

WHEREAS, on April 25, 2005, the Debtors and Cynthia Licata and Purchaser entered into an asset purchase agreement which was amended by the First Amended Asset Purchase Agreement dated as of May 18, 2005 (the "FAAPA");

WHEREAS, the Bankruptcy Court entered an order dated June 21, 2005 authorizing and approving the sale of assets (the subject of the FAAPA) to the Purchaser after completion of a prescribed auction;

WHEREAS, the Purchaser effected the purchase of all of the assets subject to FAAPA ("Acquired Assets") for a purchase price of $11,250,000, in accordance with the terms of the FAAPA, consent orders of the Bankruptcy Court dated October 12, 2005 and February 2, 2006, and the order of the Bankruptcy Court dated March 9, 2006 (the "March 9, 2006 Order") approving the manner and sourcing of payments and other matters affecting the FAAPA;

WHEREAS, the purchase price consisted of three components: a previously posted $400,000 deposit which was released from escrow on the purchase date; a $5,000,000 cash payment made on or about February 15, 2006 which was released from

escrow on the purchase date, and the Purchaser's $5,850,000 promissory note to the Debtors dated the purchase date ("Purchaser Note");

WHEREAS, the $5,000,000 cash payment was funded by Purchaser from a borrowing from Dare Investments, LLC, a Utah limited liability company, which shall be evidenced by a promissory note to be executed by Purchaser and Cobra/Ventura Equities, LLC in favor of Dare Investments, LLC (the "DI Note");

WHEREAS, the Purchaser, after giving effect to the closing of the FAAPA and the transfer to it of the Acquired Assets, intends to immediately secure its obligations under the DI Note by granting to Dare Investments, LLC a first lien on the Acquired Assets and, to secure its obligations under the Purchaser Note, granting a second lien on the Acquired Assets in favor of the Sellers, on the terms and conditions and with the priorities of payment hereinafter described; and

WHEREAS, Dare Investments, LLC and the Sellers, in order to reflect the relative lien priorities on and rights in and to the Acquired Assets that constitute common collateral and to provide for the orderly administration of such collateral, hereby agree, *inter sese*, to the terms and conditions hereinafter set forth below.

NOW, THEREFORE, in consideration of the premises and mutual undertakings and agreements set forth herein, the parties hereto, intending to be bound, agree as follows:

1.    Creation of Security Interests.

1.1    Grantor hereby grants (a) to Dare Investments, LLC, to secure Grantor's obligations to Dare Investments, LLC under the DI Note, a continuing first priority lien on and security interest in, and (b) to Debtors, to secure Grantor's obligations to Debtors under the Purchaser Note, a continuing second priority lien on and security interest in, all of the Purchaser's right, title and interest in and to all of the assets, properties, rights and ownership interests of Sellers constituting Acquired Assets, other than Excluded Assets, which Acquired Assets were acquired by purchase through the FAAPA, including (A) assets described on Exhibit A hereto, (B) assets described on Exhibit B hereto,

(C) Acquired Claims, (D) Assumed Contracts, (E) all books, records, accounts, instruments, mortgages, chattel paper, documents, financial assets, securities, security entitlements, investment property, payment intangibles and general tangibles relating thereto or arising therefrom (including, without limitation, all rights under the FAAPA), and (F) all proceeds of each of the foregoing, in each case subject to Section 4.1 (collectively, the "Collateral").

    1.2    Capitalized terms used herein without definition shall have the meanings accorded to them under the FAAPA.  Terms utilized in Section 1.1 (E)-(F) which are defined in the applicable Uniform Commercial Code shall have herein the respective meanings provided therein.  As used herein, the following terms shall have the following meanings.

    **"Acquired Claims"** means any claim or cause of action that accrues, arises, is derived or emanates from, is on account of the Acquired Assets set forth and identified on Exhibit A and/or Exhibit B hereof, including all actions, claims, causes of actions, chose of actions, rights, demands, acts, costs, counterclaims, defenses, promises and agreements, suits, liens and encumbrances, of the Debtors and the Acquired Assets set forth and identified on Exhibit A and/or Exhibit B hereof against the Moccos and or Peiter de Jung and others or any exhibit or schedule thereto, whether now known or unknown and whether or not suspected or unsuspected, contingent or fixed, whether liquidated or unliquidated, whether in contract, tort or otherwise, by statute, under common law or otherwise, whether fixed or contingent, matured or unmatured, foreseen or unforeseen, choate or inchoate (including but not limited to claims for indemnity, contribution or otherwise, now existing or hereafter arising, in law or equity, civil or criminal, seeking damages, attorneys' fees, litigation costs, injunctive, contractual, extra-contractual, declaratory or any other relief, or brought by way of demand, complaint, cross-claim, counterclaim, third-party claim or otherwise; provided, however, Acquired Claims do not include any defense by the Debtors or the estates to the existence, validity or priority of an encumbrance on or with respect to an Excluded Asset or the purchase price pursuant to the FAAPA.

    **"Assumed Contracts"** means all executory contracts and unexpired leases of the Debtors listed on Exhibit C hereto.

    **"EMP Entity"** means any person controlled by or affiliated with EMP Whole Loan I, L.L.C. or Titan Management, L.P. or any of their respective principals.

    **"Excluded Assets"** means, collectively, the assets listed in Section 1.2 of FAAPA hereof, namely,

(a)    The rights arising under the Tax Indemnification Claims, but only to the extent that any taxing authority has imposed, or attempted to impose, any tax liabilities upon any of the Debtors, whether or not such tax liabilities are several or joint with respect to any non-Debtor Persons, including but not limited to Cynthia Licata, any EMP Entity, Peter Mocco and/or Lorraine Mocco;

(b)    The $760,000 in cash, and all accrued interest thereon, which is being held in escrow by Debtors' counsel for the benefit of the First Connecticut Consulting Group, Inc. and First Connecticut Holding Group L.L.C. XXIII pursuant to orders of the Bankruptcy Court entered on April 29, 2003 and July 30, 2003, respectively;

(c)    All claims of any Debtor entity against or with respect to Q Properties, L.P., Betty Evans, Whitney S. Quillen, Joan F. Quillen, Parker S. Quillen, including but not limited to claims of contribution and/or indemnity under operating agreements or otherwise against any of them, any member of any of their families or any of their respective affiliates, including but not limited to those related to the Somerset, New Jersey assisted living facility, First Inn I, L.L.C.'s hotel in Morgan City, Louisiana, First Inn II, L.L.C.'s hotel, First Inn III's hotel, First Inn Holdings Kansas' hotel in Hutchinson, Kansas, and the building lots and hotel in Cumberland Gap, Tennessee;

(d)    All assets of First Connecticut Holding Group L.L.C. I, including but not limited to all claims of, or assertable in the name of, First Connecticut Holding Group L.L.C., if any, to ownership of, and title to, 555 Elizabeth Street, Newark, New Jersey or arising out of the transfer of title to Bel Air Holdings, LLC;

(e)    Equity interests in First Connecticut Consulting Group, Inc.; and

(f)    Membership interests in the following entities:  (i) First Connecticut Holding Group L.L.C. XXIII, (ii) First Connecticut Holding Group L.L.C. XXIV, (iii) First Inn I, L.L.C., (iv) First Inn II, L.L.C., (v) First Inn Holdings Kansas, (vi) First Inn Louisiana, L.L.C.

"**Moccos**" means, collectively, Peter Mocco or Lorraine Mocco, and/or any entity owned or controlled by Peter Mocco or Lorraine Mocco.

"**Tax Indemnification Claims**" means all claims and entitlements of any Debtor relating to federal, state or local income tax liabilities arising from any transfer or obligation to transfer any property, including but not limited to membership interests in any Debtor or former debtor to the Moccos or any affiliate under the three-page informal agreement between Peter Mocco and/or Hamilton Park Health Care Center, Ltd. and James Licata and/or First Connecticut Consulting Group, Inc. made on or about September 25, 1996, the Escrow Agreement dated as of May 1997 between the same parties and others, and any other agreements providing any similar terms.

- 4 -

1.3    Dare Investments, LLC and Debtors (acting through their designated representatives) shall have the right, from time to time hereafter during normal business hours of Purchaser, to inspect the Collateral. Grantor will reflect on its books and records the respective liens of the secured parties and will exercise due care with respect to preservation, administration and safekeeping of the Collateral until such liens have been terminated.

1.4    Grantor, in the exercise of its reasonable business judgment, shall have the right, upon ten (10) days' notice to each of the secured parties hereunder and to counsel for the Debtors and the Committees, to transfer, sell, pledge or encumber any of the Collateral through commercially reasonable means, for cash in immediately available funds, and free of any lien described herein, subject, however, to compliance with the provisions of Section 4 dealing with segregation and application of all resulting proceeds. Such notice shall identify the proposed transferee (and any affiliation with Grantor and/or Cobra/Ventura Equities LLC), the purchase/transfer price and the other material contract terms thereof. Absent objection by any secured party to the proposed disposition of Collateral, which objection shall be based on bona fide commercial reasons, the lien of the secured parties shall be deemed released upon any such disposition of Collateral, subject to the provisions of Section 4.1. After giving effect under Section 4.1 to the application of proceeds received from any transfer, sale, pledge or encumbrance of Collateral effected pursuant hereto, the liens of Sellers and Dare Investments, LLC in and to the remaining Collateral shall continue unaffected and in full force and effect until all obligations secured thereby (as described herein) are satisfied in full. With respect to any proposed transfer or sale of collateral for non-cash consideration, Grantor shall obtain the consent of the Debtors and the Committee, which consent shall not be unreasonably withheld or delayed, and shall cooperate with Debtors to effect perfection of a first priority security interest in and to any such proceeds in the form of non-cash consideration (e.g., instruments, notes or securities).

1.5    The March 9, 2006 Order provides that the security interests granted by the Grantor to the Debtors to secure Grantor's obligations under the Purchaser Note have been perfected without the need of further filings or further order of the Bankruptcy

Court. Nevertheless, Grantor shall cooperate with the Debtors and Dare Investments, LLC, upon their reasonable request, to further assure the enforceability, perfection and priority of their respective liens. Without limiting the generality of the foregoing, (a) promptly upon reasonable request of a secured party hereunder, Grantor will execute and deliver appropriate instruments of transfer with respect to Acquired Assets constituting interests in real property or mortgages, such as collateral assignments, (b) Grantor hereby authorizes the secured parties hereunder to file financing statements with respect to the collateral hereunder, and (c) Grantor will deliver to Dare Investments, LLC, as agent for itself and the Debtors ("Collateral Agent"), and Dare Investments, LLC accepts appointment as Collateral Agent, with respect to original instruments, chattel paper, stock certificates with stock powers executed in blank, and such other items of collateral, a security interest in which can be perfected by possession, to the extent, but only to the extent, Grantor acquires possession of such original collateral.

Dare Investments, LLC and the Debtors each agree with the other that any action undertaken by either of them for purposes of perfecting the security interests granted hereunder shall be undertaken by it as agent for itself and the other secured party hereunder, whether or not any separate agreement, financing statement, assignment document or other filing or agreement expressly recognizes such agency, and Grantor acknowledges such agency relationship. The foregoing sentence shall not be deemed to obligate Dare Investments, LLC or the Debtors to take any action to perfect, or continue the perfection of, any security interest granted hereunder. In performing its obligations as collateral agent, Dare Investments, LLC will exercise with respect to the Collateral entrusted to it the same care that it would exercise with respect to its own property, and, without limiting the foregoing, shall maintain documents in a secure, fireproof environment, with such levels of insurance (fire, hazard, theft, fidelity bond, etc.) as are customarily maintained by bank custodians for like property and in strict accordance with the Uniform Commercial Code.

2.    Lien Priorities.

Subject to Section 4.1., Dare Investments, LLC shall have a senior and prior lien on, and security interest in, the Collateral and all proceeds thereof to secure the DI Note. Subject to Section 4.1, the lien of the Debtors on, and its security interest in, the Collateral shall be junior and subordinate to the senior lien.

3.    Enforcement.

3.1    Exercise of Remedies.  In connection with any default under, or arising from, the DI Note that has occurred and is continuing, Dare Investments, LLC shall not commence any legal action, call a default, seek to accelerate or otherwise commence a foreclosure or other enforcement action against the Grantor and/or the Collateral without providing at least three (3) Business Days' prior written notice of such intended action to each of counsel to the Debtors and to the Committees, as set forth in Exhibit D hereto. "Business Day" means any day that commercial banks in New Jersey are open for business.

3.2    In connection with any default under or arising from, the Purchaser Note, that has occurred and is continuing, Debtors shall not commence any legal action, call a default, seek to accelerate or otherwise commence a foreclosure or other enforcement action against the Grantor and/or Collateral without providing at least three (3) Business Days' prior written notice of such intended action to Dare Investments, LLC.

3.3    To the extent that the Debtors receive from the Purchaser any funds in respect of the Purchaser Note in derogation of the provisions of this Agreement, such funds will be deemed to have been received in trust and promptly remitted in accordance with Section 4.  To the extent that Dare Investments, LLC receives from the Purchaser any funds in respect to the obligations referred to in Section 4.1(vi) prior to payment in full of the Purchaser Note, such funds will be deemed to have been received in trust and promptly remitted or applied, as the case may be, in accordance with Section 4.

3.4    For the avoidance of doubt, nothing herein shall prohibit or impair action by the Debtors, upon the occurrence and continuation of a default under the Purchaser

- 7 -

Note, to enforce the guarantee of payment and performance of the Purchaser Note made for the benefit of the Debtors by Cobra/Ventura Equities LLC, including with respect to security supporting such guarantee.

3.5     In addition to all rights and remedies available to the secured parties under applicable law, the secured parties shall have all of the rights and remedies of a secured party under the applicable Uniform Commercial Code. Subject to the provisions of this Agreement, the secured parties shall have the right to foreclose on and sell Collateral or any part thereof in one or more parcels at public or private sale, at the offices of any of the secured parties or elsewhere, for cash, on credit or for future delivery, and upon such other terms as are commercially reasonable. The Grantor agrees that, to the extent notice of sale shall be required by law, at least ten days' notice to the Grantor at the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. Notwithstanding notice of sale having been given, the secured parties may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice (except to the Grantor), be made at the time and place to which it was so adjourned. Grantor is aware that Securities and Exchange Commission ("SEC") staff personnel have, over a period of years, issued various No-Action Letters that describe procedures which, in the view of the SEC staff, permit a foreclosure sale of securities to occur in a manner that is public for purposes of Part 6 of Article 9 of the Uniform Commercial Code, yet not public for purposes of Section 4(2) of the Securities Act of 1933. Grantor specifically agrees that a foreclosure sale conducted in conformity with the principles set forth in the No-Action Letters (i) will be considered to be a "public" sale for purposes of Section 9-610(c) of the Uniform Commercial Code; (ii) will be considered to be commercially reasonable notwithstanding that the Sellers or Dare Investments, LLC has not registered or sought to register the Collateral under the securities laws; and (iii) will be considered to be commercially reasonable notwithstanding that the Sellers or Dare Investments, LLC purchases Collateral at such a sale.

4.    Application of Proceeds.

4.1    Notwithstanding any issue of perfection or non-perfection of the respective security interests of Sellers or Dare Investments, LLC, the proceeds of sale, transfer or foreclosure of, or other realization upon or other receipt from, Collateral, net of reasonable out-of-pocket selling expenses and reasonable related out-of-pocket legal and administrative fees incurred by the secured parties, shall be received in trust, segregated from the general assets of the recipient and applied promptly upon receipt in the following order of priorities:

(i)    The first $6,000,000 (less any payments previously or otherwise received on the DI Note, or otherwise received from the Purchaser) shall be applied against and in reduction of amounts due under the DI Note;

(ii)    The next $2,000,000 of the proceeds (less any payments previously or otherwise received under the Purchaser Note derived from the Acquired Assets) shall be paid to the Debtors and applied against and in reduction of the amounts due under the Purchaser Note;

(iii)    The next $2,000,000 of proceeds (above the aforementioned $8,000,000 in proceeds) shall be paid to Dare Investments, LLC and applied against and in reduction of the amounts due under the DI Note;

(iv)    The next proceeds shall be paid to the Debtors and applied against and in reduction of the amounts due under the Purchaser Note, to pay the Purchaser Note in full;

(v)    The next proceeds shall be paid to Dare Investments, LLC to pay the DI Note in full; and

(vi)    Any further proceeds remaining thereafter, together with any unsold Collateral, shall, subject to any junior security interest(s) in the Collateral granted to Dare Investments, LLC to secure obligations owed to it by Cobra/Ventura Equities, LLC pursuant to an amended master loan agreement dated March 13, 2006 (the "MLA") and executed and delivered in connection with the DI Note, be released to the Grantor.

In each case involving the DI Note and the Purchaser Note, proceeds, to the extent realized, shall be applied, first, to interest, fees and expenses and, second, to principal. Grantor shall calculate the unpaid DI Note and Purchaser Note balances at the time of any remittance/apportionment pursuant hereto in good faith based on requested proof thereof received from each of the secured parties or their representatives, but if no such proof is received, calculation shall be based on Grantor's payment records. The calculations of Purchaser shall be binding in the absence of manifest error. Dare Investments, LLC shall release its lien promptly upon its receipt of all amounts due in respect of the DI Note, it being acknowledged and agreed that Debtors' estates shall have the right, at any time, to make payment to Dare Investments, LLC in the amount necessary to effect such lien release, whereupon the Debtors' estates shall be subrogated to the rights of Dare Investments, LLC in, to, and arising from the DI Note and security therefor.

For the avoidance of doubt, any proceeds derived from security provided to Sellers under the Guaranty and Security Agreement, dated as of March 13, 2006, by and between Cobra/Ventura Equities, LLC, as guarantor, and James J. Licata, First Connecticut Consulting Group, Inc., First Connecticut Holding Group L.L.C. XXIII, and First Connecticut Holding Group L.L.C. XXIV, as sellers, shall, until the obligations in respect of the Purchaser Note are fully satisfied, be for the exclusive benefit of Sellers. Any interest in and to such proceeds claimed by Dare Investments, LLC shall be subordinated to the prior payment in full of the Purchaser Note.

5.      <u>Representations and Warranties of Grantor</u>.

        5.1     It has good and indefeasible title to the Collateral, free and clear of liens and encumbrances, except for the liens granted hereunder and the junior lien granted pursuant to the MLA to Dare Investments, LLC to secure obligations owed to Dare Investments, LLC by Cobra/Ventura Equities, LLC.

        5.2     It is duly organized and validly existing and in good standing under the laws of the jurisdiction of its formation.

- 10 -

5.3    Execution, delivery and performance by it of this Agreement has been duly authorized by all necessary limited liability company action.  The execution, delivery and performance by it of this Agreement does not violate its constitutional documents nor conflict with, result in a breach or constitute (with due notice or lapse of time or both) a default under any of its material contractual obligations.

5.4    This Agreement, when executed and delivered by it, will be its legally valid and binding obligation, enforceable against it in accordance with its terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally.

5.5    To Grantor's knowledge, none of the partnership or limited liability company interests constituting acquired assets under the FAAPA which are part of the Collateral are in certificated form.

6A.    Representations and Warranties of Dare Investments, LLC and Debtors.

Each of Dare Investments, LLC (as to itself) and Debtors (individually as to itself and collectively as to all Debtors) makes the same representations as Grantor makes in Sections 5.2 – 5.4.  In addition, each of Dare Investments, LLC, on the one hand, and Debtors, on the other hand, represents that it has delivered to the other true, correct and complete copies of all underlying notes, contracts and agreements in respect of which a pledge of Collateral is provided herein, and each of Dare Investments, LLC and Debtors acknowledges receipt thereof.

6B.    Covenant of Dare Investments, LLC.

Dare Investments, LLC covenants for the benefit of Debtors that the stated maturity of the DI Note, presently December 15, 2006, will not be modified to a date earlier than December 15, 2006.

0145/58159-001 Current/8328510v8

6.

7.    <u>Notices.</u>

All notices by any party relating to this Agreement shall be in writing and shall be personally delivered or sent by registered or certified mail (postage prepaid, return receipt requested), overnight courier or facsimile transmission. The parties may change the addresses at which they are to receive notices by notice in writing in the foregoing manner given to the others. All notices shall be deemed received on the earlier of the date of actual receipt or three days after the deposit thereof in the mail. The current addresses for notices to each party hereto is set forth on Exhibit D.

8.    <u>CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER.</u>

THE VALIDITY OF THIS AGREEMENT, THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF, AND THE RIGHTS OF THE PARTIES HERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW JERSEY. THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT SHALL BE TRIED AND LITIGATED ONLY IN THE STATE AND FEDERAL COURTS LOCATED IN THE STATE OF NEW JERSEY. THE PARTIES WAIVE, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS <u>SECTION 8</u>. THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS.

9.    <u>General Provisions</u>.

    9.1    <u>Effectiveness</u>.  This Agreement shall be binding and deemed effective when executed by all of the parties.  Each of the signatories to this Agreement shall cooperate to effect the orderly and timely effectuation of the conditions precedent, and shall provide proof of satisfaction thereof to the others.

    9.2    <u>Successors and Assigns</u>.  This Agreement shall bind and inure to the benefit of the respective successors and permitted assigns of each of the parties.

    9.3    <u>Captions</u>.  Headings and numbers have been set forth herein for convenience only.  Unless the contrary is compelled by the context, everything contained in each section applies equally to the entire Agreement.

    9.4    <u>Severability</u>.  Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

    9.5    <u>Amendment</u>.  This Agreement can only be amended by a writing signed by the parties to be charged.

    9.6    <u>Counterparts; Facsimile Execution</u>.  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.  Delivery of an executed counterpart of this Agreement by facsimile shall be equally as effective as delivery of an original executed counterpart of this Agreement.  Any party delivering an executed counterpart of this Agreement by facsimile shall also deliver an original executed counterpart of this Agreement, but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

9.7    <u>Integration</u>.  This Agreement reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

9.8    <u>Conflicts</u>.  In the event of any conflict between the provisions of this Agreement and the provisions of the DI Note or the Purchaser Note (and related guarantees and documents), the provisions of this Agreement shall govern and control.

9.9    <u>Survival</u>.  The terms of this Agreement shall survive, and shall continue in full force and effect, in any insolvency proceeding involving Grantor.

9.10    <u>Collateral Agent</u>.  The secured parties hereunder shall have the right, upon notice to the Grantor, to appoint a third party to act as their Collateral Agent with respect to the administration and exercise of remedies in respect of Collateral.  A copy of any such agreement appointing the Collateral Agent and evidencing acceptance of appointment by the Collateral Agent and specifying the duties of the Collateral Agent shall be promptly furnished to the Grantor for its acknowledgment and acceptance, not to be unreasonably withheld or delayed.  Grantor shall have no liability with respect to the appointment of, or performance by, any such Collateral Agent.

10.    <u>Termination</u>.

The security interests herein shall terminate when the respective secured obligations have been paid and performed in full, at which time there shall be executed and delivered by the applicable secured party(ies) to the Grantor, at the Grantor's expense, all Uniform Commercial Code termination statements and similar documents to evidence such termination.

IN WITNESS WHEREOF, the parties hereto, by their respective duly authorized representatives, have caused this Agreement to be duly executed and delivered as of the date first above written.

SWJ HOLDINGS, LLC, as Grantor

By: _____
    Name: Stephen Podell
    Title: Managing Member


DARE INVESTMENTS, LLC, as first
    lien holder


By: _____
    Name:
    Title:


DEBTORS/SELLERS, as second lien holders:


_____
JAMES J. LICATA


FIRST CONNECTICUT CONSULTING GROUP, INC.

By: _____
    Name:
    Title:    **James J. Licata**
            **President**

0145/58159-001 Current/8328510v8

IN WITNESS WHEREOF, the parties hereto, by their respective duly authorized representatives, have caused this Agreement to be duly executed and delivered as of the date first above written.

SWJ HOLDINGS, LLC, as Grantor

By: _____
     Name:
     Title:

DARE INVESTMENTS, LLC, as first
lien holder

By: _____
     Name: RICHARD D. McCLOSKEY JR.
     Title: MANAGING MEMBER

DEBTORS/SELLERS, as second lien holders:

JAMES J. LICATA

By: _____

FIRST CONNECTICUT CONSULTING GROUP, INC.

By: _____
     Name:
     Title:

- 15 -

FIRST CONNECTICUT HOLDING GROUP L.L.C. XXIII

By: _____
      Name:
      Title:    **James J. Licata**
                    **Member**


FIRST CONNECTICUT HOLDING GROUP L.L.C. XXIV

By: _____
      Name:
      Title:    James J. Licata
                    **Member**


We consent to the Debtors' execution and
performance of this Agreement:

OFFICIAL COMMITTEES OF UNSECURED CREDITORS

By: _____
      Name: Alan J. Brody, Esq.
      Title: Counsel to the Official Committees
      of Unsecured Creditors of James Licata
      and First Connecticut Consulting Group, Inc.

# EXHIBIT A

**[insert text of Exhibit A to the FAAPA]**

(i)

## EXHIBIT A

### ACQUIRED ASSETS



EXHIBIT A

Inventory of Acquired Assets
Re: James J. Licata Chapter 11 Bankruptcy Proceedings

**Debtor(s) / Legal Entity - James J. Licata, Chapter 11**

| Debtor/Owner | Acquired Asset | Address | Source/ Ownership | Units | Description | Mortgage/Lien/Encumbrances |
|---|---|---|---|---|---|---|
| James J. Licata | | | | | | |
| Footnote 1 below | (1) Joint Venture Agreement dated 1/28/98 made effective 5/1/97 between James Licata and Peter Mocco, as amended ("the JVA") and any asset of the joint venture created by the JVA in which James Licata has any interest. | | | | | |
| | (2) Membership interests in Diversified Venture Capital Investments Group, LLC, which was organized to hold some assets subject to the JVA or the joint venture created thereby. | | | | | |
| | The joint venture created by the JVA holds without limitation some interest in those assets listed in (a) through (g) below: | | | | | |
| Footnote 2 below | (a) Liberty Harbor Holdings, LLC | holds title to Liberty Harbor parcels (deed from Peter Mocco dated 1/22/00 b 5566, p. 98) | JVA | 19 acres 80+(-) acres | Lot 21-D Lot 22-b Lot 23-A Lot 24-B Lot 25-H Lot 26-A Lot 26-B Lot 27 Lot 27-B Lot 27-D Lot 41 Lot 51 | Lis pendens filed by J Licata /FCCG dated 10/4/02 and recorded at b338, p. 248, b339, p. 154 and b339, p. 158

Lis pendens filed by Liberty Harbor Holdings, LLC dated 5/6/03 and recorded at b344, p. 75 |
| Footnote 3 below | | 345 10th Street Jersey City, NJ; and other waterfront property in | | | | |

0710/58159-001  NYLIB1/1919872v2

Page 1 of 6

05/17/2005 06:57 PM

**Debtor(s) / Legal Entity - James J. Licata, Chapter 11**

| Debtor/Owner | Acquired Asset | Address | Source/Ownership | Units | Description | Mortgage/Lien/Encumbrances |
|---|---|---|---|---|---|---|
| Footnote 4 below | (b) Fulton's Landing Urban Renewal Co., LLC (originally known as Fulton's Landing, LLC) ("FLLLC") | Jersey City holds title to property known as Fulton's Landing 149 Essex St., Jersey City, NJ | Lis pendens filed by Jersey City Develp. Agency July 19, 2001 | 102 | 2-story building | None known |
| Footnote 5 below | (c) Renewal Associates, LLC | Holds The Atrium at Hamilton Park, 350 9th St., Jersey City, NJ ("the Atrium") | dead dated 11/16/00 recorded at b 5716, p. 269 | | | The Atrium is subject to a mortgage dated 9/28/00 in the original principal amount of $12.289 m in favor of Prudential Huntoon Paige Assoc, Ltd. and recorded at B 7650, p. 148 |
| | (d) 125 South Harrison Street East Orange, NJ, to the extent not owned by FOHG LLC XXIV | | Title held in FOHG, LLC XXIV | | | |
| | (e) Mesquite Charlie's Note | | | | | |
| | (f) 50% interest in Metropolitan Management, LLC | | | | | |
| | (g) All claims against Mr. Mocco arising out of the loss of the Camelot Hotel and the investment of $270m in Stonyhurst LLC, which owned that hotel | | | | | |

0710/58159-001  NY:LIBT/1919872v2

05/17/2005 06:57 PM

**Debtor(s) / Legal Entity - James J. Licata, Chapter 11**

| Debtor/Owner | Acquired Asset | Address | Source/ Ownership | Units | Description | Mortgage/Lien/Encumbrances |
|---|---|---|---|---|---|---|
| | (3) 50% interest in Metropolitan Management Corp., either directly or through the joint venture created under the JVA | | | | | |
| | (4) All claims against A-1 Management for rents collected from properties transferred into joint venture created under the JVA by Mr. Licata and retained by Mr. Mocco or any affiliate. | | | | | |
| | (5) All claims against Mr. Mocco and/or any affiliate in connection with the Transatlantic Capital Co. refinancing of The Morgan-Steuben Development, LLC, which owns 37 townhouses in Jersey City, New Jersey. According to Mr. Licata, Mr. Moccos and Mr. de Jong misappropriated $2 million in excess refinance proceeds. | | | | | |
| | (6) All claims against Mr. Mocco and/or any affiliate for unaccounted collections of rents under leases on Liberty Harbor. | | | | | |
| | (7) All claims against Mr. Mocco and/or affiliate for losses incurred as a result of not closing on eight of ten pending acquisitions which were Schedule B properties under the joint venture created by the JVA due to Mr. Mocco's failure to fund his share. | | | | | |
| | (8) Ownership interests in First Connecticut Holdings Group (FCHG) denominated LLCs and other related business entities as set forth on attached Schedule A, not otherwise denominated as Excluded Assets and any asset of the joint venture created by the JVA in which James Licata has any interest. | | | | | |
| | (9) All claims against Pieter de Jong arising from asserted conflicts of interest and malpractice and alleged improper usurpation of client opportunities relating to representation of James Licata and FCCG in relationship to the Moccos and their affiliates | | | | | |
| | (10) All claims against Chris Gibbs, Bank of Illinois and Scarinci & Hollenbeck, LLC and Pieter de Jong, arising from or related to the Cumberland Gap project. | | | | | |
| | (11) All claims for funds allegedly held by Pellno & Lentz | | | | | |

0710/58159-001  NYLIB1/1919872v2

Page 3 of 6

05/17/2005 06:57 PM

A

| Debtor(s) / Legal Entity - James J. Licata, Chapter 11 | | | | | |
|---|---|---|---|---|---|
| **Debtor/Owner** | **Acquired Asset** | **Address** | **Source/ Ownership** | **Units** | **Description** | **Mortgage/Lien/Encumbrances** |

LLP in relation to the Mesquite Charlie's property (approximately $75,000).

(12) All claims of Mr. Licata and/or FCCG against FCHG LLC IV for fees associated with mortgage financings and losses resulting from property foreclosures.

(13) All claims against Mr. Mocco for failing to make his matching share of $450m advance on Fulton's Landing

(14) All claims against EMP Whole Loan 1, LLC (EMP 1) and/or Titan Management, LP (Titan) for damages, loss of rental income and illegal self-payment of fees and other charges relating to EMP loans to FCCG with respect to acquisition of the First Union portfolio pursuant to the First Union Acquisition Agreement and/or the loan to FCHG LLC 1.

(15) All claims and entitlements of any debtor relating to federal, state or local income tax liabilities arising from any transfer or obligation to transfer to Peter and/or Lorraine Mocco or any affiliate any property, including but not limited to membership interests in any debtor or former debtor in these proceedings under the three-page informal agreement between Peter Mocco and/or Hamilton Park Health Care Center, Ltd. and James Licata and/or FCCG made on or about September 25, 1996 ("the TPA"), the Escrow Agreement dated as of May, 1997 between the same parties and others ("the EA"), and any other agreements providing any similar terms the TPA or the EA ("Tax Indemnification Claims"), except to the extent otherwise expressly provided in Section 1.2(a) of this Agreement.

(16) All claims under the Separation Agreement dated June 4, 2002 between James Licata and Cynthia Licata relating to ownership of various First Connecticut Holding Group ("FCCG") denominated LLCs and other related business entities identified in attached Schedule A and any claims relating to any of them.

(17) All claims against Mr. Mocco in connection with 5 Pomona, Newark, New Jersey, which was originally held by FCHG LLC XIII, subject to a $900,000 mortgage in

0710/58159-001  NYLIB1/1918872v2

05/17/2005 06:57 PM

**Debtor(s) / Legal Entity - James J. Licata, Chapter 11**

| Debtor/Owner | Acquired Asset | Address | Source/Ownership | Units | Description | Mortgage/Lien/Encumbrances |
|---|---|---|---|---|---|---|
| | by FCHG LLC XIII, subject to a $900,000 mortgage in favor of the Moneystore, Inc. for the joint venture. Mr. Licata was required to pay approximately $1.8 million to complete the acquisition and claims that Mr. Mocco failed to fund his 50% share.<br><br>18) All claims against Mr. Mocco for his share of the Hope 6 venture in the amount of approximately $5 million. | | | | | |

**Footnote:**

(1) Mr. Licata claims that in 1998, there was single page amendment to the JVA, a copy of which has not yet been found, which transferred to the joint venture created by the JVA ownership to FCHG LLCs XIII, XXIIII and XXIV.

(2) In the Mocco Chapter 11 bankruptcy proceedings in 1996, First Union had the option to either retain two mortgages on a 19-acre parcel at Liberty Harbor (respectively in the principal amounts of $6.8m and $900m) or to acquire this parcel and grant Mr. Mocco a credit against his total indebtedness of about $8m. FCCG obtained this same right when it bought First Union's position pursuant to the First Union Acquisition Agreement (as defined in the Asset Purchase Agreement). Mr. Licata claims that, in January 1998, Messrs. Licata and Mocco signed the JVA and FCCG/Licata released the mortgage debt on the 19-acre parcel as part of its or his contribution to the joint venture and the mortgage debt was accordingly discharged.

(3) In state court litigation between Mocco and Licata/FCCG, a lis pendens has been filed against all parcels comprising the Liberty Harbor project in favor of FCCG/Licata. Judge Levy discontinued the actions but left the lis pendens in effect; the Appellate Division reversed the dismissal on May 3, 2005 and the actions reinstated.

(4) Mr. Licata claims to have advanced $450m to Geometry Pension Company ("Geometry"), which in turn is alleged to have advanced $500m to the joint venture created by the JVA to purchase the property to become a 25% partner; that Geometry requested that the funds be returned and that Mr. Licata returned $450m.; and that FCCG released to Titan its mortgage securing a loan of $600,000 to Wisconsin Dells Hotel, LLC, which owned a hotel in Wisconsin Dells, Wisconsin, ("Wisconsin Mortgage") to secure a release of Titan's unsecured loan to FFLLC in the amount of $450m. Mr. Licata claims that as a result of FCCG's release of the Wisconsin Mortgage, he or FCCG became a joint venturer in the Fulton's Landing property.

(5) On April 16, 2004, Lorraine Mocco filed a "Correctory Deed" dated March 11, 2004 recorded in B 7268 at pg. 6 which purports to transfer The Atrium property to Liberty Harbor North 1 Urban Renewal

Page 5 of 6

0710/55159-001 NY.LIB1/1919872v2

05/17/2005 06:57 PM

**Debtor(s) / Legal Entity - James J. Licata, Chapter 11**

| Debtor/Owner | Acquired Asset | Address | Source/Ownership | Units | Description | Mortgage/Lien/Encumbrances |
|---|---|---|---|---|---|---|
| Co., LLC. Mr. Licata as that this is joint venture property. | | | | | | |

05/17/2005 06:57 PM

Page 6 of 6

0710/58159-001  NYLIB1/1919872v2

**Inventory of Acquired Assets**
**Re: James J. Licata Chapter 11 Bankruptcy Proceedings**

**Debtor(s) / Legal Entity – First Connecticut Consulting Group, Inc. (FCCG)**

| Debtor/Owner | Acquired Assets | Address | Comments |
|---|---|---|---|
| First Connecticut Consulting Group, Inc. ("FCCG") | (1) FCCG's interest in the mortgage for principal amount of $2 m from Lorraine Mocco to FCCG secured by 81 and 41 Clark Road in Bernardsville, NJ, and the underlying indebtedness as described in Schedule A-1 as the Bernardsville Loan. | | Footnote 1 |
| | (2) FCCG's interest in the mortgage for the principal amount of $15 million from Lorraine Mocco to FCCG secured by 158 acres in Sayreville, New Jersey and the underlying indebtedness as described in Schedule A-1 as the Sayreville Debt. | | Footnote 1 |
| | (3) FCCG's interest in the mortgage loan (note and mortgage) in the original amount of about $2.9 million secured by condominium town house units and appurtenant right and all related rights including those under the stipulation listed in Schedule A-1, all as described in Schedule A-1 as the VTE Loan. | | Footnote 1 |
| | (4) Mortgage to Dough Land and Cattle Co. of Missouri, Inc. dated 5/2/96 and secured indebtedness; the mortgage is recorded at b 338, p. 6332 in Jersey County, Missouri Land Records and has been collaterally assigned to EMP 1. | | Footnote 2 |
| | (5) All claims against Peter Mocco in the amount of $160,000, more or less, plus interest for Mr. Mocco's share of $300,000, more or less, spent for site work at scattered sites in Newark | | |
| | (6) All claims relating to the heavy equipment used for development of Liberty Harbor and acquired by FCCG at a cost of approximately $1.2 m, subject to liens and encumbrances, if any | | |
| | (7) All claims against Cove Marina in Norwalk, Connecticut for the | | |

0710/0581 59-001 NYLIB1/1919872v2

Page 1 of 3

05/17/2005 06:57 PM

**Debtor(s) / Legal Entity – First Connecticut Consulting Group, Inc. (FCCG)**

| Debtor/Owner | Acquired Assets | Address | Comments |
|---|---|---|---|

acquisition price of $1m, more or less, for the Sea Ray, a 58-foot yacht that Cove Marina sold for $38,000 in excess of a $400,000 marine mortgage in favor of Deutsche Bank.

(8) All claims against Ray and/or Adam Chodos relating to the assertedly illegal disposition by one or both of them of a 1998 Mercedes 500SL owned by FCCG.

(9) The First Union Acquisition Agreement.

(10) All collateral and/or security formerly held by First Union National Bank ("First Union") to secure obligations of Peter and/or Lorraine Mocco and/or any affiliate, as acquired by FCCG pursuant to the First Union Acquisition Agreement, including all guarantees, pledges, notes, leasehold mortgages and related loan documents, subject to liens and encumbrances, if any.

(11) All claims and other assets (not included in (10) above) acquired under the First Union Acquisition Agreement, including all claims against Peter Mocco and/or Lorraine Mocco, and/or any of their affiliates and all proofs of claims submitted by First Union in the Mocco bankruptcy proceedings, subject to liens and encumbrances, if any.

(12) All claims against First Connecticut Holding Corp. I under loan in original principal amount of $1.4 m, secured by a mortgage made 7/23/96 and recorded in B6683/P797, which mortgage was assigned to EMP 1 and was further secured by assignment of leases dated 7/23/96 and recorded in b 6683, p. 930.

(13) All claims against Chris Gibbs, Pieter de Jong, Bank of Illinois and Scarinci & Hollenbeck, LLC re: Cumberland Gap Properties.

(14) FCCG's interest in the Tax Indemnification Claims, except to the extent otherwise expressly provided in Section 1.2(a) of this Agreement.

Page 2 of 3

0710/58159-001  NYLIB1/1919872v2

05/17/2005 06:57 PM

Debtor(s) / Legal Entity – First Connecticut Consulting Group, Inc. (FCCG)

| **Debtor/Owner** | **Acquired Assets** | **Address** | **Comments** |
|---|---|---|---|
| | (15) All claims described in the asset schedule in this Exhibit A for James J. Licata, of which assets FCCG is either the owner or has an interest. | | Footnote 1 |

**FOOTNOTES:**

Footnote 1 - Subject to any collateral assignment or pledge of this debt and/or mortgage to EMP 1 as set forth in Section 1.6.  Buyer is presently negotiating with EMP 1 to acquire EMP 1's debts from FCCG for which such collateral assignments and/or pledges have been made.
Footnote 2 - FCCG borrowed $4 mm from EMP 1; pledged and/or collaterally assigned this mortgage to EMP 1.

0710/58159-001  NYLIB1/1919872v2

Page 3 of 3

05/17/2005 06:57 PM

**Inventory of Acquired Assets**

**Re: James J. Licata Chapter 11 Bankruptcy Proceedings**

**Debtor(s) / Legal Entity - First Connecticut Holding Group LLCs I, XXIII and XXIV**

| Debtor/Owner/Non-Owner | Acquired Assets | Address | Source/Ownership | Units | Description | Mortgage/Lien |
|---|---|---|---|---|---|---|
| FCHG LLC XXIII | All claims arising out of the loss of the Hwang portfolio caused by, or related to, any of the events described in footnote (1) below | 562-566 Scotland Road Orange, NJ<br>725 Scotland Road Orange, NJ<br>421 Lincoln Ave. Orange, NJ<br>818-820 Canton St. E. Orange, NJ | | | | Mortgage in the principal amount of $5.4 mm in favor of Transatlantic Capital Co., LLC (Transatlantic) secured by a blanket lien on all parcels; Transatlantic foreclosed on the mortgage and took title to all properties. |

Page 1 of 3

0710/58159-001  NYLIB1/1919872v2

05/17/2005 06:57 PM

Debtor(s) / **Legal Entity** - First Connecticut Holding Group LLCs I, XXIII and XXIV

| Debtor/Owner/Non-Owner | Acquired Assets | Address | Source/Ownership | Units | Description | Mortgage/Lien |
|---|---|---|---|---|---|---|
| | All claims arising out of loss of Lasalle portfolio properties, caused by, or related to, any of the events described in footnote (1) below | 431 Park Ave. Orange, NJ | | | | |
| | | 385 Park Ave. Orange, NJ | | | | |
| | | 382-396 Tremont St. Orange, NJ | | | | |
| | | 25 Van Velsor St. Newark, NJ | | | Property transferred to FCHG LLC XXIII 10/97 | Mortgage in the principal amount of $9.1 mm mtg. in favor of Transatlantic Capital Co., LLC secured by all of the LLCs' properties dated 11/21/97, and recorded b 6919 p 471; mortgage foreclosed. |
| | | 158 S. Harrison St. E. Orange, NJ | | | Property transferred to FCHG LLC XXIII 10/97 | |
| | | 36-40 Munn St. E. Orange, NJ | | | Property transferred to FCHG LLC XXIII 10/97 | |
| | | 4 Chestnut St. E. Orange, NJ | | | Property transferred to FCHG LLC XXIII 10/97 | |
| | | 111 S. Harrison St. E. Orange, NJ | | | Property transferred to FCHG LLC XXIII 10/97 | |
| | | 195 Prospect St. E. Orange, NJ | | | Property transferred to FCHG LLC, XXIII 10/97 | |
| FCHG LLC XXIV | | 125 S. Harrison St. E. Orange, NJ | | | see footnote (2) | Mortgage in the principal amount of $450,000 made by FCHG LLC XXIV in favor of Titan dated 4/7/98 rec'd B6999/P460 |
| | | | | | | Mortgage in principal amount of $675 mm in |

Page 2 of 3

05/17/2005 06:57 PM

Debtor(s) / Legal Entity - First Connecticut Holding Group LLCs I, XXIII and XXIV

| Debtor/Owner/Non-Owner | Acquired Assets | Address | Source/Ownership | Units | Description | Mortgage/Lien |
|---|---|---|---|---|---|---|
| | | | | | | favor of Stamford Federal Savings Bank, dated 4/28/98 rec'd in B7021/P511, assignment of rents and leases B7021/P532 |
| | | | | | see footnote (3) | Mortgage in the principal amount of $9mm in favor of Hamilton Park Health Care Center, LTD. dated 10/2/98 and recorded B7124/P230 from LLC XXVII (106 Harrison Ave) and LLC XXIV per loan agreement dated 5/1/97 |
| | | | | | | (4) Lis pendens filed 6/8/04 by Eastern Savings Bank |

**Footnote:**

(1) Blanket mortgage on these properties were foreclosed and sold at auction.    Debtor has claim related to loss of properties as a result of Mr. Peter Mocco's deliberate failure to properly manage property and to make required mortgage payments from available rental proceeds.

(2) Note guaranteed by Mr. Licata.  NB:  release  rec'd b 253, p. 294 and that Schedule A of the JVA includes 125 South Harrison Street

(3) According to Mr. Licata, this mortgage was never funded, although Mr. Mocco prepared the loan agreement dated as of 5/1/97 in response to litigation with EMP 1; Mr. Licata also claims that Mr. Mocco never intended to make a loan.

Page 3 of 3

0710/58159-001  NYLIB1/1919872v2

05/17/2005 06:57 PM

**Schedule A**
**(James J. Licata ownership interests in various entities)**

| Entity | EIN, If Known | |
|---|---|---|
| First Connecticut Holding Group, LLC II | 22-3466172 | Footnotes 1 and 3 |
| First Connecticut Holding Group, LLC III | 22-3466173 | Footnotes 1 and 3 |
| First Connecticut Holding Group, LLC IV | | Footnote 2 |
| First Connecticut Holding Group, LLC V | 22-3466219 | Footnote 3 |
| First Connecticut Holding Group, LLC VI | 22-3466220 | Footnote 3 |
| First Connecticut Holding Group, LLC VII | 22-3466221 | Footnote 3 |
| First Connecticut Holding Group, LLC VIII | 22-3466222 | Footnote 3 |
| First Connecticut Holding Group, LLC IX | 22-3466224 | Footnote 3 |
| First Connecticut Holding Group, LLC X | 22-3466226 | Footnote 1 |
| First Connecticut Holding Group, LLC XI | 22-3466227 | Footnotes 1 and 3 |
| First Connecticut Holding Group, LLC XII | 22-3466228 | Footnote 3 |
| First Connecticut Holding Group, LLC XIII | 22-3466223 | Footnotes 1, 3, 4 |
| First Connecticut Holding Group, LLC XIV | 22-3466180 | Footnote 3 |
| First Connecticut Holding Group, LLC XVI | 22-3520325 | Footnote 3 |
| First Connecticut Holding Group, LLC XVII | 22-3520325 | Footnote 3 |
| First Connecticut Holding Group, LLC XVIII | 22-3520330 | Footnote 3 |
| First Connecticut Holding Group, LLC XIX | 22-3520333 | Footnote 3 |
| First Connecticut Holding Group, LLC XXI | 22-3521609 | Footnote 3 |
| First Connecticut Holding Group, LLC XXII | 22-3538044 | Footnote 3 |
| First Connecticut Holding Group, LLC XX | | Footnote 3 |
| First Connecticut Holding Group, LLC XXV | | Footnote 3 |
| First Connecticut Holding Group, LLC XXVI | | Footnote 3 |
| First Connecticut Holding Group, LLC XXVII | | Footnote 3 |
| First Connecticut Holding Group, LLC XXVIII | | Footnote 3 |
| The Morgan-Steuben Development, LLC ("MSD") | 22-3521834 | Footnote 5 |
| First Connecticut Holding Corporation III ("FCHC III") | | Footnote 5 |
| Stonyhurst LLC | | Footnote 6 |

**FOOTNOTES:**

(1) Mr. Mocco's motion to dismiss chapter 11 proceedings for these former debtors was granted by Bankruptcy Judge Colleen Brown, sitting by designation of the United States District Court for the District of Connecticut, in the United States District Court for the District; her order is on appeal to the United States District Court for the District of Vermont ("the Vermont Appeal"). Title to the membership certificates in these former debtors, in the names of James and Cynthia Licata, are held by Dennis Drasco, in trust, under an order from Judge Levy in the New Jersey state court actions, pending outcome of all relevant litigation. The membership interests to be acquired from James Licata under this Agreement includes all rights to control the Vermont Appeal, any further appeal or appeals from the United States District Court for the District of Vermont, and any proceedings on remand from any of them.

(2) Cynthia Licata claims 100% ownership pursuant to a 1998 transaction with James Licata, but see Separation Agreement dated June 4, 2002.

(3) Cynthia Licata claims 50% ownership, but see Separation Agreement dated June 4, 2002.

(4) By this Agreement, Cynthia Licata is agreeing to transfer her interest, if any, in this entity to Buyer.

(5) Titan claims to own 2/3 of the stock of FCHC III and that only the balance is owned by Mr. Licata. Titan also asserts

0710/58159-001 NYLIB1/1919872v2

 05/17/2005 06:57 PM

that FCHC III owns 37.5% of MSD, while Mr. Licata claims to own 50% and that Mrs. Licata owns the other 50%. Purchaser will acquire Mr. Licata's interests in FCHC III, subject to Titan's claim of ownership and takes no position on the extent of FCHC III's interest in MSD.

(6) This entity, according to Mr. Licata, is owned by the joint venture.



05/17/2005 06:57 PM

# EXHIBIT B

**[insert text of Exhibit A-1 of FAAPA]**

(ii)

## EXHIBIT A-1

**Sayreville Secured Debt**

1.  Indebtedness of Peter Mocco under the confirmed plan in the Mocco bankruptcy proceedings in the amount of $15 million assumed and/or secured by Lorraine Mocco and acquired by FCCG under the First Union Acquisition Agreement and the confirmed plan in such proceedings.

2.  Mortgage, made by Lorraine Mocco to FCCG, dated September 26, 1996, and recorded September 26, 1996 in the Middlesex County Clerk's Office in Mortgage Book 5164, Page 55, securing $15,000,000; as assigned to EMP Whole Loan 1, L.L.C. ("EMP 1") by Assignment of Mortgage dated September 25, 1996 and recorded September 26, 1996 in Book 658, Page 312.

3.  Amended and Restated Mortgage, made by Lorraine Mocco to FCCG, dated September 26, 1996, and recorded November 14, 1996 in the Middlesex County Clerk's Office in Mortgage Book 5187, Page 815 securing $15,000,000.

**Bernardsville Loan**

1.  Promissory Note, dated September 25, 1996, in the original principal amount of $2,000,000, made by FCCG in favor of EMP 1.

2.  Pledge Agreement, dated as September 26, 1996, made by FCCG in favor of EMP 1.

3.  Leasehold Mortgage, made by Lorraine Mocco to FCCG, dated September 26, 1996, and recorded September 26, 1996 in the Office of the Clerk/Register of Somerset in Book 2693, Page 865 securing $2,000,000; as assigned to EMP 1 by Assignment of Mortgage dated September 26, 1996 and recorded September 26, 1996 in Book 319, Page 259;

4.  Amended and Restated Mortgage, made by Lorraine Mocco to FCCG, dated September 25, 1996, and recorded October 15, 1996 in the Office of the Clerk/Register of Somerset in Book 2699, Page 442 securing $2,000,000;

5.  Second Amended and Restated Mortgage, made by Lorraine Mocco to FCCG, dated September 25, 1996 , and recorded October 24, 1996 in the Office of the Clerk/Register of Somerset in Book 2703, Page 339 securing $2,000,000.

**VTE Loan**

1.  Stipulation and Order concerning Summit Bank's claims against debtors Peter Mocco and Village Townhouse Estates, Inc. (case No. 94-310932), filed with the



United States Bankruptcy Court for the District of New Jersey on September 26, 1996.

2.  Loan Sale Agreement, dated September __, 1996, between Summit Bank and FCCG.

3.  Construction Loan Agreement, dated March 12, 1986, between VTE and Commercial Trust Company of New Jersey.

4.  Construction Mortgage Note, dated March 12, 1986, in the original principal amount of $2,900,000, made by VTE in favor of Commercial Trust Company of New Jersey.

5.  Construction Loan Mortgage, made by VTE to Commercial Trust Company of New Jersey, dated March 12, 1986, and recorded March 14, 1996 in the Hudson County Register's Office in Mortgage Book 3376, Page 104, securing $2,900,000; as modified by (i) as modified by Note & Mortgage Modification, dated July 14, 1988, among VTE, Peter Mocco and United Jersey Bank/Commercial Trust, recorded October 17, 1988 in Release of Mortgage Book 264, Page 257, (ii) as modified by Second Note & Mortgage Modification, dated December 30, 1988, recorded January 17, 1989 in Release of Mortgage Book 272, Page 281, (iii) as modified by Third Note & Mortgage Modification, dated September 26, 1989, recorded October 6, 1989 in Release of Mortgage Book 294, Page 227, and (iv) as modified by Fourth Note & Mortgage Modification, dated as of March 28, 1990; assigned to FCCG by Assignment of Construction Loan Mortgage and Construction Mortgage Note, by Summit Bank in favor of FCCG, dated October 17, 1996, and recorded January 8, 1997 in the Hudson County Clerk's/Register's Office in the Assignment of Mortgage Book 767, Page 249.

6.  Collateral Assignment of Mortgage, dated December 18, 1996, by FCCG in favor of Seller assigning a Mortgage from VTE, dated March 12, 1986, and recorded January 14, 1997 in the Hudson County Clerk's/Register's Office in the Assignment Book 3776, Page 104.

7.  Guaranty, dated March 12, 1996, made by Peter Mocco in favor of Commercial Trust Company of New Jersey.

8.  Promissory Note, dated December 18, 1996, in the original principal amount of $450,000, made by FCCG in favor of Seller; as amended by Note and Pledge Agreement Modification Agreement, dated as of July 31, 1997, by and between Seller and FCCG, thereby increasing the original principal amount of the Original VTE Note to $700,000.

9.  Pledge Agreement dated December 18, 1996 made by FCCG in favor of EMP 1.



10.    Guaranty, dated on or about December 18, 1996 and made by James J. Licata in favor of EMP 1.

11.    Collateral Assignment of Loan-Related Documents, dated as of December 18, 1997, by and between FCCG and EMP 1.



**<u>EXHIBIT C</u>**

**[insert text of Exhibit F to FAAPA]**

(iii)

# EXHIBIT F

## ASSUMED CONTRACTS[1]

The Assumed Contracts are as follows:

A.     Shareholder agreements and Limited liability company operating agreement with respect to the following limited liability companies and/or the Seller's rights, if any, thereunder; except that, Purchaser shall not be charged with or required to provide cure of any defaults thereunder nor shall there be any recourse against Purchaser, its successors or assigns on account of any liability or obligation arising under such operating agreements. For the avoidance of doubt, the Purchaser shall not be deemed to have assumed or otherwise deemed liable for any Encumbrances:

First Connecticut Holding Group, LLC II; First Connecticut Holding Group, LLC III; First Connecticut Holding Group, LLC IV; First Connecticut Holding Group, LLC V; First Connecticut Holding Group, LLC VI; First Connecticut Holding Group, LLC VII; First Connecticut Holding Group, LLC VIII; First Connecticut Holding Group, LLC IX; First Connecticut Holding Group, LLC X; First Connecticut Holding Group, LLC XI; First Connecticut Holding Group, LLC XII; First Connecticut Holding Group, LLC XIII; First Connecticut Holding Group, LLC XIV; First Connecticut Holding Group, LLC XV; First Connecticut Holding Group, LLC XVI; First Connecticut Holding Group, LLC XVII; First Connecticut Holding Group, LLC XVIII; First Connecticut Holding Group, LLC XIX; First Connecticut Holding Group, LLC XX; First Connecticut Holding Group, LLC XXI; First Connecticut Holding Group, LLC XXII; First Connecticut Holding Group, LLC XXV; First Connecticut Holding Group, LLC XXVI; First Connecticut Holding Group, LLC XXVII; First Connecticut Holding Group, LLC XXVIII; The Morgan Steuben Development, LLC; ; Stonyhurst LLC and First Connecticut Holding Corporation III.

B.     The Seller's rights under the Acquired Assets listed on Exhibit A-1 hereof, to the extent they constitute executory contracts and unexpired agreements; except that, Purchaser shall not be charged with, be obligated for or be required to provide cure of any defaults thereunder nor shall there be any recourse against Purchaser, its successors or assigns on account of any liability or obligation on account of such Acquired Assets. For the avoidance of doubt, the Purchaser shall not be deemed to have assumed or otherwise deemed liable for any Encumbrances.

---

[1]     The proposed cure amounts for Assumed Contracts are set forth on the attached Cure Schedule. Nondebtor parties to the Assumed Contracts must dispute these proposed cure amounts prior to the objection deadline for the entry of the Approval Order. If no objections are received, the parties to the Assumed Contracts shall be forever barred from seeking cure of any defaults existing under such Assumed Contracts.



C.      Such executory contracts, leases and agreements that will confer upon the Purchaser the rights in the Acquired Assets that the Purchaser seeks to acquire; except that, Purchaser shall not be charged with, be obligated for or be required to provide cure of any defaults thereunder nor shall there be any recourse against Purchaser, its successors or assigns on account of any liability or obligation on account of such Acquired Assets. For the avoidance of doubt, the Purchaser shall not be deemed to have assumed or otherwise deemed liable for any Encumbrances

Notwithstanding anything to the contrary provided or contained in this Agreement, or otherwise, including any order of the Bankruptcy Court (including the Approval Order), the Purchaser may elect not to assume any executory contract, lease or agreement that imposes any liability or obligation upon the Purchaser. Following is a non-exhaustive list of the Acquired Assets that are not Assumed Contracts, but the Seller's rights thereunder shall be an Acquired Asset: (i) the agreements under which the Tax Indemnification Claims (as described in Exhibit A and subject Section 1.2(a) of this Agreement) arise; (ii) Separation Agreement between James Licata and Cynthia Licata; (iii) the Mortgage and related note with respect to FCHG XXIV Real Property; (iv) Sayreville Secured Debt (as described in **Exhibit A-1 attached hereto**) is subject to the rights of EMP 1 under the Amended and Restate Pledge Agreement, dated as September 25, 1996, made by FCCG in favor of EMP 1; (v) the Bernardsville Loan (as described in **Exhibit A-1 attached hereto**) is subject to the rights of EMP 1 under the Pledge Agreement dated as of September 26, 1996, made by FCCG in favor of EMP 1; (vi) VTE Loan (as described in **Exhibit A-1 attached hereto**) is subject to the rights of EMP 1 under the Pledge Agreement dated December 18, 1996 made by FCCG in favor of EMP 1; and (vii) the mortgage to Dough Land and Cattle Co. of Missouri, Inc. dated May 2, 1996 (as described in **Exhibit A attached hereto** under FCCG) is subject to the Collateral Assignment of Loan-Related Documents, dated as of December 18, 1997, made by FCCG and EMP 1.

For the avoidance of doubt, the Debtors shall have no obligation to provide a cure of pre-petition monetary defaults under any Assumed Contract.



**CURE SCHEDULE**[2]

| Contract | Cure Amount |
|---|---|
| First Connecticut Holding Group L.L.C. II | $0.00 |
| First Connecticut Holding Group L.L.C. III | $0.00 |
| First Connecticut Holding Group L.L.C. IV | $0.00 |
| First Connecticut Holding Group L.L.C. V | $0.00 |
| First Connecticut Holding Group L.L.C. VI | $0.00 |
| First Connecticut Holding Group L.L.C. VII | $0.00 |
| First Connecticut Holding Group L.L.C. VIII | $0.00 |
| First Connecticut Holding Group L.L.C. IX | $0.00 |
| First Connecticut Holding Group L.L.C. X | $0.00 |
| First Connecticut Holding Group L.L.C. XI | $0.00 |
| First Connecticut Holding Group L.L.C. XII | $0.00 |
| First Connecticut Holding Group L.L.C. XIII | $0.00 |
| First Connecticut Holding Group L.L.C. XIV | $0.00 |
| First Connecticut Holding Group L.L.C. XV | $0.00 |
| First Connecticut Holding Group L.L.C. XVI | $0.00 |
| First Connecticut Holding Group L.L.C. XVII | $0.00 |
| First Connecticut Holding Group L.L.C. XVIII | $0.00 |

---

[2]    The cure amounts are amounts listed on this schedule or such other amounts that a nondebtor party to an Assumed Contract can establish and is expressly fixed by the Bankruptcy Court in the Approval Order. Purchaser reserves the rights to amend, modify or supplement this Cure Schedule.

6220/58159-001 NYWORD/338154v6



| | |
|---|---|
| First Connecticut Holding Group L.L.C. XIX | $0.00 |
| First Connecticut Holding Group L.L.C. XX | $0.00 |
| First Connecticut Holding Group L.L.C. XXI | $0.00 |
| First Connecticut Holding Group L.L.C. XXII | $0.00 |
| The Morgan Steuben Development, LLC | $0.00 |
| Stonyhurst LLC | $0.00 |
| First Connecticut Holding Corporation III | $0.00 |
| Those Acquired Assets listed on **Exhibit A and Exhibit A-1** that are Assumed Contracts | $0.00 |



_

**EXHIBIT D**

**Notices**

Official Committees of
Unsecured Creditors

Buchanan Ingersoll PC
700 Alexander Park — Suite 300
Princeton, NJ 08540
      Att:  Alan J. Brody
      Facsimile:  (609) 520-0360

Debtors' Counsel

Arent Fox PLLC
1675 Broadway
New York, NY 10019
      Att:  Robert E. Grossman
      Facsimile:  (212) 484-3990

Debtors/Sellers

c/o James J. Licata
23 Meeting House Road
Greenwich, CT 06831
      Facsimile:

Purchaser/Grantor

SWJ Holdings, LLC
c/o Blackhawk Partners, LLC
219 E. 69th St. – Apt. 4-H
New York, NY 10021
      Att:  Steven Podell
      Telephone:  (917) 763-7310
      E-mail:  spodell@nyc.rr.com

Dare Investments, LLC

c/o Jones Waldo Holbrook & McDonough
170 South Main Street, Suite 1500
Salt Lake City, UT 84101
      Att.: George W. Pratt
      Telephone: (801) 521-3200
      Facsimile: (801) 328-0537

(iv)