UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

In re:                          :
                                :
FIRST CONNECTICUT CONSULTING    :
GROUP, INC., et al.,            :
                                :
        Debtors.                :
                                :
_____       :
                                :
FIRST CONNECTICUT CONSULTING    :
GROUP, INC., FIRST CONNECTICUT  :
HOLDING GROUP, LLC II, FIRST    :
CONNECTICUT HOLDING GROUP, LLC III, :
FIRST CONNECTICUT HOLDING GROUP,   :
LLC X, FIRST CONNECTICUT HOLDING   :
GROUP, LLC XI, FIRST CONNECTICUT   :
HOLDING GROUP, LLC XIII,        :
                                :
        Appellants,             :
                                :
        v.                      :        Docket No. 2:04-cv-230
                                :
PETER MOCCO and LORRAINE MOCCO, :
                                :
        Appellees.              :

**OPINION AND ORDER**

The Debtors (collectively "First Conn") appeal from an order
of the United States Bankruptcy Court for the District of Vermont
(Brown, J.) entered on July 27, 2004 that granted Appellees Peter
and Lorraine Mocco's motion to dismiss the Chapter 11 cases of
First Connecticut Holding Group, LLC II, III, X, XI and XIII
(collectively the "LLCs" or the "Debtor LLCs").  The Debtor LLCs
are New Jersey limited liability companies, whose cases are,
along with several other cases, jointly administered and pending
in the United States Bankruptcy Court for the District of
Connecticut, Bridgeport Division.  The Moccos filed their motion

to dismiss in the Connecticut proceeding, *In re: First Connecticut Consulting Group, Inc.,* No. 02-50852 (AHWS) (Bankr. D. Ct. filed July 12, 2002), on March 19, 2003.  The parties consented to an order transferring venue to the District of Vermont for consideration of the motion, pursuant to 28 U.S.C. § 1412.  Following an eight-day trial in February 2004, the Bankruptcy Court granted the Moccos' motion to dismiss, and ordered that its memorandum of decision and order be transmitted to the Bankruptcy Court for the District of Connecticut, Bridgeport Division for docketing in the jointly administered case.  First Conn filed a timely notice of appeal on August 16, 2004.[1]

### Jurisdiction and Standard of Review

Section 1412 of Title 28 permits a court to transfer a case or proceeding under title 11 to another district in the interest of justice or for the convenience of the parties.  28 U.S.C.A. § 1412 (West 1993).  This Court has jurisdiction under 28 U.S.C. § 158(a) to hear an appeal from a final order of a bankruptcy judge from the District of Vermont.  28 U.S.C.A. § 158(a) (West 1993 & Supp. 2005).  A bankruptcy court's dismissal of a Chapter 11 case is a final order.  *Cf. C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)*, 113 F.3d 1304 (2d Cir. 1997) (entertaining

---

[1]  First Conn requested and was granted an extension of its deadline for filing a notice of appeal from August 6 to August 16, 2004.

appeal from dismissal of Chapter 11 petition filed in bad faith). The bankruptcy judge's findings of fact will be upheld unless clearly erroneous, with due regard given to her opportunity to judge the credibility of the witnesses.  Fed. R. Bankr. P. 8013. Conclusions of law are reviewed de novo.  *Official Comm. of Unsecured Creditors v. Mfrs. & Traders Trust Co. (In re Bennett Funding Group, Inc.)*, 146 F.3d 136, 138 (2d Cir. 1998).

### Factual Background

In March and April 1994, the Moccos, business operators and real estate owners and developers, found themselves in financial distress and filed for Chapter 11 reorganization for themselves and some of their business entities in the District of New Jersey.  As of spring 1996, the Moccos' major secured creditor, First Union National Bank ("First Union"), was pressing for Chapter 7 conversion, and had filed a competing plan of reorganization.  The Moccos, having submitted a Fourth Amended Plan of Reorganization, were desperate to have a plan of reorganization confirmed.

The Moccos concluded that in order to obtain confirmation of their plan they had to negotiate a buy-out of First Union's claim, approximately $44 million.  They reached an agreement with First Union on a discounted purchase price, but were unable to arrange financing within the time frame insisted upon by First Union.  The Moccos decided to seek two-step financing, a short

term bridge loan to finance the purchase of the discounted debt, with permanent financing to follow.

In May 1996 Peter Mocco hired First Connecticut Consulting Group, Inc. ("FCCG") to arrange the financing the Moccos needed. FCCG, owned by James and Cynthia Licata, specializes in arranging financing for financially distressed parties. Mocco entered into a consulting agreement with Licata and FCCG, in which, for a $200,000 consulting fee, Licata was to act as Mocco's agent to find and secure a bridge loan using one of the Moccos' properties, the Hamilton Park Health Care Center in Jersey City, New Jersey, as collateral. The consulting agreement contemplated that the Moccos would borrow from a third-party lender engaged by FCCG and that they would retain ownership of their properties. At the time, Licata was placing most of FCCG's clients' loans with EMP Whole Loan, Inc. ("EMP").

On May 23, 1996, FCCG itself agreed to lend up to $16 million in bridge loans to the Moccos to refinance their fourteen First Union mortgages, using all of the secured properties as collateral. The loan commitment letter expressly superseded all previous discussions or agreements between FCCG and Mocco.

Licata negotiated a price of $22 million for purchase of the Moccos' First Union mortgages. Licata also learned that First Union was not willing to deal with Mocco directly. First Union's draft contract for FCCG's purchase of the debt included a

covenant that FCCG was not entering into the First Union contract for the benefit of any other person. In the meantime, FCCG and EMP were discussing the terms of a loan to FCCG to enable it to fulfill its loan commitment to Mocco. EMP insisted that it would not loan money to FCCG if the loans were to be secured by real property owned by any entity in bankruptcy proceedings. Licata then threatened to "walk away" from the transaction unless Mocco agreed to change the structure of the transaction.

Mocco agreed to transfer ownership of the real property to limited liability companies owned by FCCG. He and Licata agreed that the LLCs would hold title to the properties in order to facilitate the reorganization plan and the refinancing, but that Licata would reconvey title to Mocco or his designee for nominal consideration after long-term financing was secured.

In connection with FCCG's purchase of the First Union claims, a "Third Immaterial Modification" to the Moccos' Fourth Amended Plan was submitted to the New Jersey Bankruptcy Court, reflecting the transfer of title of the properties to FCCG, new holder of the First Union claims. The Bankruptcy Court determined that the change would not adversely affect the treatment of any creditor, and was only an adjustment between Mocco and FCCG, to which both had consented.

Then EMP insisted on lending the full $22 million to FCCG, with Mocco supplying the $6 million difference, not to reduce the

First Union debt but to invest in EMP.  Mocco reluctantly agreed
to this condition as well.

Mocco drafted a three-page agreement that reflected the
terms of the understanding between himself and Licata, specifying
that FCCG was acting as negotiator, agent and consultant for
Hamilton Park Health Care Center, Ltd. ("Hamilton Park"), a Mocco
entity; that the conveyance to FCCG was solely to facilitate
paying off the acquisition debt; and that after refinancing FCCG
would reconvey to the Moccos or their designee for nominal
consideration.  Hamilton Park was to repay the FCCG loans and to
maintain FCCG in a tax neutral position should FCCG incur
additional tax liability as a result of the transaction.  Licata
signed the agreement on September 25, 1996, and the properties
were transferred to limited liability companies registered under
New Jersey law.  Attorney Pieter J. de Jong was charged with the
administration of the records of the five LLCs.

On September 26, 1996, the closing on the loan from EMP to
FCCG took place, the closing on the sale of First Union's secured
debt to FCCG took place, and the Moccos' reorganization plan was
confirmed by the New Jersey bankruptcy court.

Repayments to EMP were made from time to time during 1996
and 1997 as the Moccos obtained long-term financing for their
properties.  Neither FCCG nor the Licatas ever expended any sums
for debt service or satisfaction of the EMP acquisition loans or

6

the permanent loans.  The Moccos or their affiliates made all payments of principal and interest on the acquisition loans and the refinancings.

In May 1997 Mocco and Licata entered into an escrow agreement, naming de Jong as their escrow agent.  The stated purpose of the escrow agreement was to provide for the orderly transition of title to the properties held by the LLCs as the properties were refinanced and reconveyed to the Moccos. According to the terms of the escrow agreement, as each property was refinanced and EMP released its lien, it was to convey its ownership interest to the escrow agent.  The escrow agent was authorized to issue replacement shares for the LLCs to Mocco or his designee.  The Licatas granted de Jong a limited power of attorney to enable de Jong to endorse and surrender the member shares in the LLCs.  Licata also signed an Authorization Statement instructing EMP to deliver the member certificates to de Jong as each property was refinanced and released from the lien.  Licata also re-executed the three-page agreement from September 1996.

Although the properties were refinanced and EMP's liens released in 1997, Mocco did not seek reconveyance of the ownership interests in the five LLCs until August 25, 1998.  On December 16, 1998, Licata and Mocco directed de Jong to forward to Mocco the remaining documents necessary to reconvey the LLCs

7

to Mocco.  On January 19, 1999, however, Licata advised Mocco and de Jong that he would not reconvey the properties.  De Jong did not deliver the ownership documents to Mocco.

In April 1999 the Moccos brought suit in Essex County Superior Court, New Jersey, against FCCG, Licata and de Jong to compel reconveyance of the properties.  In September 2001 de Jong delivered the ownership documents for the LLCs that he had previously refused to deliver.  At that time, to preserve the status quo until a decision could be made regarding ownership of the LLCs, the Superior Court ordered the Moccos to turn over the documents to a court-appointed agent, and enjoined all parties from transferring or encumbering the LLCs or their property, pending a determination of the ownership interests.  *Mocco v. Licata*, No. ESX-C-397-99 (N.J. Super. Ct. Ch. Div. Sept. 21, 2001) (order directing delivery of documents).

FCCG then moved to re-open the Mocco bankruptcy to litigate the enforceability of Licata's obligation to reconvey.  The motion was denied.

By June 2002, Licata was in financial difficulty himself, and he filed for Chapter 11 protection in the District of Connecticut.  In September 2002 he caused FCCG and all affiliated entities, including the five LLCs at issue here, to file for Chapter 11 protection as well.  In his personal bankruptcy schedules Licata denied having had any ownership interest in the

8

LLCs at any time after 1996, however.

In March 2003, the Moccos moved to dismiss the five Debtor LLC petitions on the grounds that the Licatas did not own the Debtor LLC certificates and the filing was unauthorized. The Moccos alleged that Licata filed the petitions in bad faith in an attempt to exercise control over property they did not own, for the benefit of their creditors and to defeat an imminent ruling in the state court lawsuit that would have vindicated the Moccos' claim to ownership of the LLCs.

After a bench trial, the Bankruptcy Court granted the Moccos' motion to dismiss, holding that Mocco was the owner of the LLCs at the time Licata filed for Chapter 11 protection, and that Licata filed the Debtor LLC Chapter 11 petitions in bad faith. The Court found that Mocco was a more credible witness than Licata on all issues, and found Licata's testimony on the issue of whether he intended to be bound by the three-page agreement "both disturbing and disingenuous." Mem. of Decision at 3, 6.

On appeal First Conn argues (1) that the Bankruptcy Court could not adjudicate the Licatas' ownership interest in the Debtor LLCs without formally joining Cynthia and James Licata and other necessary parties in an adversary proceeding; (2) that the Moccos at best had an option to re-purchase the properties; (3) that the agreements are not enforceable because they were not

9

disclosed to the New Jersey bankruptcy court; (4) that the Moccos did not satisfy the conditions to reconveyance that were set forth in the three-page agreement and the escrow agreement; (5) that Mocco breached the escrow agreement by altering the language of the general release; and (6) that the Bankruptcy Court erroneously concluded that Licata filed the Debtor LLC Chapter 11 petitions in bad faith.

## Discussion

I.   Joinder of James and Cynthia Licata

The matter before the Bankruptcy Court proceeded as a contested motion. First Conn argues that the issue should have been brought as an adversary proceeding that joined James and Cynthia Licata as necessary parties, claiming that the procedure employed by the Bankruptcy Court denied the Licatas "procedural protections afforded by an adversary proceeding," and "deprived the Debtor LLCs and other interested parties of notice of the true nature of the claim." Appellants' Br. at 59, 60. This issue is raised for the first time on appeal.

The Licatas, FCCG and the Debtor LLCs do not claim that they lacked adequate notice of the motion to dismiss the Chapter 11 petitions. Licata, FCCG and the Debtor LLCs are all represented by the same law firm, which participated fully in every stage of the proceedings on the contested motion. The firm did not indicate in any way that its representation was limited. James

10

Licata participated in the proceedings and was a witness at the hearing on the motion.  Cynthia Licata was permitted to intervene in the proceedings, and her counsel participated until Cynthia Licata advised the Bankruptcy Court, through counsel, that she no longer wanted to participate in the contested motion.  The Official Committee of Unsecured Creditors for the bankruptcy estate of James Licata participated through counsel in the proceedings on this motion.  If there were other interested parties on the question of who owned the LLC certificates, or whether the Chapter 11 cases were filed in bad faith, First Conn has not shown that they were necessary to adjudication of these issues, nor has it demonstrated that they lacked notice of the proceedings.[2]

Adversary proceedings are defined in Rule 7001.  First Conn contends that Rule 7001(2) and (9) require that the Moccos' motion to dismiss be brought as an adversary proceeding, because in actuality it was a proceeding to determine the validity of an interest in property by obtaining a declaratory judgment.  *See* Fed. R. Bankr. P. 7001(2), (9).  The Moccos sought dismissal for

---

[2]  First Conn suggests that EMP and Titan Management, an affiliate of EMP, were necessary parties, but has not specified why they were necessary to a determination of ownership of the LLC certificates, or bad faith, or how First Conn was prejudiced by their absence from the proceedings.  That these entities may have been able to provide information relevant to whether the interim financing had been paid in full, or held a different opinion on the issue, does not render them necessary parties.

cause, not declaratory judgment, and their motion was properly brought under 11 U.S.C. § 1112(b).  Rule 9014 governs a proceeding to dismiss a case under § 1112(b).  Fed. R. Bankr. P. 1017(f).

Rule 9014 requires reasonable notice and opportunity to be heard be afforded the party against whom relief is sought.  This was provided; in fact, this contested motion was conducted similarly to an adversarial proceeding, with full discovery, motions in limine, and pre-trial motions for summary disposition. First Conn has not identified any procedural protections that were not afforded the Licatas or FCCG.

Given that First Conn participated fully in the proceedings before the Bankruptcy Court, the gravamen of its argument is that the adjudication of ownership of the LLC certificates was procedurally defective.  Its citation to *Chittenden Trust Co. v. Sebert Lumber Co. (In re Vermont Toy Works, Inc.)*, 135 B.R. 762 (D. Vt. 1991) is inapposite, however.  *Vermont Toy* involved a marshaling action in which the bankruptcy judge merged the assets of the debtor company and its sole shareholder.  On appeal the district court held that the marshaling action was defective because the shareholder was not a party to the action and his personal assets were not subject to the bankruptcy court's jurisdiction.  135 B.R. at 768-69.  The Moccos' motion sought dismissal of the Debtor LLCs' chapter 11 petitions.  The

bankruptcy court unquestionably had jurisdiction over the assets at issue, the Debtor LLCs. Moreover, unlike in *Vermont Toy*, the issues were thoroughly framed and addressed in the submissions to the bankruptcy court and in the testimony of the witnesses. *See id.* at 769 (pleadings did not mention marshaling doctrine or piercing corporate veil; extraordinary application of marshaling doctrine not foreseeable to shareholder or other creditors).

The Bankruptcy Court properly adjudicated this matter as a contested motion, and afforded more than adequate notice and an opportunity to be heard to the Licatas, FCCG and their creditors. First Conn has not shown prejudice to the interests of any party or non-party.[3]

II. <u>Ownership of the Debtor LLCs</u>

The Bankruptcy Court found that the Debtor LLCs created on September 12, 1996 were intended to be bankruptcy-remote entities that would hold title to the Moccos' properties. They were established in New Jersey and were governed by the laws of New Jersey. The operating agreement of each LLC contained a requirement that agreement of all members was required in order

---

[3]  Even were this Court to conclude that this matter should have been brought as an adversary proceeding, the error is harmless, given the utter absence of prejudice to the Licatas, FCCG or their creditors by proceeding on contested motion with full discovery and an eight-day hearing on the merits. *See In re Orfa Corp. of Phila.*, 170 B.R. 257, 275-76 (E.D. Pa. 1994) (citing *In re Command Servs. Corp.*, 102 B.R. 905, 908 (Bankr. N.D.N.Y. 1989) (citing cases)).

13

to effect the transfer of any member's interest, but there was no procedure specified for the transfer of an ownership interest. For each LLC there was a certificate book and a certificate ledger. Certificates were issued for each LLC and recorded in the appropriate ledger.

The Bankruptcy Court found that pursuant to the May 1997 escrow agreement Licata granted de Jong a limited power of attorney to endorse the member/shareholder share certificates issued in his name, and he also authorized EMP to deliver all ownership shares to the LLC upon EMP's release of the liens pertaining to each property. De Jong was further authorized to issue replacement shares to the Moccos or their designee. By executing the escrow agreement the existing members agreed to transfer their interests in the Debtor LLCs. The issuance and transfer of certificates to the Moccos' designee were documented in the ledgers, but not all of the certificates were endorsed. The Bankruptcy Court noted that there was no additional evidence in the LLC records of transfer of ownership, such as minutes of member meetings or resolutions adopted by the members or amendments of the operating agreements.

With the operating agreements and the New Jersey Limited Liability Act silent on the issue of how to effect the transfer of an ownership interest, the Bankruptcy Court turned to analogous law in the context of corporations or partnerships.

14

The Court concluded that these LLCs were most similar to closely-held corporations on the issue of ownership interests and their transfer.  The Bankruptcy Court reasoned because under New Jersey law a stock certificate is not required to establish ownership rights to a closely-held corporation, the failure to transfer certificates to the Moccos or their designee did not defeat their claim of ownership.  The Court concluded that according to the certificate ledger, the Moccos were the record owners of the LLCs as of September 1, 2001 and thus were the owners of the properties held by the LLCs.  Mem. of Decision at 11.

First Conn has not challenged this conclusion on appeal.  Instead, it argues that the 1996 arrangement set forth in the three-page agreement at best gave the Moccos an option to re-purchase the commercial properties for a nominal sum once they had fulfilled their part of the bargain.  It contends as an initial matter that the Bankruptcy Court's characterization of Licata as the Moccos' nominee was error, and violates the terms of their confirmed plan of reorganization, "and therefore violates basic principles of res judicata."  Appellants' Br. at 22.

Under the Moccos' confirmed plan, they were to convey five commercial properties to the Debtor LLCs, "free and clear of all claims, liens and encumbrances incurred by or asserted against the debtors except as otherwise provided in the Plan and the

15

Third Immaterial Modification." The Moccos did so.

A confirmation plan binds debtors and creditors as to all of its provisions and all related claims which could have been litigated in the same cause of action. *Sure-Snap Corp. v. State St. Bank & Trust Co.*, 948 F.2d 869, 873 (2d Cir. 1991). As of the date of the confirmation, September 26, 1996, the understanding between Licata and the Moccos, as evidenced by the three-page agreement, was that the conveyance to FCCG was solely to facilitate paying off the acquisition debt, and that the properties would be reconveyed to the Moccos or their designee for nominal consideration once the properties were refinanced. There was no claim against Licata or FCCG for the Moccos to litigate until Licata refused to convey in 1999, and consequently res judicata does not bar the Moccos' seeking a determination of their ownership of the Debtor LLCs as of 2002.

Moreover, the Bankruptcy Court's characterization of the relationship between the Moccos and Licata and FCCG in 1996 is not essential to her conclusion that the Moccos were the owners of the Debtor LLCs by September 2001. Whatever ownership interest FCCG and the Licatas had in the Debtor LLCs in 1996, in May 1997 when FCCG and the Licatas entered into the escrow agreement, they authorized the surrender of their ownership shares upon EMP's release of the shares. In July 1998 refinancing was complete and EMP had released the collateral.

Escrow agent de Jong proceeded to record changes of ownership in the records of the Debtor LLCs, and as of September 1, 2001 the records reflect that ownership of the shares in the Debtor LLCs had been transferred to Lorraine Mocco.

First Conn has not shown error in the Bankruptcy Court's conclusion that the Moccos are the owners of the Debtor LLCs.

III. <u>Enforceability of agreements</u>

First Conn also claims error in the Bankruptcy Court's conclusion that because neither Licata nor Mocco disclosed the existence of the three-page agreement to the New Jersey bankruptcy court, Mocco's failure to disclose it should not preclude him from obtaining relief.

Under the Moccos' Fourth Amended Plan of Reorganization, as accepted by all their creditors except First Union, the Moccos retained ownership of all their properties, subject to the restructured claim of First Union. Unsecured creditors accepted their proposed treatment under the plan, and how the Moccos and First Union restructured their loan was left up to them. When FCCG took over the First Union loan, it was understood that the substance of the plan was not altered. Accordingly, the New Jersey bankruptcy court found this modification to the plan immaterial. *See* Fed. R. Bankr. P. 3019 (proposed modification that does not adversely change treatment of claim of creditor deemed accepted by all creditors who have previously accepted

plan).  Changing title to the properties involved in the First Union claim from the Moccos to FCCG affected only the holder of the First Union claim, FCCG, and it was fully aware of the terms of the three-page agreement.

Essentially, First Conn seeks to apply the equitable doctrine of judicial estoppel to preclude the Moccos from seeking to enforce the three-page agreement here when they allegedly denied its existence before the New Jersey bankruptcy court.

Judicial estoppel may apply in "situations where a party both takes a position that is inconsistent with one taken in a prior proceeding and has had that earlier position adopted by the tribunal to which it was advanced." *Uzdavines v. Weeks Marine, Inc.*, 418 F.3d 138, 148 (2d Cir. 2005) (quoting *Stichting v. Schreiber*, 407 F.3d 34, 45 (2d Cir. 2005)).  The later position must be "clearly inconsistent" with the earlier position, and the party must have succeeded in persuading a tribunal to accept that earlier position, *id.* at 147, so that "'the risk of inconsistent results with its impact on judicial integrity is certain.'"  *Id.* at 148 (quoting *Simon v. Safelite Glass Corp.*, 128 F.3d 68, 72 (2d Cir. 1997)); *see also Wight v. BankAmerica Corp.*, 219 F.3d 79, 90 (2d Cir. 2000) (no occasion to apply estoppel if statements can be reconciled).  A further consideration is whether the party seeking to assert the inconsistent position "would derive an unfair advantage or impose an unfair detriment

on the opposing party if not estopped." *Uzdavines*, 418 F.3d at 147 (quoting *New Hampshire v. Maine*, 532 U.S. 742, 751 (2001)).

The Bankruptcy Court did not abuse its discretion by declining to impose judicial estoppel. The Bankruptcy Court reviewed the transcript of the confirmation hearing and concluded that there was no deliberate concealment or fraud upon the New Jersey bankruptcy court. Although unnecessary to the resolution of this issue, this Court reaches the same conclusion. The position taken by the Moccos before the New Jersey bankruptcy court, that they were transferring title to the contested properties to FCCG, is not clearly inconsistent with the position taken here, that FCCG held title strictly as a nominee to facilitate the refinancing of the properties. The distinction was immaterial except to the Moccos and FCCG. There is no risk of inconsistent results; the New Jersey bankruptcy court was not asked to rule, and did not rule one way or the other on the nature of the transferred title. Finally, there is no unfair detriment to Licata or FCCG by declining to impose judicial estoppel; the Moccos seek to enforce what was always the understanding between Mocco and Licata, that title would be transferred in order to facilitate the refinancing.

IV.  <u>Conditions for reconveyance</u>

The Bankruptcy Court found that "[h]aving examined the Escrow Agreement together with the record . . . [that] the

19

conditions of the Escrow Agreement were met such that de Jong, in his capacity as the Escrow Agent, was required to issue documents of ownership to Mocco or his designee." Mem. of Decision at 9. First Conn contends that this finding is clearly erroneous, because the Moccos failed to repay the EMP bridge loan, and failed to provide tax neutral indemnification to Licata.

A.    Repayment of the EMP bridge loan

Under the terms of the escrow agreement, EMP was to release its ownership interest in each Debtor LLC as the properties were refinanced and the proceeds paid to EMP to reduce the balance of the loan. The escrow agent was then to issue replacement shares to the Moccos or their designee. Consistent with the escrow agreement, EMP released the liens, and the membership certificates were sent to de Jong to effect a transfer of ownership to the Moccos or their designee.

First Conn makes much of litigation between Licata and EMP over the EMP note, and proofs of claim for $746,979.17 filed by EMP in the Debtor LLC bankruptcies, arguing that there is abundant uncontroverted evidence that the Moccos have not repaid the EMP loan in full.

The Bankruptcy Court acknowledged, however, that there were unresolved disputes over amounts owed to EMP. She simply found that the escrow agreement provided that the ownership rights were to revert to the Moccos as each property was refinanced and EMP

20

released its liens.

    B.   <u>Tax neutral status</u>

    The agreement to maintain FCCG in a tax neutral position is contained in paragraph 2(F) of the three-page agreement that Licata signed in September 1996 and re-executed in May 1997.[4]

    First Conn devotes several pages of its brief to a theoretical discussion of depreciation, gain and basis calculation. At no time, in submissions to the Bankruptcy Court or this Court on appeal has Licata specified what tax liability he or FCCG has incurred as a result of the transactions specified in the three-page agreement. Licata has not even filed tax returns since 1998. There is no evidence of record that Licata or FCCG has been left other than in a tax neutral position.

    The argument that indemnifying Licata for any tax consequences of the transfer of ownership was a precondition to transfer of ownership borders on the absurd. The hypothetical taxable gain calculated in connection with refinancing the Property owned by LLC II, Appellants' Br. at 38-40, could only

_____

[4]  The paragraph reads as follows:

        Hamilton agrees that in all of the above contemplated transactions, exercises, transfers and mortgaging, First Connecticut shall be maintained in a tax neutral position. Thus if First Connecticut incurs any additional tax liability over and above its own tax obligation on its earned interest income and consulting fee income, then in that event Hamilton agrees to make First Connecticut whole.

have been realized after a transfer of ownership back to the Moccos. Moreover, the escrow agreement provides for reconveyance of the properties without regard to tax effects. The Bankruptcy Court's finding that the conditions of the escrow agreement were met and that the escrow agent was obligated to transfer ownership to the Moccos was not clearly erroneous.

V.   Breach of the escrow agreement

     The Licatas and the Moccos, as part of the May 1997 escrow agreement, agreed to execute mutual general releases. The Bankruptcy Court found that Peter Mocco amended his general release in favor of the Licatas and FCCG by inserting a handwritten footnote specifying that the agreements and obligations regarding the properties meant the escrow agreement and the documents referred to in the escrow agreement.[5]

     First Conn claims that the alteration was a material breach of the escrow agreement that "excuses or at least suspends the Licatas' obligation to convey their LLC certificates to Mocco for $1.00." Appellants' Br. at 53. The Bankruptcy Court rejected the contention that the alteration constituted a material breach of the escrow agreement excusing the Licatas from performance. First Conn has not demonstrated error in that conclusion. The

---

[5]  The releases are held by the escrow agent until he receives a written termination agreement signed by Mocco and Licata, at which point the escrow agent is authorized to deliver the general releases to the parties. The record does not reflect that a termination agreement has been provided to the escrow agent.

22

Bankruptcy Court was not required to speculate whether Mocco's unilateral alteration would be effective to limit his release of FCCG and Licata should Mocco attempt sometime in the future to establish Licata's liability under other agreements between them regarding the LLC properties.

VI.   Bad faith

Under 11 U.S.C. § 1112(b) and § 305(a), a Chapter 11 petition may be dismissed only "for cause."  When the circumstances surrounding a debtor's Chapter 11 filing indicate a lack of good faith, its petition may be dismissed.  *C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship),* 113 F.3d 1304, 1309 (2d Cir. 1997).  Because dismissal for cause, including bad faith, involves the exercise of a bankruptcy court's equitable discretion, a dismissal for bad faith is reviewed for abuse of discretion.  *See Cedar Shore Resort, Inc. v. Mueller (In re Cedar Shore Resort, Inc.),* 235 F.3d 375, 379 (8th Cir. 2000).

The Bankruptcy Court found as fact that Licata had no legitimate reorganization purpose to be served by filing Chapter 11 petitions for the Debtor LLCs; rather Licata's purpose in filing was to attempt to retain possession and control over property in which he had no ownership rights and to stay state court litigation which could have defeated his claimed ownership interest.  Mem. of Decision at 15, 20.

First Conn argues that Licata and FCCG had good cause to

23

file for Chapter 11 protection, a fact that has not been disputed. It insists that because the Licatas own the Debtor LLC certificates, either outright or subject to the Moccos' repurchase option, filing Chapter 11 for the Debtor LLCs was justified. It maintains that the Debtor LLCs are crucial to Licata's own reorganization plan, and the petitions "should not be dismissed on theory of bad faith filing and abuse of bankruptcy process, even if they were solvent and filed bankruptcy petitions shortly before the New Jersey Superior Court was about to rule on a case dispositive motion." Appellants' Br. at 57, citing *Heisley v. U.I.P. Engineered Prods. Corp. (In re U.I.P. Engineered Prods. Corp.)*, 831 F.2d 54, 56 (4th Cir. 1987).

If the Debtor LLCs were wholly owned subsidiaries of FCCG, then citation to *In re U.I.P. Engineered Products Corp.* might be more useful, but First Conn's argument that the Debtor LLC petitions were filed in good faith is simply a disagreement with the Bankruptcy Court's findings of fact that Licata had no ownership interest in the Debtor LLCs and knew it at the time he caused them to file for Chapter 11 protection. First Conn has not shown that these findings were clearly erroneous. Furthermore, in issues of bad faith a bankruptcy court is advised to use its equitable powers to reach an appropriate result in individual cases. *In re C-TC 9th Ave. P'ship*, 113 F.3d at 1311 n. 5 (quoting H.R. Rep. No. 95-595, at 405-06 (1977)). Taking

all of the circumstances into consideration, the Bankruptcy Court concluded that dismissal of the Debtor LLC Chapter 11 petitions was warranted, based on Licata's bad faith.   This Court finds no abuse of discretion.

<u>**Conclusion**</u>

The decision of the Bankruptcy Court is **affirmed.**


Dated at Burlington, Vermont this 28th day of March, 2006.


<u>/s/ William K. Sessions III</u>
William K. Sessions III
Chief Judge