asserting, prosecuting, or otherwise pursuing such Interests of any kind or nature whatsoever against the Purchaser, its property, its successors and assigns, or the Acquired Assets or the Assumed Contracts, as an alleged successor or otherwise, with respect to any Interest of any kind or nature whatsoever such person or entity had, has, or may have against or in the Debtors, their estates, officers, directors, shareholders, or the Acquired Assets or the Assumed Contracts. Following the Closing Date, no holder of an Interest in the Debtors shall interfere with the Purchaser's title to, or use and enjoyment of, the Acquired Assets or the Assumed Contracts based on or related to such Interest, or any actions that the Debtors may take in their Chapter 11 cases.

27.    The Break-up Fee that shall become payable by the Debtors pursuant to the Asset Purchase Agreement or any of the documents delivered by the Debtors pursuant to or in connection with the Asset Purchase Agreement shall (a) be paid by the Debtors in the time and manner as provided in the Asset Purchase Agreement, without further order of this Court; and (b) not be discharged, modified, or otherwise affected by any plan of reorganization or liquidation of any of the Debtors.

28.    The Debtors, the Purchaser, or an Affiliate of the Purchaser are each hereby authorized and directed to enter into, execute, and take all actions and execute all documents and instruments that are necessary and/or appropriate to effectuate the Asset Purchase Agreement. Any and all such documents and instruments are hereby authorized and approved without the need for any other or further order of this Court.

29.    This Court shall retain jurisdiction over any matter or dispute arising from or relating to the implementation of this Order as well as to enforce and implement the terms and

provisions of the Asset Purchase Agreement, all amendments thereto, any waivers and consents thereunder, and each of the agreements and instruments executed in connection therewith in all respects, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Acquired Assets to the Purchaser, (b) resolve any disputes arising under, or related to, the Asset Purchase Agreement, except as otherwise provided therein, (c) interpret, implement, and enforce the provisions of this Order, and (d) protect the Purchaser against any Interests in the Acquired Assets, of any kind or nature whatsoever, which (other than the Assumptions) shall attach to the proceeds of the Transactions.

30.    Nothing contained in any plan of liquidation or reorganization confirmed in these cases or any order of this court confirming such plan shall conflict with, or derogate from, the provisions of the Asset Purchase Agreement or the terms of this Order.

31.    The sale price under the Asset Purchase Agreement was not controlled by an agreement between potential or actual bidders within the meaning of section 363(n) of the Bankruptcy Code. The Asset Purchase Agreement was negotiated, proposed, and entered into by the Debtors and the Purchaser without collusion, in good faith, and from arm's-length bargaining positions. Neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the Asset Purchase Agreement or any part of the Transactions to be avoided under section 363(n) of the Bankruptcy Code. Accordingly, the transactions contemplated by the Asset Purchase Agreement cannot be avoided.

32.    The transactions contemplated by the Asset Purchase Agreement are undertaken by the Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code, *In re Gucci*, 126 F.3d 380 (2d Cir. 1997) and *Committee of Equity Sec.*

*Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063 (2d Cir. 1983). Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Transactions shall not affect the validity of the Transactions as to the Purchaser, except to the extent such authorization is duly stayed pending such appeal prior to such consummation.

33.    The terms and provisions of the Asset Purchase Agreement and this Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates, and their creditors, and the Purchaser, and its designees, affiliates, successors and assigns, and shall be binding in all respects upon any affected third parties including, but not limited to, the Creditors' Committee, all creditors, all parties-in-interest and all persons asserting Interests in such assets and contracts to be sold or assigned to the Purchaser pursuant to the Asset Purchase Agreement, notwithstanding any subsequent appointment of any trustee(s) or similar party under any Chapter of the Bankruptcy Code, as to which trustee(s) or similar party such terms and provisions likewise shall be binding.

34.    The transfer of the Acquired Assets and the assumption and assignment of the Assumed Contracts to the Purchaser shall not subject the Purchaser to any liability whatsoever with respect to the operation of the Debtors' affairs or businesses prior to the Closing Date or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, in any theory of law or equity, including, without limitation, any theory of antitrust, successor, or transferee liability.

35.    The conditions to closing set forth in Sections 5.1 and 5.2 of the Asset Purchase Agreement and Transactions are hereby approved in their entirety. The Parties are

27

authorized and directed to take such actions and to execute such documents and agreements that may be necessary to implement the conditions to closing, including the Transactions.

36.    The failure specifically to include or reference any particular provision, section, or article of the Asset Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, section, or article, it being the intent of the Court that the Asset Purchase Agreement be authorized and approved in its entirety. Likewise, all of the provisions of this Order are nonseverable and mutually dependent.

*In lieu of Debtors' signature, the signature of the Debtors' counsel shall have the same force and effect.*

37.    Should the Debtors not be able or willing to sign the documents necessary for Closing that comply with this Order (the "Documents"), then counsel for the Debtors, upon 24 hours notice to the Debtors, with the consent of the Creditors' Committee, is authorized to sign the Documents, and the Purchaser shall accept the signatures of counsel for the Debtors. Should the Debtors' counsel need to sign the Documents, Debtors' counsel shall give notice to the Court, the Debtors, the Creditors' Committee, and the Purchaser, that they have given notice, or used good faith efforts to give notice, to the Debtors, that they are required to sign the Documents. The Debtors' counsel shall be held harmless and shall be indemnified by the Estates for any and all actions taken by the Debtors' counsel pursuant to this Order; provided, however, in the event that any Debtor individually or by counsel or any other Person files an application raising any objection with respect to the implementation of this paragraph, the Debtors and the Purchaser shall have no obligation to close until such time as this Court makes a determination with respect thereto.

38.    The Asset Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented in accordance with the terms

28

thereof, without further order of the Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors' estates.

39.    As provided by Bankruptcy Rule 7062, this Order shall be effective and enforceable immediately upon entry. Time is of the essence in closing the Transactions, and the Debtors and the Purchaser intend to close the Sale and other Transactions as soon as possible. Therefore, any party objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay or risk their appeal being foreclosed as moot.

40.    As provided by Bankruptcy Rules 6004(g) and 6006(d), this Order shall not be stayed for 10 days after the entry thereof and shall be effective and enforceable immediately upon the entry thereof.

Dated:    ~~May~~ _June 21_ , 2005

Honorable _Alan H. W. Shiff_
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT

IN THE MATTER OF

*First CT Consulting Group*

DEBTOR(S)                    CASE NO. *CJ 50852*

ADV. NO.

DOC. #

CLAIM #

# SUBSTITUTION FORM

The attachments to this document were not imaged. If these attachments need to be reviewed and/ or copied, please refer to the original case file.

DEBORAH HUNT
CLERK OF COURT

# **EXHIBIT 2**

# EXHIBIT FILED UNDER SEAL

# **<u>EXHIBIT 3</u>**

Westlaw.

Slip Copy, 2010 WL 3782065 (Bkrtcy.D.N.M.)
**(Cite as: 2010 WL 3782065 (Bkrtcy.D.N.M.))**

Only the Westlaw citation is currently available.

United States Bankruptcy Court,
D. New Mexico.
In re: Troy Michael BAILLIO and Jasmine Baillio,
Debtors.
Phoenix Equity Ventures, LLC, Plaintiff,
v.
Troy Michael Baillio, Defendant.

Bankruptcy No. 7-08-12171 JA.
Adversary No. 08-1124 S.
Sept. 21, 2010.

Timothy R. Mortimer, Albuquerque, NM, for Debtors.

Chris W. Pierce, Hunt & Davis, P.C., Albuquerque, NM, for Plaintiff.

### MEMORANDUM OPINION ON DEFENDANT'S MOTION FOR RULE 52(c) DISMISSAL

JAMES S. STARZYNSKI, United States Bankruptcy Judge.

**\*1** This matter came before the Court for trial on the merits of Plaintiff's Complaint. At the conclusion of Plaintiff's case, Defendant orally moved for dismissal, which the Court took under advisement. Defendant's motion will be granted.

Plaintiff appeared through its attorney Hunt & Davis, P.C. (Chris W. Pierce). Defendant appeared through his attorney Moore, Berkson & Gandarilla, P.C. (George M. Moore). This is a core proceeding to determine dischargeability of a debt. 28 U.S.C. § 157(b)(2)(I). This Memorandum Opinion constitutes the Court's Findings of Fact and Conclusions of Law as may be required by Bankruptcy Rule 7052(a).

Plaintiff's complaint is based on 11 U.S.C. § 523(a)(2)(A) and (B), which provide:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt-

(1) ...

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by-

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;[or]

(B) use of a statement in writing-

(I) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive[.]

Defendant's motion implicates Bankruptcy Rule 7052, which incorporates Fed.R.Civ.P. 52(c). Rule 52(c) provides:

**Judgment on Partial Findings.** If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of the evidence. A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

A Rule 52(c) motion should be granted either 1) if plaintiff fails to make out a *prima facie* case, or 2) despite a *prima facie* case, the Court determines that the preponderance of evidence goes against the plaintiff's claim. *Regency Holdings (Cayman), Inc. v. The*

Slip Copy, 2010 WL 3782065 (Bkrtcy.D.N.M.)
**(Cite as: 2010 WL 3782065 (Bkrtcy.D.N.M.))**

*Microcap Fund, Inc. (In re Regency Holdings (Cayman), Inc.), 216 B.R. 371, 374 (Bankr.S.D.N.Y.1998)* (Citation omitted.) The Court does not draw any special inferences in nonmovant's favor, nor does the court consider the evidence in the light most favorable to the nonmoving party. *Id.* (Citations omitted.) Rather, the court acts as both judge and jury, weighs evidence, resolves conflicts, and decides where the preponderance of the evidence lies. *Id.* (Citations omitted.) *See also Follett Higher Education Group, Inc. v. Berman (In re Berman), 427 B.R. 432, 434 n. 1 (N.D.Ill.2010)*(same).

**INTRODUCTION**

**\*2** In general, after an individual debtor files for chapter 7 bankruptcy, the bankruptcy court discharges all of the debtor's pre-existing obligations, absent the applicability of a statutory exception. *See* 11 U.S.C. § 523(a) (identifying nineteen statutory exceptions to discharge). Because exceptions to discharge are narrowly construed in favor of the debtor in an effort to further the "fresh start" policy underlying the Bankruptcy Code, the creditor asserting an exception to discharge must show that its claim "comes squarely within an exception enumerated in Bankruptcy Code § 523(a)." *See Century 21 Balfour Real Estate v. Menna (In re Menna), 16 F.3d [7] at 9 [ (1st Cir.1994) ]; see also McCrory v. Spigel (In re Spigel), 260 F.3d 27, 32 (1st Cir.2001); Palmacci [v. Umpierrez (In re Umpierrez) ], 121 F.3d [781] at 786 [ (1st Cir.1997) ].*

Pursuant to § 523(a)(2), some debts incurred as a result of the debtor's fraudulent actions or statements are excepted from discharge. *See* 11 U.S.C. § 523(a)(2). Specifically, § 523(a)(2)(A) excepts from discharge debts obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). Section 523(a)(2)(B), on the other hand, bars the discharge of a debt obligation obtained by a false written statement "respecting the debtor's ... financial condition." *See* 11 U.S.C. § 523(a)(2)(B). Based on this statutory language, discharge claims based on fraudulent written statements concerning a debtor's financial condition must be brought pursuant to § 523(a)(2)(B), not § 523(a)(2)(A). In addition: These two subsections of § 523(a) were enacted to address distinct factual situations.... [T]hey

[also] differ with respect to the element of reliance-that is, the extent to which the creditor altered its position because of the debtor's misrepresentations. Whereas subsection (2)(A) requires the creditor to prove "justifiable reliance," subsection (2)(B) mandates the more demanding showing of "reasonable reliance." *Colombo Bank v. Sharp (In re Sharp), No. 08-1646, 340 Fed.Appx. 899, 2009 U.S.App. LEXIS 18200, 2009 WL 2480841 (4th Cir. Aug. 14, 2009)* (citing *Field [v. Mans], 516 U.S. [59] at 66, 116 S.Ct. 437 [1995] ).*

*Douglas v. Kosinski (In re Kosinski), 424 B.R. 599, 607-08 (1st Cir.BAP2010)* (footnote omitted). *See also Larazon v. Lucas (In re Lucas), 386 B.R. 332, 336 n. 5 (Bankr.D.N.M.2008)*(emphasizing fact that sections 523(a)(2)(A) and 523(a)(2)(B) are mutually exclusive.)

To establish that a claim is non-dischargeable under section 523(a)(2)(A) the creditor must prove the following by a preponderance of the evidence: (1) the debtor made a false representation; (2) the debtor made the representation with the intent to deceive the creditor; (3) the creditor relied on the representation; (4) the creditor's reliance was reasonable [FN1]; and (5) the debtor's representation caused the creditor to sustain a loss. *Fowler Bros. v. Young (In re Young), 91 F.3d 1367, 1373 (10th Cir.1996).*

FN1. The United States Supreme Court ruled that for section 523(a)(2)(A) the reliance must only be "justifiable." *Field, 516 U.S. at 74-75.*

**\*3** To establish that a claim is non-dischargeable under section 523(a)(2)(B) the creditor must prove the following by a preponderance of the evidence: (1) the debtor made a statement in writing; (2) the statement concerned the debtor's or an insider's financial condition [FN2]; (3) the statement was materially false; (4) the creditor actually and reasonably relied on this false statement; and (5) the debtor made the false statement with the intent to deceive the creditor. *Kosinski, 424 B.R. at 608.*

FN2. The Tenth Circuit construes the phrase "financial condition" strictly and limits it to only those statements that present an overall picture of the debtor's financial condition, purports to state the debtor's overall net

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3782065 (Bkrtcy.D.N.M.)
(Cite as: 2010 WL 3782065 (Bkrtcy.D.N.M.))

worth, overall financial health, or overall ability to generate income, or a statement that provides an equation of assets and liabilities. *Lazaron v. Lucas (In re Lucas),* 386 B.R. 332, 336 (Bankr.D.N.M.2008)(citing *In re Joelson,* 427 F.3d 700 (10th Cir.2005), *cert. denied,* 547 U.S. 1163, 126 S.Ct. 2321, 164 L.Ed.2d 840 (2006)).

*FACTS*

*FACTS ADMITTED IN ANSWER* [FN3]

> FN3. For the sake of completeness and continuity, the Court has also included certain findings in this part of the memorandum opinion based on the testimony of Mr. Douglas McKinnon.

1. Plaintiff is a New Mexico Limited Liability Company with its primary place of business being located in Bernalillo County, New Mexico. (Admitted in Defendant's Answer, paragraph 1).

2. Defendant Troy M. Baillio is a resident of Bernalillo County, New Mexico. (Admitted in Defendant's Answer, paragraph 1).

3. JTS/Simms, LLC, Debtor in Case No. 07-07-12153 SA, is a New Mexico Limited Liability Company ("JTS Simms") with its primary place of business being located in Bernalillo County, New Mexico. New Mexico. (Admitted in Defendant's Answer, paragraph 1).

4. JTS Properties and Investments, LLC is a New Mexico Limited Liability Company ("JTS Properties") with its primary place of business being located in Bernalillo County, New Mexico. New Mexico. (Admitted in Defendant's Answer, paragraph 1).

5. The Court has jurisdiction over the subject matter herein and the parties to this action. This action is a core proceeding under 28 U.S.C. § 1334 and 28 U.S.C. § 157(b)(2)(I). Venue is proper in this Court. (Admitted in Defendant's Answer, paragraph 1).

6. JTS Simms owned the real Property located at

400 Gold S.W. in Albuquerque, NM, commonly known as the Simms Building (the "Simms Building" or the "Property"). (Admitted in Defendant's Answer, paragraph 1).

7. JTS Simms financed the purchase of the Simms Building by entering into short-term bridge financing with Silar Special Opportunities Fund, L.P. ("Silar"). (Admitted in Defendant's Answer, paragraph 1).

8. Troy Baillio was the Managing Member of JTS Simms. In June of 2007, Troy Baillio and JTS Simms were in need of a significant loan or infusion of cash in order to make payment on the obligation to Silar. At some point, Troy Baillio came into contact with, among others, Art Silva ("Silva"), in an attempt to locate lenders. (Admitted in Defendant's Answer, paragraph 2, except that Art Silva found Defendant rather than Defendant contacting Art Silva).

9. Plaintiff and Defendant Baillio agreed the Plaintiff would loan Defendant Baillio or "the Simms Building" $250,000.00 for 30 days, at which time Defendants would repay the loan plus $75,000.00 for a total payment of $325,000.00. (Admitted in Defendant's Answer, paragraph 4).

10. On Saturday morning, June 23rd 2007, Timothy D. Steider, Douglas H. McKinnon and G. Luke McKinnon, who are the three members of the Plaintiff LLC, met with Defendant Baillio at Plaintiff's office. (Admitted in Defendant's Answer, paragraph 7).

*4 11. Troy M. Baillio, as President of JTS Properties and Investments, LLC, signed the Promissory Note dated June 23, 2007 (the "Note" or "Promissory Note"), a true and correct copy of which was attached as Exhibit 1 to the complaint. (Admitted in Defendant's Answer, paragraph 10).

12. Troy M. Baillio, as Member of JTS/Simms, LLC and G. Luke McKinnon, as Member of Phoenix Equity Ventures, LLC, signed the Agreement dated June 23, 2007 (the "Agreement"), a true and correct copy of which was attached as Exhibit 2 to the complaint. (Admitted in Defendant's Answer, paragraph 10).

Slip Copy, 2010 WL 3782065 (Bkrtcy.D.N.M.)
(Cite as: 2010 WL 3782065 (Bkrtcy.D.N.M.))

13. Troy M. Baillio, as member of JTS/Simms, LLC, a New Mexico Limited Liability Company, signed the Warranty Deed dated June 23, 2007 (the "Warranty Deed"), a true and correct copy of which was attached as Exhibit 3 to the complaint. (Admitted in Defendant's Answer, paragraph 10).

14. Troy M. Baillio, as Member/President of JTS Properties and Investments, LLC, and Douglas H. McKinnon, as Member of Phoenix Equity Ventures, LLC signed the Extension Agreement dated July 23, 2007 (the "Extension Agreement"), a true and correct copy of which was attached as Exhibit 4 to the First Amended Complaint. (Admitted in Defendant's Answer, paragraph 10).

15. Pursuant to the Agreement, the Warranty Deed was placed in escrow at Sunwest Trust, Inc. (Admitted in Defendant's Answer, paragraph 11) (remainder of paragraph denied).

16. On June 23, 2007, pursuant to the terms of the Promissory Note, the Agreement and the Warranty Deed, Plaintiff Phoenix Equity Ventures, LLC delivered to Troy Baillio a check in the amount of $100,000, made payable to " * *U.S. Title* * * *FOR JTS,/Simms, LLC* *." (Admitted in Defendant's Answer, paragraph 12).

17. On June 29, 2007, Plaintiff delivered a check for $150,000.00 made out to JTS Simms. (Testimony of Douglas McKinnon.)

18. At approximately, 5:13 PM on July 23, 2007, Plaintiff sent a proposed Extension Agreement (Plaintiff's Trial Exhibit 4), to Defendant, via facsimile. (Admitted in Defendant's Answer, paragraph 21). The Extension Agreement sought to extend the deadline for repayment by an additional 46 (forty six) hours.

19. In return for the approval of the additional 46 hours, Plaintiff demanded an additional $30,000.00 to be repaid, which Defendant agreed to. (Testimony of Douglas McKinnon.)

20. Neither Troy Baillio, JTS Properties and Investments, LLC, nor anyone on their behalf, have ever repaid any of the $250,000.00 received from Phoenix Equity Ventures, LLC, and the entire amount owed pursuant to the Promissory Note, the Agreement and the Extension Agreement [a total of $355,000.00] remains due and payable. (Admitted in Defendant's Answer, paragraph 28).

21. At the time of the execution of the Promissory Note, Agreement, and Warranty Deed, Defendant Baillio knew that the JTS Simms' Articles of Organization prohibited JTS Simms from incurring debt other than ordinary trade payables without unanimous consent of the members, including the Independent Member. (Admitted in Defendant's Answer, paragraph 30).

*5 22. At the time of the execution of the Promissory Note (Exhibit 1), Agreement (Exhibit 2) and Warranty Deed (Exhibit 3), Troy Baillio knew that the Mortgage held by Silar Special Opportunities on the Simms Building prohibited JTS Simms from placing a lien on, or transferring any interest in, the Simms Building, without the written approval of Silar Special Opportunities. (Admitted in Defendant's Answer, paragraph 30).

23. At the time of the execution of the Note, Warranty Deed and Agreement, Defendant Baillio had no way to repay the $325,000.00 to Plaintiff other than by refinancing the bridge loan with Silar, or borrowing money from some other source. (Admitted in Defendant's Answer, paragraph 32).

24. The needed refinance or borrowing was not approved and never occurred. (Admitted in Defendant's Answer, paragraph 34; remainder of paragraph denied).

25. Troy Baillio and JTS Properties are also alleged to be liable to other parties for obligations, which obligations resulted in lawsuits against Troy Baillio and JTS Properties. (Admitted in Defendant's Answer, paragraph 36; remainder of paragraph denied).

### FACTS DETERMINED AT TRIAL

During Plaintiff's case, Plaintiff put on the testimony of four witnesses over two days. The Court observed the demeanor of the witnesses and resolved to its satisfaction certain discrepancies between different versions of events.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3782065 (Bkrtcy.D.N.M.)
**(Cite as: 2010 WL 3782065 (Bkrtcy.D.N.M.))**

**A. _Witness one._**

The first witness, Douglas McKinnon testified as follows: He is a member of the Plaintiff. He is a consultant for an independent trust company. He received his B.A. in business from Baylor University and has been an entrepreneur for 20 years, after working in a trust department for 10 years. He has purchased real estate in the past and dealt with real estate contracts and mortgages.

Plaintiff, an LLC, was formed by three individuals who each hold a one-third interest: Mr. KcKinnon and his son Luke McKinnon and a friend Timothy Steider (the "members"). Mr. McKinnon first heard of Defendant and the Simms Building through a call from Mr. Steider, who in turn had been contacted by Art Silva, a loan broker that advised he had a client seeking short term funds to get from interim financing to permanent. Mr. Steider had previously told Mr. Silva that Plaintiff was interested in certain types of lucrative deals.

During the evening of June 22, 2007, the members met and looked at a synopsis of Defendant's finances that Mr. Silva had prepared. On the morning of June 23, 2007, the members met with Mr. Silva briefly, who gave them more documents from Defendant. Mr. Silva left and the members reviewed them, including a personal financial statement (exhibit 7), a financial statement of JTS Properties (not in evidence), and an appraisal of and cash flow projection for the building.

Later in the morning, the members were joined by Defendant, who told them that he needed $250,000 for two weeks until his permanent financing came through. Defendant told the members that he was willing to pay their price. Plaintiff required that the Defendant and his LLC's ("the entities") would need to put up a one-half interest in the Simms Building as collateral.

**\*6** The members then questioned Defendant on his personal financial statement, which valued his net worth at $7.9 million. Mr. McKinnon testified that he asked if the statement was valid, and Defendant stated that it was valid as of April 30, 2007. He told them he also owned property in New Mexico and Massachusetts. He valued his interest in all the real estate at $6.0 million.

Defendant told the members that JTS Simms purchased the Simms Building and JTS Properties owned most of JTS Simms.

Mr. McKinnon testified that it was important for the members to know that Defendant was a successful business person; and that without a substantial personal financial statement Plaintiff would not have made the loan.

The members also reviewed the rent rolls for the Simms Building with Defendant and the building appraisal. The members wanted to determine if the cash flow made the collateral profitable. The members determined that the cash flow was not sufficient to make interim financing payments, but they believed that Defendant had a confirmation letter for permanent financing [FN4] Mr. McKinnon did not recall reviewing any other documents regarding the LLCs or Silar.

FN4. There was no evidence presented that he did not have such a letter.

Mr. McKinnon described the overall deal as follows: Defendant stated that he needed $250,000 for Silar and tenant improvements and for that $250,000 he would sign a note for $325,000 due in 30 days; in exchange, Plaintiff would loan JTS Properties $250,000 and as security for payment the entities would execute a special warranty deed for a 50% interest in the Simms Building to be kept in escrow in the event of default.

Mr. McKinnon specifically stated that there was a discussion about Defendant's ability to deliver a deed. Defendant stated that he had the authority as a majority member to execute a deed. Defendant stated that his wife was another member and that there was also a 1% owner. Defendant stated that the deed would need to state that JTS Simms was the grantor. Exhibit 3 is a copy of a June 23, 2007 warranty deed in which JTS Simms granted a 50% interest in the Simms Building to Phoenix Equity Ventures.

Exhibit 1 is a copy of a June 23, 2007 promissory note in which JTS Properties and Investments, LLC promises to pay to Phoenix Equity Ventures $325,000 in one payment on or before July 23, 20007[sic]. The Promissory Note was signed by Troy M. Baillio, "President", JTS Properties and Invest-

Slip Copy, 2010 WL 3782065 (Bkrtcy.D.N.M.)
**(Cite as: 2010 WL 3782065 (Bkrtcy.D.N.M.))**

ments, LLC.

Exhibit 2 is a copy of an Agreement between Plaintiff and JTS Simms dated June 23, 2007 but "[e]xecuted on June 25, 2007". Recital 1 states the parties' intent to make a short term loan regarding the Simms Building. Recital 2 states:

> The parties acknowledge that this transaction is being consummated in a very short period of time, and that there has been very little time to allow borrower [sic] to perform due diligence by performing a review of documents and inspection of the property. Accordingly, the parties acknowledge that the return of, and on, the lender's investment is high due to the risk factors considered by the parties-specifically, real estate market and financial market considerations. The risk factor for potential misrepresentation or fraud was not considered risk factor in this transaction, and any successful action brought by lender for losses for reasons other than real estate market or financial market causes shall entitle lender to an award of attorney's frees and costs along with consequential and punitive damages, as the court may deem reasonable.

*7 Terms and Conditions 1 and 2 state that Plaintiff will provide the $250,000 as follows: a $100,000 check upon execution of the documents, and a $250,000 check on or before Friday, June 29, 2007 at 4:00 P.M. Terms and Conditions 3 states that JTS Simms (not JTS Properties) will execute a promissory note for $325,000 payable 30 days after execution of the documents. Terms and Conditions 4 states that JTS Simms will execute a warranty deed for an undivided one half ownership in the Simms Building, to be held in escrow until the agreement is fully completed. Terms and Conditions 5 and 6 provide for release of the deed in case of performance or default. Terms and Conditions 7 states that JTS Simms will not cause any liens to be recorded subsequent to the agreement. Terms and Conditions 8 anticipates that the parties will become joint owners of the Simms Building and will share equally all equities, liabilities and decisions normally associated with joint ownership of property of this type. Terms and Conditions 9 states that both parties have entered the agreement voluntarily without coersion [sic], force or threats and acknowledge that they have had adequate opportunity to have legal counsel review the Agreement. Terms and Conditions 10 acknowledges that Timothy

Steider is a licensed real estate broker and a licenses [sic] attorney in the State of New Mexico and has in no way represented or provided counsel to either party and that he is participating in this transaction as a member of Plaintiff for his own personal profit. Terms and Conditions 16 provides that "this lease" [sic] is governed by and construed in accordance with New Mexico law. Terms and Conditions 17 provides that "this lease" [sic] shall not be altered, changed, or amended except by written instrument executed by the parties. Terms and Conditions 18 states: "This document contains the entire understanding between the parties, and any prior oral or written agreements are incorporated in this agreement and any prior oral or written agreements are hereinafter excluded from this agreement." (the "integration clause [FN5].") The Agreement was signed by JTS Simms, by Troy Baillio, its Member and Phoenix Equity Ventures, LLC by G. Luke McKinnon, Member.

> FN5. Black's Law Dictionary (8th ed.2004) defines "integration" as:
>
> Contracts. The full expression of the parties' agreement, so that all earlier agreements are superseded, the effect being that neither party may later contradict or add to the contractual terms.-Also termed merger.
>
> It also defines "integration clause" as:
>
> A contractual provision stating that the contract represents the parties' complete and final agreement and supersedes all informal understandings and oral agreements relating to the subject matter of the contract.-Also termed merger clause; entire-agreement clause.

Mr. McKinnon specifically testified that the Agreement outlined the total agreement that Plaintiff had with the entities.

When questioned regarding Plaintiff's due diligence, Mr. McKinnon stated that doing any was difficult due to the urgency of the situation. He believed that Silar was going to "drop the hammer" on Monday, so the situation was urgent. He stated "we relied on [Defendant's] representations as little as we could." He also stated that after the $100,000 was

Slip Copy, 2010 WL 3782065 (Bkrtcy.D.N.M.)
**(Cite as: 2010 WL 3782065 (Bkrtcy.D.N.M.))**

lent, the members visited the building and went to the courthouse to verify the ownership of the building.

When questioned what Plaintiff specifically relied on in making the loan, Mr. McKinnon stated that it relied on: 1) the appraisal of $12 to $13 million [FN6], 2) the purchase price for the building at $7 million [FN7], 3) Defendant's personal financial statement [FN8], and 4) the members' expertise [FN9] in looking at real estate transactions and the accuracy of the items provided [FN10].

> FN6. Regarding the appraisal, Mr. McKinnon saw two, one for $12.8 million and one for $13 million. Plaintiff contacted the appraiser after the bankruptcy filing, who allegedly stated that the property was worth only $11 million. The appraiser did not appear as a witness, however. Mr. McKinnon claims that the appraisals were altered. Mr. McKinnon also specifically testified that he was not accusing Defendant of altering the appraisal. He just opined that someone did. Plaintiff's only evidence that the appraisal was not accurate is hearsay. And, Plaintiff presented no evidence that Debtor altered anything. The Court is unable to find that this was an intentional misrepresentation.

> FN7. There was no evidence presented at trial that this was a misrepresentation.

> FN8. The personal financial statement was probably materially false. This will be discussed below.

> FN9. The member's expertise is not a representation by Defendant.

> FN10. Other than the Defendant's personal financial statement, Plaintiff has not proved anything else was inaccurate.

*8 Mr. McKinnon stated that this $250,000 transaction was the largest deal that Plaintiff had entered.

When asked if Plaintiff had considered what would happen if Silar started to foreclose, Mr.

McKinnon testified that the money being lent was to prevent foreclosure. In other words, no.

The next contact Plaintiff had with Defendant was either one day before or the due date of the loan, in a phone call from Defendant's attorney. The message was that the Internal Revenue Service had filed a lien and that Defendant had the money but could not pay it, and he was requesting an extension. Mr. McKinnon stated that Plaintiff offered a 46 hour extension in exchange for an additional $30,000. Defendant agreed.

Mr. McKinnon then testified that Defendant's attorney wrote a letter to the escrow agent denying that there was a default and demanding that the deed not be released. As of the trial date neither the loan nor the extension fee were paid.

On cross examination, Mr. McKinnon testified that Plaintiff was formed in November, 2006 and had entered into five or six previous transactions. All were single family residence bailouts. He testified that all three members have years of real estate experience. The experience is not in making real estate loans, however. None of the members were ever in the "loan business." Rather, they would advance money in exchange for an ownership interest in real estate [FN11]. That was why the "security" Plaintiff had on the Simms Building was a promissory note and a warranty deed.

> FN11. On cross examination, Mr. McKinnon testified that all of Plaintiff's projects were "hard money deals." He described those as problem cases where no alternative financing was available. Plaintiff's procedures did not call for a loan application. When asked how the loans were documented, or records made of them, he stated that he did not understand the question. The Court concludes that Plaintiff did not have established policies and procedures in place and dealt with loans on a case by case basis.

Mr. McKinnon stated that in the past he had guaranteed a loan. He understood that a lender could require a guarantee in order "to get paid." Plaintiff did not have Defendant guarantee the loan in this case. When asked why there was no personal guarantee, Mr. McKinnon stated that nobody had suggested

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3782065 (Bkrtcy.D.N.M.)
(Cite as: 2010 WL 3782065 (Bkrtcy.D.N.M.))

a personal guarantee because "we had one-half of the building." At trial, however, in retrospect he believed that Plaintiff should have had Defendant sign one.

Mr. McKinnon knew what a "special purpose entity" was, but had not heard the term "bankruptcy remote entity." He was unaware that the JTS Simms LLC documents established an independent member FN12

> FN12. He earlier testified that Defendant told him has wife also had an interest and that there was a 1% owner. There was no evidence that any member questioned why there would be a 1% owner, or who it was, or what the function of such an owner would be.

The Plaintiff did not see the Silar mortgage before executing the loan documents because there was "no time." Plaintiff did not ask to see the mortgage at the meeting because "[Defendant] was in a hurry."

When questioned what exactly Defendant misrepresented, Mr. McKinnon stated that there were three and only three items: 1) Defendant's failure to disclose the contract restrictions about transfers of the Sims Building, 2) the personal financial statement, and 3) the appraisal.

The personal financial statement shows $312,000 in cash. When asked why Defendant did not simply pay his own money to Silar, Mr. McKinnon stated that Plaintiff knew that the money was gone because it was used for a down payment on the Simms Building. When asked how Plaintiff could then believe that the financial statement was still accurate, he responded that the $312,000 was immaterial.

*9 When asked how Plaintiff would collect on its loan, Mr. McKinnon responded "the deed." When asked what Plaintiff would do if the Silar permanent financing fell through, he responded "the deed." However, he also stated that Defendant had verbally guaranteed that he expected permanent financing within two weeks, and that Art Silva had confirmed that.

Mr. McKinnon admitted that Defendant told Plaintiff that JTS Simms was a special purpose entity.

He knew what a "due on sale" clause was, and he assumed that there was one in the Silar mortgage. He thought Silar would have called the loan if it knew that Plaintiff had acquired a one-half interest in the building.

On redirect Mr. McKinnon again summarized his understanding of the deal: We [*i.e.,* Plaintiff] agreed to loan whoever needed the money, $250,000, and we'd receive either $325,000 or one-half the building in two weeks. The security was critical. "One-half of a building worth $2 or $3 million was key to making it work."

**B.** *Witness two.*

Defendant testified second as an adverse witness for Plaintiff. At the time of trial he was unemployed, but in 2007 he was buying and selling real estate. At one time he testified that he owned 97% of JTS Simms and a "Special Member" owned the other 3%. At another time he stated that JTS Properties owned 97% of JTS Simms. He and his wife each own 50% of JTS Properties. Defendant testified that he did not understand the difference between personal assets and corporate assets, or personal liabilities and corporate liabilities, or the significance of this lack of knowledge. Later in his testimony Defendant purported not to understand the difference between a mortgage and a deed, or between real estate and an entity that owns the real estate. Despite having a career that involved purchase and sale of real estate, Defendant claims he has never received a deed because he never owned any property outright-he always signed a mortgage. He admitted he could be wrong on this point, but believed he only applied for loans, signed loan documents at the title companies, and sometimes would sign a guarantee or HUD forms. When later questioned whether Simms Building, Inc. (The prior owner from whom JTS Simms purchased the Simms Building) filed a lawsuit against him on a promissory note he responded "I don't know. I didn't show up. I should have only owed $530,000. I don't even read complaints, I can't deal with it, I throw them in the trash." The Court was surprised about the extent of Defendant's claimed lack of knowledge, and finds the witness less than honest and credible. The Court also finds that in 2007, Defendant was in business matters quite above his head.

In late 2006 or early 2007, Defendant paid a non-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3782065 (Bkrtcy.D.N.M.)
(Cite as: 2010 WL 3782065 (Bkrtcy.D.N.M.))

refundable $350,000 for an option to purchase the Simms Building. He sought financing from several people [FN13]. He finally obtained interim financing with Silar Special Opportunities Fund. He understood that the Silar loan would be for a sixty-day term and then roll over into a twelve-month loan; and, if it failed to rollover there would be a $405,000 prepayment penalty. That, however, was not Silar's understanding and the issue was litigated in the JTS Simms bankruptcy case. Eventually Silar obtained stay relief and foreclosed on the property.

    FN13. The inference is that he lacked permanent financing when he paid $350,000 for the option.

    *10 Defendant met Plaintiff during his attempt to payoff the Silar loan. He went to Art Silva, a loan broker, seeking a "hard money loan," which he described as an alternative to mainstream financing. Hard money loans are difficult to find and come with a high interest rate due to perceived risk. Defendant stated that Mr. Silva put him in contact with Mr. Steider about ten days before the loan closed, and that during those ten days he and Mr. Steider exchanged e-mails about the deal.

    Defendant's recollection of the June 23, 2007 meeting is drastically different from Mr. McKinnon's. Defendant testified that they did not review his personal financial statement at the meeting, nor the JTS Simms financial statement, nor the rent rolls. Defendant knew that Plaintiff had those documents, but they did not discuss them. The sole topic of discussion was the documents that were being executed as they met. Defendant stated that he never discussed his personal finances with Plaintiff until after default, probably in August, 2007. At that time he was attempting to repay the debt and gave a list of assets and debts and told what the LLC's owned. Debtor also testified that when he prepared his personal financial statement in April, 2007, it was generally accurate, "but missed something [FN14]."

    FN14. This "something" was not pursued at trial.

    Defendant also testified that he knew that any conveyance of the Simms Building real estate had to be approved, but he was unsure whether it had to be approved by Silar or by the Special Member. His

attorney informed him that there was no prohibition on transferring units of JTS Simms as collateral. Therefore, his intent was to pledge units of JTS Simms as collateral for Plaintiff's loan. Defendant further testified that he informed Plaintiff of this restriction and the necessity of structuring the deal to conform to this restriction. Defendant testified that he told Plaintiff the only way he could do the loan was by pledging "shares."

    Defendant's testimony is supported by Exhibit F. Exhibit F is an e-mail from Defendant to Mr. Steider dated June 20, 2007, that enclosed the prior owner's profit and loss statement for 2006 [FN15] and two "security instruments." The security instruments were a draft promissory note from JTS Properties and a draft "JTS Simms Unit Transfer Agreement" ("Transfer Agreement"). The draft Transfer Agreement is actually an agreement between JTS Properties and an unspecified lender. It provides that, upon default of the loan, JTS Properties will transfer an unspecified number (to be determined) of units of "Simms [FN16]" to the lender in full satisfaction for the note. Section 2, Risk Factors, states that **"These securities are highly speculative in nature, and Lenders in this offering face a substantial risk that they will lose all or part of their investments, or that their investments will generate an inadequate return."** It further states that Simms has no operating history and the membership units have restrictions on transfer and there may never be a market for them.

    FN15. This profit and loss statement is not accompanied by a balance sheet, or notes to describe the accounting method or any assumptions. It does not make any disclosures, and is not signed by anyone. The Defendant also did not disclose the source of this document in the e-mail or at trial.

    FN16. The term "Simms" is not defined in the document, but presumably is JTS Simms.

    *11 Defendant testified that when he showed up on the morning to execute documents, Plaintiff had different documents from those in the e-mail. Defendant questioned what documents he was signing, and claims that the members told him they were "the same thing." He further testified that when he signed the warranty deed (exhibit 3) the members told him

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3782065 (Bkrtcy.D.N.M.)
(Cite as: 2010 WL 3782065 (Bkrtcy.D.N.M.))

he was only transferring a one-half interest in the LLC.[FN17] When asked whether the deed transferred real estate rather than an LLC, he responded "That was not how it was explained to me." He stated that he only discovered that he had signed a deed about a month later when Plaintiff attempted to remove it from escrow in order to record it.

> FN17. He never clarified which LLC.

**C. Witness three.**

The third witness was Art Silva, a mortgage broker who finds loans for residential and commercial properties. Defendant informed Mr. Silva that he needed a short term loan and a refinance of a property that already has a mortgage. He then came to Mr. Silva's office with papers: personal and corporate financial statements, profit and loss statements, tax returns, appraisals, a game plan, pro formas, and rent rolls. Mr. Silva specifically recalled receiving both the personal and JTS Properties financial statements, and recalled giving both to the potential lenders. Mr. Silva also gave Defendant Mr. Steider's name as a potential lender and gave a copy of the packet[FN18] of documents to Mr. Steider. When Mr. Silva had no further contact with Defendant ninety days to six months later, he shredded his file.

> FN18. The "packet" itself, as a whole, does not appear in evidence. Nor do any tax returns, pro formas, game plans, or LLC financial statements.

**D. Witness four.**

The fourth witness was Timothy Steider, an attorney and member of Plaintiff. Mr. Steider was a real estate broker before law school and now practices real estate law in Albuquerque. He testified that Plaintiff was organized to invest in properties. Mr. Silva introduced Defendant to Plaintiff and gave Mr. Steider a loan packet. The members reviewed the packet and decided it was worth looking into. The terms were not good enough, however, because Defendant was offering to pledge shares in an LLC. Mr. Steider claimed that Plaintiff was simply not interested in shares. He also recalled receiving an e-mail with a share purchase agreement.

Mr. Steider did not recall receiving the e-mail in Exhibit F that contained the unit transfer agreement. He did recall seeing the document at the June 23

meeting. He testified "We told [Defendant] at the meeting we were not interested. We decided that if we could get an interest in the Simms Building it would be worth it."

When asked what was his understanding of the deal, he stated that it was "the Simms Building as collateral to guarantee a loan." He stated that the Plaintiff wanted "a real estate secured investment." When asked why Plaintiff was not interested in shares, he responded "we didn't know him or his company." He then testified that Defendant finally agreed to give a deed in escrow.

Mr. Steider next testified that there were specific discussions of Defendant's authority to execute a deed and that Defendant told them he could. Mr. Steider then testified that if Plaintiff had known that he was prohibited from signing a deed there would have been no loan.

**\*12** Mr. Steider testified that Defendant's personal financial statement had a large impact on the decision to lend. Although the financial statement showed $6.0 million out of a total $7.9 million net worth was in JTS Properties, he testified that the members did not single that asset out to look at or verify. The statement was obviously not professionally prepared and it fails to list any assumptions, notes, or disclosures.[FN19] Mr. Steider testified that it looked more like a summary of a financial statement as opposed to an actual financial statement because of its lack of detail.

> FN19. For example, the tax basis of assets is omitted and there is no deferred tax calculation if the assets were to be sold. Since most of the assets are depreciable real estate or LLC's heavily invested in depreciable real estate, this could be a significant number. "Accounting for deferred tax liability is in accordance with generally accepted accounting principles." _U.S. v. Hillard_, 31 F.3d 1509, 1511-12 (10th Cir.1994).

When asked why Defendant needed cash, Mr. Steider stated that Defendant claimed he needed it to stay current until a refinance of the property came through, that he had a lot of commitments but was cash poor, but he knew money was coming. He further testified that that seemed "viable" to the mem-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 11

Slip Copy, 2010 WL 3782065 (Bkrtcy.D.N.M.)
**(Cite as: 2010 WL 3782065 (Bkrtcy.D.N.M.))**

bers, and that they "understood."

Mr. Steider prepared the subject documents. When questioned why the wrong LLC appeared as the borrower on the promissory note, he testified that it didn't matter, the members believed they were all one and the same thing. He also testified that the deed was what the agreement required.

Mr. Steider testified that the members were satisfied with the package from the mortgage broker and assumed that Mr. Silva had done due diligence. He also testified that he saw an appraisal of the building at $12.8 million with approximately $6.5 owed on a mortgage, so believed that there was a large equity. He claimed that the Plaintiff offered to outright purchase one-half of the property for $250,000 instead of loaning the money, but Defendant refused.

When asked specifically what he relied on in deciding to approve the loan, he responded that he relied on 1) the documents [FN20], 2) the equity in the Simms Building, 3) "heavily" on the profit and loss statement [FN21], 4) Defendant's representations that the deal was "solid [FN22]", 5) Defendant's representation that he had a lot of real estate experience [FN23], 6) Defendant's honest appearance [FN24], and 7) Mr. Silva's representation that the refinance would occur in two weeks [FN25]. He reiterated that if he had known of the transfer restrictions he would not have agreed to the loan.

FN20. The questioning did not follow up on exactly which documents he relied. Earlier he testified that he relied on the personal financial statement. The actual loan documents would not have been drawn up before a decision was made to make the loan, so it could not have been those documents. It must have been the documents in the loan packet, only some of which are in evidence. Plaintiff did establish a question regarding an appraisal that was possibly altered, but specifically did not accuse Defendant of that act. And, Plaintiff has not pointed to anything else in the loan packet that was materially false.

FN21. The profit and loss statement was that of Simms Building, Inc., the prior owner of the building.

FN22. Defendant's representation that the deal was "solid" was an opinion. Opinions are not false representations of existing or prior facts. *Hodgin v. Conlin (In re Conlin), 294 B.R. 88, 100 (Bankr.D.Minn.2003)*(A debtor's representation that a transaction is safe or makes good financial sense is only an opinion, not a representation of fact actionable under section 523(a)(2)(A).) "Solid" in this context is a relative term. Solid compared to what? Solid based on what factors? *See* Restatement (Second) of Torts § 538A. "A representation is one of opinion if it expresses only (a) the belief of the maker, without certainty, as to the existence of a fact; or (b) his judgment as to quality, value, authenticity, or other matters of judgment." *Id.* cmt. b expands:

One common form of opinion is a statement of the maker's judgment as to quality, value, authenticity or similar matters as to which opinions may be expected to differ. Thus the statement that an automobile is a good car is a relative matter, depending entirely upon the standard set as to what is a good automobile and what is not, and it is a matter upon which individual judgments may be expected to differ. The maker of a statement of this nature will normally be understood as expressing only his own judgment and not as asserting anything concerning horsepower, riding qualities or any of the dozen other factors that would influence his judgment.

FN23. Defendant did have a lot of real estate experience. The testimony indicated that he had bought and sold over 50 houses. This representation appears true. If anything, generalized statements such as this appear to be mere puffing rather than a misrepresentation. *See, e.g., Alvine v. Keller (In re Keller), 72 B.R. 599, 602 (Bankr.M.D.Fla.1987)*(An alleged representation by defendants that their corporation enjoyed an excellent reputation in the community was merely puffing and not fraudulent.)(Decided pre-*Field* on clear and convincing evidence grounds, but that is not material to the point being cited.);

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3782065 (Bkrtcy.D.N.M.)
(Cite as: 2010 WL 3782065 (Bkrtcy.D.N.M.))

*see also* *Rezin v. Barr (In re Barr)*, 194 B.R. 1009, 1018 (Bankr.N.D.Ill.1996)(Marketing hyperbole is mere puffing.)

FN24. An honest appearance is not a statement by the Debtor and cannot be the basis for holding a debt nondischargeable.

FN25. The Court thinks that it takes a bit of a stretch to consider Mr. Silva as Defendant's "agent." However, even assuming he were and therefore his statements were attributable to Defendant, there was no proof that the statements regarding the expectation of the imminent refinance were untrue.

On cross examination, Mr. Steider testified that the members looked at the loan packet for an "hour or two." He also testified that they wanted a secured debt, not a debt guaranteed by Defendant. To ensure payment, they secured the loan with the Simms Building.

He further testified that no member reviewed the Silar mortgage before the loan closed. When asked if that were "uncautious" he responded that Mr. Silva had given him his due diligence and told them it was a refinancing in two weeks. When asked if the Silar mortgage was in the loan packet, he answered "probably was-probably some title work." No member had reviewed the mortgage because there was no time.

When questioned why Plaintiff did not require a personal guarantee after seeing the personal financial statement, Mr. Steider responded that the members "didn't know [Defendant] but we knew the Simms Building and were willing to take that."

## DEFENDANT'S MOTION TO DISMISS

*13 At the close of Plaintiff's case, Defendant moved to dismiss. After reviewing the testimony presented by Plaintiff and the arguments of the parties, and considering the relevant authorities, the Court finds that the Defendant's Motion is well taken and should be granted.

First, as to both dischargeability claims, Defendant argues that the loan document contains an integration clause that precludes the Plaintiff from argu-

ing it relied on anything extrinsic to the explicit statement in the document.

Next, Defendant makes several arguments specific to the "tort" claim (the section 523(a)(2)(A) claim). First, Defendant argues that there was no misrepresentation: Plaintiff bargained for either $75,000 in interest in 30 days or an escrowed deed to one-half of the Simms Building. Defendant asserts he complied by executing and escrowing a deed FN26, so there was no misrepresentation. Furthermore, Plaintiff in fact received exactly that for which it bargained. To the extent Defendant argued that Plaintiff suggested that statements regarding the refinance of the Simms Building were untrue, Plaintiff specifically admitted 1) that it was not arguing that the promises to pay were misrepresentations and 2) that Defendant really thought that the refinance would go through.

FN26. Plaintiff also argues that Defendant misrepresented the facts by failing to disclose that some contract with Silar (not in evidence) prohibited anyone from executing a deed or granting a junior lien on the Simms Building. The Court does not find this relevant. The fact that Defendant or one of his LLC's breached a contract with Silar does not impact on the validity of the deed that in fact was delivered to Plaintiff. *See Kokoricha v. Estate of Keiner*, 236 P.3d 41, 47, 2010 WL 2793780 at *6, 2010-NMCA-053 at ¶ 26, 148 N.M. 322 (N.M.App.2010)(Despite proof of fraud, a voidable deed passes good title to a bona fide purchaser.)(Citing *State ex rel State Tax Commission v. Garcia*, 77 N.M. 703, 709, 427 P.2d 230, 234-35 (1967)). *See also Security Federal Savings & Loan Ass'n of Albuquerque v. Commercial Investments, Ltd. (In re Commercial Investments, Ltd.)*, 99 B.R. 455, 459 (Bankr.D.N.M.1989)(Under New Mexico law, a bona fide purchaser for value takes free of defects that are unknown to the purchaser and not discoverable in the exercise of ordinary care.) Mr. Steider further testified that despite certain omissions in the deed, it was valid as written and sufficiently acknowledged to record.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3782065 (Bkrtcy.D.N.M.)
**(Cite as: 2010 WL 3782065 (Bkrtcy.D.N.M.))**

Plaintiff also raises certain obstructions that Defendant and his attorney created to hinder Plaintiff from removing the deed from escrow after default. These actions are not related to nor probative of fraud in the inception of the loan or the false financial statement.

Second, Defendant argues that Plaintiff did not prove justifiable reliance on anything Defendant did, said or omitted. Rather, he claims Plaintiff relied on Mr. Silva, the upcoming refinance of the Simms Building and the escrowed deed to a multimillion dollar property. Third, Defendant argues that any representations were unrelated to the actual loss, which was caused by the failure to refinance.

Finally, Defendant also makes several specific arguments regarding the false financial statement claim. First, Defendant argues that Plaintiff did not actually rely on the financial statement. The borrower was JTS Properties. Defendant urges that, if Plaintiff were truly relying on Defendant's personal financial statement as a source of funds for repayment, it would have insisted on a personal guarantee by Defendant. Plaintiff did not obtain a personal guarantee.

Second, Defendant argues that the financial statement is not one that a professional real estate investor would reasonably rely on. Third, Defendant argues that the fact that the loan was a "hard money loan" in itself proves Plaintiff was relying on the collateral more than any financial statement as a source of repayment. Fourth, Defendant argues that the financial statement was unrelated to the loss; the loss was caused by the failure to refinance, which was exactly the risk Plaintiff assumed.

*PLAINTIFF'S RESPONSE*

Plaintiff responds that its reliance need only be justifiable, and that in this case it was. Plaintiff consists of three individuals unsophisticated in large real estate transactions. Silva was Defendant's agent and approached them with a materially false financial package that induced their reliance and subsequent loss. Defendant's omission of facts relevant to transfer of ownership in the Simms Building was fraudulent, and Plaintiff would never have loaned the money had it known of the restrictions. It is true that the loan was a "hard money" loan, but that further justifies Plaintiff's reliance because of the "back-up security."

*DISCUSSION*

**\*14** To make out a prima facie case under a section 523(a)(2)(A) or 523(a)(2)(B) cause of action, the lender must prove each element of the appropriate cause of action by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Thus, the Court must grant the Debtor's motion for judgment on partial findings with respect to either of Plaintiff's objections to discharge of debt if it failed to prove any element of the appropriate objection by a preponderance of the evidence. *Palmacci v. Umpierrez (In re Umpierrez),* 121 F.3d 781, 787 (1st Cir.1997).

*A. The Integrated Contract Argument*

Defendant argues that the integration clause quoted above precludes Plaintiff's claims. This argument is logical and appealing. And, in fact, several bankruptcy and appellate courts have ruled this way, based on state law. *See Margaux Warren Park Partners, Ltd. v. GE Business Financial Services, Inc. (In re Margaux Warren Park Partners, Ltd.),* 2009 WL 5061806 at \*5 (Bankr.E.D.Tex.2009):

The existence of merger clauses both in the Loan Agreement and in the negotiating agreement bars all of Plaintiff's fraud claims as a matter of law.... These merger clauses are effective to bar all of Plaintiff's fraud claims because they were clear and unequivocal expressions of intent, by two sophisticated and knowledgeable parties, represented by counsel and dealing at arms length, to disclaim reliance on such alleged representations beyond the terms of the Loan Agreement and the negotiating agreement.

(Citations omitted) *and Hovis v. General Dynamics Corp. ( In re Marine Energy Systems Corp.),* 396 B.R. 895, 908-15 (D.S.C.2007), *aff'd,* 299 Fed. Appx. 222 (4th Cir.2008)(District Court examines "anti-reliance" provisions in a confidentiality agreement and asset purchase agreement and finds that under South Carolina law, New York law, and Delaware law, Plaintiff was not entitled to pursue fraud claims.)

In this instance, the merger clause is somewhat minimal, and it is certainly questionable whether in the context of the merger clause Plaintiff intended

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3782065 (Bkrtcy.D.N.M.)
(Cite as: 2010 WL 3782065 (Bkrtcy.D.N.M.))

that it be precluded from asserting fraud or reliance on any alleged fraud by Defendant. For example, Recital 2 of Plaintiff's Trial Exhibit 2 raises explicitly "potential misrepresentation or fraud" and contemplates the possibility of a subsequent action for that. Thus the language of the merger clause should probably not be construed as an "anti-reliance" provision, notwithstanding that it was Plaintiff's member that drafted the merger clause. This Court did not discover any New Mexico cases directly on point. *But see Wilburn v. Stewart*, 110 N.M. 268, 270, 794 P.2d 1197, 1199 (1990)("We ... hold that parol evidence is admissible to show any misrepresentation that induced the parties to contract, whether they are fraudulent, negligent, or innocent.") (Citation omitted.) Based on the rulings on Defendant's other arguments, however, it is not necessary for the Court to predict how New Mexico would rule on this argument at this time.

**B. The "Tort Claim", *section 523(a)(2)(A)*.**

    *15 The Court concludes that Plaintiff has not proved reliance, justifiable reliance or causation by a preponderance of the evidence. The section 523(a)(2)(A) claim will be dismissed.

**B1. *Reliance and Justifiable Reliance.***

    In *Field* the United States Supreme Court opined that section 523(a)(2)(A) was designed to deal with the common law torts of false pretenses, false representation, and fraud. *Field*, 516 U.S. at 69. Congress could have enumerated the elements of these causes of action but did not. *Id.* This suggests that Congress meant to incorporate the established common law meanings of these terms. *Id.* (citation omitted). The Court then looked to the Restatement (Second) of Torts (1976) ("Restatement") as definitive of the meanings:

        The section on point [in the Restatement] dealing with fraudulent misrepresentation states that both actual and "justifiable" reliance are required. [Restatement (Second) of Torts] § 537. The Restatement expounds upon justifiable reliance by explaining that a person is justified in relying on a representation of fact "although he might have ascertained the falsity of the representation had he made an investigation." *Id.,* § 540. Significantly for our purposes, the illustration is given of a seller of land who says it is free of encumbrances; according to the Restatement, a buyer's reliance on this

factual representation is justifiable, even if he could have "walk[ed] across the street to the office of the register of deeds in the courthouse" and easily have learned of an unsatisfied mortgage. *Id.,* § 540, Illustration 1.... Here a contrast between a justifiable and reasonable reliance is clear: "Although the plaintiff's reliance on the misrepresentation must be justifiable ... this does not mean that his conduct must conform to the standard of the reasonable man. Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *Id.,* § 545A, Comment b. Justifiability is not without some limits, however. As a comment to § 541 explains, a person is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation. Thus, if one induces another to buy a horse by representing it to be sound, the purchaser cannot recover even though the horse has but one eye, if the horse is shown to the purchaser before he buys it and the slightest inspection would have disclosed the defect. On the other hand, the rule stated in this Section applies only when the recipient of the misrepresentation is capable of appreciating its falsity at the time by the use of his senses.

*Id.* at 70-71. The Court then continued to examine the modern authorities on tort law:

    *16 Similarly, the edition of Prosser's Law of Torts available in 1978 (as well as its current successor) states that justifiable reliance is the standard applicable to a victim's conduct in cases of alleged misrepresentation and that "[i]t is only where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own." W. Prosser, Law of Torts § 108, p. 718 (4th ed.1971); (footnotes omitted); *accord,* W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 108, p. 752 (5th ed. 1984) (Prosser & Keeton). Prosser represents common-law authority as rejecting the reasonable person standard here, stating that "the matter seems to turn upon an individual standard of the plaintiff's own capacity and the knowledge which he has, or which may fairly be charged against him from the

Slip Copy, 2010 WL 3782065 (Bkrtcy.D.N.M.)
(Cite as: 2010 WL 3782065 (Bkrtcy.D.N.M.))

facts within his observation in the light of his individual case." Prosser, supra, § 108, at 717; *accord,* Prosser & Keeton, § 108, at 751[.]

*Id.* at 71-72. The Court ruled that for section 523(a)(2)(A) purposes a plaintiff must prove justifiable, but not reasonable, reliance. *Id.* at 74.

The Plaintiff is an LLC composed of three members that are intelligent, well educated, and very experienced in real estate matters. One is a real estate broker and real estate attorney. Plaintiff has experience in making loans for distressed properties owned by individuals under the extreme stress of the threat of losing their homes. Plaintiff should be held to this level of capacity, knowledge and sophistication.

First, the Court finds that Plaintiff did not actually rely on any representations by Defendant. Instead, it relied on either 1) the 360% [FN27] interest rate it demanded which was supported by everyones' expectation that the refinance would come through very shortly, or 2) the real possibility of a windfall return of one-half of the Simms Building. It was very clear to the Court that the only factors that were of any importance to Plaintiff were the value of the Simms Building, the building's ability to cash flow, and Plaintiff's ability to obtain a one-half interest. The two members that testified stated that they relied as little on Defendant as possible, they did not know him or his business, and they relied on "the deed."

> FN27. Calculated as follows: $75,000 interest / 30 days = $2,500 per day. $2,500 per day * 360 day year = $900,000 interest for one year. $900,000 interest / $250,000 principal = 3.6 = 360%. (In fact, this calculation significantly understates the interest rate, since the first advance of $100,000 was delivered two days after the execution of the documents on June 23 and the second advance of $150,000 was delivered six days after the execution of the documents .) The $30,000 for a 46-hour extension constituted a much higher interest rate. Rounding the 46 hours up to 48 for ease of calculation, $30,000 interest / 2 days = $15,000/day* 360 day year = 2,160% per annum.

Second, the Court finds that any reliance by Plaintiff would not have been justified under the circumstances. As the Supreme Court has explained, a duty to investigate can arise when the surrounding circumstances give rise to red flags that merit further investigation. *See Field,* 516 U.S. at 72. Thus, when the circumstances are such that they should warn a creditor that he is being deceived, he cannot justifiably rely on the fraudulent statements without further investigation. Considering Plaintiff's level of sophistication the following "red flags" should have been obvious:

*17 1. How is it conceivable that someone with a net worth of over $7 .9 million would be out in the alternative financing market trying to borrow money at a 360% interest rate?

2. If the Simms Building were truly worth $12.8 million, why would the previous owners have sold it to JTS Simms for only $7 million? Isn't an actual arms length sales price the best indication of value? If the building only had a $7 million value, and Plaintiffs knew that Silar had a $6.5 million mortgage, how could Plaintiff believe there was a huge equity?

3. Why would an experienced real estate investor with great net worth offer a warranty deed to a property (as opposed to only a lien interest) with a supposed net worth of several millions as security for a $250,000 loan?

4. Didn't the extreme time pressures to close the loan suggest to Plaintiff a certain desperation on Defendant's part? Plaintiff admits it knew neither the Defendant nor his business [FN28]. Wasn't Plaintiff curious of how and why Defendant's situation had deteriorated to this point?

> FN28. When a lender is sophisticated, the sums involved are significant, and lender has no history with borrower, the lender cannot justifiably rely on information only from the borrower. *Columbo Bank, FSB v. Sharp (In re Sharp),* 2007 WL 2898704 at *4 (Bankr.M.D.Md.2007), *subsequently aff'd,* 340 Fed. Appx. 899, 907 (4th Cir.2009). *Compare Johnson v. Riebesell (In re Riebesell),* 586 F.3d 782, 792 (10th Cir.2009)(It was justifiable for plaintiff to initially rely on debtor because he was a long-standing friend and client and plaintiff already trusted him. However, plaintiff was a competent

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3782065 (Bkrtcy.D.N.M.)
**(Cite as: 2010 WL 3782065 (Bkrtcy.D.N.M.))**

businessman who was aware that debtor's financial condition was declining, so further extensions of credit were not justifiable.) ("Even under the 'justifiable' test, however, the plaintiff must 'use his senses' and at least make 'a cursory examination or investigation' of the facts of the transaction before entering into it.")(Citing *Field*, 516 U.S. at 71.)

5. The Court finds it more likely than not that Plaintiff had the Silar mortgage in its possession before the loan closed. Plaintiff was not justified in relying on an assumption that Mr. Silva had read it and that Mr. Silva's reading of the Silva mortgage precluded Plaintiff's members from needing to read the mortgage themselves.

6. The deal was too good to be true.[FN29]

> FN29. *See Johnson v. Curtis (In re Curtis)*, 2006 WL 1506209 at *10 (Bankr.C.D.Ill.2006)(Promises of high returns-in this case 100% in 15 days-on investments that seem too good to be true usually turn out to be too good to be true.)(Citing *U.S. v. Frykholm*, 362 F.3d 413, 414 (7th Cir.), *cert. denied*, 543 U.S. 928, 125 S.Ct. 318, 160 L.Ed.2d 228 (2004)(Ponzi scheme)).

7. Why didn't Plaintiff take Defendant's word for it when he stated he was out of cash and could not pay his obligations without a 360% loan?

8. If Plaintiff believed Defendant's allegations of net worth why did it not insist on a personal guarantee?

9. Defendant sent an e-mail to Plaintiff that contained warnings that any ownership interest in or loan to JTS Simms might turn out to be worthless, the interests might not ever be transferrable, and that JTS Simms had no operating history.

In summary, the Court finds that Plaintiff 1) did not actually rely on any of Defendant's representations and 2) if it had, it would not have been justifiable.

**B2. *Loss Causation.***

One element of a section 523(a)(2)(A) claims is the proof that the debtor's representation *caused* the creditor to sustain a loss. *Young*, 91 F.3d at 1373.

As *Field* teaches, § 523(a)(2) requirements must be determined under common law tort principles. For this reason, a damage requirement is uniformly read into § 523(a)(2)(A), even though no express inclusion of such a requirement appears in the text of that Code section. We attribute the presence of the requirement that "resulting injury" proximately caused by alleged fraudulent conduct is included as a requirement in a § 523(a)(2)(A) claim to the fact that this is an element which is necessary for the proof of common law fraud generally.

*Woodstock Housing Corp. v. Johnson (In re Johnson)*, 242 B.R. 283, 292 (Bankr.E.D.Pa.1999). *See also Domann v. Vigil*, 261 F.3d 980, 984 (10th Cir.2001) ("[U]nder New Mexico law, proximate cause is a necessary element to any recovery in tort.") (Citation omitted.) *Accord Cain v. Champion Window Co. of Albuquerque, LLC*, 2007-NMCA-085, ¶ 25, 142 N.M. 209, 216, 164 P.3d 90, 97 (Ct.App.2007)(A defendant is liable for damages proximately caused by fraudulent misrepresentation.)(Citing UJI 13-1633 NMRA.)

**\*18** To prove fraud under the Restatement, a plaintiff must prove "proximate causation", which consists of both "causation in fact" and "legal causation." *See Gem Ravioli, Inc. v. Creta (In re Creta)*, 271 B.R. 214, 219 (1st Cir.BAP2002).

"Causation in fact" requires that the plaintiff's reliance on the misrepresentations be a "substantial factor in determining the course of the conduct that results in [the] loss." Restatement § 546.

[Section 546] is concerned with the question of whether the misrepresentation made by the defendant has caused the plaintiff's loss at all.

...

If the misrepresentation has not in fact been relied upon by the recipient in entering into a transaction in which he suffers pecuniary loss, the misrepresentation is not in fact a cause of the loss under the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3782065 (Bkrtcy.D.N.M.)
(Cite as: 2010 WL 3782065 (Bkrtcy.D.N.M.))

rule stated in this Section. If the misrepresentation has in fact induced the recipient to enter into the transaction, there is causation in fact of the loss suffered in the transaction; and the question becomes one of whether the loss is of a kind for which the maker is legally responsible.

*Id.,* cmt. a.

"A fraudulent misrepresentation is a legal cause of a pecuniary loss resulting from action or inaction in reliance upon it if, but only if, the loss might reasonably be expected to result from the reliance." *Id.* § 548A.

Not all losses that in fact result from the reliance are, however, legally caused by the representation. In general, the misrepresentation is a legal cause only of those pecuniary losses that are within the foreseeable risk of harm that it creates.

...

Pecuniary losses that could not reasonably be expected to result from the misrepresentation are, in general, not legally caused by it and are beyond the scope of the maker's liability. This means that the matter misrepresented must be considered in the light of its tendency to cause those losses and the likelihood that they will follow.

*Id.,* cmts. a and b.

The distinction between these two types of causation is found in *Liebowitz v. Great American Group, Inc. (In re Goldblatt's Bargain Stores, Inc.), 559 F.3d 644, 647 (7th Cir.2009).* In *Goldblatt's* the Debtor entered into an agreement with Great American Group ("GAG") to purchase inventory from two stores it was closing. It was keeping four other stores open. Under the agreement, GAG would buy the inventory for a percentage of Debtor's cost. An independent inventory service would then value the inventory and, if GAG had overpaid, it would be entitled to a refund of the overpaid amount. LaSalle Bank, debtor's lender, approved. *Goldblatt's, 559 F.3d at 646.* Before the transaction closed, for unstated reasons, Debtor transferred an additional $450,000 of inventory to the two stores that were to be closed. GAG knew of this transfer but did not in-

form LaSalle. *Id.*

Later, Debtor decided to close its remaining stores and entered the same agreement with GAG. Again LaSalle consented and also agreed to reimburse GAG if it overpaid. The inventory service determined that the inventory was worth $2 million less than represented. GAG sought a refund of approximately $1 million from LaSalle. LaSalle refused to pay on its indemnification claiming that GAG had committed fraud. *Id.*

**\*19** The bankruptcy court found that GAG had a duty to reveal the inventory transfer. *Id.* Its silence constituted fraud. *Id.* at 647. But, the bankruptcy court also concluded that LaSalle would not have acted any differently had it known of the transfer. And, it concluded that LaSalle did not prove any loss from the fact that the inventory was transferred. *Id.* The bankruptcy court entered a $1.09 million judgment against LaSalle in favor of GAG.

LaSalle appealed. The district court reversed, finding that the fraud excused LaSalle's performance. *Id.*

The Court of Appeals for the Seventh Circuit reversed the district court and remanded for reinstatement of the bankruptcy court's judgment. It ruled as follows:

A legal remedy, whether rescission or damages, does not follow automatically from the existence of a false statement or material omission. There must be reliance, which is often called transaction causation, and injury, which is often called loss causation. *See Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005).* (*Dura Pharmaceuticals* was decided under federal securities law, but Illinois and most other states also follow this approach.) *See, e.g., Oliveira v. Amoco Oil Co., 201 Ill.2d 134, 267 Ill.Dec. 14, 776 N.E.2d 151 (2002); Restatement (Second) of Torts §§ 525, 546, 548A.)* The bankruptcy judge found that LaSalle Bank had not demonstrated either transaction causation or loss causation. It tried to show reliance by contending that it would have insisted that Goldblatt's use a different liquidator had it known that Great American Group had failed to reveal a material fact. The bankruptcy judge did not believe this, however, remarking that the evi-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3782065 (Bkrtcy.D.N.M.)
(Cite as: 2010 WL 3782065 (Bkrtcy.D.N.M.))

dence did not establish that any other firm would have offered the Bank better terms-and the Bank's obligations to its own investors demanded that it take the best deal available. LaSalle Bank did not even try to establish loss causation: It did not contend that the omission had anything to do with the sum that Great American Group wanted to recover, or that the movement of inventory among stores reduced the aggregate price received from the two sales to Great American Group.

*Id.* at 648-49.

Another example of "loss causation" is found in the Seventh Circuit securities fraud case [FN30] of *Bastian v. Petren Resources Corp.*, 892 F.2d 680 (7th Cir.), *cert. denied*, 496 U.S. 906, 110 S.Ct. 2590, 110 L.Ed.2d 270 (1990). "In 1981 the plaintiffs invested $600,000 in oil and gas limited partnerships promoted by the defendants. The plaintiffs allege that, had it not been for the offering memoranda's misrepresentations and misleading omissions concerning the defendants' competence and integrity, the plaintiffs would not have invested in these partnerships, which by 1984 were worthless." *Id.* at 682. The district court dismissed for failure to allege "loss causation."

>   FN30. The Seventh Circuit commented that "loss causation" is the same standard common law fraud rule borrowed for use in securities fraud cases. *Bastian*, 892 F.2d at 683-84. It is an instance of the common law's requirement that a tort plaintiff prove causation. *Id.* "No hurt, no tort." *Id.* (Citation omitted.) Since a securities law analysis of loss causation is based on common law, that analysis should apply equally to common law, non-securities law cases.

The Seventh Circuit described Plaintiff's argument as follows:

>   **\*20** The plaintiffs argue that they should not be required to allege that, but for the circumstances that the fraud concealed, the investment that they were induced by the fraud to make would not have lost its value. They say it should be enough to allege that they would not have invested but for the fraud; for if they had not invested, they would not have lost their money, and the fraud was therefore the cause of their loss. They say they have no idea why

their investment was wiped out and it does not matter; the defendants, being responsible for the disaster by having used fraud to induce the investment, must not be allowed to get off scot-free just because the plaintiffs do not know how the investment would have fared in the marketplace had the facts about the defendants' competence and integrity been as represented. As a fallback position the plaintiffs argue that the defendants should have the burden of proving what part (if any) of the loss would have occurred even if the defendants had been as competent and honest as represented.

*Id.* at 683. The Court commented on plaintiff's arguments:

>   The plaintiffs alleged that they invested in the defendants' limited partnerships because of the defendants' misrepresentations, and that their investment was wiped out. But they suggest no reason why the investment was wiped out. They have alleged the cause of their entering into the transaction in which they lost money but not the cause of the transaction's turning out to be a losing one.

*Id.* at 684. The court rejected the arguments:

>   If the plaintiffs would have lost their investment regardless of the fraud, any award of damages to them would be a windfall.

>   ...

>   "Loss causation" is an exotic name-perhaps an unhappy one, for the standard rule of tort law that the plaintiff must allege and prove that, but for the defendant's wrongdoing, the plaintiff would not have incurred the harm of which he complains. Like a stock-market crash, the collapse of oil prices in the early 1980s reverberated throughout the economy. Since the United States is a net importer of oil, the reverberations were for the most part good ones. But there were some losers. No social purpose would be served by encouraging everyone who suffers an investment loss because of an unanticipated change in market conditions to pick through offering memoranda with a fine-tooth comb in the hope of uncovering a misrepresentation. Defrauders are a bad lot and should be punished, but Rule 10b-5 does not make them insurers against national economic calamities. If the defendants' oil and gas ventures failed not because of the personal shortcomings that the defendants con-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3782065 (Bkrtcy.D.N.M.)
(Cite as: 2010 WL 3782065 (Bkrtcy.D.N.M.))

cealed but because of industry-wide phenomena that destroyed all or most such ventures, then the plaintiffs, given their demonstrated desire to invest in such ventures, lost nothing by reason of the defendants' fraud and have no claim to damages.

*Id.* at 684-85. (Citations omitted.) The Seventh Circuit affirmed dismissal of the case.

**\*21** The two cases discussed above indicate that a Plaintiff must demonstrate a direct link between the misrepresentation and the actual damages suffered. "But for" causation alone is not enough. *See, e.g., U.S. v. St. Louis University,* 336 F.3d 294, 302 (4th Cir.), *cert. denied,* 540 U.S. 1050, 124 S.Ct. 839, 157 L.Ed.2d 700 (2003)(SLU's claim against the government requires evidence of proximate cause in addition to evidence of but-for causation.) *See also Citibank, N.A. v. K-H Corp.,* 968 F.2d 1489, 1496-97 (2nd Cir.1992):

Citibank argues that under New York law, proximate causation is satisfactorily pleaded in a suit for common law fraud by a lender, when the lender alleges that (a) it would not have financed a transaction but-for the alleged misrepresentation, and (b) the financing was not repaid.

...

We agree with the district court, however, that Citibank did not adequately allege that the damages it suffered were proximately caused by the alleged misrepresentations of Fruehauf and Kelsey-Hayes, and that the fourth amended complaint failed to allege adequately a causal connection between the non-disclosure of the promissory note and the subsequent decline in the value of the securities pledged by Stoecker and GAIL as collateral to Citibank.

*and Parker v. Grant (In re Grant),* 237 B.R. 97, 118 (Bankr.E.D.Va.1999)(A doctor's representation that he was married, made in order to obtain a lease, was not a causal connection to later physical damages and lost rents. "The damages complained of rather appear to be the result of causes wholly unrelated to the misrepresentation of marital status."); *and Kaufman v. Vamvakaris (In re Vamvakaris),* 197 B.R. 228, 230 (Bankr.E.D.Va.1996)(A debtor's misrepresentation that he had insurance was not the proximate

cause of plaintiff's loss, which was theft.) *Compare Hemi Group, LLC v. City of New York, N.Y.,* --- U.S. ----, 130 S.Ct. 983, 989, --- L.Ed.2d ---- (2010)(RICO case):

[T]o state a claim under civil RICO, the plaintiff is required to show that a RICO predicate offense "not only was a 'but for' cause of his injury, but was the proximate cause as well." [ *Holmes v. Securities Investor Protection Corporation,* 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992),] at 268, 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532. Proximate cause for RICO purposes, we made clear, should be evaluated in light of its common-law foundations; proximate cause thus requires "some direct relation between the injury asserted and the injurious conduct alleged." *Ibid.* A link that is "too remote," "purely contingent," or "indirec[t]" is insufficient. *Id.,* at 271, 274, 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532.

In the case before the Court, Plaintiff has adequately proved why it loaned the money, but has completely failed to prove how any misrepresentations caused its loss. Plaintiff was aware of the high risk nature of the transaction, but nevertheless proceeded with it. The Court finds that Plaintiff's loss was caused by the foreclosure of the Simms Building and not by any representation made to it. Therefore, the Section 523(a)(2)(A) claim will be dismissed.

### C. False Financial Statement, *section 523(a)(2)(B).*

**\*22** The Court concludes that Plaintiff has not proved actual or reasonable reliance on the financial statement by a preponderance of the evidence. As discussed above, the Court found that Plaintiff did not actually rely on anything represented by Defendant. This also includes the personal financial statement. Furthermore, the "red flags" discussed above apply equally to the section 523(a)(2)(B) claim. *See First Nat'l Bank v. Cribbs (In re Cribbs),* 327 B.R. 668, 675 (10th Cir.BAP2005), *aff'd,* 2006 WL 1875366 (10th Cir.2006)(Unpublished opinion.)(The court found no reasonable reliance. "Despite obvious inconsistencies" in financial statement the bank made no investigation. "A creditor has a responsibility to ensure there exists some basis for reliance on the debtor's representations.") (Citation omitted.)

There is another red flag concerning the personal financial statement as well. Mr. McKinnon testified that he knew the financial statement was out of date

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3782065 (Bkrtcy.D.N.M.)
**(Cite as: 2010 WL 3782065 (Bkrtcy.D.N.M.))**

and that Defendant no longer had any cash. Defendant had also told them he was out of cash, unable to pay his debts timely and was relying on the refinancing of an asset that he did not even own (JTS Simms owned the Property) to get him out of the bad situation in which he found himself. This suggests big trouble. Furthermore, even a cursory review of the financial statement would show that there were no other sources of liquidity to repay debts. Any reliance by Plaintiff would not have been reasonable.

Since Plaintiff could not establish actual or justifiable reliance it cannot prove reasonable reliance, a higher standard, on the same evidence. The Section 523(a)(2)(B) claim will also be dismissed.

**CONCLUSION**

From an overall perspective, it is quite clear that Plaintiff's members viewed this proposal as an opportunity that had virtually no downside. At worst, if Defendant performed, Plaintiff would earn a 30% return on its $250,000 within 30 days, or a 42% return within almost 32 days. At best, Defendant would default and Plaintiff would obtain perhaps $3 million of equity in the well known Simms Building for a mere $250,000. It was the latter prospect in particular that dazzled Plaintiff's members and had them planning on where the offices for themselves and new tenants would be located in the building-part of what they characterized as "due diligence"-after they had committed the funds and advanced the first $100,000. Indeed, Plaintiff's Trial Exhibit 2, the agreement, is written almost as if Plaintiff was already a part owner of the building. And this was why as well the members did not record the transaction with the Bernalillo County Clerk's office, why they sent the letter to Silar asserting they did not hold a lien on the Property (Defendants' trial exhibit R), why the documentation did not reflect the $7 million mortgage lien of Silar, and perhaps why they overlooked the fact that the promissory note was from JTS Properties rather than JTS Simms. Plaintiff's members were not neophytes, nor, to their credit, did they claim to be. Whatever reliance the members in reality placed on Defendant's representations, it fell far below anything that would support a ruling of justifiable or reasonable reliance on the statements of Troy Baillio.

**\*23** For all of the reasons stated, the Court will grant Defendant's oral motion to dismiss pursuant to Rule 52(c) and dismiss this adversary proceeding by

separate Order.

Bkrtcy.D.N.M.,2010.
In re Baillio
Slip Copy, 2010 WL 3782065 (Bkrtcy.D.N.M.)

END OF DOCUMENT

# **<u>EXHIBIT 4</u>**

Westlaw.

245 Fed.Appx. 161, 2007 WL 2249064 (C.A.3 (N.J.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 245 Fed.Appx. 161, 2007 WL 2249064 (C.A.3 (N.J.)))

**H** This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Third Circuit LAR, App. I, IOP 5.7. (Find CTA3 App. I, IOP 5.7)

United States Court of Appeals,
Third Circuit.
PROFESSIONAL CLEANING AND INNOVATIVE
BUILDING SERVICES, INC., Appellant,
v.
KENNEDY FUNDING, INC.

No. 06-1405.
Submitted Under Third Circuit LAR 34.1(a) March 29, 2007.
Filed: Aug. 7, 2007.

**Background:** Purchaser of commercial property sued a lender which denied financing for the purchase, asserting claims for violation of the New Jersey Consumer Fraud Act (NJCFA), as well as state law claims for unconscionability, breach of the covenant of good faith and fair dealing, and breach of contract. The United States District Court for the District of New Jersey, William J. Martini, J., denied the purchaser's motion to file an amended complaint, and the purchaser appealed.

**Holding:** The Court of Appeals, Chagares, Circuit Judge, held that the amended complaint stated a claim under the NJCFA and for common law fraud.

Ordered accordingly.

West Headnotes

**[1] Antitrust and Trade Regulation 29T ⬤⟳358**

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and Consumer Protection
      29TIII(E) Enforcement and Remedies
         29TIII(E)5 Actions
           29Tk356 Pleading
              29Tk358 k. Particular Cases. Most Cited Cases

Purchaser of commercial property stated a claim under the New Jersey Consumer Fraud Act (NJCFA) against a lender who allegedly required a $54,000 non-refundable fee even before appraisal of the property which was to serve as security for a loan, then refused to return the fee when, despite knowing of the purchaser's need for $1,800,000, the lender offered a loan amounting to much less; the lender allegedly knew prior to accepting the fee that if it applied its "as is market value" formula to the property, it would not be able to offer the financing the purchaser sought. N.J.S.A. 56:8-2.

**[2] Banks and Banking 52 ⬤⟳100**

52 Banks and Banking
   52III Functions and Dealings
      52III(A) Banking Franchises and Powers, and Their Exercise in General
         52k100 k. Torts. Most Cited Cases

Purchaser of commercial property stated a common-law fraud claim under New Jersey law against lender who allegedly misrepresented the meaning of its "as is market value" formula to induce purchaser into signing the contract in order to extract a non-refundable commitment fee; lender allegedly knew prior to accepting the fee that if it applied its "as is market value" formula to the property which was to serve as security for the loan, it would not be able to offer the financing the purchaser required for the purchase.

**\*162** On Appeal From the United States District Court for the District of New Jersey (No. 05-cv-02384), District Judge: Honorable William J. Martini. Jill A. Lazare, Short Hills, NJ, for Appellant.

Jordan B. Deflora, Hackensack, NJ, for Appellee.

Before: RENDELL, BARRY and CHAGARES, Cir-

245 Fed.Appx. 161, 2007 WL 2249064 (C.A.3 (N.J.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 245 Fed.Appx. 161, 2007 WL 2249064 (C.A.3 (N.J.)))

cuit Judges.

OPINION OF THE COURT
CHAGARES, Circuit Judge.
**1 This case comes before us with a tortured procedural history that requires some explanation, though we assume the parties' familiarity with the factual and legal background. Plaintiff-appellant Professional Cleaning and Innovative Building Services, Inc. ("Professional") appeals from the District Court's order of December 30, 2005, which affirmed the Magistrate Judge's order of September 27, 2005 refusing to reconsider the order of August 29, 2005, which denied Professional's motion to file an amended complaint.[FN1] We conclude that the District Court erred in *163 reasoning that the proposed amended complaint failed to sufficiently plead a claim for common-law fraud and a claim under the New Jersey Consumer Fraud Act ("NJCFA"), N.J. Stat. Ann. § 56:8-1 et seq., providing the possibility for punitive or treble damages.[FN2] Reversal of this aspect of the District Court's order is therefore required. We will, however, affirm the Court's decision with respect to Professional's claim for breach of the covenant of good faith and fair dealing. We will remand for further proceedings consistent with this opinion.

FN1. Professional's appeal challenges what is effectively the denial of its motion to amend the complaint. Professional did not appeal the District Court's order of August 11, 2005, which granted defendant's motion to dismiss the complaint for lack of subject matter jurisdiction. Appeal from this order is not before us. However, because subject matter jurisdiction cannot be waived, we have an independent obligation to satisfy that jurisdiction exists. We conclude that the proposed amended complaint cures any jurisdictional defects that may have been present in the original complaint.

FN2. Punitive damages can be aggregated with compensatory damages to arrive at the amount in controversy requirement. See Golden ex rel. Golden v. Golden, 382 F.3d 348, 355 (3d Cir.2004) ("Claims for punitive damages may be aggregated with claims for compensatory damages unless the former are patently frivolous and without founda-

tion.... If appropriately made, therefore, a request for punitive damages will generally satisfy the amount in controversy requirement because it cannot be stated to a legal certainty that the value of plaintiff's claim is below the statutory minimum."). We have also previously held that treble damages may be included when calculating the amount in controversy for the purpose of subject matter jurisdiction if it appears that the plaintiff is not precluded to a legal certainty from recovering under the NJCFA. Suber v. Chrysler Corp., 104 F.3d 578, 587 (3d Cir.1997). Furthermore, when state law provides for the recovery of attorneys' fees by a successful plaintiff, those fees must be considered in calculating the jurisdictional amount in controversy. Id. at 585 (citing Missouri State Life Ins. Co. v. Jones, 290 U.S. 199, 202, 54 S.Ct. 133, 78 L.Ed. 267 (1933)).

I.

Professional is a Missouri corporation with its principal place of business in Kansas City, Missouri, in the business of purchasing, leasing, and maintaining commercial property. Professional sought financing in order to purchase commercial property in Kansas. The terms of the deal required a quick closing. Defendant-appellee Kennedy Funding, Inc. ("Kennedy") is a corporation organized and existing under the laws of the State of New Jersey. Kennedy's principal place of business is in Hackensack, New Jersey. Kennedy is a "hard-money" lender [FN3] that provides financing to companies with time-sensitive needs.

FN3. A hard-money lender is one that lends money as a last resort to borrowers who cannot get loans from other mainstream institutions because of severe time constraints or other reasons, such as lack of acceptable credit. See, e.g., Gary W. Eldred, Make Money with Fixer-Uppers & Renovations 255-57 (2003).

The relationship between Professional and Kennedy soured after it became clear to Professional that, despite expressly discussing the need for a $1,800,000 loan collateralized by the Kansas property which Professional estimated would appraise at $3,100,000 and, despite paying a non-refundable

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

245 Fed.Appx. 161, 2007 WL 2249064 (C.A.3 (N.J.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 245 Fed.Appx. 161, 2007 WL 2249064 (C.A.3 (N.J.)))

commitment fee of $54,000 prior to the appraisal of the Kansas property, Professional was not going to get the amount of financing it needed for the Kansas property-or its fee returned.

On May 5, 2005, Professional filed this diversity action against Kennedy. The complaint alleged a violation of the NJCFA, as well as state law claims for unconscionability, breach of the covenant of good faith and fair dealing, and breach of contract. Professional claimed damages of approximately $65,000 [FN4] plus attorneys' fees and costs. Additionally, Professional sought treble damages under the NJCFA, which provides that "[i]n any action under this section the court *shall,* in addition to any other appropriate legal or equitable *164 relief, award threefold the damages sustained by any person in interest. In all actions under this section, including those brought by the Attorney General, the court *shall* also award reasonable attorneys' fees, filing fees and reasonable costs of suit." N.J. Stat. Ann. § 56:8-19 (emphasis added).

> FN4. Damages included a $54,000 non-refundable commitment fee, $5,000 for legal fees paid to Kennedy for the loan preparation, and a total of $6,000 for appraisal fees.

**2 Kennedy moved to dismiss the complaint for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1). Kennedy's sole argument was that Professional failed to meet the amount in controversy requirement for jurisdiction because the loan commitment agreement contained a limitation of damages clause which limited any recovery to the amount of the commitment fee, here $54,000. Professional responded that Kennedy's contractual limitation-of-liability clause is not enforceable because Kennedy's allegedly fraudulent and unconscionable practices violate the NJCFA.

On August 11, 2005, the District Court ruled in favor of Kennedy and dismissed the Complaint for lack of jurisdiction. The Court stated, "Since plaintiff has insufficiently pled a cause of action under the [NJ]CFA, the limitation on damages clause remains in effect and it appears to a legal certainty that no recovery in excess of the jurisdictional amount is possible." 5a. The Court concluded that Professional had not made a sufficient showing of any unlawful conduct on the part of Kennedy, reasoning that both

parties were commercial entities and that the loan commitment agreement was clear and unambiguous.

On August 24, 2005, Professional moved under Fed.R.Civ.P. 59(e) to set aside the August 11, 2005 order and to amend the complaint, pursuant to Fed.R.Civ.P. 15(a). Professional's proposed amended complaint contained further allegations in support of its NJCFA claim as well as new claims including common-law fraud and unjust enrichment. Professional claimed that Kennedy was liable for punitive damages under the common-law fraud claim. The motion was summarily dismissed on August 29, 2005. Although no reason was given for the dismissal, it appears that the Magistrate Judge mistakenly considered the motion as having been filed after the requisite ten-day time period had passed. However, pursuant to Fed.R.Civ.P. 6(a), it is clear that the motion was timely filed.

On September 9, 2005, Professional filed a motion for reconsideration of the August 29, 2005 order denying its motion to amend. Kennedy opposed the motion. On September 27, 2005, the Magistrate Judge denied the motion for reconsideration stating, "Plaintiff has failed to demonstrate that Rule 59(e) is [the] appropriate vehicle to reallege jurisdictional facts after [the] complaint [was] dismissed for lack thereof." 10a.

On October 11, 2005, Professional appealed the Magistrate Judge's order denying reconsideration. The District Court held a hearing on December 14, 2005. On January 3, 2006, the District Court entered an order in which it correctly concluded that the September 27, 2005 order was contrary to applicable law. However, the District Court affirmed the decision to deny the motion to amend based alternatively on consideration of futility. The Court held that

> Professional's proposed amended complaint fails to remedy the deficiencies found in the original complaint. It has not sufficiently stated a case under the CJA [sic] or common law fraud nor has it alleged any other cause of action that would entitled it to recover in excess of $75,000. As such, this Court finds to a legal certainty that Professional cannot recover in excess of the jurisdictional amount, and that this Court cannot assert subject matter jurisdiction over this matter.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

245 Fed.Appx. 161, 2007 WL 2249064 (C.A.3 (N.J.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 245 Fed.Appx. 161, 2007 WL 2249064 (C.A.3 (N.J.)))

*165 **3 (16a.) On January 26, 2006, Professional filed a timely appeal to this Court.

## II.

We review the District Court's denial of a motion for leave to amend a complaint for abuse of discretion. *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 280 (3d Cir.2004) (citing *Cureton v. Nat'l Collegiate Athletic Ass'n, 252 F.3d 267, 272 (3d Cir.2001)*). Leave to amend a pleading "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). Liberality is the keystone of Rule 15(a). Allowing amendments in order to correct deficiencies in pleadings furthers one of the basic objectives of the federal rules-the determination of cases on their merits. "[U]nder the liberal pleading philosophy of the federal rules as incorporated in Rule 15(a), an amendment should be allowed whenever there has not been undue delay, bad faith on the part of the plaintiff, or prejudice to the defendant as a result of the delay." *Adams v. Gould Inc., 739 F.2d 858, 867-68 (3d Cir.1984)*.

[1] Futility is another basis for denying a motion to amend, *Alvin v. Suzuki, 227 F.3d 107, 121 (3d Cir.2000)*, and the one applied by the District Court in this instance. "An amendment is futile if the amended complaint would not survive a motion to dismiss for failure to state a claim upon which relief could be granted." *Id.* "[I]f a claim is vulnerable to dismissal under Rule 12(b)(6), but the plaintiff moves to amend, leave to amend generally must be granted unless the amendment would not cure the deficiency." *Shane v. Fauver, 213 F.3d 113, 115 (3d Cir.2000)*. Here, the District Court ruled that the proposed amended complaint was futile because Professional "failed to allege misrepresentation, deception, or any other conduct by Kennedy that might support a claim of common law fraud or a violation of the [NJ]CFA." 15a. We discuss each claim seriatim.[FN5]

FN5. We agree with the District Court's ruling regarding Professional's claim for breach of the covenant of good faith and fair dealing. Accordingly, we conclude that the District Court did not abuse its discretion in denying the motion to amend as to this cause of action.

The elements of a cause of action under the NJCFA are (1) unlawful conduct by the defendant;

(2) an ascertainable loss by the plaintiff; and (3) a causal relationship between the unlawful conduct and the loss. *Carton v. Choice Point, 482 F.Supp.2d 533, 535 (D.N.J.2007)* (citing *Cox v. Sears Roebuck & Co., 138 N.J. 2, 24, 647 A.2d 454 (1994)*). The NJCFA defines an "unlawful practice" broadly as:

The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby....

N.J. Stat. Ann. § 56:8-2. "Courts have emphasized that like most remedial legislation, the [NJCFA] should be construed liberally in favor of consumers." *Cox, 138 N.J. at 15, 647 A.2d 454*. The conduct specified in the NJCFA as amounting to an unlawful practice is disjunctive. *Id.* at 19, 647 A.2d 454. Therefore, "[p]roof of any one of those acts or omissions or of a violation of a regulation will be sufficient to establish unlawful conduct under the Act." *Id.*

*166 **4 In the proposed amended complaint, Professional alleged that Kennedy engaged in an unconscionable commercial practice when it required the $54,000 non-refundable fee even before appraisal of the property and then refused to return the fee when, despite knowing of Professional's need for $1,800,000, Kennedy offered a loan amounting to much less. Professional alleges that Kennedy made misrepresentations and knowingly concealed, suppressed or omitted material facts when, during an initial conference call, Kennedy stated that it would loan Professional 60% of the *appraised value* of the property which Professional told Kennedy it estimated to be $3,100,000. Kennedy allegedly did not explain that the loan would be based on a different formula which would reduce the appraised value of the property by approximately 20% to arrive at the "as is market value," which Kennedy would then further reduce by 40% to arrive at its loan amount. Even our rough calculation reveals that reducing an appraisal of $3,100,000 by 20% to arrive at the "as is

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

245 Fed.Appx. 161, 2007 WL 2249064 (C.A.3 (N.J.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 245 Fed.Appx. 161, 2007 WL 2249064 (C.A.3 (N.J.)))

market value" would not yield the necessary $1,800,000 in financing. In fact, the loan would be short by over $300,000. Professional claims that Kennedy knew at the time of this conversation that if it applied its "as is market value" formula to Professional's property, it would not be able to offer the financing Professional sought.

The proposed amended complaint further states that it was not until Professional's CEO, Brenda Wood, received the loan commitment papers that she discovered that the formula for the loan was different than her earlier expectation. She alleges that she contacted Kennedy by telephone to inquire into the meaning of "as is market value," which is nebulously defined in the contract as "a three (3) to four (4) month sale to a cash buyer." 51a. Ms. Wood claims that Kennedy verbally assured her that Professional would get the funding it needed. Relying on Kennedy's assurances, Professional wired the $54,000 commitment fee plus an additional $10,000 to cover the preparation of the loan, as well as $5,000 in legal fees and $6,000 in appraisal fees paid directly to Kennedy. We hold that these allegations are sufficient to state an NJCFA claim under the liberal standard applied to a motion to amend.

[2] We reach a similar conclusion regarding the common-law fraud claim. The elements of common-law fraud are: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." _Gennari v. Weichert Co. Realtors,_ 148 N.J. 582, 610, 691 A.2d 350 (1997) (citing _Jewish Ctr. of Sussex County v. Whale,_ 86 N.J. 619, 624-25, 432 A.2d 521 (1981)). As with the NJCFA claim, the District Court determined that Professional "failed to allege misrepresentation, deception, or any other conduct by Kennedy that might support a claim of common law fraud." 15a.

**5 "In all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b). Here, the proposed amended complaint alleges with sufficient particularity that Kennedy misrepresented the meaning of the "as is market value" formula to induce Professional into signing

the contract in order to extract from Professional its non-refundable commitment fee. The averments supporting the common-law fraud claim overlap with those supporting the NJCFA claim, but we reiterate them nonetheless. Professional claims Kennedy knew of its urgent need to raise *167 $1,800,000 and that Professional sought to collateralize the loan with property it estimated would appraise for $3,100,000. Professional claims that during a conference call with Kennedy, Kennedy stated that it would loan Professional 60% of the appraised value of the Property. Professional contends that there was no mention of any alternative valuation formula during this conversation. According to Professional, Kennedy must have known at this point that, under its "as is market value" formula, it would not offer Professional the necessary $1,800,000. Finally, Professional alleges that it contacted Kennedy with questions about the "as is market value" formula prior to sending the $54,000 commitment fee and was assured by Kennedy that Professional would get the funding it needed. Professional claims it relied on these assurances to proceed with the loan process, including sending its non-refundable commitment fee payment.

Kennedy posits a number of arguments in defense, among them, that the contract was clear and unambiguous as to the valuation formula to be applied and that the parties were sophisticated business entities who engaged in arm's-length negotiations. In fact, the District Court held that the contract "was clear, unambiguous, and laid out clearly the terms of the loan." 13a. But, on a motion to amend, the Court applies the same standard of legal sufficiency as exists under Rule 12(b)(6). _Shane,_ 213 F.3d at 115. Thus, we look only at whether the plaintiff's allegations, taken as true, state a claim upon which relief may be granted. We have concluded they do. It is besides the point, at this procedural posture, whether the contract was clear or not. Upon inquiring into the meaning of "as is market value," Professional was allegedly told not to worry, the financing it needed would be forthcoming. Professional pursued the loan based on this assurance. Professional alleges that "[d]espite [Kennedy's] failure to share the formula for calculating the 'as is' market value, Volpe, Inc.'s Evaluation reveals that there is a 20% discount applied to calculate a value for a 'cash sale to a buyer in 90 to 120 days' value." 23a. But, Volpe's appraisal was not presented to Professional until _after_ it had paid the $54,000 fee and costs. Thus, Professional claims that in response to its question asking Ken-

245 Fed.Appx. 161, 2007 WL 2249064 (C.A.3 (N.J.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 245 Fed.Appx. 161, 2007 WL 2249064 (C.A.3 (N.J.)))

nedy for its valuation formula *before* sending the commitment fee, a signal that the contract was not so clear, Kennedy intentionally misrepresented to Professional that it would get its needed financing so as to collect the non-refundable fee. The fact that Kennedy offered to loan Professional $1,458,000 also misses the point. Kennedy was aware that Professional urgently needed $1,800,000 to close on the property it wished to purchase. A loan for less would have been meaningless to Professional, who had turned to Kennedy as a lender of last resort. Professional is alleging what amounts to a bait-and-switch scheme. Under these circumstances, it was an abuse of discretion not to allow Professional to amend its complaint.

**6 Finally, the contract contains a limitation-of-liability clause, limiting damages to the $54,000 commitment fee. It was on this basis that the District Court dismissed the action for lack of subject matter jurisdiction; that being, a failure to allege the necessary amount in controversy under 28 U.S.C. § 1332. The District Court held that the limitation-of-liability clause was enforceable because Professional failed to plead a cause of action under the NJCFA or common-law fraud.

In New Jersey, parties to a contract may agree to limit their liability as long as the limitation does not violate public policy. *Mayfair Fabrics v. Henley,* 48 N.J. 483, 487, 226 A.2d 602 (1967). The law is well-settled that fraud, be it common law *168 or statutory, provides a basis for rescinding a contract. *See First Am. Title Ins. Co. v. Lawson,* 177 N.J. 125, 136, 827 A.2d 230 (2003); Restatement (Second) Contracts § 164 ("If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient."). If Professional were deceived into entering the contract by Kennedy's alleged misrepresentations and omissions, Kennedy "could not rely on the protection of the limitation of liability provision contained in the [contract]." *Wärtsilä NSD North Am. Inc. v. Hill Int'l Inc.,* 342 F.Supp.2d 267, 289, 290 (D.N.J.2004) ("[A]s the Fraud count will go to the jury, the Court cannot dispose of the Breach of Contract claim based on the limitation-of-liability clause contained in the agreement."); *see also Valhal Corp. v. Sullivan Assocs., Inc.,* 44 F.3d 195, 203-04 (3d Cir.1995) (dismissing for want of jurisdiction after

deciding that a limitation-of-liability clause capped damages at less than the jurisdictional amount in controversy, but noting that the limitation-of-liability clause would not be enforceable if the damage were caused by willful, malicious, or wanton conduct); *accord Normand v. Orkin Exterminating Co.,* 193 F.3d 908, 910-11 (7th Cir.1999) (where claim is premised on malicious misrepresentation, "[i]t is doubtful that a contractual limitation of liability would be held to be a bar to fraud ... and it might conceivably support a judgment for consequential or even punitive damages, notwithstanding the limitation of liability") (internal citations omitted); *Turkish v. Kasenetz,* 27 F.3d 23, 27-28 (2d Cir.1994) ("It is well settled that parties cannot use contractual limitation of liability clauses to shield themselves from liability for their own fraudulent conduct.") (citation omitted). We have concluded that Professional's proposed amended complaint states claims for fraud under the NJCFA and the common law. If Professional ultimately prevails on these claims, the limitation-of-liability clause in the contract will not afford Kennedy protection. Thus, at this stage of the proceedings, it would be premature to apply the limitation-of-liability clause to preclude federal jurisdiction.

III.

**7 We conclude that the District Court erred in denying Professional's motion to amend the complaint as it relates to the NJCFA and common-law fraud claims. The proposed amended complaint also contained claims for breach of contract, unconscionability, and unjust enrichment. The District Court did not address these claims in its order of December 30, 2005. Therefore we consider them included in the amended pleading. The District Court did not abuse its discretion in denying the motion to amend as to the claim for breach of the covenant of good faith and fair dealing. We remand to the District Court for further proceedings consistent with this opinion.

C.A.3 (N.J.),2007.
Professional Cleaning and Innovative Bldg. Services, Inc. v. Kennedy Funding, Inc.
245 Fed.Appx. 161, 2007 WL 2249064 (C.A.3 (N.J.))

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.