Not Reported in F.Supp.2d, 2009 WL 2488316 (D.N.J.)
(Cite as: 2009 WL 2488316 (D.N.J.))

partnership in this case was unique does not mean the fiduciary duties are disregarded. (Pls.' Opp'n 24.) Defendants reply that, even if the Court were to accept plaintiffs' breach of fiduciary duty theory, defendants' damages are implausible because defendants stood to profit 99% of the value of the property and consequently had no incentive to devalue the Property, the sole partnership asset. (Defs.' Reply 12.)

Accepting the allegations as true and making all reasonable inferences that follow from such allegations, plaintiffs entered into a partnership with defendants by transferring 99% of the equity in Waterford LP to defendants (See First Am. Compl. ¶ 24.) Defendants then owed plaintiffs a fiduciary duty not to prefer their own interests over those of plaintiffs. Although the pleadings are not a model of clarity, plaintiffs allegations, (See First Am. Compl. ¶ 48 (alleging transfer of an interest in a partnership to defendants and a breach of fiduciary duty).), are sufficient to put defendants on notice as to plaintiffs' claims, all that is required of plaintiffs to defeat this motion. See Fed.R.Civ.P. 8(a).

Defendants attach significance to plaintiffs' purported default but plaintiffs have alleged that the defendants agreed to this forbearance. (See First Am. Compl. ¶ 27.) In any event, whether plaintiff defaulted and, whether, upon such default, defendants could, consistent with their fiduciary duty, renegotiate the underlying lease and sell the property in secret are questions of fact, inappropriate to resolve at this stage. Defendants, in concluding that plaintiffs' allegations are implausible in light of their 99% interest in the partnership, fail to observe that the interests of a lender will often differ from those of a borrower. It is easy to imagine that a lender would be primarily concerned with ensuring that the outstanding principal balance was covered, even where the lender and borrower have adopted a novel structure for the loan that might allow the lender to profit from a higher sale price. The lender may not be familiar with the business of leasing commercial real estate but may be more comfortable with the business of lending money. As a result, the lender might be primarily concerned with receiving the principal owed on the loan earlier rather than a higher sale price later. At the very least, it is not implausible that defendants acted contrary to the interests of plaintiffs in selling at a price lower than market value but greater than the amount then outstanding on the second mortgage

loan. Defendants' motion to dismiss Count 6 is denied.

*9. Waste and Mismanagement*

*16 Count 7 alleges that "[b]y virtue of defendants' renegotiation of the Lease before its expiration at a below-market rent, and subsequent sale to a third-party purchaser at a below-market price, the [d]efendants wasted the only asset of Waterford LP to the detriment of [p]laintiffs." (First Am. Compl. ¶ 52, p. 10.)

a. *Discussion*

Plaintiffs attempt to clarify their waste theory in their opposition brief by stating that "this transaction may be viewed as a partnership which was controlled solely by Defendants. In this context, Defendants ... took self serving actions, modifying the lease so as to reduce the rent and selling the Property at less than its fair market value, which decimated the value of the partnership asset, the Property." (Pls.' Opp'n 24.) Plaintiffs did not, however, cite any law in support of its waste and mismanagement claim, leaving the Court to hypothesize as to what plaintiffs actually allege was wasted. Although it appears that plaintiffs claims waste and mismanagement of the assets of the partnership by defendants, the details remain unclear. Accordingly, Count 7 is dismissed with leave to amend. Plaintiffs amended pleading shall be specific as to which property is involved in its waste claim, which of the defendants caused the waste and which of the plaintiffs suffered damages therefrom.

*10. CFA*

At Count 8 plaintiffs allege that the conduct of defendants constitutes "unconscionable commercial practices in connection with the sale of merchandise in violation of the [New Jersey Consumer Fraud Act.]" (First Am. Compl. ¶¶ 56, p. 11.)

a. *Standard*

The purpose of the New Jersey Consumer Fraud Act (the "CFA") is "to 'eliminat [e] sharp practices and dealings in the marketing of merchandise and real estate.' " *Lee v. First Union Nat'l Bank,* 199 N.J. 251, 971 A.2d 1054 (2009) (quoting *Channel Cos. v. Britton,* 167 N.J.Super. 417, 418, 400 A.2d 1221 (App.Div.1979)). The New Jersey Consumer Fraud Act ("CFA") prohibits

[t]he act, use or employment by any person of any

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2488316 (D.N.J.)
(Cite as: 2009 WL 2488316 (D.N.J.))

unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate ...

N.J. Stat. Ann. § 56:8-2. A party who suffers an "ascertainable loss" from a violation of the CFA may recover treble damages, costs and attorneys fees. *See id.* § 56-8:19. For purposes of the CFA, "merchandise" is defined broadly to include "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale." *Id.* § 56-8:1. The term "advertisement" includes

the attempt directly or indirectly by publication, dissemination, solicitation, indorsement or circulation or in any other way to induce directly or indirectly any person to enter or not enter into any obligation or acquire any title or interest in any merchandise or to increase the consumption thereof or to make any loan.

*17 *Id.*

Certain types of transactions are specifically excluded from CFA protection, including the sale of equity interests, *see Waterloov Gutter Protection Systems Co., Inc. v. Absolute Gutter Protection, L .L.C.,* 64 F.Supp.2d 398 (D.N.J.1999), and the sale of securities and services provided in connection with the sale of securities. *See Lee,* 199 N.J. at 263, 971 A.2d 1054; *see also Stella v. Dean Witter Reynolds, Inc.,* 241 N.J.Super. 55, 75, 574 A.2d 468, 478 (1990); *Bramblewood Investors, Ltd. v. C & G Assoc.,* 262 N.J.Super. 96, 109 n. 6, 619 A.2d 1332 (Law Div.1992).

In order to advance its purposes the CFA is to be interpreted "liberally in favor of consumers." *Lee,* 199 N.J. at 257, 971 A.2d 1054 (internal citations omitted). However, the New Jersey Supreme Court has acknowledged "a need to place reasonable limits upon the operation of the CFA despite broad statutory language, so that its enforcement properly reflects legislative intent, however ascertained." *Id.* at 263, 971 A.2d 1054 (internal quotations omitted). Courts in this District have observed that "[t]he entire thrust of the [CFA] is 'pointed to products and services sold to consumers in the popular sense.' "

*Bracco Diagnostics,* 226 F.Supp.2d at 561 (quoting *Neveroski v. Blair,* 141 N.J.Super. 365, 378, 358 A.2d 473, 480 (App.Div.1976)); *see also Arc Networks, Inc. v. Gold Phone Card Co.,* 333 N.J.Super. 587, 756 A.2d 636 (Sup.Ct.2000) (quoting *Marascio v. Campanella,* 298 N.J.Super. 491, 499, 689 A.2d 852 (App.Div.1997)).

A key inquiry is whether a CFA plaintiff diminished or destroyed the value of the good at issue. As example, in *Arc Networks,* a telephone card retailer, Gold Phone, sued a telephone company, Arc Networks, which had agreed to provide telephone services to purchasers of Gold Phone's phone cards. The *Arc Networks* court held that the telephone services that Gold Phone purchased from Arc were not available to the general public and that the transaction did not have the characteristics of a "consumer transaction." *Arc Networks,* 756 A.2d at 637. The Arc *Networks* court analogized the scenario to the facts of *City Check Cashing,* when a check cashing service brought suit under the CFA, claiming that when it borrowed funds from a bank it was in effect buying cash for resale to its check cashing customers. *See City Check Cashing, Inc. v. National State Bank,* 244 N.J.Super. 304, 582 A.2d 809 (App.Div.1990). The *City Check Cashing* court reasoned that the check cashing service did not diminish or destroy the value of the cash and, therefore, the service was not a "consumer" for purposes of the CFA. *See City Check Cashing,* 582 A.2d at 811. According to the *Arc Networks* court, Gold Phone similarly did not diminish the value of the phone services and, as a result, did not benefit from protection under the CFA. *See Arc Networks,* 756 A.2d at 639.

b. *Discussion*

Defendants argue generally that plaintiffs, as sophisticated real estate investors should not be protected by the CFA. Specifically, defendants insist that the CFA does not apply for three reasons: (i) transfers of partnership interests are considered sales of securities and outside the scope of the CFA; (ii) mortgages are not a sale of real estate under the CFA;[FN8] and (iii) plaintiffs are not "consumers" for purposes of the CFA. Plaintiffs argue that this was not a sale of securities but an equitable mortgage, (*See* Pls.' Opp'n 26-27.), and that courts tend to hold that one cannot determine if there was an equitable mortgage in a summary fashion. (*See id.* at 28 n. 1, 756 A.2d 636.) In an attempt to cast themselves as common consumers of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2488316 (D.N.J.)
**(Cite as: 2009 WL 2488316 (D.N.J.))**

credit, plaintiffs go so far as to cite Wikipedia [FN9] for analogy of the alleged agreement to those conducted by pawn shops. (*Id.* at 28. 756 A.2d 636.) Finally, plaintiffs argue that even if it were a sale of securities it would still be covered by the CFA because the sale of securities was incidental. (*Id.* at 29, 756 A.2d 636.)

> FN8. Defendants rely on *Westervelt v. Gateway Financial Service,* 190 N.J.Super. 615, 625, 464 A.2d 1203, 1208 (Ch.Div.1983) for the proposition that a mortgage is not covered by the CFA. Although plaintiffs argue that the statute the *Westervelt* court relied upon was repealed, such statute was merely revised and reenacted. *See* N.J. Stat. Ann. § 17:11C-1 et seq.

> FN9. Plaintiffs do not provide a URL for their quotation from Wikipedia. A search of Wikipedia for their quotation does return an entry with the provided quote. *See* Pawn-broker-Wikipedia, the free encyclopedia, http://en.wikipedia.org/wiki/Pawnbroker.

**\*18** As an initial matter, this transaction is not excluded from the protection of the CFA simply because the parties are sophisticated. *See Naporano Iron & Metal Co. v. American Crane Corp.,* 79 F.Supp.2d 494, 509 (D.N.J.1999). Whether plaintiffs are consumers of credit turns not on their sophistication but on the nature of the transaction. *See Hundred East Credit Corp. v. Schuster Corp.,* 515 A.2d at 248. Nor are plaintiffs excluded on the basis of analogy to the *City Check Cashing* plaintiffs, who lent money they purchased from the defendant bank to their customers. *See* 244 N.J.Super. 304, 582 A.2d 809. In this case, plaintiffs used the proceeds of the second mortgage financing to purchase the Property. That they then lease space in the Property to their customers does not mean that they have not consumed the financing.

If the Court were to consider this a sale of real estate, as plaintiffs insist, the CFA would apply because it expressly covers sales of real estate. *See* N.J. Stat. Ann. § 56:8-2. However, a mortgage is not a "sale" of real estate for purposes of the CFA. *See Westervelt v. Gateway Financial Service,* 190 N.J.Super. 615, 625, 464 A.2d 1203, 1208 (Ch.Div.1983). Moreover, plaintiffs do not plead that the transaction was a sale of real estate. (*See* First

Am. Compl. ¶ 56, p. 11 (alleging "unconscionable commercial practices in connection with the sale of *merchandise"* ) (emphasis added).) Because plaintiffs allege that the transaction was "an effort to create a mortgage on the Property," the transaction was not a sale of real estate. (*Id.* ¶ 26, 464 A.2d 1203.) If plaintiffs are to be protected by the CFA, something in the transaction must be "merchandise" for purposes of the CFA and only two items were transferred between plaintiffs and defendants: the partnership interests in the entity that purchased the Property transferred by plaintiffs to defendants, (*Id.* ¶ 24, 464 A.2d 1203.), and the second mortgage financing provided by defendants to plaintiffs. (*Id.* ¶ 22-23, 464 A.2d 1203.)

Defendants try to cast the transaction as a sale of partnership interests, relying on language from *Westervelt.* If the Court were to view the transaction as a sale of partnership interests, the CFA would not apply. [FN10] *See Lee,* 199 N.J. at 263, 971 A.2d 1054. The *Westervelt* plaintiffs had been forced to purchase term life insurance in connection with a second mortgage and later sought to void the agreement, alleging this so-called "loan packing" violated the CFA. *See Westervelt,* 464 A.2d at 1204-1205. The *Westervelt* court concluded that the CFA did not apply for several reasons. First, the mortgage was more significantly a "security transaction" than a conveyance of real estate. Second, second mortgages were governed by a more specific statute, the Secondary Loan Mortgage Act. *See id.* at 1208; N.J. Stat. Ann. § 17:11A-34 et seq. (repealed by N.J. Stat. Ann. § 17:11C-1 et seq.) And, third, the respective remedies and means of enforcement of the Secondary Loan Mortgage Act conflicted with the CFA. *See id.* For these reasons the *Westervelt* court dismissed the CFA claims.[FN11] *See id.* at 1208-1209.

> FN10. In their opposition brief, plaintiffs rely upon the Appellate Division's opinion in *Lee v. First Union National Bank,* 402 N.J.Super. 346, 954 A.2d 499, 2008 N.J.Super. LEXIS 187 (App.Div.2008) for the proposition that "misrepresentations concerning the performance of financial services are covered by the CFA, even if the financial services relate to the purchase of a security." (Pls .' Opp'n 29.) The New Jersey Supreme Court recently reversed the Appellate Division and rejected this view, holding

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2488316 (D.N.J.)
(Cite as: 2009 WL 2488316 (D.N.J.))

that the CFA does not govern the sale of securities, nor services related to the sale of securities. See *Lee.,* 199 N.J. at 263, 971 A.2d 1054.

FN11. Despite plaintiffs' assertions that the Secondary Mortgage Loan Act was repealed, the statute was reworked as the New Jersey Licensed Lenders Act. See N.J. Stat. § 17:11C-1 et seq. (2009). The statutory provisions of the reworked act conflict with the provisions of the CFA in the same way that the provisions of the predecessor Secondary Mortgage Loan Act differed. Thus, if the New Jersey Licensed Lenders Act applied to the transaction in this case and this Court accepted the *Westervelt* court's reasoning, the CFA would not apply. However, the New Jersey Licensed Lenders Act applies only to "loans ... secured in whole or in part by a lien upon any interest in real property ... subject to one or more prior mortgage liens and on which there is erected a structure containing one, two, three, four, five or six dwelling units ..." N.J. Stat. § 17:11C-2 (2009). The complaint contains no allegation that the Property contained dwelling units. Moreover, the loan in this case, which was secured by partnership interests in an entity that owned a commercial property, can be distinguished from the loan at issue in *Westervelt,* which was secured by the *Westervelt* plaintiffs' home. See *Westervelt,* 464 A.2d at 1205. Neither party has alerted the Court to a statute that governs the transaction at issue and thereby could support analogous reasoning. Absent such a showing, the Court concludes that the *Westervelt* holding that the CFA does not apply to second mortgage is based on facts not presented by plaintiffs' complaint.

*19 Notwithstanding the *Westervelt* court's use of the phrase "security transaction," for purposes of the CFA, the transfer of partnership interests as security for a loan does not convert a transaction into a sale of securities, any more than the mortgage of property converts a transaction into a sale of real estate. See *Westervelt,* 190 N.J.Super. at 1208. The second mortgage financing was neither a sale of securities, clearly outside the protection of the CFA, nor a

sale of real estate, clearly covered by the CFA.

The Court finds most apt plaintiffs' characterization of the transaction in their opposition "that they purchased ... the use of money from defendants." (Pls.' Opp'n 30.) Consumer credit is clearly covered by the CFA. The New Jersey Supreme Court has concluded that the "[CFA] definition of 'merchandise' as 'anything offered, directly or indirectly to the public for sale' is more than sufficiently broad to include the sale of credit" and held that, by its terms, the CFA "appl[ies] to the offering, sale, or provision of consumer credit." *Lemelledo v. Benefit Mgmt. Corp.,* 150 N.J. 255, 265, 696 A.2d 546 (1997) (internal citations omitted). The *Lemelledo* court did not expound as to the scope of "consumer credit." It is not clear that "consumer credit" means any and all forms of financing provided in all contexts.

There are three reasons the Court believes that the scope of credit transactions governed by the CFA must be limited to consumer credit "in the popular sense." See *Bracco Diagnostics,* 226 F.Supp.2d at 561. First, as noted earlier, the New Jersey Supreme Court has acknowledged "a need to place reasonable limits upon the operation of the CFA despite broad statutory language, so that its enforcement properly reflects legislative intent, however ascertained." *Lee.* 199 N.J. at 263, 971 A.2d 1054. In this vein, the Third Circuit concluded that "the entire thrust of the Consumer Fraud Act is pointed to products and services sold to consumers in the popular sense." *J & R Ice Cream Corp. v. California Smoothie Licensing Corp.,* 31 F.3d 1259, 1272 (3d Cir.1994) (quoting *Neveroski,* 141 N.J.Super. at 378, 358 A.2d at 480). The *Neveroski* court provided additional context for this thrust in observing that

Such consumers purchase products from retail sellers of merchandise consisting of personal property of all kinds or contract for services of various types brought to their attention by advertising or other sales techniques. The legislative language throughout the statute and the evils sought to be eliminated point to an intent to protect the consumer in the context of the ordinary meaning of that term in the market place

*Neveroski,* 141 N.J.Super. at 378, 358 A.2d at 480. Although many forms of credit would fit this definition without significant contortions, more com-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 2488316 (D.N.J.)
(Cite as: 2009 WL 2488316 (D.N.J.))

plex credit arrangements would not be so easily analogized.

Second, in several circumstances courts have found that the CFA did not apply to particular transactions even though other transactions involving those goods or services might fall under CFA protection. *See, e.g., City Check Cashing, Inc. v. National State Bank,* 244 N.J.Super. 304, 582 A.2d 809 (check cashing service was not a "consumer" of cash it borrowed from bank because it did not diminish the value of cash before passing it on to its customers); *BOC Group, Inc. v. Lummus Crest, Inc.,* 251 N.J.Super. 271, 597 A.2d 1109 (Law Div.1990) (purchaser of experimental petroleum refining concept was not a "consumer" of "merchandise"); *J & R Ice Cream,* 31 F.3d at 1273 (CFA is not applicable to sale of restaurant franchise); *but see Kavky v. Herbalife Intern. of America,* 359 N.J.Super. 497, 820 A.2d 677 (App.Div.2003) (disagreeing with *J & R Ice Cream* to the extent it announced a blanket exclusion from the CFA of sales of businesses but approving of exclusion of franchise sales from CFA protection because such transactions were covered by a separate statute); *A.H. Meyers & Co. v. CNA Ins. Co.,* 88 Fed. Appx. 495 (3d Cir.2004) (concluding that agreement between insurer and insurance agent was indistinguishable from franchise agreement and, applying *J & R Ice Cream,* holding the CFA inapplicable); *Bracco Diagnostics,* 226 F.Supp.2d at 561 (CFA is not applicable to accounting, inventory and chargeback processing services provided incidentally to wholesaling agreement that was not governed by the CFA).

*20 Third, the Court is not convinced that the New Jersey Supreme Court would conclude that the CFA was applicable to this type of transaction. The New Jersey Supreme Court did rule that, under certain circumstances "merchandise ... appl[ies] to the offering, sale, or provision of consumer credit." *Lemelledo,* 150 N.J. at 265, 696 A.2d 546 (internal citations omitted). The *Lemelledo* court pointed to the advertisement provisions of the CFA which include in the definition of advertisement, "attempts ... to induce directly or indirectly any person to ... to make any loan ." *Id.* (citing N.J. Stat. Ann. § 56:8-1(a). This conclusion was additionally grounded on the reading, by a court in this District, of cases applying the consumer fraud statutes of other states to provisions of credit. *See id.* (citing *Tuxedo Beach Club*

*Corp. v. City Federal Sav. Bank,* 749 F.Supp. 635, 649 n. 13 (D.N.J.1990) (citing *Le Sage v. Norwest Bank Calhoun-Isles, N.A.,* 409 N.W.2d 536 (Minn.Ct.App.1987) (investment contract); *Mid-America Nat'l Bank v. First Sav. & Loan Ass'n,* 161 Ill.App.3d 531, 113 Ill.Dec. 367, 515 N.E.2d 176 (Ill.App.Ct.1987) (residential mortgages); *Madsen v. Western Am. Mortgage Co.,* 143 Ariz. 614, 694 P.2d 1228 (1985) (residential mortgages))). The Court does not read *Lemelledo* to suggest that "consumer credit" includes all extensions of credit because the types of credit involved in these cases were of the type typically offered to the consumer and because, although the language of the CFA clearly establishes that the CFA applies to certain types of credit, it does not establish that it applies to all provisions of credit.

Imposing CFA liability in this case would not serve the purposes of the CFA because the second mortgage financing, where the parties engage in extensive negotiations unique to a particular property and craft a novel financing structure involving the transfer of partnership interests as security, does not reflect "the ordinary meaning of the consumer in the marketplace." *See J & R Ice Cream,* 31 F.3d at 1273. Similar to the franchise agreement in *J & R Ice Cream* and the agency agreement in *A.H. Meyers,* the transaction in this case was not a consumer good or service and was not covered by the CFA. *See id.* at 1274; *A.H. Meyers,* 88 Fed. Appx. at 500.

Defendants' motion to dismiss Count 8 is granted. Count 8 is dismissed with prejudice.

**CONCLUSION**

In sum, defendants' motion to dismiss is granted in part and denied in part: Defendants' motion to dismiss with regard to Count 4 and Count 6 is denied. Count 3, Count 5 and Count 8 are dismissed with prejudice as to all defendants. Count 1, Count 2 and Count 7 are dismissed without prejudice, with leave to file an amended pleading consistent with this Opinion. With respect only to plaintiff USLR, Counts 6 and 7 are dismissed with prejudice. Plaintiff Waterford LP is dismissed without prejudice, with leave to amend consistent with this Opinion. Defendant Waterford LLC is dismissed without prejudice, pending service of process.

D.N.J.,2009.
U.S. Land Resources, LP v. JDI Realty LLC

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 18

Not Reported in F.Supp.2d, 2009 WL 2488316 (D.N.J.)
(Cite as: 2009 WL 2488316 (D.N.J.))

Not Reported in F.Supp.2d, 2009 WL 2488316
(D.N.J.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

# **EXHIBIT 12**

Westlaw.

Not Reported in A.2d, 2010 WL 3075578 (N.J.Super.A.D.)
**(Cite as: 2010 WL 3075578 (N.J.Super.A.D.))**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of New Jersey,
Appellate Division.
Raymond R. FERRELL and Lissa Jean Ferrell, Plain-
tiffs-Appellants,
v.
AMERICA'S DREAM HOMES, INC., a New Jersey
Corporation, Paul R. Debellis, and Paul R. Debellis,
Jr., Defendants-Respondents,
and
America's Dream Homes, Inc., Defendant/Third-
Party Plaintiff,
v.
PAC Contracting Company, Third-Party Defendant.

Argued March 15, 2010.
Decided Aug. 4, 2010.

West KeySummary**Fraud 184** 🔑 **35**

**184** Fraud
    **184II** Actions
        **184II(A)** Rights of Action and Defenses
            **184k35** k. Waiver of Right of Action. Most
Cited Cases
    Homeowners who learned of a price increase re-
garding the construction of a retaining wall prior to
executing the contract, had ample opportunity during
an attorney review period to ascertain whether the
increase was reasonable, and presented no competent
evidence suggesting that contractors misrepresented
the cost of the wall waived their fraud claims with
respect to the price increase.

On appeal from the Superior Court of New Jersey,
Law Division, Essex County, Docket No. L-792-04.
Jan Alan Brody argued the cause for appellants
(Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart &
Olstein, attorneys; Mr. Brody and G. Glennon Trou-
blefield, of counsel and on the brief).

Thomas P. Scrivo argued the cause for respondents

(McElroy, Deutsch, Mulvaney & Carpenter, attor-
neys; Mr. Scrivo, of counsel; Michael C. Delaney, on
the brief).

Before Judges RODRÍGUEZ, YANNOTTI and
CHAMBERS.

PER CURIAM.
    *1 Plaintiffs Raymond R. Ferrell (Raymond) and
Lissa Jean Ferrell (Lissa) appeal several summary
judgment orders that dismissed their complaint
against defendants Paul DeBellis (Paul), Paul DeBel-
lis, Jr. (Junior), and America's Dream Homes, Inc.
(ADH). We affirm.

    These are the pertinent facts, viewed in the light
most favorable to plaintiffs. *Brill v. Guardian Life
Ins. Co. of Am.,* 142 N.J. 520, 523, 666 A.2d 146
(1995). Plaintiffs, who were looking for a new home,
viewed property in the Highwood Park Estates devel-
opment in West Orange. Highwood Park was "built
into a mountain," meaning that many of the yards
dropped off down the mountainside. Junior spent
time walking the site with plaintiffs, who later asked
if it would be possible for something to be done to
"make their yard more usable." To accommodate
plaintiff's request, Junior spoke to the head of ADH's
construction division, who said that a retaining wall
was necessary to enlarge the usable space.

    Eventually, plaintiffs signed a contract to pur-
chase the home for $495,595, including a $50,000
"lot premium." Junior explained that the premium
"had nothing to do with the location or the square
footage of the lot. It strictly had to do with building
the retaining wall." Section 14.1 of the contract con-
cerned the issue of merger, stating that the "deed of
conveyances shall constitute [the] final and complete
agreement between [ADH] and [plaintiffs], and all
rights of the parties shall merge in [the] deed." Sec-
tion 17.1 provided that ADH would not be liable for
any damages plaintiffs might incur as a result of a
delay in closing, which was estimated to occur on
June 30, 2000. However, should issuance of the cer-
tificate of occupancy take longer than 180 days after
the estimated closing date, plaintiffs could receive a
full refund and void the contract. In accordance with
Section 18.1, the contract and attached exhibits con-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2010 WL 3075578 (N.J.Super.A.D.)
(Cite as: 2010 WL 3075578 (N.J.Super.A.D.))

stituted the "entire and only agreement" between plaintiffs and ADH. Any change to the agreement had to be written, signed by both parties, dated, and subject to attorney review.

Defendants' attorney wrote a letter to plaintiffs' attorney, informing him that the $50,000 was "exclusively for the retaining wall "behind the proposed home and that plaintiffs could "consult with the site engineer and/or their architect to confirm the information on the retaining wall cost apportionment." ADH was required to ensure that properties in the development had no greater than a 2:1 slope, subject to approval by West Orange. Shortly thereafter, Junior sent a letter to plaintiffs, enclosing a site plan of their property, labeled "Exhibit A1," and confirming that ADH's "architectural department designed [the] home on the property to allow for the most usable land area." Raymond signed the letter and Exhibit A1, which showed the 2:1 slope commencing just beyond the end of the deck and patio and running to a line of trees and the retaining wall at the back of the property. On a later date, he signed a drawing labeled "Exhibit A," which depicted the site plan, a front elevation of the home, and floor plans. The site plan showed a hand-drawn chain link fence bordering the retaining wall. Junior wrote to plaintiffs confirming and approving Exhibits A and A1. He represented that their home would be constructed in accordance with the drawings, and that the "retaining wall [would] be constructed based on Exhibit A1 specifications."

*2 Plaintiffs wrote back to Junior in part to "express [their] concern and expectations regarding the backyard of the property." They stated that July 28, 2000, was the "drop dead date" for closing on their new home because the sale of their old home was to close on the same date. Junior responded that, due to difficulties in obtaining cabinets, the estimated closing date would be August 21, 2000, and that grading of the backyard would be completed "in accordance with Schedule A."

Plaintiffs objected to the August 21 closing date, claiming that Junior had verbally agreed to the July 28 date and never informed them of the delay until this letter. They stated that they "relied materially" on their agreement for a July 28 closing. Plaintiffs agreed to postpone the closing until no later than August 15, 2000, after which they would "hold [defendants] liable for any and all damages sustained." Plaintiffs also complained that defendants' "failure to follow-up with our requests to meet at the site to discuss the discrepancies between the retaining wall as agreed to in Exhibit A-1 and as currently and incompletely constructed." They stated that defendants' commitment to construct the wall as per Exhibit A was inadequate and insisted that they "agree[d] to purchase this property based upon the level yard size represented to us." Plaintiffs further stressed that they would "seek to enforce this agreement."

In response, Paul referred plaintiffs to Section 3.1 of their contract, which stated that the original closing date of June 30 was an estimate and which required plaintiffs "to accept the deed and pay consideration" on the date of completion. With respect to the retaining wall, Paul wrote:

> [It] had to be designed by us and approved by the Town of West Orange. The wall that is currently built is exactly what was allowed by the City Engineering Department. Your concern should not be the size or shape of the wall but the fact that we are committed to giving you the exact yard area as specified in your Schedule "A".

Given plaintiffs' apparent dissatisfaction, Paul offered to "consider returning [their] deposit and voiding the contract, provided a decision is made immediately."

In subsequent letters, plaintiffs responded that August 15, 2000 was the "[t]ime is of the essence closing date." They requested a copy of the grading report and noted that they had no concern whatsoever regarding the size, shape or aesthetics of the retaining wall. Their concern was that "the wall be constructed as per our expectations diagramed in Exhibit 1." They asserted that "the wall as is does not conform." "Qualified experts" told them that the wall was unsafe. However, they stated in several letters that they wished to continue with the purchase.

Defendants' lawyer advised plaintiffs that "the wall that was built meets the Contract and Municipal requirements" and "[t]here will be no escrows and based on [plaintiffs] threats of litigation they will be required to execute a General Release to [defendants], which will except usual punch list items and items covered by the Home Owner's Warranty."

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2010 WL 3075578 (N.J.Super.A.D.)
(Cite as: 2010 WL 3075578 (N.J.Super.A.D.))

Plaintiffs' counsel responded that plaintiffs had "solid information" that the wall was noncompliant and that they were overcharged for it. Plaintiffs refused to sign a release and insisted that closing occur within ten days. The exchange of letters continued.

**\*3** In August 2000, defendants declared plaintiffs in breach of contract based on their failure to proceed to closing and their repeated attempts to add terms to the contract of sale. Three days later, however, defendants said that they would be willing to close as soon as possible, with no escrow, provided plaintiffs would sign a general release. Plaintiffs responded that, although they would not sign a general release, they would "waive the escrow requirement." The next day, plaintiffs announced that they were prepared to close "in accordance with the original terms of the Contract of Sale."

The certificate of occupancy was issued on August 28, 2000. The closing took place on August 29, 2000. Seven days later, plaintiffs conducted a walk-through of the property and created a punch list of items that needed to be corrected. None of the items involved either the rear retaining wall or the yard.

Plaintiffs filed this lawsuit more than three years later, alleging: breach of contract; breach of the implied covenant of good faith and fair dealing; equitable fraud; fraud; punitive damages; violation of the New Jersey Consumer Fraud Act, *N.J.S.A.* 56:8-1 to-20(CFA); and negligence. They sought compensatory and punitive damages. Defendants answered. A period of discovery commenced.

Plaintiffs hired John S. Stern, an architect, to review their property for defects. Stern found that "[c]ontrary to the documented construction details, changes in relationship and deviation in grading radically limit and reduce the actual usable size of the backyard." Specifically, Stern found that the placement of the chain link fence and trees at the top of the slope reduced the backyard size by half. He also determined that the slope of the yard was "twice as steep or 1:1." This "severely limits the use of the rear yard even if the chain link fence is relocated." Finally, he opined that the retaining wall deviated from construction standards and needed to be replaced.

Plaintiffs also retained Henry R. Naughton, P.E., to examine the backyard and retaining wall. Naughton concluded that: (1) "[t]he as-built chain link fence was not as depicted on Exhibit A1"; (2) the ground slope was 1.6:1, which "exceeded the maximum allowable slope" of 2:1; (3) the height of the retaining wall exceeded seven feet in places; and (4) the wall was improperly constructed because, among other things, it did not appear to include filter fabric and showed evidence of "soil and stone migration." Naughton provided an estimate for adjusting the slope and replacing the rear retaining wall to a height of six feet as required by West Orange regulations. The total cost for a new boulder wall was $211,300.

Naughton provided plaintiffs with a revised estimate "for replacing approximately 60 linear feet of the existing boulder wall with an Allan Block type coherent gravity retaining wall, approximately 13.5 feet in height." The estimate provided for backfill "behind this wall so that essentially, a level rear yard surface, approximately 60 feet in width and 32.5 feet in depth, will exist behind the house to the wall." There would be "a slope of no greater than 1:2." The total estimated cost would be $235,300.

**\*4** ADH retained George E. Derrick, P.E., of Engineering and Environmental Services, Inc., to review plaintiffs' property. He concluded that "the existing rear retaining wall is structurally sound within a reasonable degree of engineering certainty." This conclusion was supported by the fact that "the wall ha[d] been in place for approximately [seven] years without visual indication of movement or loss of soil slope." However, in his deposition, Derrick admitted that he did not observe filter fabric in the areas of the wall he examined, thereby indicating it was likely not installed. As for the slope, he noted that it varied from 1.78:1 to 2:1, a "minimal" difference from the design on Exhibit A1. He concluded that the increased slope did not degrade the wall and could be easily remedied if desired.

Defendants moved for summary judgment on all claims. Plaintiffs cross-moved for summary judgment on the breach of contract and CFA counts. Judge Sebastian P. Lombardi partially granted defendants' motion, dismissing with prejudice the implied covenant and punitive damages claims against ADH. The order dismissed all counts against Paul and Junior, except for the fraud count. Plaintiffs moved for reconsideration. Judge Lombardi denied the motion in a December 16, 2006 oral opinion and signed a Janu-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2010 WL 3075578 (N.J.Super.A.D.)
(Cite as: 2010 WL 3075578 (N.J.Super.A.D.))

ary 2, 2007 order.

Approximately six months later, defendants moved for summary judgment on the three fraud claims. Judge Alfonse J. Cifelli concluded:

With reference to the alleged mis-representations as to cost and the municipal requirements, from my review of the record I find it to be completely devoid of any proof or any competent evidential materials to prove an unlawful act on behalf of the defendants. Specifically, the plaintiffs have failed to provide this Court with any competent evidential materials to show that the alleged misrepresentations, even assuming they were made, again, as the Court must for purposes of this motion, were, in fact, false.

... [W]ith reference to the alleged misrepresentations as to slope and location of trees, I also make the same finding, i.e., lack of proof to show that the subject misrepresentations constituted an unlawful act as specified for in the [CFA].

In addition, ... I also find that [p]laintiff[s'] actions in deciding to proceed with the contract subsequent to their becoming aware of the alleged disparities constitutes a waiver....

Thus, Judge Cifelli granted the motion and issued an oral opinion dated May 31, 2007.

ADH moved for partial summary judgment to dismiss the remaining breach of contract claim. Judge Cifelli granted the motion in a April 3, 2008 order. Plaintiffs moved for leave to appeal, which we denied. No. M-5190-07 (App. Div. June 02, 2008).

Further, ADH moved for summary judgment to dismiss the remaining negligence claim. Plaintiffs cross-moved to vacate the April 3, 2008 order and reinstate the breach of contract claim against ADH. On August 1, 2008, Judge Cifelli issued an oral opinion granting ADH's motion, dismissing the negligence claim with prejudice, and denying plaintiffs' cross-motion.

*5 Plaintiffs appeal, contending that the judges erred by dismissing their complaint. We affirm.

The summary judgment standard is set by *Rule* 4:46-2 and *Brill, supra,* 142 *N.J.* at 536-41, 666 A.2d 146. The judge must determine "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party ... are sufficient to permit a rational factfinder to resolve the alleged dispute in favor of the non-moving party." *Id.* at 540, 666 A.2d 146. All favorable inferences are given the non-moving party. *Id.* at 536, 666 A.2d 146. If the evidence "is so one-sided that one party must prevail as a matter of law," the judge should grant the motion for summary judgment. *Id.* at 540, 666 A.2d 146. However, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." *Manalapan Realty. L.P. v. Twp. Comm. of Manalapan,* 140 *N.J.* 366, 378, 658 A.2d 1230 (1995). We use the same summary judgment standard that is used by trial courts. *Jolley v. Marquess,* 393 *N.J.Super.* 255, 267, 923 A.2d 264 (App.Div.2007). Applying this standard here, we are satisfied that Judges Lombardi and Cifelli were correct in granting summary judgment.

### Fraud And Equitable Fraud

As for the fraud and equitable fraud claims, plaintiffs argue that the judge was required to accept as true their claims that Junior misrepresented facts regarding the cost and construction of the wall and that the judge made improper findings with respect to Junior's knowledge and intent. They also argue that sufficient evidence was proffered to go before a jury because they certified that they relied on the alleged misrepresentations in deciding to enter into the contract. Plaintiffs based their fraud allegations on four alleged misrepresentations: (1) the retaining wall was required by West Orange; (2) the $50,000 cost for the wall was without markup or profit; (3) the slope of the backyard would be 2:1; and (4) the backyard would be larger because the trees and fence were to be located at the base of the slope.

In order to prove legal fraud, a plaintiff must demonstrate "a material representation of a presently existing or past fact, made with knowledge of its falsity and with the intention that the other party rely thereon, resulting in reliance by that party to his detriment." *Jewish Ctr. of Sussex County v. Whale,* 86 *N.J.* 619, 624, 432 A.2d 521 (1981). In contrast, recovery for equitable fraud requires only that the plaintiff "prove his or her reasonable reliance on a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2010 WL 3075578 (N.J.Super.A.D.)
(Cite as: 2010 WL 3075578 (N.J.Super.A.D.))

material misrepresentation of fact." *Daibo v. Kirsch,* 316 *N.J.Super.* 580, 588, 720 A.2d 994 (App.Div.1998).

The judge found that plaintiffs waived their fraud claims with respect to the cost of the wall. Waiver "involves the intentional relinquishment of a known right, and thus it must be shown that the party charged with the waiver knew of his or her legal rights and deliberately intended to relinquish them." *Shebar v. Sanyo Bus. Sys. Corp.,* 111 *N.J.* 276, 291, 544 A.2d 377 (1988). The party's intention to relinquish the right is derived from evidence of "a clear, unequivocal and decisive act" on which such an intention can be based. *Country Chevrolet, Inc. v. N. Brunswick Plan. Bd.,* 190 *N.J.Super.* 376, 380, 463 A.2d 960 (App.Div.1983). Waiver "cannot be predicated on consent given under a mistake of fact." *W. Jersey Title and Guar. Co. v. Indus. Trust Co.,* 27 *N.J.* 144, 153, 141 A.2d 782 (1958).

*6 Here, the evidence showed that plaintiffs learned of the price increase prior to executing the contract. They had ample opportunity during the attorney review period to ascertain whether the increase was reasonable. Plaintiffs presented no competent evidence suggesting defendants misrepresented the cost of the wall. Thus, as the court concluded, because plaintiffs executed the contract of sale after learning of the price increase, they waived their fraud claims with respect to that issue.

Moreover, there is an insufficiency of evidence to sustain the fraud claims. The slope, location of the trees and fence, and size of the backyard were all detailed in the contract to purchase. Plaintiffs were aware of all of the alleged disparities between defendants' alleged misrepresentations and the as-built conditions "for some time prior to closing." They repeatedly complained that the wall and yard did not meet their expectations. Yet, as the judge pointed out, "notwithstanding the disparities, [plaintiffs] elected to take title." This amounts to a waiver and negates the element of reliance.

### Consumer Fraud Act
Plaintiffs argue that the judge erred by dismissing their CFA claim. They contend that defendants, as developers, are subject to the CFA and that defendants' false assurances with respect to the slope, backyard space, cost of the wall were affirmative

representations that "lured" them into purchasing the house. We are not persuaded by this argument.

*N.J.S.A.* 56:8-2 provides:

The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice....

The CFA prohibits affirmative actions, as well as acts of omission. *Vagias v. Woodmont Props., L.L.C.,* 384 *N.J.Super.* 129, 133, 894 A.2d 68 (App.Div.2006). Prohibited affirmative actions include deception, unconscionable commercial practice, fraud, false promise or pretense, and misrepresentation. *Chattin v. Cape May Greene, Inc.,* 243 *N.J.Super.* 590, 598, 581 A.2d 91 (App.Div.1990), *aff'd,* 124 *N.J.* 520, 591 A.2d 943 (1991). Acts of omission, on the other hand, include suppression, concealment, or omission of a material fact. *Ibid.* Unlike acts of omission, violations of the CFA through an affirmative action "do not require proof of intent to mislead." *Vagias, supra,* 384 *N.J.Super.* at 133-34, 894 A.2d 68.

In order to bring a claim under the CFA, "a plaintiff must allege each of three elements: (1) unlawful conduct by the defendants; (2) an ascertainable loss on the part of the plaintiff; and (3) a causal relationship between the defendants' unlawful conduct and the plaintiff's ascertainable loss." *N.J. Citizen Action v. Schering-Plough Corp.,* 367 *N.J.Super.* 8, 12-13, 842 A.2d 174 (App.Div.), *certif. denied,* 178 *N.J.* 249, 837 A.2d 1092 (2003). According to the Supreme Court:

*7 Usually, consumer fraud involves a pattern of repetitive conduct, not separate incidents. Minor disagreements between consumer and business owner over quality of customer service, timing of service, or increased price is not consumer fraud. To constitute consumer fraud ... the business practice in question must be "misleading" and stand outside the norm of reasonable business practice in

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2010 WL 3075578 (N.J.Super.A.D.)
(Cite as: 2010 WL 3075578 (N.J.Super.A.D.))

that it will victimize the average consumer, and thus most clearly and directly involve a matter of legitimate public concern.

[ *Turf Lawnmower Repair, Inc. v. Bergen Record Corp.,* 139 *N .J.* 392, 416, 655 A.2d 417 (1995), cert. denied, 516 U.S. 1066, 116 S.Ct. 752, 133 L. Ed.2d 700 (1996).]

Even where the deception or fraud is "committed in good faith," the CFA applies. *Gennari v. Weichert Co. Realtors,* 148 *N.J.* 582, 604, 691 A.2d 350 (1997). In other words, "[a]n intent to deceive is not a prerequisite to the imposition of liability." *Id.* at 605, 691 A.2d 350. Thus, where real estate is concerned, "[n]ot just 'any erroneous statement' will constitute a misrepresentation prohibited by [the CFA]. The misrepresentation has to be one which is material to the transaction and which is a statement of fact, found to be false, made to induce the buyer to make the purchase." *Id.* at 605, 691 A.2d 350 (first alteration in original) (citation omitted).

The CFA applies to professional sellers of real estate, as well as "real estate brokers, agents and salespersons representing professional sellers of real estate," but it does not apply to "non-professional sellers of real estate." *Byrne v. Weichert Realtors,* 290 *N.J.Super.* 126, 134, 675 A.2d 235 (App.Div.), *certif. denied,* 147 *N.J.* 259 (1996). Defendants, as professional sellers of real estate, are subject to the CFA.

Here, as with plaintiffs' fraud claims, the only evidence submitted that the yard was not constructed as represented on Exhibit A1 was Stern's report stating that the slope was too steep and the yard was too small because of the improper location of the trees and fence. However, there is no indication that defendants' representations were false at the time they were made. Nor do plaintiffs dispute that the wall was necessary. Thus, plaintiffs failed to present competent evidence indicating an actionable affirmative act of misrepresentation occurred. *Chattin, supra,* 243 *N.J.Super.* at 598, 581 A.2d 91. Moreover, plaintiffs were offered the opportunity to walk away, but opted to continue with the purchase of their home despite deciding the property was not constructed in accordance with their expectations. They did not include the slope, wall, fence or trees on the punch list of items to be remedied. Thus, even if plaintiffs had

valid claims under the CFA, they waived them at closing.

**Breach Of Contract**

Plaintiffs argue that the judge erred by dismissing their breach of contract claims on summary judgment. They contend that the question of the existence of the alleged oral agreements with respect to the backyard posed issues of fact sufficient to survive summary judgment and that certifications of such agreements were not parol evidence. Moreover, plaintiffs argue that their claims did not merge into the deed at closing because the oral agreements constituted collateral covenants that should have been excepted from merging.

*8 Plaintiffs argue that the judge erred by finding that they presented no evidence of the existence of the alleged oral agreements. Although, because it is often reliant on credibility determinations, the existence of an oral agreement is a question of fact not ordinarily suitable for summary judgment, *McBarron v. Kipling Woods, L.L.C.,* 365 *N.J.Super.* 114, 117, 838 A.2d 490 (App.Div.2004), we conclude that plaintiffs' argument is without merit.

In support of their assertion that an oral agreement existed with respect to the yard, plaintiffs relied on Raymond's unsubstantiated certification that defendants assured them that a 2:1 slope meant that "the backyard would be flat, walkable land from the back of the house to the retaining wall." However, prior to that certification, plaintiffs repeatedly stated simply that they were promised a 2:1 slope. Although they insisted that they thought the slope would be "fairly level," they admitted that they knew there would be "a potential decline." Moreover, Lissa admitted in her deposition that, she was aware that Exhibit A1 was inconsistent with her request to have a level yard.

In his certification, Raymond also claimed for the first time that ADH had orally agreed to a "maximum amount of usable backyard space" and to closing "without an extinguishment of [plaintiffs'] claims by virtue of the deed." None of these alleged agreements were placed in writing.

The judge properly concluded that Raymond's assertions constituted parol evidence and were inadmissible in light of the clear and unambiguous terms of the contract of sale. The parol evidence rule pre-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2010 WL 3075578 (N.J.Super.A.D.)
(Cite as: 2010 WL 3075578 (N.J.Super.A.D.))

vents admission of oral promises that alter the terms of "an integrated written agreement." *Seidenberg v. Summit Bank,* 348 *N.J.Super.* 243, 256, 791 *A.2d* 1068 (App.Div.2002). Raymond's certification that defendants agreed to level the yard is contrary to plaintiffs' own statements, as well as the unambiguous contract documents.

Further, plaintiffs' assertion that ADH orally promised that their claims would not be extinguished at closing directly contradicts the terms of the contract, which states in Section 14.1 that the "deed of conveyances shall constitute [the] final and complete agreement between [ADH] and [plaintiffs], and all rights of the parties shall merge in [the] deed." Moreover, Section 18.1 of the contract requires all amendments to be written, signed by both parties, and subject to attorney review.

Thus, Raymond's self-serving, unsubstantiated allegations were insufficient to create a genuine issue of material fact with respect to the existence of the oral agreements, especially in light of the fact that plaintiffs first mention the alleged agreements approximately four years after filing their complaint. *See Lepis v. Lepis,* 83 *N.J.* 139, 159, 416 *A.2d* 45 (1980) (conclusory allegations of parties should be disregarded when deciding whether material fact is in dispute). Thus, the court correctly excluded Raymond's certification as inadmissible parol evidence.

*9 Furthermore, even if the agreements existed, they merged with the deed in accordance with Section 14.1 of the contract. "[I]n real estate transactions, all warranties and representations made in connection with a sale, unless specifically reserved to hold over after the passage of title, are merged into the deed." *Andreychak v. Lent,* 257 *N.J.Super.* 69, 72, 607 *A.2d* 1346 (App.Div.1992).

Here, Section 14.1 of the contract provided that all rights would merge at acceptance unless specifically reserved.

### Breach Of Implied Covenant Of Good Faith And Fair Dealing

Plaintiffs contend that the judge erred by dismissing their claims for breach of the implied covenant of good faith and fair dealing. They argue that the record established a prima facie case for breach of the implied covenant because defendants misrepresented: (1) when they learned of the need for the retaining wall; (2) the cost of the wall; (3) that the backyard would be level; and (4) that the trees and fence would be located at the retaining wall. However, plaintiffs' argument below focused solely on their contention that defendants deliberately delayed the closing. Because these issues were never before the lower court, we need not address them here. *See Neider v. Royal Indem. Ins. Co.,* 62 *N.J.* 229, 234, 300 *A.2d* 142 (1973) ("[W]e decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available.").

### Negligence

Plaintiffs contend that the judge erred by dismissing on summary judgment their negligence claim. They argue that the court should have found that ADH, as an experienced builder, owed an independent duty to plaintiffs that arose not solely from the contract, but also from the fact that it performed services not specifically covered in the contract.

New Jersey law provides that a tort remedy does not arise from a contractual relationship unless the allegedly breaching party owes an independent duty of care. *Saltiel v. GSI Consultants, Inc.,* 170 *N.J.* 297, 316, 788 *A.2d* 268 (2002). Where there is "no personal injury or consequential property damage arising from a traumatic event .... the loss is of a nature more normally associated with a contract action" particularly where "the relationship between the parties is governed by a lengthy and comprehensive contractual arrangement." *New Mea Constr. Corp. v. Harper,* 203 *N.J.Super.* 486, 494, 497 *A.2d* 534 (App.Div.1985). Moreover, in *Aronsohn v. Mandara,* 98 *N.J.* 92, 98, 484 *A.2d* 675 (1984), the Court implied that tort liability cannot be imposed against a contractor where the plaintiffs are only seeking to obtain the benefit of the bargain from the underlying contract.

Plaintiffs allege that defendants were negligent in not constructing the property in conformance with the exhibits, by improperly sloping the yard, and improperly constructing the retaining walls. All of these allegations arise from the contract documents, indicating that plaintiffs were merely seeking to enhance the benefit of their bargain. Moreover, plaintiffs provided no evidence suggesting that defendants owed an independent duty as to the retaining walls and the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2010 WL 3075578 (N.J.Super.A.D.)
(Cite as: 2010 WL 3075578 (N.J.Super.A.D.))

yard.

**\*10** Alternatively, as defendants point out, even if they owed an independent tort duty, the economic loss rule would prohibit plaintiffs' recovery. *Alloway v. Gen. Marine Indus., L.P.,* 149 N.J. 620, 632, 695 A.2d 264 (1997), ("When the harm suffered is to the product itself, unaccompanied by personal injury or property damage, principles of contract, rather than of tort law, [are] better suited to resolve the purchaser's claim."); *Dean v. Barett Homes, Inc.,* 406 N.J.Super. 453, 472, 968 A.2d 192 (App.Div.2009) (holding that economic loss rule prohibited a homeowner's negligence claim against a builder where the alleged negligence only caused property damage). Because any alleged damages suffered were, as shown by the evidence viewed in the light most favorable to plaintiffs, to the property only, their negligence claim is barred by the economic loss rule.

### Punitive Damages

Plaintiffs argue that the judge erred by dismissing their punitive damages claim on summary judgment. Plaintiffs maintain that the manner in which they were "lured" into purchasing the property, combined with Junior's misrepresentations "and the fact that the home was not built in accordance with [their] expectations," are sufficient for a jury to find that defendants' conduct was egregious enough to warrant an award of punitive damages.

The judge, on reconsideration, recalled that plaintiffs failed to oppose dismissal of this claim. Moreover, the judge concluded: "[A]fter three years if you don't have a solid theory for punitive damages I think it's appropriate for the Court to say that there's not sufficient [evidence] for the jury ... to find that the standard has been met."

Punitive damages may be awarded in particularly egregious cases where intentional wrongdoing, such as wanton and willful disregard of the rights of others, occurs. *Nappe v. Anschelewitz, Barr, Ansell & Bonella,* 97 N.J. 37, 49-50, 477 A.2d 1224 (1984). In accordance with the Punitive Damages Act, *N.J.S.A.* 2A:15-5.9 to 5.17, punitive damages are intended to punish the wrongdoer and deter future wrongs by that person. *Tarr v. Bob Ciasulli's Mack Auto Mall, Inc.,* 194 N.J. 212, 216, 943 A.2d 866 (2008).

Even viewed in the light most favorable to plain-

tiffs, we conclude that they have failed to articulate facts that could constitute malice or willful misconduct on the part of defendants. Even on reconsideration, plaintiffs were unable to present any evidence of malice. Thus, plaintiffs failed to state a claim of defendants' alleged misconduct that would rise to a level where an award of punitive damages could be justified.

Affirmed.

N.J.Super.A.D.,2010.
Ferrell v. America's Dream Homes, Inc.
Not Reported in A.2d, 2010 WL 3075578 (N.J.Super.A.D.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

# **<u>EXHIBIT 13</u>**

Westlaw.

Slip Copy, 2009 WL 3366464 (D.N.J.)
(Cite as: 2009 WL 3366464 (D.N.J.))

C Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**
NOT FOR PUBLICATION

United States District Court,
D. New Jersey.
YAPAK, LLC d/b/a Klassi Kids, Plaintiff,
v.
MASSACHUSETTS BAY INSURANCE
COMPANY, The Hanover Insurance Group, and
John Does 1-10, Defendants.

Civ. No. 3:09-cv-3370.
Oct. 16, 2009.

Mauro Carlo Casci, Law Offices of Mauro C. Casci, Leonardo, NJ, for Plaintiff.

John Peter Malloy, Robinson & Cole LLP, Hartford, CT, for Defendants.

OPINION & ORDER
INTRODUCTION

THOMPSON, District Judge.

*1 This matter comes before the Court upon Defendants' Motion to Dismiss Plaintiffs' Amended Complaint [12]. This matter has been decided on the papers without oral argument. For the reasons stated below, Defendants' motion is GRANTED.

BACKGROUND

This dispute arises out of an insurance coverage dispute between Plaintiff and Defendants. On June 1, 2009, Plaintiff filed this lawsuit in the Superior Court of New Jersey. Defendants removed the action to federal court on July 9. Plaintiffs filed an Amended Complaint with the Court on September 4, and the Defendants have now moved to dismiss that complaint for failure to state a claim upon which relief may be granted under Fed.R.Civ.P. 12(b)(6).

ANALYSIS

I. Standard of Review

To survive a motion to dismiss, a plaintiff must

plead sufficient factual matter to enable a court to draw the reasonable inference that the defendant is liable for the alleged misconduct. Ashcroft v. Iqbal, --- U.S. ----, ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). As the Third Circuit has explained, this requires the Court to undertake a two-step analysis:

First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief."

Fowler v. UPMC Shadyside, 578 F.3d 203, 210-211 (3d Cir.2009) (citing Iqbal, 129 S.Ct. at 1949-50). For purposes of resolving a motion to dismiss, "plausible" does not mean "probable," but it requires more than "sheer possibility." Iqbal, 129 S.Ct. at 1949; see also Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In other words, if the factual allegations are more likely explained by lawful behavior than illegal activity, then the complaint should be dismissed. Id. at 1950.

II. Application to Plaintiff's Complaint

Plaintiff's complaint makes out two claims against Defendants: breach of contract and breach of the duty of good faith and fair dealing. The Court examines each in turn.

A. Breach of Contract

The classic elements of a breach of contract claim are (1) the existence of a valid contract, (2) defective performance, and (3) damages. Coyle v. Englander's, 199 N.J.Super. 212, 223, 488 A.2d 1083 (App.Div.1985). To survive a motion to dismiss, Plaintiff must allege facts sufficient to satisfy these elements, but a mere recital of the elements themselves will not suffice. Iqbal, 129 S.Ct. at 1949. In this case, the complaint is insufficient because it fails to allege defective performance adequately. Plaintiffs' allegations essentially amount to the following: Plaintiff sustained losses; Plaintiff submitted claims to Defendants; Defendants did not pay Plaintiff's

Slip Copy, 2009 WL 3366464 (D.N.J.)
**(Cite as: 2009 WL 3366464 (D.N.J.))**

claims; Defendants thereby breached their contract with Plaintiff. (Am.Compl.1.) The last of these four allegations, that Defendants breached their contract, is a legal conclusion rather than a factual allegation, and therefore the Court must disregard it. The remaining, factual allegations simply amount to the proposition that Plaintiff had its insurance claim denied. While such a denial might be a breach of contract, it might equally well be perfectly legal under the terms of the agreement. In other words, Plaintiff's allegations do not rise beyond the "sheer possibility" threshold. *See Iqbal,* 129 S.Ct. at 1949. To make out a "plausible claim for relief," Plaintiff must allege factual matter sufficient to warrant the inference that when Defendants refused to pay, they violated their contractual obligations. Since Plaintiff has not alleged any facts concerning the terms of the contract or the losses at issue, this Court cannot infer whether the breach of contract claim is plausible. Consequentially, that claim must be dismissed.

B. *Breach of the Duty of Good Faith and Fair Dealing*

*2 There is no universally-accepted test for establishing a breach of the duty of good faith and fair dealing, but two elements appear to recur with some frequency: (1) the defendant acts in bad faith or with a malicious motive, (2) to deny the plaintiff some benefit of the bargain originally intended by the parties, even if that benefit was not an express provision of the contract. *See, e.g., Brunswick Hills Racquet Club, Inc. v. Route 18 Shoppint Ctr. Assocs.,* 182 N.J. 210, 225, 864 A.2d 387 (2005); *Wilson v. Amerada Hess Corp.,* 168 N.J. 236, 251, 773 A.2d 1121 (2001). New Jersey law also recognizes a tort specific to the insurance contract context-that it is unlawful for an insurer to deny an insurance claim without any "fairly debatable" justification. *See Pickett v. Lloyd's,* 131 N.J. 457, 621 A.2d 445 (1993).

It is not clear which of these two causes of action is the basis for the second count of the complaint, but in either event, the claim fails. The second count is full of allegations that are, in essence, legal conclusions. Plaintiff alleges that Defendants' conduct was "willful, wanton, and malicious," that Defendants "breached the common law duty of good faith and fair dealing," and that "there was no 'fairly debatable' reason for the Defendants to not make payments.' " (Am.Compl.2.) These allegations simply allege the elements of a claim of bad faith, which

make them legal rather than factual allegations. Another allegation simply states that Defendants violated a host of New Jersey statutes. (*Id.*) This is also a legal conclusion. Since all these allegations are legal rather than factual, the Court disregards them in considering the motion to dismiss. *Fowler,* 578 F.3d at 210-211. The only factual allegations in the second count of the Complaint are the facts incorporated from the first count, which simply amount to the proposition that Plaintiff made an insurance claim that was denied. This simple allegation does not support an inference that Plaintiff's claim for breach of the duty of good faith and fair dealing is a plausible one. Therefore, that claim must be dismissed as well.

*CONCLUSION*

Plaintiff has failed to state a claim upon which relief may be granted. It is therefore ORDERED that, on this 16th day of October, 2009, Defendants' Motion to Dismiss [12] is GRANTED.

It is further ORDERED that Plaintiff's Amended Complaint is DISMISSED without prejudice.

It is further ORDERED that Plaintiff is given 30 days to move for leave to file a second amended complaint. If Plaintiff does not so move, this case will be closed.

D.N.J.,2009.
Yapak, LLC v. Massachusetts Bay Ins. Co.
Slip Copy, 2009 WL 3366464 (D.N.J.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

# <u>EXHIBIT 14</u>

Westlaw.

Slip Copy, 2010 WL 5169024 (D.N.J.)
(Cite as: 2010 WL 5169024 (D.N.J.))

**C**Only the Westlaw citation is currently available.

United States District Court,
D. New Jersey.
Michael SOTO, et al., Plaintiffs,
v.
QUICKEN LOANS, Inc, et al., Defendants.

Civil Action No. 09-4862 (JAP).
Dec. 14, 2010.

## OPINION

PISANO, District Judge.

*1 This is an action brought by Plaintiffs Michael Soto and Desiree Collazo-Soto (together, "Plaintiffs") against defendants Quicken Loans, Inc. ("Quicken"); Merill Lynch Mortgage Lending ("MLML") and others alleging numerous statutory and common law claims arising from the refinancing of a residential mortgage loan. MLML and Quicken (together "Defendants") have moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons below, the motions are granted in part and denied in part.

I. Background[FN1]

> FN1. In addressing a motion to dismiss, the Court must accept as true the allegations contained in a complaint. See Toys "R" US, Inc. v. Step Two, S.A., 318 F.3d 446, 457 (3d Cir.2003); Dayhoff, Inc. v. H.J. Heinz Co., 86 F.3d 1287, 1301 (3d Cir.1996). Accordingly, the facts recited herein are taken from the First Amended Complaint unless otherwise indicated and do not represent this Court's factual findings.

According to the complaint, Plaintiffs are the owner of residential property located at 43 Washington Avenue, Old Bridge, New Jersey. In December 2006, Plaintiffs refinanced the existing mortgage loan on this property in order to consolidate that loan with the outstanding balance on their home equity line of credit. Plaintiffs "refinanced their loan with the same lender and loan officer as their two prior refinances,

Quicken and Edward Berger." Am. Compl. ¶ 14. Closing took place at Plaintiffs' home on December 9, 2006, with a notary acting as the settlement agent. Plaintiff executed a note in the amount of $380,000 in favor of Quicken and executed a mortgage to secure payment of the note. Sometime thereafter the mortgage and loan was assigned to MLML.

According to Plaintiffs, they expressly requested a fixed rate loan, but "the lender provided an adjustable rate mortgage." Am. Compl. ¶ 17. More specifically, Plaintiffs obtained "a negative amortization loan that would be fixed for the first 5 years with a 10-year interest-only payment feature." Am. Comp. ¶ 22. In making such a loan to Plaintiffs, it is alleged that "[t]he defendants failed to provide what was promised." Id. ¶ 26.

As best as the Court can discern from the Amended Complaint, which defendant MLML aptly describes as relying substantially upon "half-formed allegations, bald conclusions and legal non-sequiturs," Reply at 2, all defendants are alleged to have taken certain actions to deceive and mislead Plaintiffs about the loan terms. For example, Quicken allegedly falsely represented to Plaintiffs the interest rate of the loan and the total amount that would be financed, and its loan officer did not adequately explain to Plaintiffs the terms of their loan. Am. Compl. ¶ 19. It is further alleged that "defendants" did not provide Plaintiffs with appropriate disclosures and "made fraudulent representations about the terms of the loan to plaintiff to induce them to refinance the mortgage on their house." Id. ¶ 33. The crux of Plaintiffs' claim appears to be that when they entered into the transaction they were not aware of the negative amortization feature of their loan, and Plaintiffs discovered sometime after the loan closed that they were "going backward each month and thus owing more than they originally borrowed." Id. ¶ 34.

The complaint alleges the following fifteen counts against all defendants in the action: (1) violation of the Truth In Lending Act ("TILA"), 15 U.S.C § 1602; (2) violation of the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1, et seq.; (3) violation of New Jersey's Racketeer Influenced Corrupt Organizations act ("RICO"), N.J.S.A. § 2C:41-1, et seq.; (4)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5169024 (D.N.J.)
(Cite as: 2010 WL 5169024 (D.N.J.))

fraud; (5) "unconscionability"; (6) negligence; (7) unjust enrichment; (8) breach of contract; (9) violation of the Real Estate Settlement Practice Act, 12 U.S.C. § 2601 et seq.; (10) "negligence of settlement agent and other Defendants"; (11) breach of fiduciary duty; (12) breach of duty of good faith and fair dealing; (13) violation of New Jersey's law against discrimination; (14) violation of the New Jersey Home Ownership Security Act, N.J.S.A. § 46: 10B-22; (15) violation of the Home Ownership Equity Protection Act ("HOEPA"), 15 U.S.C. § 1639. MLML and Quicken have moved for dismissal of all counts pursuant to Federal Rule of Civil Procedure 12(b)(6).

*II. Legal Discussion*

*A. Motion to Dismiss Standard*

**\*2** Under Federal Rule of Civil Procedure 12(b)(6), a court may grant a motion to dismiss if the complaint fails to state a claim upon which relief can be granted. The Supreme Court refashioned the standard for addressing a motion to dismiss under Rule 12(b)(6) in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The *Twombly* Court stated that, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, ... a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Id.* at 555 (internal citations omitted); *see also Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir.2007) (stating that standard of review for motion to dismiss does not require courts to accept as true "unsupported conclusions and unwarranted inferences" or "legal conclusion[s] couched as factual allegation[s]." (internal quotation marks omitted)). Therefore, for a complaint to withstand a motion to dismiss under Rule 12(b)(6), the "[f]actual allegations must be enough to raise a right to relief above the speculative level, ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact) ..." *Twombly*, 550 U.S. at 555 (internal citations and footnote omitted).

More recently, the Supreme Court has emphasized that, when assessing the sufficiency of a civil complaint, a court must distinguish factual contentions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory state-

ments." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949, 173 L.Ed .2d 868 (2009). A complaint will be dismissed unless it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Id.* at 1949 (quoting *Twombly*, 550 U.S. at 570). This "plausibility" determination will be "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 2009 WL 2501662, \*5 (3d Cir. August 18, 2009) (citations omitted).

*B. Analysis*

**1. TILA Claim (Count I); [FN2] HOEPA Claim (Count IX)**

> FN2. The Defendants argue, in a generalized fashion, that Plaintiff's 15-count complaint fails under Rule 8(a) because it does not contain sufficient factual content to allow a reasonable factfinder to conclude that Defendants are liable for any of the claims alleged. To the extent the Court finds this argument relevant to any of Plaintiff's claims, it shall be discussed in the claim-by-claim analysis below.

TILA requires lenders to provide borrowers with specific disclosures with respect to certain terms of their loans. 15 U.S.C. § 1638. "Regulation Z" describes the material disclosures that lenders must make "clearly and conspicuously in writing, in a form that the consumer may keep." 12 C.F.R. § 226.17(a)(1). Plaintiffs' TILA and HOEPA claims found in Count I and XV of their complaint are governed by the time limit for a borrowers' right to rescind pursuant to 15 U.S.C. § 1635(f) and the time limitation for seeking damages for civil liability under 15 U.S.C. § 1640(e). For individuals seeking rescission, TILA mandates that "an obligor's right of rescission shall expire three years after the date of consummation of the transaction or upon the sale of the property whichever occurs first." 15 U.S.C. § 1635(f). Additionally, as to individuals seeking compensatory and statutory damages, any TILA action must be brought "within one year from the date of the occurrence of the violation." 15 U.S.C. § 1640(e).

**\*3** In the instant case, Defendants allege Plaintiffs' TILA and HOEPA claims for damages is barred

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5169024 (D.N.J.)
(Cite as: 2010 WL 5169024 (D.N.J.))

by the one-year statute of limitations. Although it has been noted that "[g]enerally speaking, [courts] will not rely on an affirmative defense ... to trigger dismissal of a complaint under Rule 12(b)(6)," *Rycoline Prods., Inc. v. C & W Unlimited*, 109 F.3d 883, 886 (3d Cir.1997), an affirmative defense such as the expiration of the statute of limitations may provide a basis for dismissal on a Rule 12(b)(6) motion in those situations where the defense is "apparent on the face of the complaint." *Benak v. Alliance Capital Mgmt. L.P.*, 435 F.3d 396, 400 n. 14 (3d Cir.2006) ("[A] statute of limitations defense is an affirmative one, and in order to undergird a dismissal, must appear on the face of the complaint."); *Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir.2002) (limitations defense may be raised on a motion under Rule 12(b)(6) "only if the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations") (internal citations and quotations omitted).

Plaintiffs do not dispute the Defendants' assertion that Plaintiff's claims for damages under TILA and HOEPA are untimely. However, Plaintiffs argue that the limitations period in this case should be subject to equitable tolling, as the Third Circuit has held that the time limitation set out in TILA not jurisdictional and is, therefore, subject to equitable tolling. *Ramadan v. Chase Manhattan Corp.*, 156 F.3d 499, 504-505 (3d Cir.1998). Three scenarios exist when equitable tolling of a limitations period may be appropriate: (1) the defendant has actively misled the plaintiff with respect to the plaintiff's cause of action; (2) the plaintiff in some extraordinary way has been prevented from asserting his rights; or (3) the plaintiff has timely but mistakenly asserted his rights in the incorrect forum. *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1387 (3d Cir.1994). Importantly, a party seeking tolling must also demonstrate that he or she "exercised reasonable diligence in investigating and bringing the claims." *Miller v. N.J. Dep't of Corr.*, 145 F.3d 616, 618-19 (3d Cir.1998). Here, the Amended Complaint sets forth no facts from which it can be inferred that equitable tolling is applicable in this case. Indeed, to the extent it is alleged that any defendants misled Plaintiffs, all such conduct occurred prior to the closing date. Further, it does not appear Plaintiffs exercised reasonable diligence in pursuing their claims, as they admit in their brief that they became aware of the negative amortization feature of their loan in "late 2007," Pl. Brf. at 3, but did not pursue their claim until July

2009. There being no basis to apply equitable tolling, Plaintiff's claim for damages under TILA shall be dismissed.

Plaintiffs also make a claim for rescission under TILA. As noted previously, a claim for rescission typically expires three years after consummation of the transaction. Only Quicken challenges Plaintiff's rescission claim, and it argues that the claim should be dismissed for two reasons. First, Quicken claims that because Plaintiffs have not demonstrated an ability to pay back the loan proceeds, their TILA claim for rescission should be dismissed. The Court finds that such an inquiry, however, would be premature at the pleading stage. *See Scivoletti v. JP Morgan Chase Bank, N.A.*, WL 2652527, *5 (D.N.J.2010) (plaintiff seeking rescission need not plead facts showing ability to repay in order to survive motion to dismiss).

*4 Second, Quicken argues that Plaintiffs have not timely tendered a notice of rescission. Quicken cites 15 U.S.C. § 1635(a), under which a borrower may exercise his statutory right to rescind a transaction "until midnight on the third business day following the consummation of the transaction or delivery of the information and rescission forms required ... whichever is later." However, as noted above, the borrower's right to rescind can be extended up to three years after the consummation of the lending transaction if the lender never submits disclosures required by TILA to the borrower. 15 U.S.C. § 1635(f). Plaintiffs have alleged that "defendants" failed to make numerous disclosures required under the TILA. By way of their complaint, Plaintiffs notified Defendants that they intended to seek rescission. Plaintiffs brought this action on August 12, 2009, within three years of December 9, 2006, the date of the loan closing. As such, the Court finds that Defendants have not demonstrated that this claim should be dismissed under Rule 12(b)(6).

### 2. Consumer Fraud Act (Count II); RICO (Count III); Fraud (Count IV)

To plead a claim under the CFA, a plaintiff must allege the following: (1) an unlawful practice by the defendants; (2) an ascertainable loss by plaintiff; and (3) a causal nexus between the first two elements-defendants allegedly unlawful behavior and the plaintiff's ascertainable loss. *New Jersey Citizen Action v. Schering-Plough Corp.*, 367 N.J.Super. 8, 12-13 (App.Div.2003). Notably, CFA claims "sounding in

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5169024 (D.N.J.)
**(Cite as: 2010 WL 5169024 (D.N.J.))**

fraud" are subject to the particularity requirements of Federal Rule of Civil Procedure 9(b). *See Naporano Iron & Metal Co. v. Am. Crane Co.*, 79 F.Supp.2d 494, 510 (D.N.J.2000). Here, Plaintiffs' CFA claim is based upon alleged "false promises and misrepresentations" by "defendants" concerning the material terms of their loan. Also, although not particularly clear from the Amended Complaint itself, Plaintiffs contend that their RICO claim is similarly based upon a "pattern of fraudulent practices and misrepresentations." Pl. Brf. at 7.[FN3]

> FN3. Plaintiff's opposition brief does not contain page numbers. Therefore, when referencing Plaintiff's brief, the Court shall use the page numbers generated in the electronic filing system's header.

Thus, three of Plaintiffs' claims-CFA, RICO and common law fraud-sound in fraud and consequently must meet the heightened pleading requirements of Rule 9(b), which requires that "[i]n allegations of fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b). Under Rule 9(b), where a complaint alleges fraud, a plaintiff must describe "with particularity" the circumstances that constitute the fraud. Fed.R.Civ.P. 9(b). Generally speaking, "Rule 9(b) serves to give defendants notice of the claims against them, provide[ ] an increased measure of protection for their reputations, and reduce[ ] the number of frivolous suits brought solely to extract settlements." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 270 (3d Cir.2006) (alterations in original) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir.1997)). The rule requires a plaintiff to plead with particularity the facts supporting the elements of fraud. *Id.* Therefore, in order to successfully plead fraud under Rule 9(b), a plaintiff must offer "some precision and some measure of substantiation." *Gutman v. Howard Sav. Bank*, 748 F.Supp. 254, 257 (D.N.J.1990). Plaintiffs may satisfy the rule's requirement "by pleading the date, place or time of the fraud, or through alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Lum v. Bank of Am.*, 361 F.3d 217, 224 (3d Cir.2004) (quotations omitted). A Plaintiff also must allege "who made a misrepresentation to whom and the general content of the misrepresentation." *Id.*

*5 Here, Plaintiffs' complaint fails to meet this heightened pleading requirement and fails to put the Defendants on notice of the "precise misconduct" that forms the basis of the CFA, RICO and fraud claims against each of them. The named defendants in this case include a mortgage broker and lender, agents of the mortgage broker, an assignee of the mortgage loan, and a title company. Many of the allegations in the Amended Complaint refer to these "defendants" collectively as a single unit, although it cannot be inferred from the complaint that they necessarily acted as such. As such, it is difficult to discern, for example, precisely what fraudulent conduct is alleged against which defendants, and specifically what conduct underlies each of Plaintiff's claims as to each defendant. Consequently, Plaintiffs' CFA, RICO and fraud claims shall be dismissed.

### 3. Unconscionability (Count V)

Plaintiffs seek, among other things, rescission of the loan transaction for unconscionability based on the imposition of "excessive fees and costs," "overly onerous loan terms" and violation of "the covenant of good faith and fair dealing." Generally speaking, "a contract is unenforceable if its terms are manifestly unfair or oppressive, and are dictated by a dominant party." *Howard v. Diolosa*, 241 N.J.Super. 222, 230, 574 A.2d 995 (App.Div.1990). A party raising a claim of unconscionability has the burden of showing "some over-reaching or imposition resulting from a bargaining disparity between the parties, or such patent unfairness in the terms of the contract that no reasonable man not acting under compulsion or out of necessity would accept them." *Rotwein v. Gen. Accident Group*, 103 N.J.Super. 406, 418, 247 A.2d 370 (Law Div.1968). A party needs to demonstrate both procedural unconscionability which identifies unfairness in the formation of the contract and substantive unconscionability which addresses disproportionate contract terms. *Sitogum Holdings, Inc. v. Ropes*, 352 N.J.Super. 555, 564, 800 A.2d 915 (Ch. Div.2002). Procedural unconscionability "can include a variety of inadequacies, such as age, literacy, lack of sophistication, hidden or unduly complex contract terms, bargaining tactics, and the particular setting existing during the contract formation process. *Id.* To establish substantive unconscionability, a party must show the "exchange of obligations so one-sided as to shock the court's conscience." *Id.* at 565, 800 A.2d 915.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5169024 (D.N.J.)
(Cite as: 2010 WL 5169024 (D.N.J.))

Defendants do not expressly challenge Count V in their motion other than, the Court presumes, as part of their general assertion that the complaint as a whole fails to meet the pleading standards of Rule 8(a). Here, Plaintiffs allege, among other things, that Defendants made misrepresentations regarding the loan, that Defendants "knew or should have known that plaintiffs lacked the legal capacity to enter into [the loan transaction] and/or did not understand the essential terms of the documents they were executing," Am. Compl. ¶ 38, that the written information provided by Defendants was confusing, contradictory and inadequate, *id.* ¶ 39, that the fees and costs associated with the loan were excessive and that the loan terms were overly onerous. In light of such allegations, the Court cannot conclude that Plaintiffs' claim fails to meet the liberal standards of Rule 8(a).

**4. Negligence (Count VI); Negligence of Settlement Agent (Count X)**

*6 Plaintiffs' complaint contains two counts of negligence, the first based upon a theory of negligence supervision, the second up a theory of *respondeat superior*. To state a claim for negligence under New Jersey law, a plaintiff must demonstrate: (1) a duty of care owed by the defendant to the plaintiff; (2) a breach of that duty by the defendant; (3) injury or harm to the plaintiff; and (4) proximate cause. *Anderson v. Sammy Redd and Associates.* 278 N.J.Super. 50, 56, 650 A.2d 376 (App.Div.1995). Defendants allege that Plaintiffs' claims fail because Plaintiffs have not demonstrated that Defendants owed them a duty of care. Quicken also asserts that the claims are barred by the economic loss doctrine.

With respect to MLML, Plaintiffs have failed to plead any facts showing that any legal duty was owed by MLML to Plaintiffs. There are no allegations that MLML supervised the employees with whom Plaintiffs dealt with or that MLML was the principal for whom settlement agent acted. However, the same cannot be said for Quicken, whose employees and/or agents are alleged to have engaged directly with Plaintiffs.

Further, Quicken has not shown that the economic loss doctrine warrants dismissal of Plaintiffs' claims under 12(b)(6). "Under New Jersey law, a tort remedy does not arise from a contractual relationship unless the breaching party owes an independent duty imposed by law." *Saltiel v. GSI Consultants, Inc.,*

170 N.J. 297, 316, 788 A.2d 268 (2002). If a defendant "owe[s] a duty of care separate and apart from the contract between the parties," a tort claim such as negligence may lie. *Id.* at 314, 788 A.2d 268. Plaintiffs allegations of negligence do not appear to arise from any breach of the contractual relationship between Quicken and Plaintiffs, but rather as a result of the actions of defendants prior and during the closing of the transaction.[FN4]

> FN4. As such, it would appear that Plaintiff's negligence claim may be untimely under the applicable statute of limitations. However, the issue was not raised by the parties and therefore shall not be addressed by the Court at this time.

**5. Unjust Enrichment (Count VII)**

Plaintiffs allege a claim against Defendants for unjust enrichment in the execution of their mortgage contract. "Unjust enrichment rests on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another." *Assocs. Commercial Corp. v. Wallia,* 211 N.J.Super. 231, 243, 511 A.2d 709 (App.Div.1986) (citing *Callano v. Oakwood Park Homes Corp.,* 91 N.J.Super. 105, 108, 219 A.2d 332 (App.Div.1966)). For a claim of unjust enrichment, a party must demonstrate that the other party "received a benefit and that retention of the benefit without payment thereof would be unjust." *Id.* As best as can be construed from the complaint, the only "benefit" received by Defendants were payments made pursuant to the Note executed by Plaintiffs. "[I]t is generally the case that when a valid, express contract covers the subject matter of the parties' dispute, a plaintiff cannot recover under a quasi-contract theory such as unjust enrichment." *Ramon v. Budget Rent-A-Car Sys.,* 2007 WL 604795 (D.N.J. February 20, 2007). *See also Moser v. Milner Hotels, Inc.,* 6 N.J. 278 (1951). As such, Plaintiffs' claim for unjust enrichment shall be dismissed.

**6. Breach of Contract (Count VIII); Good Faith and Fair Dealing (Count XII)**

*7 Plaintiffs' contract claims are premised upon their allegation that Plaintiffs "were told by defendants ... that their monthly payments would be lower than the actual payment required under the loan terms." Am. Compl. ¶ 106. Plaintiffs allege that "[s]ince [they] did not receive the agreed upon terms promised by defendants .... the contract was

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5169024 (D.N.J.)
(Cite as: 2010 WL 5169024 (D.N.J.))

breached." *Id.* ¶ 107.

As an initial matter, Plaintiffs' allegations are vague and do not identify the contract that was breached nor which of the defendants breached the agreement. Indeed, it is unclear whether the claim is based upon some sort of an agreement separate and apart from the mortgage transaction or is alleging a breach of the loan documents themselves. Moreover, to the extent that Plaintiff is alleging that oral statements by defendants prior to execution of the loan documents altered the terms of those loan documents, such a claim would appear to be barred by the parol evidence rule. "The parol evidence rule precludes the introduction of oral promises to alter or vary the terms of an integrated written agreement." *Alexander v. CIGNA Corp.*, 991 F.Supp. 427, 436 (D.N.J.1998) (quoting *Filmlife Inc. v. Mal "Z" Ena, Inc.*, 251 N.J.Super. 570, 575, 598 A.2d 1234 (App.Div.1991). As such Plaintiffs' breach of contract claim and breach of the covenant of good faith and fair dealing are dismissed.

**7. Violation of RESPA (Count IX)**

Plaintiffs' claim for violations of RESPA are governed by a one-year statute of limitations pursuant to 12 U.S.C. § 2614. RESPA requires that any action be brought "within one year in the case of violations of section 2607 or 2608 from the date of the occurrence of the violation." 12 U.S.C. § 2614. Therefore, in order to have a valid RESPA claim, a plaintiff must bring a cause of action within one year of the alleged improper fee or kickback. *See* 12 U.S.C. § 2607

Here, in Count IX Plaintiffs are alleging a cause of action under § 2607 for improper fees and costs at the closing of their mortgage loan. Because the closing on the mortgage loan occurred in December 2006, Plaintiffs were required to bring a cause of action within one year of the date of the transaction. Because Plaintiffs did not file their claim until 2009, their RESPA cause of action must be dismissed as untimely. To the extent Plaintiffs argue, as they did with their TILA claim, that equitable tolling applies, Plaintiffs' argument is rejected for the same reasons stated earlier.

**8. Breach of Fiduciary Duty (Count XI)**

In Count XI, Plaintiffs allege that all defendants owed them a fiduciary duty and all defendants

breached this duty. MLML and Quicken argue that neither one of them was in a fiduciary relationship with Plaintiffs and, therefore, this claim should be dismissed. Indeed, creditor-debtor relationships "rarely are found to give rise to a fiduciary duty." *Paradise Hotel Corp. v. Bank of Nova Scotia*, 842 F.2d 47, 53 (3d Cir.1988); *see also United Jersey Bank v. Kensey*, 306 N.J.Super. 540, 553, 704 A.2d 38, 44 (App.Div.1997) ("there is no presumed fiduciary relationship between a bank and its customer"). As the Court of Appeals for the Third Circuit has noted, because their respective positions are essentially adversarial, it " 'would be anomalous to require a lender to act as a fiduciary for interests on the opposite side of the negotiating table,' " *Paradise Hotel Corp. v. Bank of Nova Scotia*, 842 F.2d 47, 53 (3d Cir.1988) (quoting *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir.1982)).

**\*8** Exceptions, however, exist where "special circumstances" are present, such as situations where "the lender encouraged the borrower to repose special trust or confidence in its advice, thereby inducing the borrower's reliance." *United Jersey Bank v. Kensey*, 306 N.J.Super. 540, 554-55, 704 A.2d 38 (N.J.Super.1997). Here, the Plaintiffs fail to allege that any such "special circumstances" existed in this case, therefore Count XI will be dismissed.

**9. Violation of Law Against Discrimination (Count XIII)**

Plaintiffs allege in Count XIII that Defendants violated N.J.'s LAD. LAD provides that it is unlawful discrimination for "any person, bank, banking organization, mortgage company, insurance company or other financial institution ... to discriminate against any person or group of persons because of race, creed, color, national origin ... marital status [or] sex." N.J. Stat. Ann. § 10:5-12(i). The statute of limitations for claims under LAD is two years. *Montells v. Haynes*, 133 N.J. 282, 294-95, 627 A.2d 654 (1993). A cause of action under LAD accrues on the day the discriminatory act occurs. *Shepherd v. Hunterdon Dev. Ctr.*, 174 N.J. 1, 21, 803 A.2d 611 (2002).

Plaintiffs failed to allege in their complaint which class of protected individuals under LAD they are members of and what discriminatory act has occurred. Regardless of the inadequacies of their pleading, Plaintiffs' LAD claim is barred due to the two-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5169024 (D.N.J.)
**(Cite as: 2010 WL 5169024 (D.N.J.))**

year statute of limitations. The LAD claim stems from alleged discriminatory lending practices with respect to Plaintiffs mortgage loan transaction, the closing of which took place in December 2006. Count XIII, therefore, must be dismissed as untimely.

**10. Violation of NJ HOSA (Count XIV)**

Plaintiffs allege a violation of New Jersey's HOSA for abusive mortgage lending practices in Count XIV. *See* N.J. Stat. Ann. § 46:10B-23 *et seq.* Finding that "[a]busive mortgage lending has become an increasing problem, New Jersey's Legislature enacted HOSA in 2003 to combat "[a]busive mortgage lending" resulting from "the making of loans that are equity-based, rather than income-based," and "the financing of high points and fees." N.J.S.A. 46:10B-23(a). To address these abuses, HOSA prohibits creditors from engaging in a number of practices such as "recommend[ing] or encourag[ing] default on an existing loan or other debt," charging late payment fees "in excess of 5% of the amount of the payment past due," or accelerating the debt "in its sole discretion." N.J.S.A. 46:10B-25(c),(d)(1),(e).

Applying the *Twombly* standard, Plaintiffs have failed to adequately plead their claim under HOSA. Count XIV simply parrots the relevant statute, and the complaint contains no factual support for the claim. Plaintiffs' HOSA claim, therefore, shall be dismissed.

**III. Conclusion**

For the reasons above, Defendants' motions to dismiss shall be granted in part and denied in part. The motions are granted as to the following claims: TILA claims (damages only)-Counts I and XV; CFA, RICO and Fraud-Counts II through IV; Negligence (as to MLML only)-Counts VI and X; Unjust Enrichment-Count VII; Contract claims-Counts VIII and XII; RESPA-Count IX; Breach of Fiduciary Duty-Count XI; LAD-Count XIII; HOSA-Count XIV. The motions are denied as to TILA claims (rescission only)-Count I and XV; Negligence (as to Quicken)-Counts VI and X; and Unconscionability-(Count V). The Third Circuit has "instructed that if a complaint is vulnerable to 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile." *Phillips v. County of Allegheny*, 515 F .3d 224, 236 (3d Cir.2008). Therefore, the Court shall grant Plaintiffs 20 days to file an amended complaint to add

allegations to cure any of the deficiencies identified in this Opinion. If Plaintiff fails to timely file an amended complaint, the dismissal of the above listed Counts shall be deemed to be with prejudice.

D.N.J.,2010.
Soto v. Quicken Loans
Slip Copy, 2010 WL 5169024 (D.N.J.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

# **EXHIBIT 15**

**McCusker, Anselmi, Rosen, Carvelli & Walsh, P.C.**
Michael T. Millar, Esq.
98 East Water Street
Toms River, NJ 08753
Tel: (732) 914-9114
Fax: (732) 914-8024
Email: mmillar@marcw.com

**Foley & Lardner, L.L.P.**
Jay N. Varon, Esq.
Wendy K. Arends, Esq.
Michael D. Leffel, Esq.
3000 K Street, N.W.
Suite 500
Washington, DC 20007
Tel (202) 672-5300
Fax: (202) 672-5399
Email: jvaron@foley.com



Attorneys for Defendant Weichert Title Agency

| | |
|---|---|
| **JOSEPH ROGERS**, On Behalf of Himself and All Others Similarly Situated, | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: CAMDEN COUNTY |
| *Plaintiff,* | DOCKET NO.: L-6935-06 |
| *vs.* | Civil Action |
| **WEICHERT TITLE AGENCY,** | **ORDER DISMISSING COUNT I, COUNT II AND COUNT III OF THE COMPLAINT** |
| *Defendant.* | |

**THE ABOVE HAVING BEEN OPENED** to the Court by Michael T. Millar, Esq.,

of McCusker, Anselmi, Rosen, Carvelli & Walsh, P.C., and by Jay N. Varon, Esq.,

Wendy K. Arends, Esq., and Michael D. Leffel, Esq. of Foley & Lardner L.L.P.,

attorneys for defendant Weichert Title Agency on notice to James C. Shah, Esq., of

Shepherd, Finkelman, Miller & Shah, LLC and on notice to John W. Trimble, Jr., Esq.

of Trimble & Associates, attorneys for plaintiff Joseph Rogers, for the entry of an Order

dismissing Counts I, II and III of the Complaint; and the Court having considered the

papers submitted by counsel, and for good cause otherwise appearing;

**IT IS** on this _____ day of _____, 2007,

**ORDERED** that Count I, ~~Count II and Count III~~ of the Complaint be and hereby are dismissed; and

**IT IS FURTHER ORDERED** that a copy of this Order shall be served upon all counsel of record within five days of receipt hereof; and it is

**SO ORDERED.**

_____ JSC

__ opposed
__ unopposed

# **<u>EXHIBIT 16</u>**