Westlaw.

Not Reported in F.Supp.2d, 2005 WL 1719134 (D.N.J.)
**(Cite as: 2005 WL 1719134 (D.N.J.))**

C Only the Westlaw citation is currently available.

United States District Court,
D. New Jersey.
OPTICA, INC., Plaintiff,
v.
METRO PUBLIC ADJUSTMENT, INC., Travelers
Indemnity Company of America, et al., Defendants.

No. Civ.A. 03-5065.
July 21, 2005.

Mark J. Molz, Hainesport, NJ, for Plaintiff.

Susanna J. Morris, Budd Larner Rosenbaum Green-
berg & Sade, P.C., Cherry Hill, NJ, for Defendants.

OPINION

RODRIGUEZ, J.

*1 This matter is before the Court on Defendants
The Traveler's Indemnity Company of America
("Travelers") and Metro Public Adjustment, Inc.
("Metro"), Daniel M. Young ("Young"), and Robert
DeCecco ("DeCecco") (collectively the "Metro De-
fendants") individual motions for summary judg-
ment, and Plaintiff Optica, Inc.'s ("Optica") cross-
motion for summary judgment as against Travelers.
For the reasons discussed herein, summary judgment
will be granted as to all claims against Travelers, and
Optica's cross-motion for summary judgment will be
denied. Metro's motion for summary judgment will
be granted in-part and denied in-part.

## I. Factual Background

### A. Actions after the loss

This litigation concerns the coverage of Travel-
ers Property Casualty insurance under Policy No. I-
680-950H8581-TIA-02, which was issued on Octo-
ber 31, 2002. (Compl.¶ 3.) Optica is a photo develop-
ing and photo supply store located in Cinnaminson,
New Jersey. (Id. at 1.) Gregory Leomporra ("Leom-
porra") is the president of Optica. On or about Sep-
tember 17, 2002, Leomporra discovered that a photo-
graphic developing machine inside Optica's store had
malfunctioned and running waste water flooded the
business premises with water and chemicals. (Id. ¶ 4.)

Travelers contacted Leomporra about five days after
the loss was reported. (Leomp. Dep. 10/19/04 at 50.)
Travelers Claims Notes state that after a physical
inspection of the site, it discovered a "crimp in the
insured's drain line for unit [developing machine].
Insured had installed this line himself." (Travelers
Exh. F at 2.)

After the loss was reported to Travelers, Travel-
ers retained and paid ServPro, a restoration company,
to remove the water, dry out the store, and remove
the water-damaged carpet. Leomporra's testimony
and the ServPro Invoice (Travelers Exh. C) indicate
that these tasks were complete in early October 2002.
(Leomp. Dep. 10/19/04 at 64.) The October 18, 2002
ServPro Invoice stated that the remediation occurred
on September 24, 2002, and under the heading
DAMAGE NOTES:

*There was visible mold growth on the wall* in the
Studio Room and also in the Dark Room.... He
[Leomporra] instructed us [ServPro] that he would
make arrangements with his insurance company to
have the shelves dismantled and machinery moved
in order for the drywall to be removed. *ServPro in-
formed Mr. Leomporra when he is ready we would
return to due [sic] any mitigation [sic] necessary.*
Any Questions Please Call Me.

(Travelers Exh. D.) (emphasis added) Later,
Travelers Claim Notes dated April 2, 2003, recorded
that ServPro did not do the initial cleanup properly,
and that exacerbated the mold problem. (Travelers,
Exh. F. at 6.) Yet, the record does not indicate that
Optica ever contacted ServPro, or any another ven-
dor, for mitigation services for several months de-
spite the "visible mold growth" reported in late Sep-
tember 2002.

On October 16, 2002, Leomporra testified that
Travelers paid Optica a $5000.00 advance pending
the adjustment of its property damage claim. In a
letter dated October 26, 2002, Leomporra sent Op-
tica's property damage claim. (Travelers Exh. D.)
This was a list of damaged store items totaling
$9,783.84. (Id.) The letter was addressed to Bill
McNellis and stated in pertinent part:

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1719134 (D.N.J.)
**(Cite as: 2005 WL 1719134 (D.N.J.))**

*2 I was pleased to know that I can fix the dark-room in January or February when we slow down.... I want to take care of the things we can do without shutting me down.... I also have two machines that have rusted on the bottom and are not currently functioning what do I do....

(*Id.*) On November 1, 2002, Travelers paid to Optica an additional $4,283.84 ($9,783.84 less $5000, and less a $500 deductible). (Leomp. Dep. 10/19/04 at 60.)

On January 22, 2003, Travelers paid Optica an advance of $6,910.21 to allegedly make the required repairs. (*See* Travelers Br. at 5.) Traveler's Claim Notes indicate that by early February, Travelers and Leomporra became aware that mold had infested the entire store. (Travelers, Exh. F at 3.) On February 5, 2003, after an inspection, Travelers wrote Leomporra to inform him that there was mold present in his store and that it must be remediated and tested. (Travelers, Exh. F at 4.)

On or about February 12, 2003, Optica entered into a contract with Metro to serve as an adjuster in its preparation of its insurance claim. (Compl. at 5.) The Public Adjuster Retainer Agreement states that, "[Optica] engages Metro to advise and assist in the adjustment of an insurance claim." (Metro, Exh. H.) The contract included an unspecified retainer with a right to cancel within three (3) business days. (*Id.*) Metro was to be compensated based upon a percentage of the overall insurance settlement received by Optica. (*Id.*) Optica dealt with Metro's adjuster Robert DeCecco ("DeCecco"), who the day after the contract was signed, retained TTI Environmental, Inc. ("TTI") because he suspected a microbial infestation. (1/26/05 DeCecco Dep. at 33-34.)

Travelers' Claim Notes indicate that during spring of 2003 Travelers requested several mold tests and attempted to ascertain the cost of remediation and repair. (Travelers, Exh. F at 7-8.) Nicholas Kaz ("Kaz") was the Travelers Adjuster who was handling Optica's claim at this time. Sometime in April, it was determined that in order to clean up the store Optica would have to relocate; thus, Travelers began looking for alternative locations. (*Id.* at 8.) Additionally, Travelers asked Optica for an estimate of the cost to remove, clean, and reinstall the photographic machines, a list of damaged contents, and a complete estimate for the repair of the store. (*Id.*) On April 9, 2003, Kaz, DeCecco, and Leomporra attended a meeting at the Optica store. Following the meeting, DeCecco forwarded a letter to Travelers, copying Optica, which confirmed certain requests made by Kaz.

On or about April 16, 2003, Travelers advanced another $15,000 to Optica. (*Id.*) Optica informed DeCecco of the overall costs estimates, which was memorialized in a May 16, 2003 letter to Kaz. (Travelers Exh. I.) Nevertheless, Kaz testified that the form of Optica's estimates was incorrect because they were not broken down into line item costs, which is the "standard in the industry." (12/22/04 Kaz Dep. at 171-172.) DeCecco testified that he called Kaz on May 27 to confirm his receipt of the May 16th letter, however, DeCecco was told that the letter had not yet been filed. (*Id.* at 88.) DeCecco submitted these estimates, and was later advised by Travelers that they were useless. (1/26/05 DeCecco Dep. at 55.)

*3 The parties' submissions indicate that the months of June and July 2003 created great confusion among the parties and the relationships began to deteriorate. During this period, Optica enlisted its own contractor, Bercon Builders; presumably, this change was made because Optica was dissatisfied with Travelers' contractor. Also, Frank Hartmann ("Hartmann") replaced Kaz at Travelers since Kaz left the firm. On June 3, 2002, Hartman met with DeCecco and Leomporra at the Optica store. Travelers agreed to pay a six month rental expense for a temporary location and advanced $30,000 for the purposes of leasing this space. (Travelers Exh. F at 16.) After the meeting, DeCecco prepared a June 9, 2003 letter to Leomporra which summarized the information that was still needed by Travelers. (Metro Exh. P.) On June 9, DeCecco wrote to TTI to obtain information from the environmental report to give to Travelers. (Metro, Exh. Q.) On June 18, 2003, Hartmann wrote a letter to DeCecco demanding a list of documents from Optica. (Travelers Exh. K.) On June 20, 2003, DeCecco wrote to Leomporra advising him that building estimates should utilize line item pricing and reflect linear and square footage costs of all materials. (Metro, Exh. S, T.)

On July 8, 2003 Metro submitted a revised building estimate from Bercon to Travelers. (Metro, Exh.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1719134 (D.N.J.)
**(Cite as: 2005 WL 1719134 (D.N.J.))**

S., T.) The next day, Travelers wrote to Metro and indicated that it did not accept the building estimate because it did not provide sufficient details. (Metro, Exh. U.) Metro's vice-president, Daniel Young ("Young") stated it was not his policy to deal directly with the insured's contractor because Metro had no authorization or right to interfere in the contractual relationship between Optica and Bercon. (1/26/05 Young Dep. at 158.) Young stated that interference with a contractor hired by a client is not within the normal public adjusting procedure. (*Id.* at 159.)

On July 11, 2003, Travelers advanced another $30,000 for the purposes of leasing another space. (Travelers Exh. F at 16; 12/22/04 Hartmann Dep. at 11.) Leomporra testified that these advances were used to pay for the day-to-day business expenses of Optica. (10/19/04 Leomp. Dep. at 100, 131, 132, 184.) On June 18, 2003, Hartmann wrote another letter to Metro that requested numerous documents. (Travelers Exh. K.) Hartmann's testimony, and Traveler's Claim Notes indicate that Travelers advanced Optica another $10,000 and agreed to pay nine months rent for a temporary location. (Travelers Exh. F at 20-21; 12/22/04 Hartmann Dep. at 20.) Leomporra used these funds, and the previously paid funds, to pay for the day-to-day operating expenses of Optica. (10/19/04 Leomp. Dep. at 100.)

Sometime in July 2003, Leomporra requested an additional $30,000 advance to pay six (6) months rent and to pay an architect. (Travelers Exh. F at 23.) At Leomporra's request, a meeting was held on July 22, 2003, at the Optica store that included Hartman and Young. Metro wrote Travelers on July 28, 2003, to memorialize the conversations of the July 22 meeting, requested an additional $50,000 advance, and expressed concerns about the tests and inspections on the property. (Metro, Exh. W.) On July 30, 2003, Travelers advanced $50,000 to Optica and indicated that they would reimburse the expense of moving the store's equipment to the temporary location. (*Id.* at 24.) Travelers retained Callaghan Nawrocki, LLP, forensic accountants, who on July 29, 2003 wrote to DeCecco requesting a list of certain documents from Optica; namely, complete federal business income tax returns from 1998 through 2002, monthly profit and loss statements from September 1998 through the present, and a detailed general ledger from September 1998 to the present. (Metro, Exh. X.) Leomporra testified that he did not allow the forensic account-

ants to inspect his books. (10/19/04 Leomp. Dep. at 189, 1/26/05 Leomp. Dep. at 40-41.) Nor, did Leomporra supply these documents to Travelers, or submit them now in support of its cross-motion for summary judgment against Travelers.

*4 Pursuant to the terms of the policy, Travelers conveyed to Leomporra a desire to inspect the store with a building consultant and environmentalist. (Ins. Policy at 0000030-31.) Leomporra testified that he informed Metro that he did not want to work with DeCecco because he was unhappy with his representation. In a letter dated July 31, 2003, Young advised Leomporra that Travelers had the right under the terms of the policy to inspect the premises using an inspector of its choosing. (*See* Travelers, Exh. L.) The letter also discussed Leomporra's desire to re-schedule the inspection. (*See id.*) Travelers alleges that Leomporra refused to allow the inspections, to which Leomporra testified that he was "massively pissed off" and he refused to allow the inspection. (10/19/04 Leomp. Dep. at 200-201.) Sometime in August 2003, Leomporra attempted to discharge Metro. (*Id.* at 211; Metro Exh. GG.)

On September 29, 2003, Optica filed suit against Travelers, Metro, Young and DeCecco. To date, Travelers has paid Optica $122,596.64. (*See* Travelers, Exh. M.) Travelers claims that Leomporra did not use any of the money to remediate or repair the damage to the store, and has not demonstrated any loss of business income or expenses under the terms of the policy. (Travelers Br. at 11.) Optica states that the reason for this lawsuit is that "Travelers deliberately delayed payment and deliberately withheld approvals that were necessary for Optica to make the move and repairs compelled by the loss/mold." (Optica Br. at 5.) Optica contends that Travelers' motive in the delay of payment and approvals was to avoid paying "business interruption" benefits, which allegedly expired one year after the loss.[FN1] Optica states that Traveler's did not give approval for the relocation until July 2003; that is, ten months after the loss. (*Id.* at 6.) This is due, in part, to three different adjusters at Travelers who would start "all over from the beginning" each time it dealt with the Optica claim. (*Id.*) Because Travelers did not require a specific format for the expense statements, it argues that its requests for reimbursements was sufficient. (*Id.* at 7.) Optica claims that Travelers delay in approving its move to an advantageous space in the same shopping

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1719134 (D.N.J.)
**(Cite as: 2005 WL 1719134 (D.N.J.))**

center caused it to lose out on that deal. (*Id.*) Because of its equipment, renovations were required at any new space; thus, landlords demanded a full years rent up-front. (*Id.* at 8.) Optica states that the total costs of the move, repairs, and renovations totaled $330,990. (*See* Leomporra Affidavit ¶ 52.) This claim does not account for the advances made by Travelers. In addition, Optica has not proffered an expert opinion on how the conduct of the Metro Defendants fell below an established standard of care applicable to other insurance adjuster professionals.

> FN1. Optica uses the term "business interruption" period, which essentially means the same thing as the "period of restoration." *See* discussion Part I.B., *infra.*

*B. Terms of the Policy*

The policy limits the coverage to $311,472. (Ins. Policy at 0000000.) The Policy provides in pertinent part:

**\*5** In the event of loss or damage covered by this Coverage Form, at our option, we will either:

(1) Pay the value of lost or damaged property;

(2) Pay the cost of repairing or replacing the lost or damaged property, subject to b. below;

(3) Take all or any part of the property at an agreed or appraised value; or

(4) Repair, rebuild or replace the property with other property of like kind and quality, subject to b. below....

The Policy provides, subject to its other terms, conditions, limitations, and exclusions for the payment of the:

actual loss of Business Income you sustain due to the necessary 'suspension' of your 'operations' during the 'period of restoration'. The 'suspension' must be caused by direct physical loss of or damage to property at the described premises.

(Ins. Policy at 0000012.) Business Income is defined as follows:
a. Business Income means the:

(1) Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred;

(2) Continuing normal operating expenses incurred, including payroll;

(3) Includes "Rental Value"; and

(4) Includes "Maintenance Fees" if you are a condominium association.

(*Id.* at 0000013.) The Policy also covers Extra Expenses, pursuant to the following coverage provision:

We will pay the necessary and reasonable Extra Expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss of or damage to property at the premises described in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss.

(2) Extra Expense means expense incurred: (a) to avoid or minimize the "suspension" of business and to continue "operations": (i) at the described premises; or (ii) at replacement premises or at the temporary locations, including relocating expenses and costs to equip and operate the replacement or temporary locations ... to the extent it reduces the amount of loss that otherwise would have been payable under Business Income.

(*Id.* at 0000018.) To be insured, the actual loss of Business Income or Extra Expense must be sustained during the "period of restoration" defined as the period of time necessary to repair, rebuild or replace the damaged property with reasonable speed and similar quality. (*Id.* at 0000014 and 18.) The Policy extends coverage for a reasonable actual loss of business income for up to an additional 60 days, but not for Extra Expense that extends beyond the "period of restoration." The Policy further limits both Business Income and Extra Expense coverage to the period occurring within 12 consecutive months immediately following the date of the direct physical loss or damage. (*Id.*)

Travelers argues that Optica has not provided any proofs to establish a cognizable claim for loss of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1719134 (D.N.J.)
**(Cite as: 2005 WL 1719134 (D.N.J.))**

Business Income or Extra Expenses under the Policy. In Travelers' Interrogatories, Question 11, Optica was asked to

**\*6** State in detail all information and documentation plaintiff provided to Travelers Indemnity Company of America as of September 17, 2003, with regard to its claim of loss of business income and extra expense.

(Travelers, Exh. O.) Optica answered, "Objection. Question is ambiguous. Without waiving: see correspondence previously stated." (*Id.*) The Policy sets forth how Business Income and Extra Expense is calculated:
   a. The amount of Business Income Loss will be determined based on:

   (1) The Net Income of the business before the direct physical loss or damage occurred;

   (2) The likely Net Income of the business if no physical loss or damage occurred, but not including any likely increase in Net Income attributable to an increase in the volume of business as a result of favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses;

   (3) The operating expenses, including payroll expenses, necessary to resume "operations" with the same quality of service that existed just before the direct physical loss or damage; and

   (4) Other relevant sources of information, including:

      (a) Your financial record and accounting procedures;

      (b) Bills, invoices and other vouchers; and

      (c) Deeds, liens or contracts.

   b. The amount of Extra Expense will be determined based on:

   (1) All reasonable and necessary expenses that exceed the normal operating expenses that would have been incurred by "operations" during the "period of restoration" if no direct physical loss or damage had occurred. We will deduct from the total of such expenses:

      (a) The salvage value that remains of any property bought for temporary use during the "period of restoration", once "operations" are resumed; and

      (b) Any Extra Expense that is paid for by other insurance, except for insurance that is written subject to the same plan, terms conditions and provisions as this insurance; and

   (2) All reasonable and necessary expenses that reduce the Business Income loss that otherwise would have been incurred.

(Ins. Policy at 0000033-34.) Another important clause in the policy is the "Duties in the Event of a Loss" section, which states in pertinent part:
   a. You must see to it that the following are done upon the discovery of loss or damage, or a situation that may lead to loss or damage, to Covered Property:

      * * *

      (4) Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in settlement of the claim....

      (5) at our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed....

      (6) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

      * * *

      (9) Cooperate with us in the investigation and settlement of the claim.

      **\*7** (10) If you intend to continue your business, you must resume all or part of your "operations" as

Not Reported in F.Supp.2d, 2005 WL 1719134 (D.N.J.)
(Cite as: 2005 WL 1719134 (D.N.J.))

quickly as possible.

(*Id.* at 0000030.) Also, the Policy contains a "Neglect" exclusion, which states:

B. EXCLUSIONS

1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

* * *

h. Neglect.

Neglect of an insured to use reasonable means to save and preserve property from further damage at and after the time of loss.

(*Id.* at 0000027.)

The critical issue at this juncture in the litigation is whether Optica can sustain a claim under the policy when there are no records that substantiate a claim for business income and extra expenses during the relevant time period. Leomporra testified that Optica has not filed a business income tax return since 1999 (10/19/04 Leomp. Dep. at 30-31), and that he refused to send the 1998 return to Travelers. (*Id.* at 189.) Also, Optica did not maintain a monthly accounting log, or some other indicia of profits. (*Id.* at 90.) Nor, did Optica maintain a general ledger or inventory list. (*Id.*) Travelers argues that a reasonable jury could not conclude that Optica sustained an actual loss of business income, or incurred extra expenses during the twelve months following September 17, 2002.

The submissions also give some, but not complete, insight into the contentiousness of the pre-litigation conduct of the parties. No doubt, several phone conversations and in-person meetings could add greater clarity to the expectations, understandings, and assurances of all involved. Partially to blame, for what was otherwise a routine insurance claim, was the number of individuals who were involved in Optica's claim, three at Travelers (McNellis, Kaz, Hartmann) and two at Metro (DeCecco, Young), which due to turnover and/or personality

clashes, created a breakdown of communication. Further complicating the resolution of this issue is the myriad of contractors and remediation specialists, each of whom were answerable to their respective client. This Opinion and accompanying Order, however, rests only on the submissions to the Court.

*II. Standard for Summary Judgment*

Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 482 n. 1 (3d Cir.2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *accord* Fed.R.Civ.P. 56(c). Thus, this Court will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

*8 An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. *Id.* In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. *Id.*; *Maidenbaum v. Bally's Park Place, Inc.*, 870 F.Supp. 1254, 1258 (D.N.J.1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. *Andersen*, 477 U.S. at

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1719134 (D.N.J.)
**(Cite as: 2005 WL 1719134 (D.N.J.))**

256-57. "A nonmoving party may not 'rest upon mere allegations, general denials or ... vague statements....' " *Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs.* 982 F.2d 884, 890 (3d Cir.1992) (quoting *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir.1991)).

Indeed,

the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex.* 477 U.S. at 322.

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Credibility determinations are the province of the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992). Moreover, the standard by which the court decides a summary judgment motion does not change when the parties file cross-motions. *Weissman v. United States Postal Serv.*, 19 F.Supp.2d 254 (D.N.J.1998). When ruling on cross-motions for summary judgment, the court must consider the motions independently, *Williams v. Philadelphia House Auth.*, 834 F.Supp. 794, 797 (E.D.Pa.1993), *aff'd*, 27 F.3d 560 (3d Cir.1994), and view the evidence on each motion in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587. Optica has filed a cross-motion for summary judgment only against Travelers.

### III. Analysis

*9 The Court must apply the forum state's choice of law rule. *General Star Nat. Ins. Co. v. Liberty Mut. Ins. Co.*, 960 F.2d 377, 379 (3d Cir.1992) (citation omitted). With respect to insurance contract disputes such as this, the New Jersey Supreme Court has held that "the law of the place of the contract will govern the determination of the rights and liabilities of the parties." *State Farm Mut. Auto. Ins. Co. v. Simmons Estate.* 84 N.J. 28. 417 A.2d 488 (N.J.1980).

### A. Claims against Travelers

#### 1. Claims of Loss

This litigation concerns three potential policy claims: Business Personal Property Claim, Business Income Claim, and Extra Expense Claim.

The record is void of evidence indicating that Leomporra was forbidden from relocating the store because he had not received authorization to do so from Travelers. DeCecco's testimony supports this principle; namely, that receiving more advance payments was not contingent on whether it stayed or immediately moved. (1/26/05 DeCecco Dep. at 52.) On or about April 28, 2003, DeCecco wrote to Leomporra requesting that he provide documentation regarding the use of a temporary location. (*See* Metro Exh. L.) The record indicates that negotiations with his current landlord fell apart; however, it is also apparent that Leomporra did not enlist a real estate agent, confined his real estate search to only Cinnaminson, and would not consider longer-term leases. (10/19/04 Leomp. Dep. at 108-22; 187-188) Furthermore, beginning in June 2003, and after already advancing Optica $30,000, Travelers started making advances to Optica that were meant to cover rent at a temporary location. It is undisputed that as of July 30, 2003, no remedial work was undertaken on the store, nor had a temporary lease been secured. Understandably, Travelers ceased making payments, although it had sent $90,000 in June and July 2003, once it became apparent that these monies were not being used to limit Travelers' or Optica's exposure.

The relationship between the parties had significantly deteriorated by July 2003. Metro had scheduled an inspection by Travelers for August 1, 2003. Over Metro's advice that Travelers had the right to inspect the store, and that Leomporra's refusal would constitute a breach of the Insurance Policy, Leomporra nonetheless refused to let the inspection to go forward. (10/19/04 Leomp. Dep. at 197,203-204; Travelers' Exh. M.)

#### a. Business Personal Property Claim

Not until this litigation began, and upon a request for discovery, was Travelers permitted to inspect the store. Traveler's building inspector, Douglas MacKinney, estimated that the complete remediation

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1719134 (D.N.J.)
**(Cite as: 2005 WL 1719134 (D.N.J.))**

would cost $63,153.60 and that a reasonable architectural fee associated with the work would be $1500. (Traveler's Exh. N.) Optica's estimate far surpasses these figures. (*See* Leomporra Affidavit ¶ 52.)

Optica has failed to substantiate a claim for business personal property loss under the Policy because its loss would come in at just over half of the $122,596.64 that Travelers had already paid in advances. Also, the delay caused by Leomporra's refusal to allow inspectors access to the store likely made the remediation costs higher. Importantly, the Policy required that the insured take all reasonable steps to protect the property from further damage (*See* "Duties in the Event of a Loss" ¶ 4, at 0000030), and permit as often as necessary the insurer the ability to inspect the property (*id.* ¶ 9, 417 A.2d 488.). Moreover, the Policy excludes "neglect of an insured to use reasonable means to save and preserve property from further damage at and after time of loss." (Ins. Policy at 0000027.) The duties and the exclusions are sufficient themselves to provide a bases for granting Traveler's motion for summary judgment.

\*10 It will be determined below that Optica has failed to proffer evidence of business income or extra expense loss incurred during the period of restoration. Or stated differently, the advances could not have been made for a business income or extra expense because these expenses had not yet "incurred." As such, the $122,596.64 must necessarily cover the business personal property claim. Since Optica has not demonstrated a loss above what it has already been advanced there exists no genuine issue of material fact as to a business personal property claim. As such, summary judgement will be denied as to Optica, but granted as to Travelers on this claim.

*b. Business Income Claim*

Optica neither submitted a loss of business claim to Travelers that incurred during the period of restoration, (Travelers' Reply at 8), nor has it responded to Travelers' discovery requests concerning the basis for a business income loss claim (*see* Optica's Responses to Requests for Documents Nos. 11, 12, 13). Before this litigation ensued, Travelers retained Callaghan Nawrocki, LLP, forensic accountants, who on July 29, 2003 wrote to DeCecco requesting a list of certain documents from Optica; namely, complete federal business income tax returns from 1998 through 2002, monthly profit and loss statements from Sep-

tember 1998 through the present, and a detailed general ledger from September 1998 to the present. (Metro, Exh. X.) Quite likely, an insurer initiates these activities to better ascertain its business income exposure, and then, pay the insured what is owed. Leomporra testified that he did not allow the forensic accounts to inspect his books. (10/19/2004 Leomp. Dep. at 189, 1/26/05 Leomp. Dep. at 40-41.)

Leomporra testified that Optica has not filed a business income tax return since 1999 (10/19/04 Leomp. Dep. at 30-31), and that he refused to send the 1998 return to Travelers. (*Id.* at 189.) Also, Optica did not maintain a monthly accounting log, or some other indicia of profits. (*Id.* at 90.) Nor, did Optica maintain a general ledger or inventory list. (*Id.*) The policy states that the amount of Business Income Loss will be determined based on:

(1) The Net Income of the business before the direct physical loss or damage occurred;

(2) The likely Net Income of the business if no physical loss or damage occurred, but not including any likely increase in Net Income attributable to an increase in the volume of business as a result of favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses;

(3) The operating expenses, including payroll expenses, necessary to resume "operations" with the same quality of service that existed just before the direct physical loss or damage; and

(4) Other relevant sources of information, including:

(a) Your financial record and accounting procedures;

(b) Bills, invoices and other vouchers; and

(c) Deeds, liens or contracts.

\*11 The policy places a limit on actual business income loss during the "period of restoration, not to exceed twelve (12) consecutive months.[FN2] Thus, the record indicates that Optica was in breach of the duties to provide the amount of loss claimed (*see* Ins.

Not Reported in F.Supp.2d, 2005 WL 1719134 (D.N.J.)
**(Cite as: 2005 WL 1719134 (D.N.J.))**

Policy at 0000030) and it disallowed an examination of its books and records (*id.*). Without evidence of a business income loss, coupled with a breach of these duties by Optica, a claim of business income loss cannot go forward.

> FN2. To be insured, the actual loss of Business Income or Extra Expense must be sustained during the "period of restoration" defined as the period of time necessary to repair, rebuild or replace the damaged property with reasonable speed and similar quality. (Ins. Policy 0000014, 0000018.)

All reasonable inferences support the conclusion that both parties sought to keep Optica in the store as long as possible, until the mold problem became unmanageable and a temporary relocation was required. Both parties benefitted from having the store continue to operate because the business income losses and expenses involved in relocating would be less. Early correspondence between Travelers and Optica indicates that the insurer acquiesced to Optica postponing an accounting of its claim till things "slow down" in January or February 2003. (*See* Travelers' Exh. D.) Yet, based on this record, Travelers cannot be held responsible for business income loss. This correspondence does not mean that Optica was required, or permitted to forgo it duties as the insured until some later date merely because it was allowed to postpone repairs on the darkroom. The on-site insured has an express duty under the Policy to protect, report, cooperate and mitigate its claim. (*See* "Duties in the Event of a Loss" at 0000030.) Optica's claims are not retroactive, so the fact that Leomporra decided to stay in the premises, in contradiction to the advice of his public adjuster and the insurer, to the eventual detriment of his business, is of no consequence to its coverage under the Policy. In short, the insured had a duty to preserve his property and his business, and then seek redress with the insurer by way of a claim for expenses incurred, or litigation if need be.

Nevertheless, Optica has not been presented a single financial or accounting record to Travelers, or this Court, which could substantiate a business income claim which was incurred in the twelve consecutive months following September 17, 2002. Optica has not filed a federal business income tax claim since 1998, which raises numerous other legal issues

not presently before the Court. Without these documented losses, Travelers will prevail as a matter of law. Therefore, summary judgment will be granted as to the business income claim.

*c. Extra Expense Claim*

It is undisputed that the Policy provides coverage for the extra expense Optica actually incurred in equipping and operating a temporary location. Similar to business income, an extra expense under the policy must be *incurred* during the period of restoration and occur within twelve consecutive months after the date of direct physical loss or damage. (Ins. Policy 0000018.) Like the business income analysis above, Optica has not answered Traveler's discovery requests, or submitted a factual basis for extra expenses in its cross-motion for summary judgment.

**\*12** Traveler's adjuster Hartmann testified that the cost of disassembling Optica's equipment, moving, reassembly, and the rental of the temporary location were covered under the Policy. (10/20/04 Hartmann Dep. at 50.) Viewing the facts in the light most favorable to Optica, it has not demonstrated that it incurred extra expenses during the period of restoration. Summary judgment on the extra expense claim is therefore appropriate.

**2. Consequential Damages**

The New Jersey Supreme Court established the governing standard in *Pickett v. Lloyd's*, 131 N.J. 457, 621 A.2d 445 (N.J.1993) for when an insurance company might be liable for consequential damages beyond the policy limits based upon the insurer's bad faith failure to pay. In order to establish a claim for bad faith in the insurance context, a plaintiff must show two elements: (1) the insurer lacked a "fairly debatable" reason for its failure to pay a claim, and (2) the insurer knew or recklessly disregarded the lack of a reasonable basis for denying the claim. *Id.* at 454. Plaintiff must be able to establish, as a matter of law, a right to summary judgment on the substantive claim; if plaintiff cannot establish a right to summary judgment, the bad faith claim fails. *Id.* In other words, if there are material issues of disputed fact which would preclude summary judgment as a matter of law, an insured cannot maintain a cause of action for bad faith. *Id.; Tarsio v. Provident Ins. Co.*, 108 F.Supp.2d 397, 400-01 (D.N.J.2000); *Polizzi Meats v. Aetna Life & Cas. Co.*, 931 F.Supp. 328, 335 (D.N.J.1996).

Not Reported in F.Supp.2d, 2005 WL 1719134 (D.N.J.)
(Cite as: 2005 WL 1719134 (D.N.J.))

Consequential damages are not warranted here because summary judgment was granted in favor of Travelers as to the breach of contract claim. Even assuming that analysis was in error, there was a "fairly debatable" reason for Travelers' denial of Optica's claim because Traveler's received no evidence of business income loss or extra expense. Therefore, Optica's bad faith cause of action is unsustainable as a matter of law and Travelers is entitled to summary judgment.

3. Consumer Fraud Act

The breach of an enforceable insurance contract does not constitute a violation of New Jersey's Consumer Fraud Act ("CFA"), N.J.S.A. 56:8-2. *Van Holt v. Liberty Mut. Fire Ins. Co.*, 163 F.3d 161 (3rd Cir.1998). Hence, the mere denial of insurance benefits to which the plaintiffs believed they were entitled does not comprise an unconscionable commercial practice. *Id.* at 168. New Jersey courts have uniformly supported this interpretation. *See, e.g., Kuhnel v. CNA Ins. Companies*, 322 N.J.Super. 568, 731 A.2d 564 (N.J.Super.Ct.App.Div.1999) ("The issues here involve the receipt of benefits, issues which have been held to be beyond the scope of the CFA."), *cert. denied*, 163 N.J. 12, 746 A.2d 458, *cert. denied*, 531 U.S. 819, 121 S.Ct. 61, 148 L.Ed.2d 27 (2000).

Here, Optica's claim centers around receipt of benefits. Accordingly, Optica's consumer fraud allegations will be dismissed insofar as they are claimed to constitute violations of the CFA.

4. Attorney's Fees

*13 The federal courts and the courts of the State of New Jersey adhere to the "American Rule", which provides that the "prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser." *Alyeska Pipeline Serv. Co. v. Wilderness Society*, 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); *Rendine v. Pantzer*, 141 N.J. 292, 322, 661 A.2d 1202 (1995). New Jersey Civil Rule 4:42-9(a)(6) provides an exception to this rule. It authorizes counsel fees in "an action upon a liability or indemnity policy of insurance, in favor of a successful claimant". *Id.* This insurance policy at issue here is neither for liability nor indemnity coverage, but, rather, for first party coverage for alleged property damage to Optica's own property. As such, plaintiff

may not recover attorney's fees from Travelers. *See Cipala v. Lincoln Technical Institute*, 179 N.J. 45, 843 A.2d 1069, 1075 (N.J.2004); *Guarantee Ins. Co. v. Saltman*, 217 N.J.Super. 604, 526 A.2d 731, 735 (N.J.Super.Ct.App.Div.1987) (holding that the rule is "not extended to permit counsel fees to its insured on a direct suit against the insurer to enforce a casualty or other first party direct coverage").

Again, assuming arguendo that Optica could sustain a breach of contract claim, the New Jersey law would still foreclose Optica's claim for attorney fees. Therefore, summary judgment will be granted in favor of Travelers because Optica is not entitled to attorney fees as a matter of law.

5. Common Law Fraud and Misrepresentation

In order to establish a claim for fraud, plaintiff must demonstrate: i) a material representation of a fact, ii) knowledge on the speaker's part that the statement is false, iii) an intent that the other lied, iv) actual and reasonable reliance, and v) resulting damages. *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 691 A.2d 350, 367 (N.J.1997) In addition to these elements, claims of negligent misrepresentation also require reasonable reliance on the alleged misrepresentation. *In re: The Northwestern Mutual Life Insurance Company Sales Practices Ligitation*, 70 F.Supp.2d 466, 468 (D.N.J.1999) (citing to New Jersey case law).

Federal Rule of Civil Procedure 9(b) requires a plaintiff to plead fraud with particularity. In pertinent part, Rule 9(b) states that "in all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity. Malice, intent, knowledge and other conditions of mind of a person may be averred generally." *Id.* The Complaint contains only a general allegation of "representations by Travelers of a prompt and fair claims process" which have "proven false and plaintiff has relied thereon to its detriment." (Compl., ¶ 27.) Optica provides no specific factual allegations with regard to this alleged misrepresentation and/or fraud. Moreover, Optica's Opposition Brief provides nothing more than articulate the black letter law without offering one fact to support its fraud and misrepresentation claims.

A plaintiff may not rely on conclusory statements in order to establish a fraud claim. *Mardini v. Vicking Freight, Inc.*, 92 F.Supp.2d 378, 385

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1719134 (D.N.J.)
(Cite as: 2005 WL 1719134 (D.N.J.))

(D.N.J.1999). Rather, it must at least, indicate who made the material misrepresentation giving rise to the claim, and what representations were made. *Id.* Because Optica makes no specific factual allegations of misrepresentation and reliance thereon, it is appropriate under Fed.R.Civ.P. 9(b) to grant summary judgment as to these claims.

**B. Claims against the Metro Defendants**

**1. Breach of Contract**

*14 On or about February 12, 2003, Optica entered into a contract with Metro to serve as an adjuster in its preparation of its insurance claim. (Compl. at 5.) The Public Adjuster Retainer Agreement states that, "[Optica] engages Metro to advise and assist in the adjustment of an insurance claim." (Metro, Exh. H.) On August 24, 2003, Leomporra wrote DeCecco in an attempt to terminate the Retainer Agreement. (Metro, Exh. GG.) Leomporra indicated that he believed that he was entitled to a refund of the monies paid to Metro as part of a retainer. (*Id.*) The record does not indicate how much Optica paid Metro for its retainer. On September 3, Metro's vice-president Young wrote to Leomporra to indicate that he would not accept Optica's termination of the contract and stated:

I am unable to grant your request for termination of the Contract with a return of the fee paid to our firm. A review of the Contract between yourself and Metro Public Adjustment shows that your right to cancel must be invoked within three business days of signing such. Your request is not within the time limit allowed.

(Compl. ¶ 20; Compl. at Exh. 3.)

Optica devotes significant attention to "Breach of Contract" in its Opposition to Metro's Motion for Summary Judgment. However, Metro has not moved for summary judgment as to Optica's breach of contract claim. Metro's Brief does not specifically address this claim despite the request in its Motion to "dismiss all claims." (*See* Metro Br. at 39.) Furthermore, Optica only filed a cross-motion for summary judgment as against Travelers as it relates to a breach of contract claim. As a result, Optica's breach of contract claim against Metro is not being challenged, and therefore, is undisturbed by this Court's Opinion and

accompanying Order.

**2. Breach of covenant of good faith and fair dealing**

An implied duty of good faith and fair dealing is implied into all contracts in New Jersey. *Sons of Thunder, Inc. v. Borden, Inc.,* 148 N.J. 396, 690 A.2d 575 (N.J.1997) (citing cases). The New Jersey Supreme Court explained the duty as requiring that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.* (quoting *Palisades Props., Inc. v. Brunetti,* 44 N.J. 117, 207 A.2d 522 (N.J.1965)). The implied covenant is an independent duty and may be breached even where there is no breach of the contract's express terms. *See Sons of Thunder,* 690 A.2d at 588 (citing *Bak-A-Lum Corp. v. Alcoa Bldg. Prods., Inc.* 69 N.J. 123, 351 A.2d 349 (N.J.1976)).

Despite Optica's breach of contract claim, this allegation is not duplicative, and therefore, warrants an independent analysis under New Jersey law. *See Automated Salvage Transp., Inc. v. NV Koninklijke KNP BT,* 106 F.Supp.2d 606 (D.N.J.1999) Optica does not directly respond to Metro's argument concerning Metro's alleged breach of the covenant of good faith and fair dealing in its Brief. Optica, however, under the heading "Breach of Contract" avers that Metro did "next to nothing for the seven months it was retained by Optica, other than relay letters between Travelers and Optica." (Optica Opp. Br. to Metro at 8.) Also, Optica submits that Metro failed to request adequate advances, and advise Optica on when the one-year "Business Interruption" period began under the Insurance Contract. (*Id.*) Additionally, and not given consideration here, Optica makes the bald assertion that Metro colluded with Travelers in delaying its claim. Such allegations are distinct from its breach of contract claim; thus, it may "not literally violate" the agreement; it may, however, violate the covenant.

*15 Indeed, drawing all favorable inferences in favor of the non-movant, Optica, there exists a genuine issue of material fact as to whether Metro's actions "injured [Optica's] right ... to receive the fruits of the contract." *Pallisades Properties, Inc.,* 44 N.J. at 130, 207 A.2d 522. In particular, there is significant dispute of the role that Metro played in resolving Optica's claim. Importantly, there were several documents sent by way of the adjuster to the insurer

Not Reported in F.Supp.2d, 2005 WL 1719134 (D.N.J.)
**(Cite as: 2005 WL 1719134 (D.N.J.))**

that were incorrect. Metro's involvement since February 2003 calls into question how and why Optica failed to take advantage of the business income and extra expense provisions of the contract during the period of restoration once the licensed adjuster was retained. The factual record is inconclusive on whether this was the result of the insured or the adjuster, or both. Accordingly, the Court will deny summary judgment as to that claim.

3. Common law fraud and misrepresentation

The Metro Defendants have moved to dismiss the fraud and misrepresentation claims against them on the grounds that Optica has not plead the sufficient quantum of facts to survive a motion for summary judgment. (Metro Br. at 26.) This argument is unopposed in Optica's Opposition Brief. The analysis employed in Part II.A.5, *infra,* in dismissing the same claims against Travelers is applicable here.

Federal Rule of Civil Procedure 9(b) requires a plaintiff to plead fraud and misrepresentation claims with particularity. In pertinent part, Rule 9(b) states that "in all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity. Malice, intent, knowledge and other conditions of mind of a person may be averred generally." *Id.* Optica states that DeCecco and Young represented that Metro was a "knowledgeable experienced public adjuster who would promptly process information necessary to have an orderly transition from the damaged facility to the new facility within the timeframes of the Insurance Contract which provides for a 12-month coverage of business interruption losses." (Compl., ¶ 16.) Further, the Complaint contains only a general allegation that "Plaintiff has relied upon the various representations and misrepresentations to its detriment." (Compl., ¶ 21.) Neither Optica's Complaint, or the papers opposing Metro's motion, provide specific factual allegations with regard to this alleged misrepresentation and/or fraud. Because Optica makes no specific factual allegations of fraud and/or misrepresentation and reliance thereon, it is appropriate under Fed.R.Civ.P. 9(b) to grant summary judgment as to these claims.

4. Consumer Fraud Act claims

This case involves claims made by a business owner against its adjuster due to alleged failures in processing the insured's claim with the insurer. The CFA and New Jersey's jurisprudence provide a plethora of examples of what does or does not amount to consumer fraud. Minor disagreements between consumer and business owner over quality of customer service, timing of service, or increased price is not consumer fraud. *Turf Lawnmower Repair v. Bergen Record Corp..., 139 N.J. 392, 655 A.2d 417, 430 (N.J.1995).* To constitute consumer fraud sufficient to trigger the actual-malice standard, the business practice in question must be "misleading" and stand outside the norm of reasonable business practice in that it will victimize the average consumer, and thus most clearly and directly involve a matter of legitimate public concern. *Id.* New Jersey recognizes a distinction between consumer fraud and mere customer dissatisfaction. *Id.*

*16 In drawing all reasonable inferences, the evidence that Optica introduces does not set forth consumer fraud conduct that would constitute a violation of the CFA. Metro and Optica entered into a private contract for services. This litigation concerns the quality of the service provided. While professional adjusters might arguably involve "a matter of legitimate public concern," the facts provided in the Complaint and Metro's supporting papers do not create a genuine issue of material fact as to whether Metro engaged in an "unlawful practice" under the CFA.[FN3] An isolated contract dispute is not the evil the state legislators envisioned went it drafted the CFA. Therefore, summary judgment will be granted as to this claim.

FN3. The focus of the CFA is the activity of a corporation that constitutes an "unlawful practice." For example, N.J.S.A. 56:8-2, dealing with fraud in connection with sale or advertisements by merchants, reads:

[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such ... whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice....

The phrase "unconscionable commercial practice" is not defined in the Act. Ac-

Not Reported in F.Supp.2d, 2005 WL 1719134 (D.N.J.)
(Cite as: 2005 WL 1719134 (D.N.J.))

knowledging that "unconscionability" is an "amorphous concept obviously designed to establish a broad business ethic," the New Jersey Supreme Court has defined the term as "the standard of conduct contemplating * * * good faith, honesty in fact and observance of fair dealing." *Meshinsky v. Nichols Yacht Sales, Inc.,* 110 N.J. 464, 541 A.2d 1063 (1988) (quotation omitted).

**5. Negligence Claim**

Under New Jersey law, three elements are essential for the existence of a cause of action in negligence: (1) a duty of care owed by defendant to plaintiff; (2) a breach of that duty by defendant; and (3) an injury to plaintiff proximately caused by defendant's breach. *Endre v. Arnold,* 300 N.J.Super. 136, 692 A.2d 97, 100 (N.J.Super.Ct.App.Div.1997) (citation omitted). The determination of the existence of a duty is a question of law for the court. *Petrillo v. Bachenberg,* 139 N.J. 472, 655 A.2d 1354, 1357 (N.J.1995) (citations omitted). The question whether a duty exists implicates many factors, including the foreseeability of harm, fairness and public policy. *Carvalho v. Toll Bros. and Developers,* 143 N.J. 565, 675 A.2d 209, 212 (N.J.1996). Foreseeability as it impacts duty determinations refers to:

[t]he knowledge of the risk of injury to be apprehended. The risk reasonably to be perceived defines the duty to be obeyed; it is the risk reasonably within the range of apprehension, of injury to another person, that is taken into account in determining the existence of the duty to exercise care.

*Kuehn v. Pub Zone,* 364 N.J.Super. 301, 835 A.2d 692, 698 (N.J.Super.Ct.App.Div.2003). The last element of negligence concerns damages, which have traditionally been limited to actual physical injury to persons or property.

New Jersey, however, has generally rejected a per se "economic loss" doctrine and has endeavored to create exceptions to this rigid rule when the plaintiffs are reasonably foreseeable, the injury is directly and proximately caused by defendant's negligence, and liability can be limited fairly. *People's Express Airlines Inc. v. Consolidated Rail,* 100 N.J. 246, 495 A.2d 107, 109 (N.J.1985). Generally, to recover for an economic loss resulting from negligence by one

furnishing a service, a "direct contractual relationship between the parties" must exist or the injured party must be a known "beneficiary of the defendant's undertaking." *H. Rosenblum, Inc. v. Adler,* 93 N.J. 324, 461 A.2d 138, 143 (N.J.1983). Such contract existed between Metro and Optica; therefore, a duty was owed.

Metro correctly asserts that Optica has failed to proffer a genuine issue of material fact to a sustain a negligence claim because Optica has not submitted any evidence indicating that Metro, a licensed public adjuster, breached its duty to Optica. New Jersey has established a standard to determine whether expert testimony is required for a particular subject matter. Generally, subject matter that is so esoteric that it is beyond the ken of the average person typically qualifies as an appropriate subject for expert testimony. *State v. Kelly,* 97 N.J. 178, 478 A.2d 364 (N.J.1984). A factfinder should not be allowed to speculate without the assistance of expert testimony in an area where the average person could not be expected to have sufficient knowledge or experience. *Kelly v. Berlin,* 300 N.J.Super. 256, 692 A.2d 552 (N.J.Super.App.Div.1997).

\*17 Expert testimony is generally required to establish a standard of care in a professional liability case.[FN4] There exists exceptions to the expert testimony requirement where the questioned conduct presents such an obvious breach of an equally obvious professional norm that the fact-finder could resolve the dispute based on its own ordinary knowledge and experience and without resort to technical or esoteric information. *Brach, Eichler, Rosenberg, et al v. Ezekwo,* 345 N.J.Super. 1, 783 A.2d 246 (N.J.Super.Ct.App.Div.2001). The exception does not apply here because the conduct at issue cannot be said to be "such an obvious breach." The standard of care of a public adjuster would likely require analysis of standard industry practices, including the use and application of claims forms, risk and exposure assessments, and contract interpretation. Because Optica's predicate for liability as asserted in the Comtica is the manner in which a "licensed person," an adjuster, exercised responsibilities and judgment, and because the circumstances under which the deficiencies occurred, if indeed they did occur, is not a matter within the knowledge of the average citizen or juror, Optica would need an expert in order to make out a prima facie case before the jury.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1719134 (D.N.J.)
**(Cite as: 2005 WL 1719134 (D.N.J.))**

FN4. *See, e.g., Sanzari v. Rosenfeld,* 34 N.J. 128, 167 A.2d 625 (N.J.1961) (medical malpractice); *Rosenberg v. Cahill,* 99 N.J. 318, 492 A.2d 371 (N.J.1985) (legal malpractice); *Taylor v. DeLosso,* 319 N.J.Super. 174, 725 A.2d 51 (N.J.Super.Ct.App.Div.1999) (Architect malpractice); *Charles A. Manganaro Consulting Eng'rs v. Carneys Point Twp.,* 344 N.J.Super. 343, 781 A.2d 1116 (N.J.Super.Ct.App.Div.2001) (engineering malpractice); *Dimarino v. Wishkin,* 195 N.J.Super. 390, 479 A.2d 444 (N.J.Super.Ct.App.Div.1984) (Insurance broker malpractice).

Expert testimony has not been proffered; therefore, Optica's claim for professional negligence must fail because there are no genuine issues of material fact as to the breach of standard of care. Accordingly, summary judgment will be granted as to this claim.

### VI. Conclusion

For the reasons discussed herein, summary judgment will be granted as to all claims against Travelers, and therefore, Optica's cross-motion for summary judgment will be denied in its entirety. Metro's motion for summary judgment will be granted in-part and denied in-part. Optica's claims of fraud, misrepresentation, consumer fraud, and negligence as against the Metro Defendants will be dismissed. The Metro Defendants' motion for summary judgment will be denied as to Optica's breach of contract and breach of the covenant of good faith and fair dealing claims. The accompanying Order is entered.

D.N.J.,2005.
Optica, Inc. v. Metro Public Adjustment, Inc.
Not Reported in F.Supp.2d, 2005 WL 1719134 (D.N.J.)

END OF DOCUMENT

# **EXHIBIT 17**



LEXSEE 2009 US DIST LEXIS 49508

**PROFESSIONAL CLEANING AND INNOVATIVE BUILDING SERVICES, INC.,
Plaintiff, v. KENNEDY FUNDING, INC., GREGG WOLFER, JEFFREY
WOLFER, JOSEPH WOLFER, and KEVIN WOLFER, Defendants.**

**2:05-CV-2384 (WJM)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

**2009 U.S. Dist. LEXIS 49508**

**June 12, 2009, Filed**

**SUBSEQUENT HISTORY:** Affirmed by Prof'l Cleaning & Innovative Bldg. Servs. v. Kennedy Funding Inc., 2010 U.S. App. LEXIS 24400 (3d Cir. N.J., Nov. 29, 2010)

**PRIOR HISTORY:** Construcciones Haus Soceidad v. Kennedy Funding, Inc., 2008 U.S. Dist. LEXIS 33685 (D.N.J., Apr. 24, 2008)
Prof'l Cleaning & Innovative Bldg. Servs. v. Kennedy Funding, Inc., 245 Fed. Appx. 161, 2007 U.S. App. LEXIS 18827 (3d Cir. N.J., 2007)
Kennedy Funding, Inc. v. Ruggers Acquisition & Dev., 2007 U.S. Dist. LEXIS 55261 (D.N.J., July 31, 2007)
Kennedy Funding, Inc. v. Lion's Gate Dev., LLC, 2006 U.S. Dist. LEXIS 68982 (D.N.J., Sept. 25, 2006)
Royale Luau Resort, LLC v. Kennedy Funding, Inc., 2008 U.S. Dist. LEXIS 11902 (D.N.J., Feb. 19, 2008)

**COUNSEL:** [*1] For PROFESSIONAL CLEANING AND INNOVATIVE BUILDING SERVICES, INC., Plaintiff: JILL ANNE LAZARE, LEAD ATTORNEY, LAW OFFICES OF JILL ANNE LAZARE, LLC, SHORT HILLS, NJ.

For KENNEDY FUNDING, INC., Defendant: JORDAN B. DEFLORA, HACKENSACK, NJ.

For Gregg Wolfer, JEFFREY WOLFER, JOSEPH WOLFER, KEVIN WOLFER, Defendants: JORDAN B. DEFLORA, LEAD ATTORNEY, HACKENSACK, NJ.

**JUDGES:** HON. WILLIAM J. MARTINI, U.S.D.J.

**OPINION BY:** WILLIAM J. MARTINI

**OPINION**

**MARTINI, U.S.D.J.**

This matter comes before the Court on cross-motions for summary judgment arising out of claims stemming from a commercial real estate financing transaction. The Court did not hold oral argument. Fed. R. Civ. P. 78. For the following reasons, the Defendants Kennedy Funding Inc. ("Kennedy"), Gregg Wolfer, Jeffrey Wolfer, Joseph Wolfer, and Kevin Wolfer's motion for summary judgment is **GRANTED** with regards to Counts One, Two, Three, and Six. Defendants' motion or summary judgment is **GRANTED** with regards to Gregg Wolfer and **DENIED** with regards to Kennedy for purposes of Counts Four and Five. Plaintiff Professional Cleaning and Innovative Building Services, Inc.'s ("Professional") cross-motion for summary judgment is **DENIED** in its entirety. In addition, the Court will [*2] *sua sponte* **DISMISS** the present action for lack of subject matter jurisdiction.

**BACKGROUND**

This is one of many actions within this district involving Kennedy and its lending practices. [1] Kennedy is a New Jersey based lender of last resort--a "hard money lender"--that provides financing to companies with time-sensitive needs. (Aff. of Gregg Wolfer (hereinafter "Wolfer Aff.") Ex. A.) Professional is a Missouri based corporation that engages in the purchasing, leasing, and maintenance of commercial property. (Second Amend. Compl. P 5.)

Case 2:10-cv-06088-DRD-PS     Document 11-6     Filed 02/09/11     Page 17 of 31 PageID: 421

Page 2
2009 U.S. Dist. LEXIS 49508, *

1   Several courts within this district have issued opinions in related matters. *See Construcciones Haus Soceidad v. Kennedy Funding Inc.,* Civ. No. 07-0392, 2008 U.S. Dist. LEXIS 33685, 2008 WL 1882857 (D.N.J. Apr. 24, 2008); *Royale Luau Resort, LLC v. Kennedy Funding, Inc.,* Civ. No. 07-1342, 2008 U.S. Dist. LEXIS 11902, 2008 WL 482327 (D.N.J. Feb. 19, 2008); *Kennedy Funding, Inc. v. Ruggers Acquisition and Dev.,* Civ. No. 07-669, 2007 U.S. Dist. LEXIS 55261, 2007 WL 2212859 (D.N.J. July 31, 2007); *Kennedy Funding, Inc. v. Lion's Gate Dev., LLC,* Civ. No. 05-4741, 2006 U.S. Dist. LEXIS 68982, 2006 WL 2786927 (D.N.J. Sept. 26, 2006); *Kennedy Funding, Inc. v. Lion's Gate Dev., LLC,* Civ. No. 05-4741, 2006 U.S. Dist. LEXIS 48997, 2006 WL 2038496 (D.N.J. July 19, 2006).

In February 2004, Professional contacted [*3] Kennedy, through a broker, seeking to obtain a loan of $ 1,800,000 to purchase commercial property in Bonner Springs, Kansas. (*Id.* at PP 19-24.) Kennedy sent Professional a letter of interest on March 4, 2004. (Wolfer Aff. Ex. B.) The letter indicated that Kennedy would make a five-year loan to Professional for up to 60% of the "as is" market value of the real estate collateral that would secure the loan, defining "as is" market value as a "three (3) to four (4) month sale to a cash buyer." (*Id.*) Kennedy agreed to charge Professional a flat rate of 12% for the first year and 18% per year thereafter. (*Id.*) The letter also demanded a $ 10,000 fee in order for Professional to receive a draft of a loan commitment, which was "fully refundable for any reason if you do not execute a loan commitment with [Kennedy]." (*Id.*)

Professional paid the $ 10,000 fee and received a draft of the loan commitment on March 11, 2004. (*Id.* at Ex. C.) In addition to restating the above definition of "as is" market value, the draft articulated that Kennedy would select an appraiser of its choice to determine the value of the collateral property. (*Id.*) Following the initial valuation, Professional had the option [*4] to obtain a third-party appraisal, at its own expense, from a mutually agreed upon party. (*Id.*) Execution of the draft was contingent upon receipt of a $ 54,000 non-refundable fee. (*Id.*)

Professional CEO, Brenda Wood, called Kennedy CEO, Gregg Wolfer, on April 9, 2004. (Affirmation of Jill Anne Lazare (hereinafter "Lazare Affirmation") Ex. OO tab 2.) As stated at Wood's deposition, during the course of this conversation, Professional alleges that Gregg Wolfer assured Wood that Professional would receive the needed financing if the property value was appraised in excess of $ 3,100,000. (Lazare Affirmation Ex. II.)

On April 12, 2004, Professional sent Kennedy a letter seeking further clarification of the loan commitment terms. (Wolfer Aff. Ex. D.) The letter primarily focused on two issues: (1) Professional's obligation to pay Kennedy's legal fees and expenses; and (2) whether or not the initial $ 10,000 fee was refundable. (*Id.*) The letter did not address the definition of "as is" market value.

The parties executed the loan commitment on April 14, 2004 and Professional paid Kennedy a non-refundable $ 54,000 fee. (Wolfer Aff. Ex. E.) Kennedy then selected Volpe, Inc. ("Volpe") to perform [*5] the initial appraisal. (*Id.* at Ex. F.) Volpe determined that the property in question had a value of $ 2,610,000 and an "as is" market value of 20% less, or $ 2,088,000. (*Id.; Lazare Affirmation Ex. OO tab 4.) Based on this appraisal, Kennedy offered Professional a loan of $ 1,253,000, or approximately 60% of $ 2,088,000. (Wolfer Aff. Ex. F.)

Upon receipt of the loan offer, Professional requested a third-party appraisal and sent Kennedy a copy of a phone book for "use as a reference for some companies . . . in the local area." (*Id.* at Ex. G.) On May 13, 2004, Kennedy selected Adamson & Associates, Inc. ("Adamson & Associates") for the appraisal, at a cost of $ 2,000. (*Id.* at I.) After Kennedy notified Professional of its selection, Professional forwarded this amount to Kennedy. Adamson & Associates determined that the property in question had a value of $ 3,040,000 and an "as is" market value of $ 2,430,000. (*Id.* at K.) Kennedy offered Professional a second loan of $ 1,458,000, or approximately 60% of $ 2,430,000. (*Id.* at L.) Despite two extensions, Professional refused to accept this offer. (*Id.* at Exs. M, N.)

On May 5, 2005, Professional initiated the present action. The original complaint [*6] asserted claims for violation of the New Jersey Consumer Fraud Act ("CFA"), N.J.S.A. §§ 56:8-1 *et seq.,* unconscionability, breach of good faith and fair dealing, and breach of contract. On August 11, 2005, the Court granted Kennedy's motion to dismiss, finding that it lacked subject matter jurisdiction. Thereafter, Professional attempted to file an amended complaint, seeking to add claims for common law fraud and unjust enrichment. Magistrate Judge Ronald Hedges denied this request initially and upon reconsideration and this Court affirmed. On appeal, the Third Circuit reversed, stating that "the District Court erred in reasoning that the proposed amended complaint failed to sufficiently plead a claim for common-law fraud and a claim under the [CFA], providing the possibility for punitive or treble damages." *Professional Cleaning & Innovative Bldg. Servs. Inc., v. Kennedy Funding Inc.,* 245 Fed. Appx. 161, 162-63 (3d Cir. 2007). The matter was remanded.

Professional filed a first and second amended complaint on August 27, 2007 and April 29, 2008 respectively. The Second Amended Complaint added Gregg Wolfer, Jeffrey Wolfer, Joseph Wolfer, and Kevin Wolfer as defendants and sought relief [*7] under the CFA, the New Jersey Racketeer Influenced and Corrupt Organizations Act ("RICO"), N.J.S.A. §§ 2C:41-1 *et seq.,* as well as common law claims for unconscionability, breach of contract, fraud, and unjust enrichment. Defendants filed a motion for summary judgment on November 6, 2008 and Professional cross-motioned for summary judgment on December 19, 2008.

## STANDARD OF REVIEW

Summary judgment eliminates unfounded claims without resorting to a costly and lengthy trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). A court should grant summary judgment only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden of showing that no genuine issue of material fact exists rests initially on the moving party. *Celotex,* 477 U.S. at 323. Once the moving party makes a properly supported motion for summary judgment, the burden shifts to the nonmoving party to "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). [*8] When evaluating a summary judgment motion, a court must view all evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir. 1976).

The summary judgment standard does not change when, as here, the parties file cross-motions for summary judgment. *See Appelmans v. City of Phila.,* 826 F.2d 214, 216 (3d Cir. 1987). Cross-motions for summary judgment are no more than a claim by each side that it alone is entitled to summary judgment. *Transportes Ferreos de Venez. II CA v. NKK Corp.,* 239 F.3d 555, 560 (3d Cir. 2001). If review of cross-motions for summary judgment reveals no genuine issue of material fact, then judgment may be entered in favor of the party deserving of judgment in light of the law and undisputed facts. *See Iberia Foods Corp. v. Romeo,* 150 F.3d 298, 302 (3d Cir. 1998).

## DISCUSSION

## A. Consumer Fraud Act

In Count One, Professional brings a claim under the CFA against Kennedy and Gregg Wolfer individually. (Second Amend. Compl. PP 56-67.) The CFA protects consumers from deception and fraud in the sale or advertisement of merchandise. *Turf Lawnmower Repair, Inc. v. Bergen Record Corp.,* 139 N.J. 392, 414, 655 A.2d 417 (N.J. 1995). [*9] The CFA makes it unlawful for "any person" [2] to use an "unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact . . . in connection with the sale or advertisement of any merchandise or real estate." N.J.S.A. § 56:8-2. To state a claim under the Act, a plaintiff must allege three elements: (1) unlawful conduct by the defendants; (2) an ascertainable loss on the part of the plaintiff; and (3) a causal relationship between the defendants' unlawful conduct and the plaintiff's ascertainable loss. *N.J. Citizen Action v. Schering-Plough Corp.,* 367 N.J. Super. 8, 12-13, 842 A.2d 174 (N.J. Super. Ct. App. Div. 2003).

> [2]    Under the CFA, the term "person" includes any "partnership, corporation, company, trust, business entity or association . . ." N.J.S.A. § 56:8-1. Under the Act, Kennedy qualifies as a "person."

The crux of Professional's CFA claim is that Kennedy and its CEO Gregg Wolfer engaged in the following unlawful conduct. First, Kennedy and Gregg Wolfer knowingly concealed, suppressed, or omitted and/or conspired to conceal, suppress, or omit the equation for "as is" market value by [*10] nebulously defining the term as a "three (3) to four (4) month sale to a cash buyer." Plaintiff contends that this definition did not explicitly indicate that the collateral property's appraised value would be discounted by 20%, thereby inducing Professional into executing the loan commitment and paying a nonrefundable $ 54,000 loan commitment fee. (Second Amend. Compl. PP 58-63.) In support of this argument, Professional presents evidence of a February 16, 2001 transaction involving Kennedy, where the same appraiser used here, Volpe, applied a 20% and 30% discount to derive the "'as is' quick sale value" of the collateral property, defined as a 90-to-120 day sale to a cash buyer. [3] (Lazare Affirmation Exs. X, Y & Z.)

> [3]    Professional also presents evidence of other subsequent transactions involving Kennedy where the appraised market value was discounted to derive an "as is" market value or a similarly defined "quick sale value." (Lazare Affirmation Exs. C-W, AA-EE.) Under New Jersey law, in order to constitute a fact susceptible to misrepresentation or fraud, the statement's contents must be susceptible to "exact knowledge" at the time it

2009 U.S. Dist. LEXIS 49508, *

was made. *See Joseph J. Murphy Realty, Inc. v. Shervan,* 159 N.J. Super. 546, 551, 388 A.2d 990 (N.J. Super. Ct. App. Div. 1978). [*11] Since Kennedy did not have "exact knowledge" of these subsequent transactions when it executed the loan commitment with Professional, these transactions will not be considered for purposes of the CFA or claim for common law fraud discussed *infra.*

Second, Professional alleges that Gregg Wolfer made a material misrepresentation to its CEO Brenda Wood prior to the execution of the loan commitment in the form of an oral assurance. Wood asserts that during a telephone conversation on April 9, 2004 Gregg Wolfer stated that if the property met the "appraised value" [4] of between $ 3,100,000 and $ 3,200,000 "that there should be no problem getting this deal through." (Lazare Affirmation Ex. II.) Since Kennedy knew that Professional needed $ 1,800,000 in financing and according to Wood believed the property in question to be worth between $ 3,000,000 and $ 3,200,000, Kennedy's alleged assurance indicated that the collateral's appraised value would not be discounted by 20%. (Wolfer Aff. Ex. E; Lazare Affirmation Exs. II, OO tab 3.) Professional relied on this statement when entering into the loan commitment, suffering an ascertainable loss in the form of a non-refundable $ 54,000 loan commitment [*12] fee and $ 6,000 in appraisal fees. (Second Amend. Compl. P 67.)

  4  The Court notes that, even as alleged by Professional, Gregg Wolfer did not definitively state "appraised market value" during the April 9, 2004 telephone conversation. Instead, he stated "appraised value." As will be discussed more fully with regards to the common law fraud claim, the phrase "appraised value" can be reasonably construed to mean "as is" market value based on the explicit terms of the loan commitment and associated documents.

Even in light of the foregoing, Professional cannot maintain a claim under the CFA against Kennedy or Gregg Wolfer individually. The CFA does not cover every sale in the marketplace. *Papergraphics Intern., Inc. v. Correa,* 389 N.J. Super. 8, 13, 910 A.2d 625 (N.J. Super. Ct. App. Div. 2006). The statute's applicability hinges on the nature of a transaction, requiring a case by case analysis. *Id.* The CFA only applies "to consumer transactions which are defined both by the status of the parties and the nature of the transaction itself." *Hoffman v. Encore Capital Group, Inc.,* 2008 N.J. Super. Unpub. LEXIS 1627, 2008 WL 5245306, at *3 (N.J. Super. Ct. App. Div. Dec. 18, 2008) (citation omitted). Courts addressing whether a given transaction [*13] qualifies as a "consumer transaction" often examine whether the challenged service qualifies as "merchandise" [5] which is "of

the type sold to the general public." *Finderne Mgmt. Co., Inc. v. Barrett,* 402 N.J. Super. 546, 570, 955 A.2d 940 (N.J. Super. Ct. App. Div. 2008) (collecting cases); *see also Cetel v. Kirwan Fin. Group, Inc.,* 460 F.3d 494, 514 (3d Cir. 2006); *S. Broward Hosp. Dist. v. MedQuist Inc.,* 516 F. Supp. 2d 370, 399 (D.N.J. 2007); *Salamon v. Teleplus Enters., Inc.,* Civ. No. 05-2058, 2008 U.S. Dist. LEXIS 43112, 2008 WL 2277094, at *11-12 (D.N.J. Jun. 2, 2008). In addition, courts focus on the nature of the transaction, such as evidence relating to the experience of the commercial entities and evidence of equal bargaining power. *See Papergraphics,* 389 N.J. Super. at 14; *accord 539 Absecon Blvd., L.L.C. v. Shan Enters. Ltd. P'ship,* 406 N.J. Super. 242, 276, 967 A.2d 845 (N.J. Super. Ct. App. Div. 2009).

  5  The CFA defines "merchandise" to include "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale." N.J.S.A. § 56:8-1(c). The definition of "merchandise" has been found to be broad enough to include the "sale of credit." *Lemelledo v. Beneficial Mgmt. Corp. of Am.,* 150 N.J. 255, 265, 696 A.2d 546 (N.J. 1997).

Turning [*14] to the facts at hand, the record amply demonstrates that Professional and Kennedy are experienced commercial entities with relatively equal bargaining power. The parties negotiated the terms of the loan commitment prior to its execution. In an April 12, 2004 letter from Professional CEO Brenda Wood to Gregg Wolfer, Wood sought to "meet[] in the middle" with regards to Professional's obligation to pay legal fees and costs under the loan commitment. (Wolfer Aff. Ex. D.) Wood also questioned whether the $ 10,000 fee, discussed in the letter of intent, would be refundable. (*Id.*) Wood acknowledged that Professional was not a first-time buyer of real estate and mentioned that the entity recently purchased a real estate company. (*Id.*)

Moreover, the hard money financing offered to Professional is not "merchandise" which is "of the type sold to the general public." As repeatedly stated by New Jersey courts, the thrust of the CFA "is pointed to products and services sold to consumers in the popular sense." *Finderne Mgmt.,* 402 N.J. Super. at 570 (quoting *Arc Networks, Inc. v. Gold Phone Card Co.,* 333 N.J. Super. 587, 589, 756 A.2d 636 (N.J. Super. Ct. Law Div. 2000)). Unlike the sale of credit to the general [*15] public, Kennedy specializes in "unconventional financing where speed and attention to special circumstances are critical." (Wolfer Aff. Ex. A.) As evidenced by Kennedy's website, the company markets itself not as a standard commercial lender, but as "America's leading commercial hard money lender" that provides "creative fund-

2009 U.S. Dist. LEXIS 49508, *

ing solutions." (*Id.*) This type of funding does not qualify as the sale of credit in the "popular sense."

In total, Professional is not an unsophisticated buyer, suffering a disparity of industry knowledge, victimized after being lured into this purchase through fraudulent, deceptive selling or advertising practices. *See D'Ercole Sales, Inc. v. Fruehauf Corp.,* 206 N.J. Super. 11, 23-24, 501 A.2d 990 (N.J. Super. Ct. App. Div. 1985). To the contrary, Professional is an experienced commercial entity that negotiated to obtain "creative financing" from Kennedy after being introduced by its sale broker. (Second Amend. Compl. PP 20-23; Wolfer Aff. Ex. A.)

For similar reasons, Professional cannot maintain a claim against Gregg Wolfer individually. Several New Jersey courts have imposed individual liability based on the CFA's definition of "person." *See, e.g., Cardillo v. Bolger,* 2009 N.J. Super. Unpub. LEXIS 218, 2009 WL 62866 (N.J. Super. Ct. App. Div. Jan. 12, 2009); [*16] *New Mea Constr. Corp. v. Harper,* 203 N.J. Super. 486, 497 A.2d 534 (N.J. Super. Ct. App. Div. 1985); *Hyland v. Aquarian Age 2000, Inc.,* 148 N.J. Super. 186, 193, 372 A.2d 370 (N.J. Ch. Div. 1977). The CFA defines "person" to include "any natural person . . . [or] corporation . . . and any . . . officer . . . [or] stockholder . . . thereof . . . ." N.J.S.A § 56:8-1. Even if Gregg Wolfer personally engaged in the alleged conduct, as stated above, the "merchandise" offered by Kennedy is not offered to the public in the popular sense, making the CFA inapplicable.

Even assuming that Professional's claim constituted a "consumer transaction" under the CFA, the Court notes that Gregg Wolfer could not be found liable under the "tort participation theory." In limited situations, New Jersey courts have imposed individual liability under the CFA for actions involving intentional torts and negligence under the "tort participation theory." *Saltiel v. GSI Consultants, Inc.,* 170 N.J. 297, 305, 788 A.2d 268 (N.J. 2002) (citing *Kugler v. Koscot Interplanetary, Inc.,* 120 N.J. Super. 216, 253-56, 293 A.2d 682 (N.J. Ch. 1972)); *but see Cardillo,* 2009 N.J. Super. Unpub. LEXIS 218, 2009 WL 62866 at *5 (questioning whether the tort-participation theory should limit the reach of the CFA). However, [*17] liability under this theory requires that underlying action sounds in tort as opposed to contract. *Saltiel,* 170 N.J. at 308-09. A tort remedy does not arise from a contractual relationship unless the breaching party owed an independent duty imposed by law. *Id.* at 314 (citing *Int'l Minerals & Mining Corp. v. Citicorp N. Am., Inc.,* 736 F. Supp. 587, 597 (D.N.J. 1990)). Here, the loan commitment defined the scope of the parties' obligations and Professional does not present any evidence that Gregg Wolfer owed it an independent duty. As such, rendering the action sounds in contract as opposed to tort, rendering the "tort participation theory" inapplicable.

Accordingly, Professional's CFA claim against Kennedy and Gregg Wolfer must be dismissed. Defendants' motion for summary judgment is **GRANTED** and Professional's motion for summary judgment is **DENIED** with regards to Count One.

## B. New Jersey RICO

Relying in part on the same conduct described above, Professional brings a civil New Jersey RICO claim in Count Six against Gregg Wolfer, Kevin Wolfer, Jeffrey Wolfer, and Joseph Wolfer (collectively the "Wolfer Defendants"). Professional alleges that Kennedy constitutes an enterprise though which the Wolfer [*18] Defendants effectuated racketeering activities, as defined under the statute. (Second Amend. Compl. PP 89-123.)

The New Jersey RICO statute provides that "[a]ny person damaged in his business or property by reason of a violation of [N.J.S.A.] § 2C:41-2 may sue therefor in any appropriate court and shall recover threefold any damages he sustains and the cost of the suit . . . ." N.J.S.A. § 2C:41-4(c). One of the elements of a New Jersey RICO claim is that the defendants engaged in "a pattern of racketeering activity" consisting of predicate acts. N.J.S.A. § 2C:41-2(a); *see also State v. Ball,* 141 N.J. 142, 161-62, 661 A.2d 251 (N.J. 1995). A pattern of racketeering is defined in pertinent part as "[e]ngaging in at least two incidents of racketeering conduct . . .; and [a] showing that the incidents of racketeering activity embrace criminal conduct that has either the same or similar purposes, results, participants or victims or methods of commission or are otherwise interrelated by distinguishing characteristics and are not isolated incidents." N.J.S.A. § 2C:41-1(d). The Act defines "racketeering activity" as any one of the criminal offenses enumerated in N.J.S.A. 2C:41-1(a)(1), including "forgery and [*19] fraudulent practices and all crimes defined in chapter 21 of Title 2C of the New Jersey Statutes" N.J.S.A. § 2C:41-1(a)-(o). In Professional's pleadings, it asserts that the Wolfer Defendants engaged in racketeering activity under N.J.S.A. §§ 2C:21-4(a) and 2C:21-7(h).

Section 2C:21-4(a) declares that "a person commits a crime of the fourth degree if he falsifies, destroys, removes, conceals any writing or record, or utters any writing or record knowing that it contains a false statement or information with purposes to deceive or injure anyone or to conceal any wrongdoing." N.J.S.A. § 2C:21-4(a). Similarly, § 2C:21-7(h) prohibits the use of a "false or misleading written statement for the purpose of obtaining property or credit." N.J.S.A. § 2C:21-7(h). The Supreme Court of New Jersey, in the criminal RICO context, has defined "statement" as either "a report or narrative" or "a single declaration or remark." *State v. Fleischman,* 189 N.J. 539, 546, 917 A.2d 722 (N.J. 2007). Moreover,

2009 U.S. Dist. LEXIS 49508, *

Black's Law Dictionary defines "false" simply as "untrue." *Black's Law Dictionary* 618 (7th ed. 1999).

In the loan commitment, and several other documents, Kennedy defines "as is" market value as a "three (3) to four (4)  [*20] month sale to a cash buyer." (Wolfer Aff. Ex. E.) Kennedy disclosed this definition in the letter of interest, the draft of the loan commitment, and the final loan commitment executed by the parties. (*Id.* at Ex. B-C, E.) Professional points to this definition as evidence for a "false statement" for purposes of § 2C:21-4(a) and a "false or misleading written statement" for purposes of § 2C:21-7(h). Professional maintains that the Wolfer Defendants engaged in "deceptive trade practices" by using ambiguous language. (Second Amend. Compl. PP 92-98.) This ambiguous definition lured Professional and other borrowers into executing loan commitments and forwarding non-refundable loan commitment fees. The Wolfer Defendants conspired to commit this alleged racketeering activity, as evidenced by the fact that Kennedy closed on less than 20% of the loans for which it received such fees. (*Id.*; Wolfer Aff. Exs. C-EE.)

The question thus presented to the Court is whether the Wolfer Defendants through Kennedy defined "as is" market value so ambiguously in the loan commitment that it constitutes a "false" or "false or misleading" statement for purposes of New Jersey's RICO statute. Whether a contract term  [*21] is clear or ambiguous is a question of law. *Nester v. O'Donnell,* 301 N.J. Super. 198, 210, 693 A.2d 1214 (N.J. Super. Ct. App. Div. 1997). An ambiguity in a contract exists if the terms of the contract are susceptible to at least two reasonable alternative interpretations. *Id.* Terms of contract must be given their plain and ordinary meaning. *Id.*

As stated in the loan commitment, the definition of "as is" market value is not ambiguous. A plain reading of the definition indicates that Kennedy would discount the collateral property's market value by some amount to derive the "as is" market value for purposes of determining its loan offer. Specifically, the phrase "cash buyer" signals a narrower field of potential purchasers and the phrase "three (3) to (4) four month sale" suggests a short marketing period. Combined, a short marketing period to a narrower field of potential purchasers implies a discounted valuation for the collateral property. Since Kennedy indicated to Professional that the appraised collateral value would be discounted, the definition of "as is" market value cannot be construed as "false" or even "misleading" for purposes of the New Jersey RICO statute.

Moreover, Kennedy's failure to  [*22] include the exact percentage of the discount does not render this definition ambiguous. The agreement expressly provided for the use of a third party appraiser to calculate the "as is" market value, implying that the appraiser would determine the extent of the discount and not Kennedy. As stated in the loan commitment, after receiving a "determination of value by the third party appraiser," Kennedy agreed to offer a loan of 60% of the "as is" market value "as determined by said appraiser." (Wolfer Aff. Ex. E.) The loan commitment granted Professional the election to "engage the services of a third party appraiser" if Kennedy's "determination of the value of the property is disputed by Borrower." (*Id.*) For the second appraisal, Kennedy and Professional assented to "mutually agree on a third party MAI appraiser, with proper credentials, contracted by [Kennedy]." (*Id.*)

Pursuant to the agreement, the parties utilized two independent appraisers, Volpe and Adamson & Associates. Through the use of these appraisers, the parties implicitly agreed to rely on the appraisers' professional judgment to determine the appropriate discount to a standard market value based on a three-to-four month sale  [*23] to an all cash buyer. Using their expertise, the appraisers both separately discounted the market value of the collateral property by roughly the same amount, 20%. The initial appraiser, Volpe, applied this discount because of the availability of other commercial real estate in the property's vicinity. (Lazare Affirmation Ex. OO tab 4.) The mutually agreed appraiser, Adamson & Associates, discounted the "typical" market value by this amount based on "standard assumptions" and various limiting conditions. (Wolfer Aff. Ex. K.)

There is nothing in the record to indicate that Kennedy exercised its own discretion to calculate the "as is" market value and Professional does not present any evidence that Kennedy colluded with Volpe or Adamson & Associates to artificially lower the value of the property in question. Since the parties explicitly agreed to use a appraiser to determine the "as is" market value, it was not false or misleading for Kennedy to omit a fixed percentage of discount. Clearly, the level of the discount was up to the judgment of appraiser, pursuant to the appraisal process outlined in the loan commitment.

The Court's interpretation is further supported by the parties' course  [*24] of dealing. Courts may consider "custom, usage, and the interpretation placed on the disputed provision by the parties' conduct" when resolving an ambiguous term in a contract. *Kearny PBA Local No. 21 v. Town of Kearny,* 81 N.J. 208, 221, 405 A.2d 393 (N.J. 1979). Such evidence establishes "'a common basis of understanding for interpreting their expressions and other conduct,'" *Winslow v. Corporate Express, Inc.,* 364 N.J. Super. 128, 133, 834 A.2d 1037 (N.J. Super. Ct. App. Div. 2003) (citing Restatement (Second) Contracts § 223(1) (1981)), and may be used prior to determining

whether the contract is ambiguous, Restatement (Second) Contracts § 223(2) cmt. b.

Here, the course of dealing indicates a lack of ambiguity with regards to the definition of "as is" market value. Professional never questioned the definition either before or after the execution of the agreement. Kennedy first disclosed the definition in the letter of intent and the draft of the loan commitment. (*Id.* at Ex. B-C). Following receipt of the draft, Professional attempted to negotiate the terms of the agreement, as evidenced by an April 12, 2004 letter. (*Id.* at Ex. D.) Specifically, Professional inquired into whether the initial $ 10,000 fee [*25] was refundable and attempted to avoid payment of Kennedy's legal fees for the transaction. (*Id.*) Although Professional raised issues regarding other provisions in the proposed loan commitment, the letter contains no reference to the definition of "as is" market value.

Professional also did not address the definition of "as is" market value during the April 9, 2004 telephone conversation between Gregg Wolfer and Professional CEO Brenda Wood. A close examination of the deposition testimony of Brenda Wood describing this conversation indicates that Gregg Wolfer, at most, promised to lend Professional $ 1,800,000 if the "appraised value" exceeded $ 3,100,000. (Lazare Affirmation Ex. II.) The testimony does not elaborate as to what Wolfer meant by "appraised value" and the conversation, as a whole, cannot be construed to represent a general inquiry into the definition's meaning. (*Id.*)

Even after the parties executed the loan commitment, Professional still did not question the meaning of "as is" market value. In conjunction with the first loan offer, Kennedy attached a report prepared by the first appraiser Volpe. (Wolfer Aff. Ex. F.) This report listed two market values for the collateral [*26] property--an appraised value of $ 2,610,000 and an "as is" market value of $ 2,088,000. (Lazare Affirmation Ex. OO tab 4.) Following receipt of Volpe's report, Professional did not question Kennedy about the definition and did not inquire as to why Volpe calculated two values. Instead, Professional followed the procedure outlined in the loan commitment and exercised its right to obtain a second appraisal from a mutually agreed upon third party. (Wolfer Aff. Ex. G.)

Furthermore, even if Kennedy ambiguously defined "as is" market value, the Court notes that Kennedy's behavior does not qualify as "the type of significant societal threat that RICO was designed to deter or penalize." *Tabas v. Tabas,* 47 F.3d 1280, 1309 (3d Cir. 1995). In *Tabas,* the Third Circuit stated the federal RICO statute [6] was not designed to cover the typical landlord-tenant dispute involving the construction of a lease and determination of respective sums under the lease. Likewise,

this is a typical commercial dispute between Kennedy and Professional, involving construction of a loan commitment and determination of whether one party made an alleged oral assurance.

> 6   The Supreme Court of New Jersey has explicitly stated [*27] that "federal legislative history and case law" relating to the federal RICO statute can be used for purposes of the New Jersey RICO statute, because "the federal statute served as an initial model." *State v. Ball,* 141 N.J. at 156.

In light of the plain language of the loan commitment, Kennedy's repeated disclosure of the definition of "as is" market value, and the parties' course of dealing the record does not support Professional's contention that the definition of "as is" market value was so ambiguous so as to render the loan commitment "false" or "false or misleading." Accordingly, Professional fails to identify a valid racketeering activity, necessitating dismissal of Professional's New Jersey RICO claim. Defendants' motion for summary judgment is **GRANTED** and Professional's motion for summary judgment is **DENIED** with regards to Count Six.

## C. Contract Claims

Beyond Professional's New Jersey RICO claim and CFA claim, Professional presents several other bases for relief. In Count Two, Professional attempts to rescind the contract by alleging that Kennedy and Gregg Wolfer engaged in unconscionable conduct. (Second Amend. Compl. PP 68-71.) Professional further maintains, in Count Three, [*28] that Kennedy breached the terms of the loan commitment. (*Id.* at PP 72-76.)

### 1. Unconscionability

When evaluating unconscionability, courts looks at the relative levels of both "procedural" and "substantive" unconscionability. *Sitogum Holdings, Inc. v. Ropes,* 352 N.J. Super. 555, 564, 800 A.2d 915 (N.J. Ch. 2002). "Procedural unconscionability" consists of "unfairness in the formation of the contract" and includes a variety of inadequacies, such as age, literacy, lack of sophistication, hidden or unduly complex contract terms, bargaining tactics, and the particular setting existing during the contract formation process. *Id.* "Substantive unconscionability" refers to "excessively disproportionate terms," which suggest that "the exchange of obligations [was] so one-sided as to shock the court's conscience." *Id.* at 565.

In the instant matter, the record lacks evidence of either procedural or substantive unconscionability. After being introduced by a broker, the parties negotiated the terms of the loan commitment, as evidenced by the April 12, 2004 letter from Wood to Gregg Wolfer. (Wolfer Aff. Ex. D.) The parties operated with relatively equal

bargaining positions and experience and there is no evidence [*29] that Gregg Wolfer and Professional entered into a contract independent of the loan commitment. Professional's claim of unconscionability will therefore be dismissed. Defendants' motion for summary judgment is **GRANTED** and Professional's motion for summary judgment is **DENIED** with regards to Count Two.

### 2. Breach of Contract

In addition to a claim for unconscionability, Professional maintains that Kennedy breached the terms of the loan commitment. A party establishes a breach of contract by showing a valid contract, a breach of that contract by the offending party, and damages. *See, e.g., Coyle v. Englander's*, 199 N.J. Super. 212, 223, 488 A.2d 1083 (N.J. Super. Ct. App. Div. 1985).

Professional claims Kennedy breached the loan commitment by failing to use a "reasonably competent appraiser to appraise the property" and by refusing to use a mutually agreed upon appraiser for the third-party appraisal process. (Second Amend. Compl. PP 73-74.) The loan commitment sets forth the following appraisal process:

> The Borrower understands that [Kennedy] will inspect the Collateral and will, in its sole discretion, determine the as is market value. Upon making a determination of value, [Kennedy] will deliver to Borrower [*30] a Loan Offer equal to Sixty Percent (60%) of the as is market value not to exceed the Financing Request.
>
> * * *
>
> If [Kennedy]'s determination of the value of the property is disputed by Borrower, Borrower may reject the Loan Offer and elect to engage the services of a third party appraiser. If Borrower makes this election, the Borrower and [Kennedy] shall mutually agree on a third party MAI appraiser, with proper credentials, contracted by [Kennedy], and any fees for said appraiser to be reimbursed to [Kennedy] by Borrower prior to the appraisal being performed.

(Wolfer Aff. Ex. E.)

Upon execution of the loan commitment, Kennedy adhered to the procedure outlined in the agreement. Kennedy retained Volpe for purposes of the initial appraisal. (Wolfer Aff. Ex. F.) Volpe appraised the property at $ 2,610,000, and assigned the collateral property an "as is" market value of $ 2,088,000. (Lazare Affirmation Ex. OO tab 4.) Relying on these values, Kennedy offered Professional a loan of $ 1,253,000, or approximately 60% of $ 2,088,000. (Wolfer Aff. Ex. F.) Dissatisfied with the appraised value, Professional requested a third-party appraisal and sent Kennedy a letter on April 27, 2004 attaching "a [*31] copy of an area phone book for you to use as reference for some companies to use in the local area." (*Id.* at Ex. G.) From this phone book, Kennedy selected Adamson & Associates at a cost of $ 2,000. (*Id.* at Ex. I.) Kennedy notified Professional in a May 13, 2004 letter that it had selected Adamson & Associates and requested reimbursement. (*Id.*) Thereafter, Professional paid Kennedy $ 2,000.

Although Professional did not explicitly suggest Adamson & Associates, there was nothing in the record to indicate that the parties did not "mutually agree" on this selection. Professional affirmatively sent Kennedy a copy of the phone book with instructions "to use it as a reference for some companies in the local area." (*Id.* at Ex. G.) After selecting Adamson & Associates, Kennedy promptly notified Professional by letter. (*Id.* at Ex. I.) Professional did not object to this appraiser and, to the contrary, evidenced mutual acceptance by forwarding Adamson & Associates's $ 2,000 fee, as required under the loan commitment. Following the selection of Adamson & Associates, the third party appraiser determined the collateral property had a market value of $ 3,040,000 and an "as is" market value of $ 2,430,000. [*32] (*Id.* at Ex. K.) Based on these values, Kennedy offered Professional financing of $ 1,458,000, or approximately 60% of $ 2,430,000. Despite two extensions of time, Professional did not accept the offered financing. (*Id.* at Exs. M-N.)

Lacking any evidence that Kennedy breached the underlying loan commitment or any evidence that either Volpe or Adamson & Associates were not "reasonably competent" appraisers, Professional's claim for breach of contract must be dismissed. Defendants' motion for summary judgment is **GRANTED** and Professional's motion for summary judgment is **DENIED** as to Count Three.

### D. Common Law Fraud and Unjust Enrichment

In Counts Four and Five, Professional further asserts claims against Kennedy and Gregg Wolfer for common law fraud and unjust enrichment. Based on this alleged wrongdoing, Professional seeks $ 54,000, as well as punitive damages. (Second Amend. Compl. PP 77-88.)

### 1. Common Law Fraud

To state a claim of common law fraud, a plaintiff must demonstrate: (1) a material misrepresentation of a

2009 U.S. Dist. LEXIS 49508, *

presently existing or past fact; (2) knowledge or believe by the defendant of its falsity; (3) an intent by the other person to rely upon it; (4) reasonable reliance thereof by [*33] the other person; and (5) resulting damages. *Gennari v. Weichert Co. Realtors,* 148 N.J. 582, 610, 691 A.2d 350 (N.J. 1997). Fed. R. Civ. P. 9(b) requires that claims of fraud be pled with particularity. Professional maintains that Kennedy engaged in fraud by "deliberately misrepresent[ing] the meaning of the 'as is' market value" and by making an oral assurance, which deprived Professional of a non-refundable loan commitment fee. [7] (Second Amend. Comp. P 80.)

> 7    Professional also alleges that Kennedy engaged in fraud by "deliberately caus[ing] the evaluation of the real estate collateral to be substantially understated." (Second Amend. Compl. P 81.) However, Professional presents no evidence related to this statement in its opposition papers. Without evidence to support this contention, Professional's claim for common law fraud cannot be supported on this basis.

As an initial matter, two triable issue of fact exist as to whether Kennedy's alleged oral assurance rises to the level of common law fraud. Professional presents evidence that Kennedy, via Gregg Wolfer, told Brenda Wood during an April 9, 2004 telephone conversation that if the property met the "appraised value" of between $ 3,100,000 and $ [*34] 3,200,000 "that there should be no problem getting this deal through." (Lazare Affirmation Exs. II, OO tab 2.) First, an issue of fact exists as to whether Gregg Wolfer made this assertion. The only evidence supporting Professional's contention is the self-serving deposition testimony of its CEO Brenda Wood. Second, assuming that Gregg Wolfer made this assertion, there is a question of fact as to what Wolfer meant by "appraised value." As stated in its supporting papers, Professional interpreted "appraised value" to mean "appraised market value" and thus to indicate that the collateral property would not be discounted by 20% for purposes of determining the loan offer, since Kennedy knew that Professional believed the property to have a value of between $ 3,000,000 and $ 3,200,000. (Wolfer Aff. Ex. E; Lazare Affirmation Exs. II, OO tab 3.) A second reasonable interpretation of this phrase exists, namely that "appraised value" meant "as is" market value, as repeatedly disclosed in the loan commitment and associated documents. (Wolfer Aff. Exs. B-C, E.) Depending on the resolution of this material fact, Professional could have reasonably relied upon Gregg Wolfer's statement when entering [*35] into the loan commitment, suffering a pecuniary loss in the form of the non-refundable $ 54,000 loan commitment fee.

Even so, Professional cannot maintain a claim for fraud based on allegations that Kennedy deliberately misrepresented the meaning of "as is" market value by failing to disclose the exact percentage that the appraised value would be discounted to derive the "as is" market value. As described more fully above, the definition of "as is" market value is not ambiguous. The use of the phrases "cash buyer" and "three (3) to four (4) month sale" indicates that Kennedy intended to discount the collateral's value for purposes of determining the loan offer. Moreover, the absence of an exact percentage of discount does not render the definition ambiguous, because the parties agreed to rely on the independent determination of an appraiser to determine the "as is" market value. Implied in this agreement was the notion that the appraiser would use specialized knowledge to determine a value of the collateral based on a short marketing period to a cash buyer. There is nothing in the record to indicate that Kennedy held itself out to be an "appraiser" or that Kennedy colluded with either [*36] appraiser to lower the appraised value of the collateral property.

Professional attempts to avoid this conclusion by arguing that Kennedy was under a duty to disclose the amount the appraised value would be discounted. Professional points to evidence of one prior transaction involving Kennedy, where the same appraiser used here, Volpe, discounted the collateral's appraised value by 20% and 30% to derive the similarly termed "'as is' quick sale market value," defined as a 90-to-120 day sale to a cash buyer. (Lazare Affirmation Exs. X, Y & Z).

Under New Jersey law, silence in the face of a "duty to disclose" may constitute fraudulent concealment. *Strawn v. Canuso,* 140 N.J. 43, 56, 657 A.2d 420 (N.J. 1995). The question of whether a duty to disclose exists is a matter of law. *Carter Lincoln-Mercury, Inc. v. EMAR Group, Inc.,* 135 N.J. 182, 194, 638 A.2d 1288 (N.J. 1994). This determination is one of fairness and policy that "involves identifying, weighing, and balancing several factors--the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution." *Hopkins v. Fox & Lazo Realtors,* 132 N.J. 426, 439, 625 A.2d 1110 (N.J. 1993). Such a [*37] duty generally arises if: (1) a fiduciary relationship exists; (2) either party entering into the contract "expressly reposes" a trust and confidence in the other; or (3) the transaction is "intrinsically fiduciary" in nature. *Berman v. Gurwicz,* 189 N.J. Super. 89, 93-94, 458 A.2d 1311 (N.J. Ch. 1981).

In the instant matter, Professional presents no evidence showing that Kennedy had a duty to disclose the percentage by which the appraised collateral would be discounted to calculate the "as is" market value. The record lacks evidence that the parties operated under a fi-

duciary relationship or that Professional "expressly reposed" trust and confidence in Kennedy. Moreover, the creditor-debtor relationship between Kennedy and Professional fails to qualify as an "intrinsically fiduciary" relationship. *United Jersey Bank v. Kensey,* 306 N.J. Super. 540, 552, 704 A.2d 38 (N.J. Super. Ct. App. Div. 1997) (collecting cases and stating that creditor-debtor relationships rarely give rise to a fiduciary duty).

Evidence related to Professional's opportunity to exercise care also mitigates against finding a duty to disclose. Being an experienced commercial entity, Professional had more than sufficient opportunity to inquire [*38] into the definition of "as is" market value. Professional received the definition of this phrase in three separate documents, including the final version of the loan commitment. (Wolfer Aff. Exs. B-C, E.) Although Professional attempted to negotiate the terms of the loan commitment and raised several unrelated issues in its April 12, 2004 letter, Professional never questioned the definition's meaning. (*Id.* at Ex. D.) Based on the plain language of the commitment and a lack of evidence relating to Kennedy's duty to disclose, the Court concludes that no reasonable mind could disagree as to whether Kennedy misrepresented the meaning of "as is" market value.

Even though Professional can maintain a fraud claim against Kennedy, the claim against Gregg Wolfer must be dismissed. Corporate officers can be held personally liable for torts under the "tort participation" theory if the action sounds in tort as opposed to contract. *Saltiel,* 170 N.J. at 305, 314. Much like the individual claim under the CFA, the loan commitment defined the scope of the parties obligation. The expectation was that Kennedy would provide the needed financing and not Gregg Wolfer individually. Nothing in the record indicates [*39] that Gregg Wolfer owed an independent duty outside of this contractual relationship or that Wolfer committed any separate and independent fraud.

Likewise, Professional's claim for punitive damages must also be dismissed. An award of punitive damages requires that a plaintiff prove, by clear and convincing evidence, that the harm suffered by the plaintiff was the result of the of the defendants' actions or omissions and that either: (1) the defendants' conduct was malicious; or (2) the defendants acted in wanton and willful disregard of another's rights. N.J.S.A. § 2A:15-5.12(a). Malicious conduct is "an intentional wrongdoing in the sense of an evil-minded act." Willful or wanton disregard is "a deliberate act or omission with knowledge of a high degree of probability of harm to another and reckless indifference to the consequences of such act or omission." N.J.S.A. § 2A:15-5.10.

Professional fails to present any evidence, much less "clear and convincing" evidence, that Kennedy acted with malice or willful disregard when making the alleged oral assurance. At most, Professional can assert that Wolfer acted with willful disregard based on his knowledge of prior Kennedy transactions where [*40] the lender discounted the appraised collateral values by 20% or more. (Lazare Affirmation Exs. X, Y & Z). However, Professional does not present evidence linking Gregg Wolfer to any such transaction. The only prior transaction in the record was executed on February 16, 2001 by Kennedy Vice President Mike Bahiri. Volpe's subsequent appraisal was sent to Joseph Wolfer and Matt Cole, not Gregg Wolfer. (*Id.*) Failing to establishing that Gregg Wolfer knew that the collateral property would be discounted by a certain percentage or presenting any other related evidence, Professional's request for punitive damages claim must be dismissed.

For purposes of Count Four, Defendants' motion for summary judgment is **GRANTED** with regards to Gregg Wolfer and both parties' motions for summary judgment are **DENIED** with regards to Kennedy.

### 2. Unjust Enrichment

Finally, in Count Five, Professional asserts a related claim for unjust enrichment based on the "substantial benefit" that Kennedy and Gregg Wolfer received from the alleged misrepresentations. (Second Amend. Compl. PP 85-88.) A claim for unjust enrichment requires a showing that "defendant received a benefit and that retention of that benefit without [*41] payment would be unjust." *VRG Corp. v. GKN Realty Corp.,* 135 N.J. 539, 554, 641 A.2d 519 (N.J. 1994). Where there is an express contract covering the identical subject matter of the claim, a plaintiff cannot pursue a quasi-contractual claim for unjust enrichment. *St. Matthew's Baptist Church v. Wachovia Bank Nat'l Ass'n,* Civ. No. 04-4540, 2005 U.S. Dist. LEXIS 46607, 2005 WL 1199045, at *7 (D.N.J. May 18, 2005) (citing *Winslow v. Corp. Express, Inc.,* 364 N.J. Super. 128, 143, 834 A.2d 1037 (N.J. Super. Ct. App. Div. 2003)). However, if the written document is unenforceable, the plaintiff may maintain an unjust enrichment claim. *In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 975 F. Supp. 584, 621-22 (D.N.J. 1996). A contract induced by fraud may be deemed invalid and unenforceable under the law. *Nolan by Nolan v. Lee Ho,* 120 N.J. 465, 472, 577 A.2d 143 (N.J. 1990).

Since a question of fact exists as to Professional's fraud claim against Kennedy, it would be premature to dismiss Professional's unjust enrichment claim against the lender. Therefore, Defendants' motion for summary judgment is **GRANTED** with regards to Gregg Wolfer and both parties' motion for summary judgement are **DENIED** with regards to Kennedy.

2009 U.S. Dist. LEXIS 49508, *

## G. Subject Mater Jurisdiction

With only [*42] a viable claim against Kennedy in Counts Four and Five for common law fraud and unjust enrichment, the Court must consider whether it still has subject matter jurisdiction over the present action. A district court must dismiss an action, at any stage of the litigation, whenever it appears to a "legal certainty" that subject matter jurisdiction is lacking. *See Kontrick v. Ryan,* 540 U.S. 443, 124 S. Ct. 906, 157 L. Ed. 2d 867 (2004) (holding that subject matter jurisdiction may be raised initially by either party, or *sua sponte* by the court, at any stage of litigation, including appeal).

For diversity matters, a court lacks subject matter jurisdiction if the amount-in-controversy falls below $ 75,000, excluding interest and costs. 28 U.S.C. § 1332(a). The only remaining claims are Counts Four and Five against Kennedy for compensatory damages. Under these claims, Professional only seeks damages of $ 54,000, equal to the amount of the non-refundable loan commitment fee. This amount is well below the jurisdictional threshold, making it a "legal certainty" that this

Court lacks jurisdiction. The present action is thus *sua sponte* **DISMISSED.** [8]

> 8   Since the Court lacks subject matter, it will not address Kennedy's request to enforce [*43] the limitation-of-liability clause and "waiver of trial by jury" clause found in the loan commitment.

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is **GRANTED** with regards to Counts One, Two, Three, and Six. Defendants' motion for summary judgment is **GRANTED** with regards to Gregg Wolfer and **DENIED** with regards to Kennedy for purposes of Counts Four and Five. Professional's cross-motion for summary judgment is **DENIED** in its entirety. In addition, the Court will *sua sponte* **DISMISS** the present matter for lack of subject matter jurisdiction. An appropriate Order accompanies this Letter Opinion.

/s/ William J. Martini

**William J. Martini, U.S.D.J.**

# EXHIBIT 18

Westlaw.

Slip Copy, 2010 WL 936201 (D.N.J.)
(Cite as: 2010 WL 936201 (D.N.J.))

▷ Only the Westlaw citation is currently available.NOT FOR PUBLICATION

United States District Court,
D. New Jersey.
CENTRUM FINANCIAL SERVICES, INC., Plaintiff,
v.
CHICAGO TITLE INSURANCE COMPANY and
Horizon Title Agency, Inc., Defendants.

Civil Action No. 09-3300.
March 12, 2010.

Christopher C. Humphrey, Thomas & Humphrey, Morristown, NJ, for Plaintiff.

Michael R. O'Donnell, Riker, Danzig, Scherer, Hyland, & Perretti, PA, Morristown, NJ, for Defendants.

**OPINION**

CHESLER, District Judge.

*1 This matter comes before this Court on the motion to dismiss the Complaint for failure to state a claim upon which relief can be granted, pursuant to FED.R.CIV.P. 12(b)(6), by Defendant Chicago Title Insurance Company ("CTIC"). For the reasons set forth below, CTIC's motion to dismiss is granted in part and denied in part.

**BACKGROUND**

This case arises out of a dispute over a title insurance policy. The Complaint makes very complex factual allegations which need not be covered here in detail. To provide background to this motion, it is sufficient to state the following. Plaintiff Centrum Financial Services, Inc. ("Centrum") loaned purchaser SWJ $15 million to purchase certain property. Centrum required SWJ to procure title insurance to benefit Centrum, as lender. SWJ hired CTIC and Defendant Horizon Title Agency, Inc., as agent of CTIC, to fulfill this requirement. CTIC issued a $15 million title insurance policy to Centrum. SWJ's title to the purchased properties is now unmarketable, related to problems that CTIC had discovered, but

failed to disclose to Centrum, prior to issuance of the policy. Centrum has filed a claim under the policy. CTIC has neither denied the claim nor paid it.

In 1999, litigation related to the properties at issue commenced in the Superior Court of New Jersey (the "Superior Court Litigation"). In 2007, an interpleader action (the "Interpleader Action") was begun in the Superior Court of New Jersey concerning escrow funds from the property purchase transaction.

On July 6, 2009, Centrum filed the Complaint in this Court. On September 22, 2009, CTIC filed the instant motion to dismiss the Complaint for failure to state a claim.

**ANALYSIS**

**I. Governing Legal Standards**

A. *Standard for a Rule 12(b)(6) Motion to Dismiss*

In deciding a motion to dismiss pursuant to Rule 12(b)(6), courts must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny,* 515 F.3d 224, 233 (3d Cir.2008) (quoting *Pinker v. Roche Holdings, Ltd.,* 292 F.3d 361, 374 n. 7 (3d Cir.2002)). A Rule 12(b)(6) motion to dismiss should be granted only if the plaintiff is unable to articulate "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). "The defendant bears the burden of showing that no claim has been presented." *Hedges v. United States,* 404 F.3d 744, 750 (3d Cir.2005).

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Twombly,* 127 S.Ct. at 1964 (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 936201 (D.N.J.)
**(Cite as: 2010 WL 936201 (D.N.J.))**

obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 127 S.Ct. at 1964-65 (internal citations omitted); *see also* FED.R.CIV.P. 8(a)(2). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 1965 (internal citations omitted).

**\*2** Factual allegations must be well-pleaded to give rise to an entitlement to relief:

> [A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

> *Ashcroft v. Iqbal,* --- U.S. ----, ----, 129 S.Ct. 1937, 1950, 173 L.Ed.2d 868 (2009).

In reviewing a motion to dismiss, pursuant to Rule 12(b)(6), a court may consider the allegations of the complaint, as well as documents attached to or specifically referenced in the complaint, and matters of public record. *Pittsburgh v. W. Penn Power Co.,* 147 F.3d 256, 259 (3d Cir.1998); *see also* 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure:* Civil 3d § 1357 (3d ed.2007). "Plaintiffs cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them." *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1997).

The Supreme Court has characterized dismissal with prejudice as a "harsh remedy." *New York v. Hill,* 528 U.S. 110, 118, 120 S.Ct. 659, 145 L.Ed.2d 560 (2000). Dismissal of a count in a complaint with prejudice is appropriate if amendment would be inequitable or futile. *Alston v. Parker,* 363 F.3d 229, 235 (3d Cir.2004). "When a plaintiff does not seek leave to amend a deficient complaint after a defendant moves to dismiss it, the court must inform the plaintiff that he has leave to amend within a set period of time, unless amendment would be inequitable or futile." *Grayson v. Mayview State Hosp.,* 293 F.3d 103, 108 (3d Cir.2002).

## II. Defendant's 12(b)(6) motion to dismiss

*A. Dismissal pursuant to the entire controversy doctrine, or abstention*

Defendant first argues that the Complaint must be dismissed pursuant to New Jersey's entire controversy doctrine, based on the fact that the Interpleader Action is an active case in the Superior Court of New Jersey. Defendant contends that the entire controversy doctrine requires a single controversy to be decided in a single action in a single court. In response, Plaintiff correctly argues that Defendant has misunderstood the doctrine. Plaintiff cites the Third Circuit's holding in *Rycoline Prods. v. C & W Unlimited,* 109 F.3d 883, 886 (3d Cir.1997): "application of the Entire Controversy Doctrine [is] also an affirmative defense [which] does not defeat the subject matter jurisdiction of a federal court." Furthermore, the Third Circuit quoted and adopted the following holding from the New Jersey Appellate Division: "the entire controversy doctrine only precludes successive suits involving related claims. It does not require dismissal when multiple actions involving the same or related claims are pending simultaneously." *Rycoline,* 109 F.3d at 887 (quoting *Kaselaan & D'Angelo Assocs. ., Inc. v. Soffian,* 290 N.J.Super. 293, 299, 675 A.2d 705 (N.J.Super.Ct.App.Div.1996)). This defeats Defendant's argument. Even if the present action and the Interpleader Action involve the same or related claims, the entire controversy doctrine does not preclude multiple simultaneous actions.

**\*3** Defendant next argues that this Court should abstain from this case, pursuant to *Colo. River Water Conservation Dist. v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), because a parallel state court matter is pending. This argument does not get off the ground. Actions are parallel when they involve an identity of parties and claims. *IFC Interconsult. AG v. Safeguard Int'l* Partners, LLC, 438 F.3d 298, 306 (3d Cir.2006). Defendant has not shown that the present action and the Interpleader Action are truly parallel, and has thus not persuaded that *Colorado River* abstention is appropriate.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 936201 (D.N.J.)
**(Cite as: 2010 WL 936201 (D.N.J.))**

B. *Third count: declaratory judgment of liability under the title policy*

Defendant next argues that the third count of the Complaint should be dismissed on several grounds. First, Defendant argues that Plaintiff cannot succeed on its claim because it assigned its rights in the mortgages. This is an argument seeking summary judgment, based on factual matters outside the Complaint. On a motion to dismiss, the Court accepts all well-pleaded factual allegations in the Complaint as true. An argument that relies on proof of facts outside the Complaint cannot succeed on a motion to dismiss.

Defendant next argues that the third count is premature, given its rights under the title insurance contract. This is persuasive. The parties do not dispute that this Court may look to the provisions of the title insurance policy, which is specifically referenced in the Complaint. (Compl.¶¶ 23-31.) CTIC points to the limitation of liability provision, No. 8(b):

In the event of any litigation, including litigation by [Chicago Title] or with [Chicago Title's] consent, [Chicago Title] shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals therefrom, adverse to the title or to the lien of the insured mortgage, as insured.

(Def.'s Br. 13.) In its opposition, Centrum does not challenge the relevance or validity of this provision, nor dispute that the Complaint alleges that such litigation is ongoing and has not yet reached a final determination. Rather, Plaintiff argues only that it should not have to endure years of litigation. In the face of a provision in a contract, alleged to be valid, which shows that Plaintiff agreed to do otherwise, this argument carries no weight.

Under the terms of the title policy, the issue of CTIC's liability under the policy, and thus the third count, is not ripe for decision until the underlying litigation has been concluded, and the third count will be dismissed without prejudice for lack of ripeness.

C. *Fourth count: breach of the duty of good faith and fair dealing*

Defendant first contends that the fourth count must be dismissed based on the argument, already discussed and rejected, that Plaintiff assigned all its rights in its mortgages. Next, Defendant argues that the fourth count fails to adequately allege a bad faith claim.

*4 The fourth count appears to allege bad faith in two regards: 1) in CTIC's conducting a coverage investigation; and 2) in CTIC's refusing to communicate in a timely fashion the results of the coverage investigation. In support of its position that the fourth count fails to state a valid claim, Defendant points to those New Jersey cases which recognize the obligation of an insured to cooperate with a coverage investigation. This, however, misses the obvious point of the fourth count, which is that the coverage investigation was performed in bad faith and constitutes an unreasonable delay in processing the claim. The New Jersey Supreme Court has recognized a cause of action for unreasonable delay in processing a valid claim. *Pickett v. Lloyd's,* 131 N.J. 457, 474, 621 A.2d 445 (1993). Plaintiff has pled sufficient facts to raise the right to relief for such a claim above the speculative level. *Twombly,* 127 S.Ct. at 1965. As to the fourth count, the motion to dismiss will be denied.

D. *First count: violation of the New Jersey Consumer Fraud Act ("NJCFA")*

Defendant contends that the first count must be dismissed for failure to state a valid claim because a commercial hard money loan is not covered by the NJCFA. Defendant persuasively points to the New Jersey cases which hold that:

It is the character of the transaction, not the identity of the purchaser, which determines whether the CFA is applicable ... To qualify as a consumer transaction ..., the challenged services generally must be of the type sold to the general public.

*Finderne Management Co., Inc. v. Barrett,* 402 N.J.Super. 546, 570, 955 A.2d 940 (N.J.Super.Ct.App.Div.2008). "Furthermore, the entire thrust of the Act is pointed to products and services sold to consumers in the popular sense." *Cetel v. Kirwan Fin. Group, Inc. .,* 460 F.3d 494, 514 (3d Cir.2006). Plaintiff does not contend, nor could it reasonably, that title insurance is sold to the general public, nor that title insurance is sold to consumers in the popular sense of that word. Rather, while title insurance may be purchased as part of an ordinary consumer's home purchase, the insurance purchase is

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Slip Copy, 2010 WL 936201 (D.N.J.)
(Cite as: 2010 WL 936201 (D.N.J.))

done by an expert, typically a real estate attorney. No one could reasonably contend that an ordinary consumer has the expertise needed to purchase title insurance, or that title insurance is marketed to ordinary consumers.

The facts alleged in the Complaint are similar to those in *Cetel,* which involved the sale of a complex financial product "to a very specific class of investor." *Id.* at 515. The Third Circuit found that these were "complex arrangements that do not reflect the kinds of goods or services generally sold to the public," and, as such, did not come within the scope of NJCFA. *Id.* Similarly, in the instant case, the $15 million title insurance appears to have been a complex product that does not reflect services generally sold to the public; as just discussed, ordinary consumers do not directly purchase title insurance. Plaintiff has no cause of action under the NJCFA, and, as to the first count of the Complaint, the motion to dismiss will be granted. The first count of the Complaint will be dismissed with prejudice.

E. *Second count: common law fraud*

**\*5** Defendant argues that the second count fails to state a valid claim for relief because the alleged omissions and affirmative statements are not actionable. Defendant begins by noting that omissions must be supported by a duty to speak to be actionable. Defendant contends that neither CTIT nor its agent had any duty to disclose the allegedly omitted information to Plaintiff.

Defendant contends that New Jersey recognizes a duty to disclose in three situations:

The first involves fiduciary relationships such as principal and agent or attorney and client. The second embraces situations in which 'either one or each of the parties, in entering ... [the] transaction, expressly reposes ... a trust and confidence in the other ... or [because of the] circumstances of the case, the nature of their dealings, or their position towards each other, such a trust and confidence ... is necessarily implied.' The third includes contracts or transactions which in their essential nature, are 'intrinsically fiduciary, and 'necessarily call[ ] for perfect good faith and full disclosure, without regard to any particular intention of the parties.'

*United Jersey Bank v. Kensey,* 306 N.J.Super.

540, 551, 704 A.2d 38 (N.J.Super.Ct.App.Div.1997) (citations omitted). Defendant argues that the Complaint does not allege a relationship that comes within any of these categories. This Court is not ready to make that judgment at this early stage of the case. Construing the Complaint in the light most favorable to the Plaintiff, it is entirely conceivable that, under the circumstances of the case, a trust and confidence would be implied between the parties, thus creating a duty to disclose. The motion to dismiss the second count will be denied.[FN1]

> [FN1]. Defendant also argues that the second count should be dismissed because Plaintiff has not alleged any recoverable damages, which is simply not true.

F. *Fifth count: declaratory judgment*

Defendant contends that the fifth count, seeking a declaratory judgment that it is not required to assert certain claims in the state court actions, should be dismissed because it does not present an actual controversy, as required by the Declaratory Judgment Act. This is entirely correct: the fifth count seeks an advisory opinion about how Plaintiff should proceed in matters under litigation in state court. Such an opinion would bind no one. Federal courts may not render advisory opinions. *Herb v. Pitcairn,* 324 U.S. 117, 126, 65 S.Ct. 459, 89 L.Ed. 789 (1945) ("We are not permitted to render an advisory opinion.") As to the fifth count, the motion to dismiss will be granted, and the fifth count will be dismissed with prejudice.

### CONCLUSION

For the reasons stated above, Defendant's motion to dismiss the Complaint, pursuant to FED.R.CIV.P. 12(b)(6), will be granted in part and denied in part. As to the third count, the motion to dismiss will be granted, and the third count will be dismissed without prejudice. As to the first and fifth counts, the motion to dismiss will be granted, and the first and fifth counts will be dismissed with prejudice. As to the remaining counts, the motion to dismiss will be denied.

D.N.J.,2010.
Centrum Financial Services, Inc. v. Chicago Title Ins. Co.
Slip Copy, 2010 WL 936201 (D.N.J.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.