**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| DARE INVESTMENTS, LLC <br>                          Plaintiff, <br><br> v. <br><br> CHICAGO TITLE INSURANCE <br> COMPANY, ET AL., <br>                     Defendants. | Civ. No. 10-6088 (DRD) <br><br> **O P I N I O N** |

*Appearances by:*

PETER STROJNIK, P.C.
by: Peter Strojnik, Esq.
3030 North Central Avenue, Suite 1401
Phoenix, Arizona 85012

     *Attorneys for Plaintiffs,*

RIKER DANZIG SCHERER HYLAND & PERRETTI, LLP
by: Michael O'Donnell, Esq.
   Derrick R. Freijomil, Esq.
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey 07962

    *Attorneys for Defendant Chicago Title Insurance Company.*

**DEBEVOISE, Senior District Judge**

    This matter arises out of a title insurance policy, issued by Defendant Chicago Title

Insurance Co. ("Chicago"), and negotiated by Horizon Title Agency, Inc. ("Horizon"),

Chicago's title agent, insuring the marketability and validity of a mortgage serving as collateral

for a loan from Plaintiff Dare Investments, LLC ("Dare") to another investment entity.  The

mortgage has a rather complex history and became subject to adverse claims after issuance of the

title policy. As a result, Dare claimed coverage under the policy, but Chicago disclaimed coverage on a number of grounds, including several exclusionary provisions in the policy.

On November 20, 2010, Dare filed a Complaint against Chicago and Horizon asserting claims for common law fraud, reformation, breach of contract, negligence, bad faith, consumer fraud under the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. 56:B-1 *et. seq.*, civil conspiracy, civil aiding and abetting under, and violations of, the Racketeer Influenced and Corrupt Organizations Act ("Federal RICO"), 18 U.S.C. § 1961 *et. seq.*, and the New Jersey Racketeering Influenced and Corrupt Organizations Act ("New Jersey RICO"), N.J.S.A. 2C:41-1, *et seq*.

On February 9, 2011, Chicago moved for summary judgment[1] against all of Dare's claims. On March 4, 2011, Dare cross-moved for summary judgment in favor of its claims for breach of contract and bad faith. For the reasons set forth below, Chicago's motion is granted in part and denied in part, while Dare's motion is denied in its entirety.

Chicago is entitled to summary judgment against Dare's common law fraud and negligence claims because Dare cannot show that it reasonably relied on Chicago's alleged misrepresentations and omissions. Chicago is entitled to summary judgment against Dare's reformation claim because Dare cannot show that Chicago misrepresented the alleged value of the mortgage being insured by the title policy. Chicago is also entitled to summary judgment against Dare's Federal and New Jersey RICO claims because both the Complaint and the record fail to establish a RICO enterprise and the predicate acts that allegedly constitute a pattern of racketeering activity.

However, Chicago is not entitled to summary judgment against Dare's claim for breach of contract because (1) the intent of the exclusionary provisions in the title policy under which

---

[1] See Note 6.

Chicago disclaims coverage are ambiguous and (2) Dare's reasonable expectation under the title policy remain unclear on the current record.  As a result, Dare is not entitled to summary judgment in favor of its claim for breach of contract.  However, Chicago is entitled to summary judgment against Dare's claim for bad faith because Dare has failed to establish that Chicago had no reasonable basis on which to deny coverage under the title policy.

## I.  BACKGROUND

**A.    Dare's Loan to SWJ**

On February 15, 2006, Dare loaned $5 million to SWJ Investments, LLC ("SWJ") so that it could purchase certain assets from a bankruptcy sale arising out of the bankruptcy proceedings of James Licata and several entities that he owns.  One of the assets that SWJ intended to purchase was a $15 mortgage (the "Sayreville Mortgage") on 158 acres of land located in Sayreville, New Jersey (the "Sayreville Property").  The Sayreville Mortgage was one of several assets assigned to Dare as collateral on its $5 million loan to SWJ, pursuant to a Security and Intercreditor Agreement (the "Security Agreement"), dated March 13, 2006, between Dare and SWJ (and others who are not parties to this lawsuit).  See (Compl., Ex. 1.)

**B.    The Mocco/Licata Transaction**

Mr. Licata initially gained ownership over the Sayreville Mortgage from the bankruptcy proceedings of Peter and Lorraine Mocco.  During the course of those bankruptcy proceedings, which began in 1994, the Moccos reached an agreement with their principal secured creditor, First Union Bank ("First Union"), to purchase its claims at a discounted price of $22 million.[2] To do so, the Moccos reached an agreement with James Licata under which First Connecticut

---

[2]      First Union's claims amounted to $44 million in full.

Consulting Group, Inc. ("FCCG"), an entity owned by Mr. Licata, would act as the Moccos' agent in securing loans from third-party lenders.

However, First Union would not deal directly with the Moccos. Thus, FCCG came to an agreement with First Union whereby FCCG would assume the Moccos' debt to First Union and simultaneously loan the $22 million to the Moccos with which to purchase First Union's claims through a third-party lender. FCCG ultimately negotiated a short-term loan of $16 million and a second loan of $6 million from EMP Whole Loan I, Inc. ("EMP"). EMP wanted certain properties owned by the Moccos to serve as security on its loan to FCCG, including the Sayreville Property. In addition, EMP required that those properties be held by a bankruptcy-remote entity. Thus, on September 25, 1996, the Moccos transferred title to those properties to the First Connecticut Holding Group LLCs (the "Holding LLCs")—a group of entities that were specifically set up by FCCG (i.e. James Licata) to hold the Mocco properties outside the bankruptcy—as nominees. EMP then asserted liens on the properties. That same day, the parties entered into an agreement under which Mr. Licata would reconvey title to the Moccos once the Moccos secured long-term financing with which to purchase all of First Union's claims (the "Reconveyance Agreement").

As part of the arrangement under which FCCG would assume and secure the Moccos' debt to First Union, on September 26, 1996, the Moccos provided FCCG with a $15 million mortgage on the Sayreville Property—hence the Sayreville Mortgage. That same day, FCCG assigned the Sayreville Mortgage to EMP and acquired an Amended and Restated Sayreville Mortgage.[3]

---

[3]     Both the Sayreville Mortgage and the Amended and Restated Sayreville Mortgage were assigned to SWJ, on March 13, 2006, the date of the Security Agreement.

In May 1997, the Moccos and Licatas entered into an Escrow Agreement in order to facilitate the reconveyance of title to the Mocco real estate that was serving as the collateral for the FCCG/EMP loans.  According to the Escrow Agreement, "once EMP released its lien on the ownership interest in [the Holding LLCs] holding each parcel of real property, EMP was to convey ownership of that parcel to the Escrow Agent," and the Escrow Agent would then transfer ownership shares in the respective Holding LLCs to the Moccos.  (Compl., Ex. 4.)

Later that year, the Moccos secured the aforementioned long-term financing and EMP released its liens on the Holding LLCs.  In December 1998, Mr. Licata directed the Escrow Agent to forward the Moccos the necessary documents with which to effect reconveyance of title to their real estate.  However, Mr. Licata ultimately refused to reconvey title.

## C.      The Mocco/Licata Litigation

In 1999, the Moccos sued Mr. Licata in the New Jersey Superior Court of Essex County to enforce the Reconveyance Agreement.  On September 21, 2001, the court ordered that the Moccos turn over the Holding LLCs' ownership certificates to a receiver and issued an injunction stating that "no party or any affiliate of a party shall transfer, lien, or encumber any interest in the Holding LLCs or any properties owned in the name of the Holding LLCs." (Certification of Michael R. O'Donnell, Esq. in Support of Chicago Title Insurance Company's Motion to Dismiss, Dated February 9, 2011 ("O'Donnell Cert."), Ex. 7.)

In 2002, the Mr. Licata filed for bankruptcy in the District of Connecticut and listed a number of the Holding LLCs as assets to be placed into the bankruptcy proceedings.  The Moccos filed a motion to challenge the Licata bankruptcy filings of those Holding LLCs, but not those of FCCG.  That motion was heard in the District of Vermont, as opposed to the District of Connecticut, due to scheduling reasons.  The Bankruptcy Court of the District of Vermont issued

a decision, on July 27, 2004, specifically noting the litigation in the Superior Court of Essex County, upholding the court's injunction regarding the property owned by the Holding LLCs, and finding that "Mocco was the owner of the property at the time the state court entered its order." (Compl., Ex. 4.) That decision was affirmed by the District of Vermont, on March 28, 2006, see (Compl., Ex. 5), and the Second Circuit in 2007. See In re First Conn. Consulting Grp., Inc., 2007 WL 3498199 (2d Cir. 2007).

**D.    Dare's Due Diligence Prior to Entering into the Security Agreement**

Through its counsel, Dare conducted extensive due diligence before issuing the loan to SWJ and entering into the Security Agreement. See (Certification of Richard McCloskey, dated February 28, 2011 ("McCloskey Cert."), ¶ 6.) E. Kenneth Williams, Jr., Esq.—an attorney who worked on behalf of Dare in issuing the loan to SWJ, investigating the validity and enforceability of the Sayreville Mortgage, and procuring the title policy to insure the Sayreville Mortgage—testified at an Examination under Oath that he had reviewed the aforementioned litigation between the Moccos and the Licatas. (O'Donnell Cert., Ex. 6, Williams Tr. at 16-17.)

In addition, Mr. Williams became aware of a letter written by James A. Scarpone, Esq., counsel to the Moccos, dated February 23, 2006, that was addressed to counsel for the Licata bankruptcy's creditor's committee following a meeting with them. The letter specifically disputes the validity of the Sayreville Mortgage. (Certification of James A. Scarpone Esq., dated February 25, 2011. ("Scarpone Cert."), Ex. B) In doing so, it points to the fact that, "shortly after commencement of the Mocco lawsuit against Licata (sometime in the summer of 1999) Mocco requested and received a statement from [] EMP of what [it] claimed were the outstanding balances on the two loans." (Id.) That statement indicated that, "as of July 1998 the principal balance due on the loan secured by the Sayreville property was reduced to

$74,212.34."[4]  (Id.)  The letter maintained that, as of February 23, 2006, the loan secured by the Sayreville property had "not only been paid, but overpaid."  (Id.)

Mr. Williams also received a response to the Scarpone Letter, on March 2, 2006, written by Dale Schreiber, Esq., counsel to SWJ, via email.  See (O'Donnell Cert., Ex. 9.)  Mr. Schreiber's email set forth several arguments against the positions taken in the Mr. Scarpone's letter and maintained that the Sayreville Mortgage was valid and enforceable.  See (id.)

However, Mr. Williams disagreed with Mr. Schreiber's analysis, and, based on Dare's entire due diligence, Mr. Williams "had serious doubts about [the Sayreville Mortgage's] validity."  (O'Donnell Cert., Ex. 6, Williams Tr. at 126.)  As a result, Mr. Williams and Dare's other attorneys told Mr. McCloskey not to go forward with the $5 million loan to SWJ due to the serious risks involved.  (O'Donnell Cert., Ex. 5, McCloskey Tr. at 69, 105).  Nonetheless Mr. McCloskey went forward with the transaction because he believed the returns outweighed the risks.  See (id. at 47-48, 73.)

**E.      The Title Policy**

Apparently to insure against the risks involved with the Sayreville Mortgage, Dare took out a title insurance policy on the Sayreville Mortgage for $5.5 million, on March 30, 2006, which was issued by Chicago and negotiated by Horizon., Chicago's title agent.  The policy insures against, among other things, "unmarketability of the title" to and "[t]he invalidity or unenforceability of" the Sayreville Mortgage.  (Compl., Ex. 2.)  In addition, the policy provides that Chicago will "pay the costs, attorneys' fees and expenses incurred in defense of the title or the lien of the [Sayreville Mortgage], as insured."  (Id.)

---

[4]      Mr. Scarpone attached a copy of the statement to the letter.  (Scarpone Cert., Ex. B.)

The policy excludes from coverage, among other things, "defects, liens, encumbrances, adverse claims or other matters . . . (a) created, suffered, assumed or agreed to by the Insured Claimant" ("Exclusion 3(a)") or (b) not known to Chicago or recorded in public records as of the policy date, but known to Dare and not disclosed in writing to Chicago prior to the policy date ("Exclusion 3(b)")."  (Compl., Ex. 2.)  The policy also limits coverage "[s]ubject to the terms, conditions, covenants, court orders etc., as set forth in the United States Bankruptcy Court, District of Connecticut, Bridgeport Division Case No. 02-50851[5] (AHWS) ("Item 7")."  (Id.)

At the same time, the policy omits the disclaimer in Exclusion 3(b) "as specific to the said "Mocco"/"Scarpone" claims and positions challenging positions in and to said mortgage hereunder as per letter of February 23, 2006 from James A. Scarpone, Esq. to Alan J. Brady, Esq., et als. ("Item 8")."  (Id.)  Immediately following Item 8, the policy states that Chicago, "through its due diligence, can verify that the amount currently due and owing on the said mortgage being insured hereunder, at the date of this Commitment, is no less than $15,000,000.00 ("Item 9")."  (Id.)

## F.     Dare's Claim for Coverage under the Title Policy

In 2007, upon discovering Dare's interest in the Sayreville Mortgage, the Moccos amended their complaint in the Superior Court of Essex County to include, among other things, a claim against Dare to quiet title to the property and render it free and clear of the Sayreville Mortgage.  In doing so, they argue that because FCCG was merely acting as their agent in buying out the claims of First Union, FCCG purchased only the debt that they owed to First Union, which was financed by EMP and secured, in part, by the Sayreville Mortgage.  Therefore, they contend that because (1) the Bankruptcy rulings in the District of Vermont held that the

---

[5]     The docket number noted in the policy is incorrect.  The correct number is 02-50852.

Moccos were the owners of the Sayreville Property and (2) the EMP debt had allegedly been paid in full, the Sayreville Mortgage was no longer valid or enforceable.

On April 25, 2007, after discovering the amended complaint, Dare sought indemnification under the title policy for unmarketability of title to the Sayreville Mortgage and costs associated with defending against the Moccos' claim.  Shortly thereafter, Chicago conducted an investigation into Dare's claim for coverage.  On August 14, 2007, Chicago sent Dare a letter disclaiming coverage on a host of grounds, including Exclusion 3(a), Exclusion 3(b), and Item 7.  See (Compl., Ex. 3.)  In doing so, Chicago maintained, among other things, that the Moccos' claim was based on the decisions arising out of the aforementioned rulings of the Superior Court of Essex County and the District of Vermont, of which Dare had prior knowledge.  See (id.)

On November 20, 2010, Dare filed a Complaint against Chicago and Horizon asserting claims for common law fraud, reformation, breach of contract, negligence, bad faith, consumer fraud under the NJCFA, and several claims under the Federal RICO and New Jersey RICO statutes.

## II.  DISCUSSION

Chicago now moves for summary judgment against all of Dare's claims pursuant to Federal Rule of Civil Procedure 56.[6]  In doing so, it argues, among other things, that (1) Dare

---

[6]    Chicago initially framed its motion as a request for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6).  Dare notes that both parties' motion papers present exhibits not relied on by the Complaint and argues that, under Federal Rule of Civil Procedure 12(d), Chicago's motion should be treated as one for summary judgment under Federal Rule of Civil Procedure 56.  (Pl.'s Br. Opp. Mot. Dismiss 17-18.)  Rule 12(d) states that "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Citing to In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410 (3d Cir. 1997), Chicago argues that its motion should not be treated as one for summary judgment because the exhibits attached to it

cannot show reasonable reliance to meet the elements of common law fraud claim; (2) Dare

cannot meet the reliance element required for a negligent misrepresentation claim; (3) Dare

cannot establish unilateral mistake, coupled with fraud or unconscionable conduct, in order to

state a claim for reformation; (4) Dare's claim for coverage is barred by the terms of the title

policy, which precludes Dare's claims for breach of contract and bad faith; (5) the NJCFA does

not apply to the payment of insurance benefits.  With respect to Dare's Federal and New Jersey

RICO claims, Chicago argues that Dare's RICO claims are untimely and that Dare has failed to

(1) establish RICO standing; (2) plead RICO with particularity; (3) establish Chicago's

participation in the alleged RICO enterprise; and (4) plead a RICO enterprise separate from the

predicate acts.

        In addition, Dare moves for summary judgment in favor of its breach of contract and bad

faith claims.  In doing so, it argues that (1) Chicago breached the express terms of the title

policy; and (2) Chicago had no reasonable basis on which to deny coverage under the title

policy.


A.      **Standard of Review**

_____

form the basis of Dare's claims.  (Def.'s Reply Br. 36-37.)  Chicago attaches a number of
exhibits to its motion that were cited to in the exhibits to the Complaint, but do not themselves
form the basis of Dare's claim, including Examination Under Oath ("EUO") testimony from
Richard McCloskey and E. Kenneth Williams Esq. (id., Ex. 5, 6), and a March 2, 2006 email
from Mr. Williams to James Scarpone, Esq. (id., Ex. 8, 9).  See In re Burlington Coat Factory,
114 F.3d at 1426 ("what is critical is whether the claims in the complaint are based on an
extrinsic document and not merely whether the extrinsic document was explicitly cited.").
Because the Court will not exclude these exhibits, Chicago's motion must be treated as one for
summary judgment.  Moreover, Chicago has further taken the opportunity to present material
pertinent to its motion by attaching additional EUO testimony of Mr. McCloskey and Mr.
Williams as exhibits to its reply brief, (Certification of Michael R. O'Donnell, Esq. in Further
Support of Chicago Title Insurance Company's Motion to Dismiss and in Opposition to Dare
Investment, LLC's Motion for Summary Judgment, dated April 4, 2011, Ex. 1, 2).

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party."  Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006).  For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law."  Id.  Disputes over irrelevant or unnecessary facts will not preclude granting summary judgment.

The party moving for summary judgment has the burden of showing that no genuine dispute of material fact exists.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When the moving party does not bear the burden of proof at trial, it may discharge its burden under the summary judgment standard by showing that there is an absence of evidence to support the non-moving party's case.  Id. at 325.  If the moving party can make such a showing, then the burden shifts to the non-moving party to present evidence that a genuine factual dispute exists and a trial is necessary.  Id. at 324.  In meeting its burden, the non-moving party must offer specific facts that establish a material dispute, not simply create "some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  In deciding whether an issue of material fact exists, the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party.  See Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).  The Court's function, however, is not to weigh the evidence and rule on the truth of the matter, but rather to determine whether there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  If there are no issues that require a trial, then judgment as a matter of law is appropriate.  Id. at 251-52.

**B.      Dare's Common Law Fraud Claims**

Dare's common law fraud claims[7] are based on Chicago's alleged misrepresentation to Dare that (1) title to the Sayreville Mortgage was valid and marketable and (2) as of the date of the title policy, the amount due on the Sayreville Mortgage was no less than $15 Million.  See (Pl.'s Br. Opp. Mot. Dismiss 22.)

Chicago argues that Dare cannot show that it reasonably relied on these alleged misrepresentations because (1) "[t]he security agreement, to which Dare was a party, explained how the Sayreville Mortgage was being obtained out of the [Licata] Bankruptcy Sale in the Bankruptcy proceeding and further specifically referenced [the prior litigation regarding the Sayreville Mortgage] in its Schedules and Exhibits. . . "; and (2) "Dare's counsel reviewed [the prior litigation] . . . against the Sayreville Mortgage."  (Def.'s Br. Supp. Mot. Dismiss 21, 22).

Dare argues that it reasonably relied on the alleged misrepresentations because it "investigated SWJ's ability to repay the $5M loan, not the condition of the mortgage and the amount still due under the Mortgage.  Horizon Title and Chicago Title conducted that investigation."  (Pl.'s Br. Opp. Mot. Dismiss 22) (emphasis omitted).  Dare further argues it "had the right to rely [on] Chicago Title's fiduciary obligation to exercise utmost honesty and good faith in its dealings with Dare," which also includes "a negative duty not to misinform."  (Id. at 23) (quotations and citations omitted).  Finally, Dare argues that it reasonably relied on Chicago and Horizon's "superior knowledge."  (Id.)

In New Jersey, common law fraud has five elements: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages."  Gennari v. Weichert Co. Realtors, 148 N.J. 582, 610 (1997).  "[I]f a

---

[7]     Dare asserts one claim for Fraud in the Inducement and another for Failure to Disclose.

party to whom representations are made nevertheless chooses to investigate the relevant state of facts for [it]self, [it] will be charged with knowledge of whatever [it] could have discovered by a reasonable investigation." DSK Enters., Inc. v. United Jersey Bank, 189 N.J. Super. 242, 251 (App. Div. 1983), certif.. denied, 94 N.J. 598 (1983); see also Berman v. Gurwicz, 189 N.J. Super. 89, 102-03 (Ch. Div. 1981) certif.. denied, 94 N.J. 549 (1983) (no reasonable reliance on misrepresentations or concealments where plaintiffs were represented by counsel who "made or should have made an independent investigation of the facts.").

Dare's arguments in support of reasonable reliance are factually contradicted by the record, which clearly indicates that Dare, through its attorneys, investigated the validity and enforceability of the Sayreville Mortgage and reviewed the prior litigation surrounding it.[8]  Thus, Dare is charged with knowledge, and in fact knew, of (1) the prior injunction on the Sayreville Property, (2) the rulings that the Moccos were the owners of the Sayreville Property, and (3) the Moccos' position regarding the status of the Sayreville Mortgage.  As a result, Dare, as a matter of law, cannot have reasonably relied on any representations made by Chicago or Horizon. Accordingly, Dare's common law fraud claims are dismissed.

**C.    Dare's Negligence Claim**

Dare's claim for negligent misrepresentation fails for the same reason as those for common law fraud.  As with a claim for common law fraud, a party stating a claim for negligent misrepresentation must establish reasonable reliance on the alleged misrepresentation.  Kaufman v. i-State Corp., 165 N.J. 94, 109 (2000).  As discussed above, with respect to its common law fraud claims, Dare, as a matter of law, cannot have reasonably relied on the alleged

---

[8]       Dare's allegations of fraud are particularly disingenuous considering that the title policy itself refers to the prior litigation surrounding the Sayreville Property and the Moccos' positions regarding the condition of the Sayreville Mortgage.

misrepresentations of Chicago or Horizon regarding the validity or enforceability of the

Sayreville Mortgage because Dare, through its attorneys, investigated the enforceability and

validity of the Sayreville Mortgage and was fully aware of the prior litigation between the

Moccos and Mr. Licata.  Thus, Dare cannot have reasonably relied on any such

misrepresentations to sustain a claim for negligent misrepresentation.  Accordingly, that claim is

dismissed.

**D.      Dare's Reformation Claim**

Dare seeks reformation of the title policy because Chicago "negligently or intentionally

failed to advise [Dare] that the ostensible value of the real estate securities pledged in the

Security Agreement . . . was greatly in excess of the policy amount actually issued."  (Compl. ¶

86.)  Chicago argues that Dare is not entitled to reformation of the policy because it cannot

establish fraud or mistake.  Dare simply responds that its reformation claim is properly pled.

Courts are generally not in the business of rewriting contracts, absent fraud, accident, or

mistake.  Dunkin Donuts of America, Inc. v. Middletown Donut Corp., 100 N.J. 166, 183

(1985); see also Martinez v. John Hancock Mut. Life Ins. Co., 145 N.J. Super. 301, 312 (App.

Div. 1976) ("The extraordinary remedy of reformation is available only where there is mutual

mistake . . . or where a mistake on the part of one party is accompanied by fraud or other

unconscionable conduct of the other party."  (quotations and citation omitted)).

Dare's claim for reformation is truly disingenuous.  The Security Agreement specifically

indicates the value of the Sayreville Mortgage as $15 Million.  See (Compl., Ex. 1)  Moreover,

Item 9 of the title policy states that Chicago, "through its due diligence, can verify that the

amount currently due and owing on the said mortgage being insured hereunder, at the date of this

Commitment, is no less than $15,000,000.00."  (Compl., Ex. 2.)  Thus, Dare cannot, in good

faith, argue that Chicago failed to disclose the "ostensible value" of the Sayreville Mortgage.  As a result, Dare's claim for reformation is dismissed.

**E.      Dare's Claim under the NJCFA**

Dare's claim under the NJCFA fails simply because there is no evidence in the record that Chicago violated the statute.  The NJCFA states:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby. . .

N.J.S.A. 56:8-2.

Liability under the statute falls into "three general categories of unlawful acts: (1) affirmative acts; (2) knowing omissions; and (3) regulatory violations."  Thiedemann v. Mercedes-Benz USA, LLC, 183 N.J. 234, 245 (2005).  Affirmative acts are "unlawful practices that include unconscionable commercial practices, fraud, deception, false promise, false pretense, and misrepresentation."  Id.   "The standard of conduct that the term "unconscionable implies is lack of good faith, honesty in fact and observance of fair dealing."  Cox v. Sears Roebuck & Co., 238 N.J. 2, 18 (1994).

As discussed above, the record contradicts Dare's allegations that Chicago "concealed, suppressed, and/or omitted the Vermont Decision, the District Court Decision, [and] the Superior Court Litigation."  (Compl. ¶ 130.)  Furthermore, Dare's representation that no less than $15 million was due on the Sayreville Mortgage as of the date of the title policy is a specific term of the title policy under which Dare is attempting to claim insurance benefits and that therefore cannot provide the basis of a claim under the NJCFA.  See Van Holt v. Liberty, 163 F.3d 161,

168 ("The mere denial of insurance to which [a party] believes they were entitled does not compromise an unconscionable commercial practice" under the NJCFA); Baughman v. United States Liability Ins. Co, 662 F. Supp. 2d 386, 401 (D.N.J. 2009) (alleged misrepresentation of scope of insurance policy not actionable under NJCFA). Accordingly, Dare's claim under the NJCFA is dismissed.

### E. Dare's RICO Claims

Both federal and New Jersey RICO statutes make it unlawful for "any person to acquire or maintain any interest in or control of an 'enterprise' through 'a pattern of racketeering activity.'" Seville Indus. Machinery Corp. v. Southmost Machinery Corp., 742 F.2d 786, 788 (3d Cir. 1984) (citing 18 U.S.C. 1962(b)); see also State v. Ball, 141 N.J. 142, 155 (1995) ("The gravamen of a New Jersey Jersey RICO violation, frequently referred to as 'racketeering,' is the involvement in the affairs of an enterprise through a pattern of racketeering activity."). Thus, to allege a violation of either statute, a party must show (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985); see also Ball, 141 N.J. at 161-62.

On the face of its Complaint, Dare's RICO claims[9] are woefully deficient for a number of reasons, two of which are discussed here. First, Dare fails to plead the existence of a RICO enterprise. Dare alleges an association-in-fact enterprise, entitled the "Chicago Title RICO Enterprise." See (Compl. ¶ 77b.) Under Federal RICO, an association-in-fact enterprise is a "group of persons associated together for a common purpose of engaging in a course of conduct." United States v. Turkette, 452 U.S. 576, 583 (1981). To establish such an enterprise, a party must show that (1) the enterprise is an "ongoing organization, formal or informal;" (2)

---

[9] These claims include Count Six (Civil Conspiracy), Count Seven (Civil Aiding and Abetting), and Count Eight (Federal and NJRICO) of Dare's Complaint.

the members of the enterprise function as a "continuing unit" with established duties; (3) the enterprise is "separate and apart from the pattern of activity in which it engages." Id.  With respect to the first element, the Court of Appeals has explained that the enterprise must have "some sort of structure . . . within the group for the making of decisions, whether it be hierarchical or consensual." United States v. Riccobene, 709 F.2d 214, 222 (3d Cir. 1983).

Similarly, New Jersey RICO requires showing that the enterprise (1) "is distinct from the incidents constituting the pattern of activity," and (2) has an "organization" consisting of "those kinds of interactions that become necessary when a group, to accomplish its goal, divides among its members the tasks that are necessary to achieve a common purpose." Ball, 141 N.J. at 162. Such an organization "must necessarily engage in a high degree of planning, cooperation and coordination." Id.

Dare's Complaint alleges three "scams" in which (1) SWJ procured loans from three entities, including Dare, that were secured by certain mortgages or properties; (2) Chicago issued title insurance policies insuring the marketability and validity of those mortgage or properties; and (3) all the while Chicago and SWJ knew that the mortgages or properties were invalid and/or umarketable.  See (Compl. ¶ 22- 59.)  The Complaint then goes on to allege a pattern of racketeering activity.  See (Compl. ¶ 77a-r.)  Nowhere does the Complaint allege any sort of structure or organization separate and apart from the alleged "scams."  Thus, Dare, has failed to plead a RICO enterprise.

Second, Dare does not even come close to pleading the predicate acts of mail and wire fraud in its Complaint that serve as the basis of the "Chicago RICO Title Enterprise['s]" pattern of racketeering activity.  To plead mail or wire fraud, a plaintiff must demonstrate "(1) the defendant[s'] knowing and willful participation in a scheme or artifice to defraud, (2) with the

specific intent to defraud, and (3) the use of the mails or interstate wire communications in furtherance of the scheme."  <u>United States v. Antico</u>, 275 F.3d 245, 261 (3d Cir. 2001).

The Complaint states that (1) "The Chicago Title RICO Enterprise's actions involved a scheme or artifice to defraud, or for obtaining money or property and/or services by means of false or fraudulent pretenses, representations, or promises, and transmitted or caused to be transmitted by means of communication in interstate or foreign commerce, any writings and/or signs and/or signals and/or pictures and/or sounds for the purpose of executing such scheme or artifice;" (2) "The Chicago Title RICO Enterprise used the United States Mail Service in their scheme, including depositing matters or things to be sent or delivered by the Postal Service, and/or deposited and/or caused to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, and/or took or received therefrom, any such matter or thing, and/or knowingly caused to be delivered by mail or such carrier according to the direction thereon, and/or at the place at which it is directed to be delivered by the person to whom it is addressed;" and (3) "The acts of the Chicago Title RICO Enterprise may be indictable pursuant to 18 U.S.C. § 1341 relating to mail fraud; and [t]he acts of the Chicago Title RICO Enterprise may be indictable pursuant to 18 U.S.C. § 1343 relating to wire fraud."  (Compl. ¶ 77o-r.)  Such allegations amount to "threadbare recitals of a cause of action's elements, supported by mere conclusory statements," that are not entitled to the assumption of truth. <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1940 (2009).  Accordingly, Dare's Federal and New Jersey RICO claims are dismissed.

**F.      Dare's Claim for Breach of Contract/Coverage**

Chicago argues that it did not breach the terms of the title policy because Dare's claim for coverage under the policy is barred by Exclusion 3(a) and Item 7.  Dare contends that those

exclusions do not apply to its claim for coverage.  Dare further contends that it is clearly entitled

to coverage under Item 8 and Item 9 of the title policy and thus seeks summary judgment in

favor of its breach of contract claim for Chicago's failure to provide coverage.

"[A]s with any contract, construing insurance policies requires a broad search for the

probable common intent of the parties."  S.T. Hudson Eng'rs, Inc. v. Pa. Nat'l Mut. Cas. Co.,

388 N.J. Super. 592, 604 (App. Div. 2006) certif.. denied, 189 N.J. 647 (2007).  However, courts

are to "give special scrutiny to insurance contracts because of the stark imbalance between

insurance companies and insureds in their respective understanding of the terms and conditions

of insurance policies."  Zacarias v. Allstate Ins. Co., 168 N.J. 590, 594 (2001) (citation omitted).

Thus, courts should start by giving "the words of an insurance policy . . . their plain, ordinary

meaning."  Id. at 595.  However, "[w]hen there is ambiguity in an insurance contract, courts

interpret the contract to comport with the [objectively] reasonable expectations of the insured,

even if a close reading of the written texts reveals a contrary meaning."  Id.

### i.  *Exclusion 3(a)*

Exclusion 3(a) bars coverage for "defects, liens, encumbrances, adverse claims or other

matters . . . created, suffered, assumed or agreed to by the Insured Claimant."  (Compl., Ex. 2.)

In the context of such an exclusionary clause, the term "created" has been interpreted to mean

"the idea of knowledge, the performance of some affirmative act by the insured, a conscious or

deliberate causation."  Feldman v. Urban Commercial, Inc., 87 N.J. Super. 391, 404 (App. Div.

1965).  An insured who creates a defect under a title policy generally engages in "some

fraudulent or inequitable behavior."  Keown v. West Jersey Title and Guaranty Co., 161 N.J.

Super. 19, 26 (1978).  In contrast, "[t]he term 'suffer' implies the power to prevent or hinder,

and includes knowledge of what is to be done under the sufferance and permission, and the intention that what is done is to be done."  Id.

New Jersey courts have not interpreted the terms "assumed" or "agreed to."  However, in the oft-cited case of American Savings and Loan Ass'n v. Lawyers Title Ins. Co., 793 F.2d 780 (6th Cir. 1986), the Sixth Circuit defined "assumed" as "requir[ing] knowledge of the specific [] defect," and explained that "agreed to carries connotations of 'contracted,' requiring full knowledge by the insured of the extent and amount of the claim against" it.  793 F.2d at 784.

Here, there is no evidence that Dare performed some affirmative act to cause Moccos' adverse claim against the Sayreville Mortgage.  In addition, there is no evidence that Dare had any control over the Moccos' ability to bring that adverse claim.  Therefore, Dare cannot be found to have "created" or "suffered" the Moccos' claim against the Sayreville Mortgage under Exclusion 3(a).

Nor can the Court, at this time, find that Dare assumed or agreed to that claim under that exclusion.  The intent of Exclusion 3(a) remains ambiguous in the context of the broader title policy.  While it could be construed to bar coverage because Dare had full knowledge of the prior litigation surrounding the Sayreville Property and the Moccos' position that the Sayreville Mortgage had been paid off, Item 8 specifically excepts the Moccos' position regarding the Sayreville Mortgage as a bar to coverage with respect to the disclaimer under Exclusion 3(b), and the logic behind excepting that position with respect to Exclusion 3(b), but not Exclusion 3(a), remains unclear.  Moreover, at the same time as the policy acknowledges the Moccos' position that the Sayreville Mortgage has been paid off, Item 9 verifies that $15 million was due on the Sayreville Mortgage as of the policy date.  Thus, from these provisions, it is unclear

whether the parties intended the title policy to bar coverage for the Moccos' claim against the Sayreville Mortgage.

On the other hand, the Court cannot interpret Exclusion 3(a) according to Dare's objectively reasonable expectation under the title policy because the current record does not speak to it. Therefore, there remains a factual dispute regarding whether denying coverage under Exclusion 3(a) would defy the reasonable expectations of Dare under the title policy. Accordingly, the Court cannot find that Dare's claim for coverage is barred under Exclusion 3(a).

### ii.    Item 7

There remains a similar factual dispute regarding whether Item 7 bars Dare's claim for coverage. Item 7 states that "[t]his policy will not insure against loss or damage by reason of . . . the terms, conditions, covenants, court orders, etc, as set forth in the [Licata bankruptcy proceedings]." (Compl., Ex. 2.) To be sure, the Moccos' claim against the Sayreville Mortgage arises out of the decisions in the Licata bankruptcy proceedings. However, like Exclusion 3(a), the intent of Item 7 is rendered ambiguous when read in conjunction with Item 8 and Item 9. Thus, because the current record remains unclear regarding Dare's reasonable expectation under the title policy, the Court cannot find that Dare's claim for coverage is barred under Item 7.

### iii.    Item 8 and Item 9

Dare's contention that it is entitled to coverage under Item 8 and Item 9 is unavailing. While Item 8 identifies the Moccos' position regarding the status of the Sayreville Mortgage, it does not specifically insure against those positions. Similarly, Item 9 verifies, but does not insure, that no less than $15 million was due on the Sayreville Mortgage as of the policy date. Most importantly, as discussed above, Dare's reasonable expectation under the title policy

remains unclear on the current record.  Therefore, the Court cannot find that Chicago breached

the terms of the insurance policy in refusing to deny benefits to Dare.

**G.      Dare's Claim for Bad Faith**

Dare's claim for bad faith fails because Chicago had a reasonable basis on which to deny

benefits under the title policy.  "To show a claim for bad faith, a plaintiff must show the absence

of a reasonable basis for denying benefits of the policy and the defendant's knowledge or

reckless disregard of the lack of a reasonable basis for denying the claim."  Pickett v. Lloyd's,

131 N.J. 457, 453 (1992) (quotation and citation omitted).  In other words, "a claimant who

could not have established as a matter of law a right to summary judgment on the substantive

claim would not be entitled to assert a claim for an insured's bad-faith refusal to pay the claim."

Id. at 454.  As discussed above, in light of the ambiguity in the title policy and Dare's reasonable

expectations thereunder, the Court cannot find that Dare is clearly entitled to coverage under the

title policy and grant summary judgment in favor of its claims for breach of contract.

Accordingly, Dare's claim for bad faith is dismissed.

### III.  CONCLUSION

For the foregoing reasons, Chicago's motion for summary judgment is GRANTED in

part and DENIED in part, while Dare's motion for summary judgment is DENIED in its entirety.

Dare's claims for common law fraud, negligence, reformation, consumer fraud, bad faith, and

those under the federal and New Jersey RICO statutes are dismissed with prejudice.

The Court will enter an order implementing this opinion.

**s/Dickinson R. Debevoise**
DICKINSON R. DEBEVOISE,
U.S.S.D.J.

DATED:  June 29, 2011