<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| DARE INVESTMENTS, LLC<br><br>                                Plaintiff,<br><br>v.<br><br>CHICAGO TITLE INSURANCE<br>COMPANY, ET AL.<br><br>                                Defendants. | Civ. No. 10-6088 (DRD)<br><br>**O P I N I O N** |

*Appearances by:*

PETER STROJNIK, P.C.
by: Peter Strojnik, Esq.
3030 North Central Avenue, Suite 1401
Phoenix, Arizona 85012

    *Attorneys for Plaintiff,*

RIKER DANZIG SCHERER HYLAND & PERRETTI, LLP
by: Michael O'Donnell, Esq.
   Derrick R. Freijomil, Esq.
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey 07962

    *Attorneys for Defendant Chicago Title Insurance Company.*

**<u>DEBEVOISE, Senior District Judge</u>**

      This matter arises out of a title insurance policy, issued by Defendant Chicago Title Insurance Co. ("Chicago"), and negotiated by Horizon Title Agency, Inc. ("Horizon"), Chicago's

title agent, insuring the marketability and validity of a mortgage serving as collateral for a loan from Plaintiff Dare Investments, LLC ("Dare") to another investment entity. The mortgage has a rather complex history and became subject to adverse claims after issuance of the title policy. As a result, Dare claimed coverage under the policy, but Chicago disclaimed coverage on a number of grounds, including several exclusionary provisions in the policy.

On November 20, 2010, Dare filed a Complaint against Chicago and Horizon asserting claims for common law fraud, reformation, breach of contract, negligence, bad faith, consumer fraud under the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. 56:B-1 *et. seq.*, civil conspiracy, civil aiding and abetting under, and violations of, the Racketeer Influenced and Corrupt Organizations Act ("Federal RICO"), 18 U.S.C. § 1961 *et. seq.*, and the New Jersey Racketeering Influenced and Corrupt Organizations Act ("New Jersey RICO"), N.J.S.A. 2C:41-1, *et seq*.

On February 9, 2011, Chicago moved for summary judgment[1] against all of Dare's claims. On March 4, 2011, Dare cross-moved for summary judgment in favor of its claims for breach of contract and bad faith. On June 29, 2011, the Court issued an Opinion and Order granting summary judgment against all of Dare's claims except that for breach of contract and denying summary judgment in favor of Dare's breach of contract and bad faith claims. On July 6, 2011, Dare submitted a Motion for Reconsideration of the Court's ruling denying summary judgment in favor of its breach of contract claim. For the reasons set forth below, Dare's motion is DENIED.

---

[1] Chicago initially framed its motion as a request for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6). However, the Court converted Chicago's motion to one for summary judgment because it relied on matters outside the pleadings. See Dare Investments, 2011 WL 2600594, at *5 n. 6.

## I. BACKGROUND

The facts this case are fully set forth in <u>Dare Investments, LLC v. Chicago Title Ins. Co.</u>, No. 10-6088, 2011 WL 2600594 (D.N.J. June 29, 2011). Thus, for the sake of brevity, the Court will only recite those facts that are necessary to this ruling.

On February 15, 2006, Dare loaned $5 million to SWJ Investments, LLC ("SWJ") so that it could purchase certain asserts from a bankruptcy sale arising out the bankruptcy proceedings of James Licata and several entities that he owns. One of the asserts that SWJ intended to purchase was a $15 million mortgage (the "Sayreville Mortgage") on 158 acres of land located in Sayreville, New Jersey (the "Sayreville Property"). The Sayreville Mortgage was one of several assets assigned to Dare as collateral on its $5 million loan to SWJ.

Mr. Licata initially gained ownership over the Sayreville Mortgage from the bankruptcy proceedings of Peter and Lorraine Mocco. During the course of those bankruptcy proceedings, Mr. Licata and the Moccos reached a rather complicated arrangement whereby one of Mr. Licata's entities assumed and secured the Moccos' debt with their principal secured creditor. As part of this arrangement, the Moccos transferred title to their properties, including the Sayreville Property, to Mr. Licata along with a $15 million mortgage on the Sayreville Property—i.e. the Sayreville Mortgage. The Sayreville Mortgage was assigned to EMP Whole Loan, Inc. ("EMP"), which provided short-term financing for the Mocco debt assumed by Mr. Licata.

Mr. Licata was to reconvey the Moccos' properties once they secured long-term financing for their debt pursuant to a Reconveyance Agreement. However, when the Moccos secured such financing, Mr. Licata refused to reconvey their properties. As a result, the Moccos sued Mr. Licata in the New Jersey Superior Court of Essex County to enforce the Reconveyance Agreement.

3

The Superior Court, among other things, issued an injunction stating that "no party or affiliate of any party shall transfer, lien, or encumber" the Sayreville Property. ("Certification of Michael R. O'Donnell, Esq. in Support of Chicago title Insurance Company's Motion to Dismiss, dated February 9, 2011 ("O'Donnell Cert."), Ex. 7.)  Mr. Licata then filed for bankruptcy in the District of Connecticut and listed a number of his entities with title to the Mocco properties as assets to be placed into the bankruptcy proceedings.  Consequently, the Moccos filed a motion to challenge the Licata bankruptcy filings of those properties.  The bankruptcy court found that "Mocco was the owner of the property at the time [the Superior Court] entered its order."  (Compl., Ex. 4.)  This finding was affirmed by the District Court and the Second Circuit.

The record is clear that, prior to issuing the loan to SWJ, Dare, through counsel,[2] conducted extensive due diligence into the validity and enforceability of the Sayreville Mortgage and was aware of the aforementioned litigation.  Dare was further aware of a letter written by James A. Scarpone Esq., counsel to the Moccos, dated February 23, 2006, that was addressed to counsel for the Licata bankruptcy creditor's committee following a meeting with them.  The letter specifically disputes the validity of the Sayreville Mortgage.  (Certification of James A. Scarpone Esq., dated February 25, 2011, ("Scarpone Cert."), Ex. B.)  In doing so, it points to the fact that, "shortly after commencement of the Mocco lawsuit against Licata (sometime in the summer of 1999) Mocco requested and received a statement from [] EMP of what [it] claimed were the outstanding balances on the two loans."  (Id.)  That statement indicated that, "as of July 1998 the principal balance due on the loan secured by the Sayreville property was reduced to

---

[2] Dare retained two well known law firms: the Jones Waldo Law Firm, in Utah, where Dare is located, and the Seiden Wayne firm in New Jersey, where the Sayreville Mortgage was recorded.  The Seiden Wayne firm has since merged with a larger New Jersey firm.

$74,212.34."[3]  (Id.)  The letter maintained that, as of February 23, 2006, the loan secured by the Sayreville property had "not only been paid, but overpaid."  (Id.)

Due to concern about the positions taken in this letter, Dare's counsel solicited a response from, Dale Schreiber, Esq., counsel to SWJ, on March 2, 2006, via email.  See (O'Donnell Cert., Ex. 9.)  Mr. Schreiber's response set forth several arguments against the positions taken in Mr. Scarpone's letter and maintained that the Sayreville Mortgage was valid and enforceable.  See (id.)

Nonetheless, Dare's counsel disagreed with Mr. Schreiber's analysis, and based on Dare's entire due diligence, "had serious doubts about [the Sayreville Mortgage's] validity."  (O'Donnell Cert., Ex. 6, Williams Tr. at 126.)  Consequently, they advised Dare against going forward with the $5 million loan to SWJ.  (O'Donnell Cert., Ex. 5, McCloskey Tr. at 69, 105.)  However, Richard McCloskey, Dare's CEO, went forward with the transaction because he believed the returns outweighed the risks.  See (id. at 47-48, 73.)

Apparently to insure against the risks associated with the Sayreville Mortgage, on March 30, 2006, Dare took out a title insurance policy on the Sayreville Mortgage for $5.5 million, which was issued by Chicago and whose terms were negotiated by Dare's counsel and Horizon, Chicago's title agent.  The policy insures against, among other things, "unmarketability of the title" to and "[t]he invalidity or unenforceability of" the Sayreville Mortgage.  (Compl., Ex. 3.)  In addition, the policy provides that Chicago will "pay the costs, attorneys' fees and expenses incurred in defense of the title or the lien of the [Sayreville Mortgage], as insured."  (Id.)

The policy excludes from coverage, among other things, "defects, liens, encumbrances, adverse claims or other matters . . . (a) created, suffered, assumed or agreed to by the Insured Claimant" ("Exclusion 3(a)") or (b) not known to Chicago or recorded in public records as of the

---

[3] Mr. Scarpone attached a copy of the statement to the letter.  (Scarpone Cert., Ex. B.)

5

policy date, but known to Dare and not disclosed in writing to Chicago prior to the policy date ("Exclusion 3(b)")." (Compl., Ex. 3.) The policy also limits coverage "[s]ubject to the terms, conditions, covenants, court orders etc., as set forth in the United States Bankruptcy Court, District of Connecticut, Bridgeport Division Case No. 02-50851[4] (AHWS) ("Item 7")." (Id.)

At the same time, the policy omits the disclaimer in Exclusion 3(b) "as specific to the said "Mocco"/"Scarpone" claims and positions challenging positions in and to said mortgage hereunder as per letter of February 23, 2006 from James A. Scarpone, Esq. to Alan J. Brady, Esq., et als. ("Item 8")." (Id.) Immediately following Item 8, the policy states that Chicago, "through its due diligence, can verify that the amount currently due and owing on the said mortgage being insured hereunder, at the date of this Commitment, is no less than $15,000,000.00 ("Item 9")."[5] (Id.)

In 2007, upon discovering Dare's interest in the Sayreville Mortgage, the Moccos amended their complaint in the Superior Court of Essex County to include, among other things, a claim against Dare to quiet title to the Sayreville Property and render it free and clear of the Sayreville Mortgage. On April 25, 2007, after discovering the amended complaint, Dare sought indemnification under the title policy for unmarketability of title to the Sayreville Mortgage and costs associated with defending against the Moccos' claim. Shortly thereafter, Chicago conducted an investigation into Dare's claim for coverage. On August 14, 2007, Chicago sent Dare a letter disclaiming coverage on a host of grounds, including Exclusion 3(a), Exclusion 3(b), and Item 7. See (Compl., Ex. 4.) In doing so, Chicago maintained, among other things,

---

[4] The docket number noted in the policy is incorrect. The correct number is 02-50852.

[5] Item 9 was specifically requested by Dare, however, in the course of negotiating that term, Dare was told specifically that Chicago "was not providing affirmative insurance as to the amount due and owing on the [Sayreville Mortgage] at the time of closing . . . [and] that type of insurance could not be provided in a title policy." (Certification of David Cohn, dated April 1, 2011 ("Cohn Cert."), ¶ 3.)

6

that the Moccos' claim was based on the decisions arising out of the aforementioned rulings of the Superior Court of Essex County and the bankruptcy court, of which Dare had prior knowledge.  See (id.)

On November 20, 2010, Dare filed a Complaint against Chicago and Horizon asserting claims for common law fraud, reformation, breach of contract, negligence, bad faith, consumer fraud under the NJCFA, and several claims under the Federal RICO and New Jersey RICO statutes.  On February 9, 2011, Chicago moved for summary judgment against all of Dare's claims.  On March 4, 2011, Dare cross-moved for summary judgment in favor of its claims for breach of contract and bad faith.

On June 29, 2011, the Court issued an Opinion and Order granting summary judgment against all of Dare's claims, except that for breach of contract, and denying summary judgment in favor of Dare's breach of contract and bad faith claims.  With respect to Dare's breach of contract claim, the Court found that coverage could not be granted under Item 8 or Item 9 of the policy because those provisions do not affirmatively insure against the Moccos' claim regarding the Sayreville Mortgage.  At the same time, the Court could not determine whether Exclusion 3(a) or Item 7 barred coverage under the policy because those provisions remained ambiguous when read in conjunction with Item 8 and Item 9.  In addition, the Court was unable to interpret Exclusion 3(a) and Item 7 in accordance with Dare's reasonable expectations under the policy because those expectations remained unclear based on the record at that time.

## II.  DISCUSSION

Dare now moves for reconsideration of the Court's June 29, 2011 ruling denying summary judgment in favor of its breach of contract claim pursuant to Local Civil Rule 7.1(i).  In doing so, Dare argues that because the Court found that the policy exclusions were

7

ambiguous, it was required under New Jersey Law to construe those provisions against Chicago and grant coverage to Dare. Chicago argues that (1) Dare fails to provide a basis for reconsideration; (2) the doctrine of reasonable expectations does not apply in this case as a matter of law; (3) Dare cannot show that it had a reasonable expectation of coverage under the policy.

**A.     Standard of Review**

"[I]t is well-established in this district that a motion for reconsideration is an extremely limited procedural vehicle." Resorts Int'l v. Greate Bay Hotel & Casino, 830 F. Supp. 826, 831 (D.N.J. 1992). As such, a party seeking reconsideration must satisfy a high burden, and must "rely on one of three major grounds: (1) an intervening change in controlling law; (2) the availability of new evidence not available previously; or (3) the need to correct clear error of law or prevent manifest injustice." N. River Ins. Co. v. CIGNA Reins. Co., 52 F.3d 1194, 1218 (3d Cir. 1995).

Since the evidence relied upon in seeking reconsideration must be "newly discovered," a motion for reconsideration may not be premised on legal theories that could have been adjudicated or evidence which was available but not presented prior to the earlier ruling. See id. Local Civil Rule 7.1(i), which governs such motions, provides that they shall be confined to "matter[s] or controlling decisions which the party believes the Judge or Magistrate Judge has 'overlooked.'" The word "overlooked" is the dominant term, meaning that except in cases where there is a need to correct a clear error or manifest injustice, "[o]nly dispositive factual matters and controlling decisions of law which were presented to the court but not considered on the original motion may be the subject of a motion for reconsideration." Resorts Int'l, 830 F. Supp.

at 831; see also Egloff v. N.J. Air Nat'l Guard, 684 F. Supp. 1275, 1279 (D.N.J. 1988); Pelham v. United States, 661 F. Supp. 1063, 1065 (D.N.J. 1987).

A decision suffers from "clear error" only if the record cannot support the findings that led to that ruling. United States v. Grape, 549 F.3d 591, 603-04 (3d Cir. 2008) (citations omitted). Thus, a party must do more than allege that portions of a ruling were erroneous in order to obtain reconsideration of that ruling; it must demonstrate that (1) the holdings on which it bases its request were without support in the record, or (2) would result in "manifest injustice" if not addressed. See Grape, 549 F.3d at 603-04; N. River Ins., 52 F.3d 1218. Mere "disagreement with the Court's decision" will not suffice. P. Schoenfeld Asset Mgmt., LLC v. Cendant Corp., 161 F. Supp.2d 349, 353 (D.N.J. 2001).

**B.      Bases for Reconsideration**

Dare argues that the Court committed a clear error of law in failing to grant summary judgment in favor of its breach of contract claim. Specifically, Dare contends that, in New Jersey, under the doctrine of reasonable expectations, to the extent the Court finds a provision in an insurance policy to be ambiguous, it must interpret the provision in favor of the insured. As a result, according to Dare, the Court committed clear error when it found Exclusion 3(a) and Item 7 ambiguous but refused to grant coverage under the policy. Chicago argues that Dare fails to provide a basis for reconsideration because Dare previously raised this precise argument in its prior motion papers, which the Court rejected.

It is true that Dare previously raised the doctrine of reasonable expectation in its opposition to Chicago's Motion for Summary Judgment:

> It is well accepted that insurance contracts are to be interpreted to effectuate the reasonable expectations of the insured. S.T. Hudson Eng'rs, Inc. v. Pa. Nat'l Mut. Cas. Co., 388 N.J. Super. 592, 603-04 (App. Div. 2006), cert. denied, 189 N.J. 647 (2007) (citations omitted). Here, Dare reasonably expected that Chicago Title would honor the

9

>policy and provide coverage against loss or damage caused by Mocco/Scarpone Claims and Positions. "Courts are bound to protect the insured to the full extent that any fair interpretation will allow." Mazzilli v. Accident & Cas. Ins. Co. of Winterthur, Switzerland, 35 N.J. 1 at 7 (1961)

(Pl.'s Br. Opp. Mot. Dismiss 19.) Nonetheless, Dare provides a basis for reconsideration of the Court's ruling on its breach of contract claim, because it contends not that the Court failed to consider the doctrine of reasonable expectations but that it applied that doctrine in a clearly erroneous manner.

C. **Applicability of the Doctrine of Reasonable Expectations**

The Court need not determine whether it misapplied the doctrine of reasonable expectations in its prior ruling because it is persuaded by Chicago's contention that the doctrine of reasonable expectations is wholly inapplicable in this case. Specifically, Chicago contends that the doctrine of reasonable expectations does not apply to the subject title policy because Dare is a sophisticated commercial entity that negotiated its terms. Dare counters that it does not have the requisite level of sophistication to bar the doctrine's application and did not negotiate the specific policy terms under which Chicago is disclaiming coverage.

The doctrine of reasonable expectations is applied in cases where "the insurance company is the expert and unilaterally prepares the policy, whereas the insured is a layman unversed in insurance provisions and practices." Villa v. Short, 195 N.J. 15, 24 (2008) (quotations and citations omitted). In other words, "because of the vast differences in the bargaining positions between an insured and an insurance company in the drafting of an insurance policy, [courts] pay special attention and apply special rules of interpretation to such contracts." Id. (citation omitted).

Accordingly, the doctrine of reasonable expectations is not invoked in cases where the insured is a "sophisticated commercial entit[y] that do[es] not suffer from the same inadequacies

10

as the ordinary unschooled policyholder and that ha[s] participated in the drafting of the insurance contract." Benjamin Moore & Co. v. Aetna Cas. & Sur. Co., 179 N.J. 87, 102 (2004). " [O]nly where it is clear that an insurance policy was actually negotiated or jointly drafted, and where the policyholder had bargaining power and sophistication, is the [doctrine of reasonable expectations] not invoked." Id. (quotations and citations omitted); see also Pittston Co. Ultramar America Ltd. v. Allianz Ins. Co., 124 F.3d 508, 521 (3d Cir. 1997) ("[T]he dispositive question is not merely whether the insured is a sophisticated corporate entity, but rather whether the insurance contract is negotiated, jointly drafted, or drafted by the insured.").

New Jersey law does not set forth the specific level of sophistication required to prevent an insured from invoking the doctrine of reasonable expectations. In arguing that Dare is a sophisticated corporate entity, Chicago cites to McNeilab, Inc. v. North River Ins. Co., 645 F. Supp. 525 (D.N.J. 1986), Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am., 195 N.J. 231 (2008), Werner Indus. Inc. v. First State Ins. Co., 112 N.J. 30 (1988), and President v. Jenkins, 180 N.J. 550 (2004).

In McNeilab, this court refused to apply the doctrine of reasonable expectations because the plaintiff was insured through Johnson & Johnson, its parent company, which maintained a "Corporate Insurance Department consisting of an expert insurance staff with a legal staff at its disposal." 645 F. Supp. at 526, 547. Thus, the court found that "this was not the usual insured-insurer relationship. . . . [T]he parties were of equal bargaining power and that all that preceded and all that followed the execution of the policy at issue here is reminiscent of the entry into and the living under a treaty between two great nations." Id. at 547-48. Similarly, in Chubb, the New Jersey Supreme Court found that the plaintiff, a large insurance company, could not invoke the doctrine of reasonable expectations as a sophisticated commercial entity with equal

11

bargaining power.  195 N.J. at 246.  Finally, in Werner, the New Jersey Supreme Court held that "a policy covering commercial risks procured through a broker, and thus involved parties on both sides of the bargaining table who were sophisticated with regard to insurance," was not subject to the doctrine of reasonable expectations.  112 N.J. at 38.

Dare maintains that these cases are inapposite because it neither has the sophistication and expertise of a company like Johnson & Johnson or Chubb, nor hired an insurance broker to negotiate the terms of the title policy.  Be that as it may, Dare was nonetheless "sophisticated with regard to insurance," having hired two well known law firms to conduct due diligence on the validity and enforceability of the Sayreville Mortgage and negotiate the terms of the title policy covering that mortgage.

Moreover, the record is clear that Dare, through its counsel, actually negotiated the terms of the title policy.  Dare contends that the doctrine of reasonable expectations should nonetheless apply because there is no evidence specifically indicating that Dare negotiated or participated in drafting namely Exclusion 3(a) and Item 7, under which Chicago is disclaiming coverage.  In doing so, they cite to language from the New Jersey Appellate Division stating that the doctrine of reasonable expectations applies to policies procured by "commercial entities as well as individual insureds, so long as the insured did not participate in drafting the insurance provision at issue."  Wakefern Food Corp. v. Liberty Mutual Fire Ins. Co., 406 N.J. Super 524, 540 (App. Div. 2009)

The Court's interpretation of New Jersey law is determined by the Supreme Court of New Jersey.  See Gares v. Willingboro Twp., 90 F.3d 720, 725 (3d Cir. 1996) ("In adjudicating a case under state law . . . [federal courts] are to apply state law as interpreted by the state's highest court.").  "In the absence of clear guidance from" the New Jersey Supreme Court, this Court

"must consider decisions of the [Appellate Division] for assistance in predicting how the [New Jersey Supreme Court] would rule." Id. However, the Court may choose not to follow the decisions of the Appellate Division if it is "convinced that the [New Jersey Supreme Court] would decide otherwise." Id.

The Court is convinced that the New Jersey Supreme Court would not rule that, in determining whether to apply the doctrine of reasonable expectations, courts should look to whether the insured actually negotiated or participated in drafting the particular provision under which coverage is being claimed or disclaimed, rather than the policy as a whole.[6] As previously discussed, the doctrine of reasonable expectations is meant to deter an insurer from taking advantage of an unschooled insured. See Shotmeyer v. New Jersey Realty Title Ins. Co., 195 N.J. 72, 82 (2008) ("Sophisticated insurers who unilaterally prepare complicated contracts should not be allowed to take advantage of their less sophisticated customers."). On the other hand, "a sophisticated insured cannot seek refuge in the doctrine [of reasonable expectations] by pretending it is the corporate equivalent of the unschooled, average consumer." Owens-Illinois, Inc. v. United Ins. Co., 137 N.J. 437, 471 (1993). Indeed, a sophisticated insured with bargaining power may strategically choose to negotiate or draft certain policy provisions but not others. Thus, limiting the inquiry to whether the insured negotiated or participated in drafting a particular policy provision, rather than the policy as a whole, would create a perverse incentive in the negotiating process for sophisticated insureds to deliberately refrain from negotiating or drafting particular terms—despite fully understanding their implications—only so that they can

---

[6] Notably, the Wakefern court found that the doctrine of reasonable expectations applied not because the plaintiff failed to negotiate a particular provision but because it was "undisputed that [the plaintiff] did not negotiate [the policy] or any of its provisions." 406 N.J. Super. at 540. Therefore, the language cited by Dare is dicta.

take advantage of the doctrine of reasonable expectations and ensure that those terms are construed against the insurer.

Thus, while there is no evidence that Dare specifically negotiated or participated in drafting Exclusion 3(a) or Item 7, it is undisputed that Dare, through counsel, negotiated the title policy as a whole and participated in drafting certain provisions, such as Item 9. Accordingly, the doctrine of reasonable expectations does not apply in this case.

**D.     Coverage under the Title Policy**

Because the doctrine of reasonable expectations is inapplicable to this case, the Court will treat the title policy as it would any contract between two parties of equal bargaining power. First, the Court must look to its plain language to ascertain "the probable common intent of the parties." S.T. Hudson Eng'rs, Inc. v. Pa. Nat'l Mut. Cas. Co., 388 N.J. Super. 592, 604 (App. Div. 2006). If a policy term is "susceptible to at least two reasonable alternative interpretations, an ambiguity exists." Chubb, 195 N.J. at 238. "In that case, a court may look to extrinsic evidence as an aid to interpretation." Id.

In its June 29, 2011 Opinion, the Court found the language "assumed or agreed to" under Exclusion 3(a) to be ambiguous. Dare Investments, 2011 WL 2600594, at *11. In doing so, it stated:

> The intent of Exclusion 3(a) remains ambiguous in the context of the broader title policy. While it could be construed to bar coverage because Dare had full knowledge of the prior litigation surrounding the Sayreville Property and the Moccos' position that the Sayreville Mortgage had been paid off, Item 8 specifically excepts the Moccos' position regarding the Sayreville Mortgage as a bar to coverage with respect to the disclaimer under Exclusion 3(b), and the logic behind excepting that position with respect to Exclusion 3(b), but not Exclusion 3(a), remains unclear. Moreover, at the same time as the policy acknowledges the Moccos' position that the Sayreville Mortgage has been paid off, Item 9 verifies that $15 million was due on the Sayreville Mortgage as of the policy date. Thus, from these provisions, it is unclear whether the parties intended the title policy to bar coverage for the Moccos' claim against the Sayreville Mortgage.

14

Id.  The Court similarly found the intent of Item 7 to be ambiguous when read in conjunction with Item 8 and Item 9.  Id.  It is further unclear whether Item 7—which states that "[t]his policy will not insure against loss or damage by reason of . . . the terms, conditions, covenants, court orders, etc, as set forth in the [Licata bankruptcy proceedings]" (Compl., Ex. 3)— is intended to disclaim coverage for any claim against Sayreville Mortgage relating to or arising out of the Licata bankruptcy proceedings, or only for findings and rulings of the bankruptcy court specifically adverse to the Sayreville Mortgage.

Consequently, the Court must look to extrinsic evidence to ascertain the parties' intent in entering into Exclusion 3(a), Item 7, Item 8, and Item 9 of the title policy.  To that end, Chicago contends that "Dare knew that it was not getting the very coverage it now seeks," (Def's. Br. Opp. Mot. Reconsid. 7), because in the course of negotiating the title policy, Dare was told specifically that Chicago "was not providing affirmative insurance as to the amount due and owing on the [Sayreville Mortgage] at the time of closing . . . [and] that type of insurance could not be provided in a title policy."  (Cohn Cert. ¶ 3.)  However, Dare does not seek coverage for the amount due on the Sayreville Mortgage, per se; rather, it seeks coverage for unmarketability of the Sayreville Mortgage due to the Moccos' claim to quiet title to the Sayreville Property.  At this time, the record does not speak to whether the parties intended the title policy to insure against such a claim.  Therefore, the Court cannot find that Chicago breached the terms of the title policy in refusing to deny benefits to Dare.

### III.  CONCLUSION

For the foregoing reasons, Dare's Motion for Reconsideration is DENIED.

The Court will enter an order implementing this opinion.

15

    **/s/ Dickinson R. Debevoise**
DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated: November 10, 2011