

**RIKER
DANZIG
SCHERER
HYLAND
PERRETTI**LLP

ATTORNEYS AT LAW

**Michael R. O'Donnell
Partner**

Direct:
t:973.451.8476
f:973.451.8700
modonnell@riker.com
Reply to: Morristown

August 14, 2007

<u>**Via Email and U.S. Mail**</u>
George W. Pratt, Esq.
Jones Waldo Holbrook &
     McDonough, P.C.
170 South Main Street, Suite 1500
Salt Lake City, Utah 84101
gpratt@joneswaldo.com

| | | |
|---|---|---|
| Re: | Insured: | **Dare Investments, LLC ("Dare")** |
| | Property: | **Vacant land located in Sayreville, New Jersey (the "Property")** |
| | Mortgage: | **$15 million Mortgage secured by the Property (the "Mortgage")** |
| | Policy No.: | **Loan Policy No. 72107-2834015 (the "Policy")** |
| | Litigation: | **Mocco et al. v. Licata et al., Action No. 2 consolidated and filed under Docket No. ESX-C-397-99 (formerly Docket No. ESX-L-4058-99), Superior Court of New Jersey, Essex County, Chancery Division (the "Action")** |

Dear Mr. Pratt:

We represent Chicago Title Insurance Company ("Chicago Title"). We write in response to the request of Dare to defend and indemnify it in the Action pursuant to the Policy. Dare's Policy provides coverage in the amount of $5.5 million with regard to the $15 million Mortgage purportedly assigned to SWJ Holdings, LLC ("SWJ") via the Connecticut Bankruptcy Sale (defined below) in which Dare obtained a security interest pursuant to a Security and Intercreditor Agreement. The Action challenges the validity of the $15 million Mortgage in which Dare claims a security interest, but not the validity of Dare's security interest under the Security and Intercreditor Agreement. Based on our investigation thus far and as explained more fully below, Chicago Title denies Dare's request for defense and indemnification in the Action under the Policy,

Headquarters Plaza, One Speedwell Avenue, Morristown, NJ 07962-1981 • t: 973.538.0800 f: 973.538.1984
50 West State Street, Suite 1010, Trenton, NJ 08608-1220 • t: 609.396.2121 f: 609.396.4578
500 Fifth Avenue, New York, NY 10110 • t: 212.302.6574 f: 212.302.6628
London Affiliate: 33 Cornhill, London EC3V 3ND, England • t: +44 (0) 20.7877.3270 f: +44 (0) 20.7877.3271
www.riker.com

George W. Pratt, Esq.
August 14, 2007
Page 2

but offers Dare the option of the rescission of the Policy and the return of its premium paid.

**The Subject Claims:**

The First Amended and Supplemental Complaint in the Action filed by plaintiffs Peter Mocco et al. (the "Moccos") on March 7, 2007 (the "Mocco Amended Complaint") names Dare as a defendant only in Count XIX, which seeks a declaratory judgment to quiet title.  Count XIX states that "Dare, through business dealings with SWJ, has acquired a lien upon the assets of SWJ which is now in default of its obligations to Dare" and that "[b]ecause Dare may assert or has asserted an interest in the properties which are the subject of this case they are [sic] joined as defendants [sic] under this Count."  See Mocco Amended Complaint at ¶ 208 (emphases added); see also id. at ¶ 18.  Count XIX challenges the Mortgage, among other things, and seeks to have title to the Property, in addition to other interests, vested in the Moccos free and clear of any claims of Dare.  See id. at ¶¶ 209-211, 214 & WHEREFORE Paragraph of Count XIX.

The Moccos claim that they own title to the Property free and clear of any claims derivative of James Licata ("JL") and his entities pursuant to July 27, 2004 and March 28, 2006 rulings made by bankruptcy courts sitting in Vermont in the bankruptcy proceedings of James Licata et al. (the "Vermont Bankruptcy Court Decisions").  See id. at ¶ 212; see also id. at ¶ 46.  The Moccos assert that JL and his entities were acting as the Moccos' agents when they bought out the position of the Moccos' creditor, First Union, and thus, JL and his entities could not have purchased any debt separate and apart from the First Union debt they acquired at a discount on behalf of the Moccos, which debt was financed through EMP Whole Loan I, L.L.C. ("EMP").  See id. at ¶¶ 73-74, 212, & 214. With regard to said EMP debt that was secured by the Mortgage, the Moccos contend that the EMP debt has been paid in full.  See id. at ¶¶ 119, 210-211, & 215.  The Moccos further maintain that the interest that SWJ acquired in the Mortgage (among other things) pursuant to the First Amended Asset Purchase Agreement, Section 363 of the Bankruptcy Code (11 U.S.C. § 363), and the orders of the Bankruptcy Court sitting in Connecticut in the bankruptcy proceedings of James Licata et al. (the "Connecticut Bankruptcy Sale") were only those "claims, defenses, and interest" of James and Cynthia Licata and were "subject to all existing claims, defenses and interest" of the Moccos.  See id. at ¶¶ 15, 18, & 76-89.  Finally, the Moccos recognize that Dare only advanced approximately $5 million to SWJ to purchase the claimed assets under the Connecticut Bankruptcy Sale on March 13, 2006, but seek to recover on Dare's

George W. Pratt, Esq.
August 14, 2007
Page 3

obligation to be repaid $12 million by SWJ that was due approximately nine months later, on December 15, 2006. See id. at ¶284.

**Dare's Loan Policy:**

Dare's Policy provides coverage in the amount of $5.5 million with regard to a $15 million mortgage purportedly assigned to SWJ via the Connecticut Bankruptcy Sale in which Dare obtained a security interest pursuant to a Security and Intercreditor Agreement. See DI 218-219. Exclusions set forth in the Policy provide in relevant part:

EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

* * *

3. Defects, liens, encumbrances, adverse claims or other matters:

(a) created, suffered, assumed or agreed to by the insured claimant;

(b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy; [or]

(c) resulting in no loss or damage to the Insured claimant[.]

* * *

4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of

George W. Pratt, Esq.
August 14, 2007
Page 4

> any subsequent owner of the indebtedness, to comply with applicable doing business laws of the state in which the land is situated.
>
> 5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.[1]
>
> * * *
>
> 7.  Any claim, which arises out of the transaction creating the interest of the mortgagee insured by this policy, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that is based on:
>
>> (i) the transaction creating the interest of the insured mortgagee being deemed a fraudulent conveyance or fraudulent transfer; or
>>
>> (ii) the subordination of the interest of the insured mortgagee as a result of the application of the doctrine of equitable subordination . . . .

See DI 226.

---

[1] An endorsement to the Policy providing coverage with regard to "changes in the rate of interest" specifically states that it "does not insure against loss or damage based upon (a) usury, or (b) any consumer credit protection or truth in lending law."

George W. Pratt, Esq.
August 14, 2007
Page 5


The Conditions and Stipulations in the Policy include the following:

## CONDITIONS AND STIPULATIONS

\* \* \*

2. <u>Continuation of Insurance</u>

\* \* \*

    (c)   <u>Amount of Insurance</u>.  The amount of insurance after the acquisition or after the conveyance shall in neither event exceed the least of:

       (i)   the Amount of Insurance stated in Schedule A; [or]

       (ii)  the amount of the principal of the indebtedness secured by the insured mortgage as of Date of Policy, interest thereon, expenses of foreclosure, amounts advanced pursuant to the insured mortgage to assure compliance with laws or to protect the lien of the insured mortgage prior to the time of acquisition of the estate or interest in the land and secured thereby and reasonable amounts expended to prevent deterioration of improvements, but reduced by the amount of all payments made
. . . .

\* \* \*

4. <u>Defense and Prosecution of Actions:  Duty of Insured Claimant to Cooperate</u>.

    (a)   Upon written request by the insured . . ., the Company . . . shall provide for the defense of an insured in litigation . . . but only as to those stated causes of action alleging a defect, lien or encumbrance or other matter insured against by this policy. . . .  The Company will not pay any fees, costs or expenses incurred by the insured in the

George W. Pratt, Esq.
August 14, 2007
Page 6

defense of those causes of action which allege matters not insured against by this policy.

\* \* \*

5.  Proof of Loss or Damage

\* \* \*

In addition, the insured claimant may reasonably be required to submit to examination under oath by any authorized representative of the Company and shall produce for examination, inspection and copying, at such reasonable times and places as may be designated by any authorized representative of the Company, all records, books, ledgers, checks, correspondence and memoranda, whether bearing a date before or after the Date of Policy, which reasonably pertain to the loss or damage.  Further, if requested by any authorized representative of the Company, the Insured claimant shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect and copy all records, books, ledgers, checks, correspondence and memoranda in the custody or control of a third party, which reasonably pertain to the loss or damage. . . . Failure of the insured claimant to submit for examination under oath, produce other reasonably requested information or grant permission to secure reasonably necessary information from third parties as required in this paragraph, unless prohibited by law or governmental regulation, shall terminate any liability of the Company under this policy as to that claim.

\* \* \*

George W. Pratt, Esq.
August 14, 2007
Page 7

7.  Determination and Extent of Liability

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the insured claimant who has suffered loss or damage by reason of matters insured against by this policy and only to the extent herein described. . . .

* * *

(b)    In the event the insured has acquired the estate or interest in the manner described in Section 2(a) of these Conditions and Stipulations[²] or has conveyed the title, then the liability of the Company shall continue as set forth in Section 7(a) of these Conditions and Stipulations.[³]

* * *

9.  Reduction of Insurance; Reduction or Termination of Liability

* * *

(b)    Payment in part by any person of the principal of the Indebtedness, or any other obligation secured by the insured mortgage, or any voluntary partial satisfaction or release of the insured mortgage, to the extent of the payment, satisfaction or release, shall reduce the amount of insurance pro tanto. . . .

(c)    Payment in full by any person or the voluntary satisfaction or release of the Insured

_____

² Section 2(a) provides in part:  "The coverage of this policy shall continue in force as of Date of Policy in favor of (i) an insured who acquires all or any part of the estate or Interest in land by foreclosure, trustee's sale, conveyance in lieu of foreclosure, or other legal manner which discharges the lien of the Insured mortgage . . . ."

³ Section 7(a) sets forth the Company's limitations of liability.

George W. Pratt, Esq.
August 14, 2007
Page 8

mortgage shall terminate all liability of the Company except as provided in Section 2(a) of these Conditions and Stipulations.

10. <u>Liability Noncumulative</u>

If the insured acquires title to the estate or interest in satisfaction of the indebtedness secured by the Insured mortgage, or any part thereof, it is expressly understood that the amount of Insurance under this policy shall be reduced by any amount the Company may pay under any policy insuring a mortgage to which exception is taken in Schedule B or to which the insured has agreed, assumed, or taken subject, or which is hereafter executed by an insured and which is a charge or lien on the estate or interest described or referred to in Schedule A, and the amount so paid shall be deemed a payment under this policy.

* * *

<u>See</u> DI 226-228.

Schedule B in the Policy contains the following exceptions:

This policy does not insure against loss or damage by reason of the following:

* * *

7. Subject to the terms, conditions, covenants, court orders, etc[.], as set forth in the United States Bankruptcy Court, District of Connecticut, Bridgeport Division Case No. 02-50851 (AHWS), and the Asset Purchase Agreement thereunder.

8. EXCLUSIONS FROM COVERAGE, ITEM #3b as set forth on the policy cover jacket to accompany said Final Title Policy, hereunder:

George W. Pratt, Esq.
August 14, 2007
Page 9

Same will be omitted only as specific to the said "Mocco"/"Scarpone" claims and positions challenging positions in and to said mortgage hereunder as per letter of February 23, 2006 from James A. Scarpone, Esq. to Alan J. Brady [sic], Esq., et als.

9. The Policy to Dare Investments will affirmatively insure that the said mortgage that is the subject of the Collateral Assignment of Mortgage hereinbefore referred to, was given pursuant to Federal Bankruptcy Court Order of September 25, 1996, as amended or modified. Also that the original principal balance of said mortgage was $15,000,000.00.

This Company, through its due diligence, can verify that the amount currently due and owing on the said mortgage being insured hereunder, at the date of this Commitment, is no less that [sic] $15,000,000.00.

See DI 221-222.

### Chicago Title's Coverage Investigation:

On February 8, 2007, Chicago Title gave Dare notice and a copy of the Moccos' motion seeking leave to file their Amended Complaint, in which the Moccos made allegations concerning the ownership of the Property. Dare did not first tender a claim for coverage until April 25, 2007. When asked why Dare waited so long to submit a coverage claim, Mr. McCloskey could only speculate that the notice must be sitting on his desk buried under paper. See McCloskey 6/8/07 Tr. at pp. 133-134.

On May 2, 2007, Chicago Title requested documents and the examinations under oath of Dare's principal, Rick McCloskey, and two of its Utah counsel, George W. Pratt and Rick L. Knuth of the Jones Waldo firm, who were involved in, among other things, negotiating title coverage. On or before May 9th, Dare had agreed to make these persons available for examinations and to produce documents, and Chicago Title further requested the examination of one of Dare's New Jersey counsel at the Seiden Wayne firm, E. Kenneth Williams, whom Chicago Title learned was involved in the underlying transaction. By May 16th, Dare had agreed to produce Mr. Williams for an examination and had produced some documents, but withheld a number of documents on claims of

George W. Pratt, Esq.
August 14, 2007
Page 10

attorney-client privilege and work product doctrine. Dare produced some additional documents thereafter.

On May 23rd, Chicago Title requested that Dare produce all non-privileged or unprotected attachments or portions of the documents being withheld and to provide sufficient identifying information to allow Chicago Title to evaluate the documents being withheld. Over the next week, Chicago Title temporarily relented on requiring this additional information, and Dare agreed to permit the examinations of Mr. McCloskey and its two Utah counsel on June 5th and to "cooperate to schedule" Mr. Williams's examination shortly thereafter.

On May 31st, Dare surprisingly refused to make its Utah counsel available for examinations on the bases that their "knowledge of events leading to the issuance of the Policy is second-hand" and that "virtually everything [they] know, that might conceivably relate to Chicago Title's investigation, is subject to the attorney-client privilege." Dare nonetheless agreed to produce Mr. Williams for an examination on the grounds that he had first-hand knowledge with regard to "negotiate[ing] with Chicago Title's agent for the issuance of the subject Policy." Chicago Title objected to Dare's position, asserting that it was required to produce the Utah counsel for examinations under the Policy. Chicago Title further explained that the documents showed that Utah counsel had been "involved substantially in non-privilege[d] communications from (i) the initial talks with regard to the loan, (ii) through the bankruptcy proceeding and (iii) culminating in the ultimate loan closing which is the subject of Dare's title claim and subsequent work-out efforts." Chicago Title also asked for the examination of an attorney at Mr. Williams's office, Todd Galante, who had participated in the bankruptcy proceedings in the underlying matter.

On June 4th, Dare reiterated its position, averring that it was not obligated to produce its Utah counsel under the Policy and that they "have little or no first-hand knowledge that did not come to [them] from Dare's counsel at Seiden Wayne." On June 6th, Chicago Title informed Dare of the duty of good faith and fair dealing implied into the Policy and maintained that Dare, as a limited liability company, principally acted through both its Utah and New Jersey attorneys and that it had a duty under the policy to give Chicago Title its permission to examine its representatives under oath. Chicago Title noted that it would supplement this response following the examinations of Messrs. McCloskey and Williams. Dare also agreed to permit the examination of Mr. Galante, and the parties agreed to try to complete the two Seiden Wayne attorneys' examinations on one day.

George W. Pratt, Esq.
August 14, 2007
Page 11

Mr. McCloskey was examined on June 8th.  See R. D. McCloskey 6/8/07 Tr.  The examination of Mr. Williams was started but not finished on June 20th, and the parties agreed to continue his examination and reschedule Mr. Galante's examination at a mutually convenient date in the future.  See E. K. Williams 6/20/07 Tr. at pp. 230-31.  On June 25th, Chicago Title followed up on its prior letter, stating that it had "become apparent to us in light of the testimony of Messrs. McCloskey and Williams that we will need to examine John Oberdorf, who handled the closing in this matter while Mr. Williams was on vacation, and either or both Mr. Pratt and Rick Knuth, given the relevant matters handled by the Jones Waldo firm before and while Seiden Wayne was engaged."  Chicago Title also challenged Dare's privilege claim, noting that Mr. McCloskey relied almost exclusively upon his attorneys to analyze the underlying matter (including the validity of the Collateral Assignment of the Mortgage) and issues concerning coverage under the Policy and had virtually no understanding of those issues beyond that of his counsel's.  Further, Mr. McCloskey testified, and a document to a third-party revealed, that he ultimately decided to do the deal on behalf of Dare contrary to its attorneys' recommendations.  Chicago Title asserted that Dare, thus, had waived any privilege with regard to these communications, having placed them at issue by relying on advice of counsel and now attempting to use them both as a sword and a shield.  Finally, Chicago Title reasserted its request for information as set forth in its May 23rd correspondence concerning the production of documents.

On June 27th, Dare responded that Chicago Title's investigation caused them to incur considerable expense and that "Jones Waldo and the Seiden Wayne attorneys involved in the process expect to be paid for their time[.]"  Dare then "determined" that the "cost of Chicago Title's investigation, to the extent it includes interviews of Dare's attorneys, or former attorneys, should be borne by Chicago Title" and that such costs included that of the witness and the other attorneys involved in both the preparation for the examination, as well as at the examination itself.  Dare further demanded that "as a condition to proceeding with further examinations, Chicago Title must pay the costs and attorneys fees incurred by Dare thus far in connection with the not-yet completed interview of Ken Williams, including the fees of Mr. Williams, Mr. Lagrotteria, and Dare's counsel."  Prior to this date, Dare had agreed to produce Messrs. Williams and Galante for examinations under oath for what the parties expected to be a day's worth of testimony – without raising any issue or claim that it be paid for costs associated with the same.

On July 2nd, Chicago Title explained that it became apparent during Mr. McCloskey's examination that he essentially had relied entirely upon his

George W. Pratt, Esq.
August 14, 2007
Page 12

attorneys to analyze the matters at issue here and that he had little, if any, personal understanding of those matters. Chicago Title further stated that during Mr. Williams's examination, it quickly learned that he had no knowledge regarding certain matters, which were handled by other attorneys at the Seiden Wayne firm and the Jones Waldo firm. Thus, Chicago Title was left with no alternative but to examine those individuals (who happen to be attorneys) with first-hand knowledge of those matters and that Dare obviously has the ability (and has the duty under the Policy) to authorize its counsel to participate in these examinations. Although it believed it did not have a duty to do so under the Policy, in an effort to move the investigation along, Chicago Title nonetheless agreed to pay going forward a reasonably hourly rate, not to exceed $250/hour, for the time Dare's attorneys spent testifying under oath. The costs associated with other counsel attending these examinations and with witness preparation, Chicago Title believed were usual business costs to be borne by Dare.

On July 6th, Dare declined Chicago Title's offer, claiming that it was "not willing to pay for [Chicago Title's] investigation." A few days later, Chicago Title informed Dare that its actions constituted a failure to cooperate under the Policy, but made an additional effort to try to address Dare's costs concerns. Chicago Title offered to complete all its requested examinations in two days' time and to continue its offer to pay $250/hour for the attorneys' time while testifying. On July 11th, Dare declined this offer, as well. The next day, Chicago Title reiterated that Dare was required under the Policy to authorize its agents/attorneys to testify under oath and that its current position was a breach of its duty to cooperate under the Policy. Chicago Title further offered to pay for counsel of Dare's choosing to prepare an Answer to the Mocco Amended Complaint contingent upon Dare authorizing the attorneys' examinations to go forward as previously offered by Chicago Title, with Chicago Title agreeing to give a coverage decision within ten days after the final examination. On July 16th, Dare again declined this offer. Dare then produced a few more documents that had been referenced during Mr. Williams' examination and specifically refused to produce documents between its counsel and between it under the claim of attorney-client privilege. On July 26th, Chicago Title specifically objected to Dare's position on this privilege and identified the bases on which Dare has waived any such privilege. Dare has not produced those documents.

George W. Pratt, Esq.
August 14, 2007
Page 13

### Chicago Title's Coverage Position:

Chicago Title has determined at this time, based on its investigation to date, to deny Dare's request for defense and indemnification coverage under the Policy based on the following reasons individually and collectively.[4]

Dare has failed to cooperate as required under the policy.  See Policy at Conditions and Stipulations ¶ 5.  The very purpose of cooperation clauses requiring examinations under oath and the production of documents is "to allow the insurer to pursue its rights under the policy in order to determine whether the claim is legitimate and should be paid." DiFrancisco v. Chubb Ins. Co., 283 N.J. Super. 601, 611 (App. Div. 1995) (citation omitted); Pearl Assurance Co. v. Watts, 58 N.J. Super. 483, 491 (App.Div.1959) ("Cooperation and assistance of the insured requires a fair, frank and truthful disclosure of information reasonably demanded by the insurer for the purpose of enabling it to determine whether or not there is a genuine defense.") (citation omitted). Indeed, the United States Supreme Court recognized more than 125 years ago that:

> [An insurer is entitled] to possess itself of all knowledge, and all information as to other sources and means of knowledge, in regard to the facts, material to their rights, to enable them to decide upon their obligations, and to protect it against false claims.

DiFrancisco, 283 N.J. Super. at 611 (quoting Claflin v. Commonwealth Ins. Co., 110 U.S. 81, 94-95 (1884)).

"Cooperation clauses generally have been held to be material provisions of the policy and compliance therewith a condition precedent to the carrier's liability." Pearl Assurance Co., 58 N.J. Super. at 490 (citation omitted); see also Prudential Prop. & Cas. Ins. Co. of N.J. v. Nardone, 332 N.J. Super. 126, 137 (App. Div. 2000); Mariani v. Bender, 85 N.J. Super. 490, 500 (App. Div. 1964). Failing to produce appropriate documents is a willful violation of the cooperation clause, and failing to provide an examination under oath is

---

[4] With regard to the current Mocco Amended Complaint, the Policy would only allow for a defense to be provided as to Count XIX therein and further only with regard to the claims against Dare as to the Mortgage – that is, no defense under the Policy would be provided for Dare to defend any of its security interests being challenged in the Mocco Amended Complaint other than the Mortgage. See Policy at Conditions and Stipulations ¶ 4(a).

George W. Pratt, Esq.
August 14, 2007
Page 14

tantamount to failing to cooperate. <u>See</u>, <u>e.g.</u>, <u>Nardone</u>, 332 N.J. Super. at 138; <u>DiFrancisco</u>, 283 N.J. Super. at 613. Moreover, dilatory tactics seeking to delay the insurer's investigation is another ground on which coverage may be denied. <u>Nardone</u>, 332 N.J. Super. at 138-139; <u>see</u> <u>also</u> <u>DiFrancisco</u>, 283 N.J. Super. at 613.

The cooperation clause in the instant Policy requires Dare to submit to examinations under oath and to provide relevant documents in its possession, custody or control, as well as to give its permission to allow Chicago Title to review and copy relevant documents in the possession, custody or control of third parties. <u>See</u> Policy at Conditions and Stipulations ¶ 5. The Policy further provides that Chicago Title's liability thereunder terminates upon Dare's failure to comply with the same. <u>See</u> <u>id.</u> Every contract in New Jersey, including the Policy, contains a covenant of good faith and fair dealing. <u>See</u> <u>Wilson v. Amerada Hess Corp.</u>, 168 N.J. 236, 244 (2001) (citing <u>Sons of Thunder, Inc. v. Borden, Inc.</u>, 148 N.J. 396, 420 (1997)). While such a covenant "cannot override an express term in a contract, a party's performance under a contract may breach that implied covenant even though that performance does not violate a pertinent express term." <u>Id.</u> (citing <u>Sons of Thunder</u>, 148 N.J. at 419). Importantly, the covenant requires that neither party "do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract[.]" <u>Id.</u> at 245 (citing <u>Sons of Thunder</u>, 148 N.J. at 421). Dare has breached the covenant of good faith and fair dealing implied in the Policy with regard to its obligations and Chicago Title's rights under the cooperation clause.

As an initial matter, Dare has failed to fully comply with Chicago Title's request to produce documents under the Policy. Chicago Title has requested that Dare produce all non-privileged documents and portions thereof, including non-privileged attachments or enclosures. Indeed, Dare has in some instances produced redacted documents. Dare admittedly has not gone back through the documents it is withholding to determine what additional portions of documents and materials, including attachments and enclosures, it can produce as non-privileged material. Claiming that doing so would be a costly and time-consuming endeavor is completely inappropriate particularly when Dare simply failed to fulfill its obligations to produce the same when it first went through these documents. There can be no dispute that the plain language of the Policy requires Dare to produce these documents. There is nothing in the Policy language to even suggest that it has a right to force Chicago Title to pay for Dare to discharge its document production duty. Thus, its failure to do so in this context is a clear violation of its duty to cooperate.

George W. Pratt, Esq.
August 14, 2007
Page 15

With regard to producing its counsel for any further examinations under oath, Dare asserts essentially three excuses for its refusal to do so:  that it is not required to do so under the Policy; that its Utah counsel have no (or "virtually" no) first hand knowledge that is not privileged to offer; and that Chicago Title is required to pay all costs incurred by Dare with regard to these examinations, including those of multiple counsel to prepare each witness and attend the examinations.  It is Chicago Title's position that each of these arguments are without merit under these circumstances and that Dare's flat refusal on this issue in the face of Chicago Title's repeated and reasonable offers, at least, suggest bad faith.

As Dare's principal, Mr. McCloskey has little, if any, first hand knowledge with regard to the issues relevant in this matter.  He has clearly and consistently testified that he relied upon his lawyers to negotiate and analyze a number of the material issues concerning the underlying transaction and the title coverage in this matter.[5]  The very purpose of the insurer's right to examine the insured under oath, as noted above, is to provide the insurer the ability to examine the relevant facts in order to make a coverage determination, including determining whether the claim is valid.  Where, as here, the insured disclaims knowledge and relies on counsel for essentially all relevant first hand knowledge, allowing the insured to then refuse to authorize the examinations of said counsel will give the insured the ability to quash the crucial and bargained for right of the insurer.  Thus, under these circumstances, Dare is in breach of its covenant of good faith and fair dealing by failing to authorize its counsel to testify under oath in this matter.

---

[5] See, e.g., McCloskey 6/8/07 Tr. at pp. 65 (stating that he relied upon counsel to analyze the Sayreville mortgage analysis and that "[t]here were so many documents going back and forth – I can tell you there were a lot of them I didn't read very closely or understand"), 66 (one of the main reasons he hired New Jersey counsel was to determine whether the Mortgage was valid and enforceable), 74-75 (he relied on his counsel to review materials concerning the Connecticut Bankruptcy Sale), 85-86 (all communication with bankruptcy trustees and creditors was through counsel), 88 (he entrusted counsel to analyze a 1996 opinion regarding the Sayreville mortgage), 88-89 (counsel were to analyze EMP's involvement in the matter and the title policy), 103-104 (he has "probably never read through a complete title policy" throughout his 10 or 15 years of being involved in real estate, and in this instance, he relied upon both Utah and New Jersey counsel with regard to the Policy), 112 (he is unable to comment on the Policy and its exceptions and exclusions, which he relied on his attorneys to handle), 115-117 (he had "no idea" about certain endorsements in the Policy and said his attorneys would be the ones to ask with regard to the same), & 117-118 (he relied upon his attorneys with regard to the February 23, 2006 letter from Jim Scarpone).

George W. Pratt, Esq.
August 14, 2007
Page 16

Dare's claim that its Utah counsel had no – or "virtually" no – relevant first hand knowledge is completely incredible and is belied by its very own documents and testimony.[6] Dare initially agreed to permit its Utah counsel to testify and, in doing so, never even suggested that it lacked essentially all relevant information as it claims now. Dare's 180 degree turn obviously evidences its willful intent to frustrate and delay Chicago Title's right to investigate its claim. More importantly, Dare knew then, as it knows now, that such a position is at best misleading. As between the Utah and New Jersey firms, Seiden Wayne was engaged to handle the local aspects of the transaction. See Williams 6/20/07 Tr. at p. 9; see also id. at p. 61 ("I think I need to clarify that I was acting as New Jersey local counsel on the transaction, but Jones, Waldo remained a major player in the transaction and some things they were involved in, some things I was involved in, and I wasn't always aware of everything that they were doing."). For example, before Seiden Wayne was engaged, Jones Waldo represented Dare when it entered into the agreement with SWJ, borrowed the $5 million that it eventually loaned to SWJ, and entered into the escrow agreement with regard to putting the $5 million in trust on February 15, 2006. See id. at pp. 54-55, 59, 60, 63 & 64; see also Dare/McCloskey 22 (D-35), a February 14, 2006 email in which Mr. Knuth identifies himself as "one of the lawyers representing Rick McCloskey and his company, Dare Investments" with regard to Dare depositing the $5 million. Similarly, on February 14 and 15, 2006 (before Seiden Wayne was engaged), Messrs. Pratt and Knuth were involved in title coverage matters. See DI 2449-52 (D-15). Of particular importance, Mr. Pratt and his office represented Dare at the time the endorsement concerning the amount of the underlying debt was negotiated. See Williams 6/20/07 Tr. at p. 140 & DI 2533-34 (D-36). In addition, documents show that the Jones Waldo firm has first hand knowledge of highly pertinent issues in this matter. See McCloskey 6/8/07 Tr. at pp. 88-89 (February 15, 2006 email in which Mr. Knuth is discussing EMP and the title commitment). This, combined with Mr. McCloskey's repeated testimony that he relied on both Utah and New Jersey counsel with regard to the underlying transaction and title coverage, makes it patently clear that the Jones Waldo attorneys have relevant first hand knowledge.

---

[6] To the extent Dare is claiming that the examinations of the three requested Seiden Wayne attorneys is inappropriate, this, too, is without merit. As one might expect on a deal such as this, Mr. Williams did not handle all material aspects of this matter on behalf of the Seiden Wayne firm. In fact, Mr. Williams testified that Todd Galante, a bankruptcy collection specialist, attended bankruptcy meetings and hearings, whereas Mr. Williams worked on the documentation and loan portion of the transaction. See Williams 6/20/07 Tr. at pp. 10, 31-32, 62, 153 & 224. Further, Mr. Williams went on vacation when this matter closed, and John Oberdorf of his office closed the deal during his absence. See id. at pp. 8 & 49.

George W. Pratt, Esq.
August 14, 2007
Page 17

Dare's most recent tact – to assert that Chicago Title is required to pay all costs incurred by Dare with regard to its counsel's examination – is unfounded and egregious. First, Dare agreed to produce Messrs. Williams and Galante for a day's worth of examinations, without regard to costs associated with the same. Dare's post-examination change of heart, claiming that Chicago Title has to pay for the costs associated with all the three attorneys (including one who flew out from Utah to New Jersey) that Dare directed to attend that day of examination, exposes this maneuver for what it is – a willful refusal to cooperate.  Second, assuming arguendo that Dare is obligated under the covenant of good faith and fair dealing to produce its counsel for examinations, there is nothing in the Policy that states that Chicago Title is required to pay any costs associated with the same. Further, Dare has pointed to no case law for such a position. Finally, to the extent costs and fees would be allowed in such a circumstance, they certainly would only be reasonable costs and fees. Dare's position on this matter is no where near reasonable, especially in light of Chicago Title's multiple and fair offers to pay certain attorneys' fees and reduce the potential cost exposure of Dare. Accordingly, it is Chicago Title's position that Dare's refusal to permit the examinations of its Utah and New Jersey counsel as to non-privileged information is a breach of its obligations under the Policy and the implied covenant of good faith and fair dealing.

Dare's refusal to allow Mr. Williams to testify as to certain matters based on attorney-client privilege and to produce documents under the claim of the same privilege is improper under these circumstances. First, as set forth above, Dare has placed such communications at issue by relying upon the advice of counsel with regard to the issues in the underlying matter and obtaining title coverage. Indeed, Dare ultimately decided to go forward with this deal against the advice of both his Utah and New Jersey counsel and told SWJ's principal, Mr. Mournes, this in an email. See McCloskey 6/8/07 Tr. at pp. 69 & 105. Having placed these communications at issue, Dare cannot now attempt to use them like a sword and a shield. See In re PSE&G S'holder Litig., 320 N.J. Super. 112, 115 (Ch. Div. 1998), aff'd sub nom., Fink v. Cody, 173 N.J. 258 (2002) ("when the opinion of counsel or advice of counsel is injected into the case, the attorney-client and work product privilege have been deemed waived.")

Second, any such claim of privilege is subject to the crime-fraud exception. See NJRE 504(b); State v. Pavin, 202 N.J. Super. 255, 264 (App. Div. 1985). See also Ocean Spray Cranberries, Inc. v. Holt Cargo Systems, Inc., 345 N.J. Super. 515, 522 (Law Div. 2000). Moreover, it is Chicago Title's position that Dare was aware that it was not receiving the type of coverage it now claims, that Horizon informed it of

George W. Pratt, Esq.
August 14, 2007
Page 18

the same particularly with regard to the endorsement concerning the amount currently due on the mortgage, and that Dare's instant insurance coverage claim satisfies the crime-fraud exception.

Third, Dare has waived any such privilege in the context of seeking title coverage in this matter pursuant to the cooperation clause, the implied covenant of good faith and fair dealing, and its reliance on counsel. Finally, Chicago Title is permitted to pierce the privilege in light of the substantial need for the information and its inability to obtain it elsewhere. In re Koslov, 79 N.J. 232, 243-244 (1979). There obviously is no alternative source for Chicago Title to obtain this information. Further, Chicago Title's need for this information is more than legitimate given counsel's involvement in this matter and Dare's reliance on counsel.

Dare's claim for coverage under the Policy is also barred by Exception 7 of Schedule B in the Policy: "Subject to the terms, conditions, covenants, court orders, etc[.], as set forth in the United States Bankruptcy Court, District of Connecticut, Bridgeport Division Case No. 02-50851 (AHWS), and the Asset Purchase Agreement thereunder." Mr. Williams testified that this was a "broad statement" (though he could not recall ever objecting to this language). See Williams 6/20/07 Tr. at p. 86. The language in this exception remained unchanged throughout the entire negotiating process and is included in the final Policy.

The bankruptcy action referenced in this exception is that of JL and his entities identified above, in which both the Vermont Bankruptcy Court Decisions were issued and the Connecticut Bankruptcy Sale occurred. See Williams 6/20/07 Tr. at p. 71. The Moccos' claims against the Mortgage in the Action, as set forth above, are based upon the effects of those decisions and the sale. Indeed, Dare's counsel, Mr. Williams, testified that, with regard to the Mocco Amended Complaint, the Moccos were making the same arguments against Dare that they had made in the Vermont Bankruptcy Decisions. See Williams 6/20/07 Tr. at p. 208-209. Similarly, Mr. Williams had reviewed the claims in the Action prior to the deal closing, and it was his opinion that there was "no question" that claims were being made against the Mortgage in the Action at that time and that those claims were "the same" as those the Moccos had made in the Vermont Bankruptcy Court Decisions. See Williams 6/20/07 Tr. at pp. 73-74.

Mr. Williams testified that it was his understanding that Dare was receiving an assignment of the bankruptcy debtor's (First Connecticut Consulting Group, Inc.'s) position in the Mortgage, as the same was assigned through SWJ. Thus,

George W. Pratt, Esq.
August 14, 2007
Page 19

whatever interest the bankruptcy debtor held was eventually assigned to Dare, and to the extent the bankruptcy debtor held no interest, Dare received nothing. See Williams 6/20/07 Tr. at pp. 65-66. Further, it is Mr. Williams's belief that if the Connecticut Bankruptcy Sale were found to have given SWJ no interest in the Mortgage, and hence the Mortgage failed on that basis, then it failed based on that bankruptcy proceeding and that transfer. See id. at p. 201. Therefore, based on the claims in the Action against the Mortgage, coverage under the Policy for Dare is prohibited by Exception 7 of Schedule B.

Coverage is also precluded under Exclusions 3(a) and (b). Mr. McCloskey did not inform Horizon (and his counsel, Mr. Williams, did not know) that he previously was involved in two failed real estate and loan deals (one in the Fall of 2000 and the other in 2004) with one of SWJ's principals, Cobra/Ventura, and its principal, William Mournes. The 2004 loans involved the same Bangkok guarantees that were put up during the Connecticut Bankruptcy Sale process and concerned "worthless" London stock that had been "completely misrepresented" to Mr. McCloskey. See McCloskey 6/8/07 Tr. at pp. 27-32. Moreover, Mr. McCloskey never told Horizon that he viewed the 2006 deal with SWJ as a "better chance of collecting what was previously due to [him]," in addition to it being a loan of additional monies from someone who previously defrauded him. Id. at pp. 43-44. Mr. McCloskey also did not disclose to Horizon the terms of the loan – the $12 million note, the immediate and subsequent interests obtained in SWJ, and the 5% addition to principal and interest rate provisions. Id. at p. 60. Nor did his counsel convey this information to Horizon. See Williams 6/20/07 Tr. at pp. 47-50.

Mr. McCloskey knew that the deal was very risky and went into the deal against the advice of both his Utah and New Jersey counsel. As he testified: "I felt that the level of risk that I was taking supported a substantial return." See McCloskey 6/8/07 Tr. at p. 73. In fact, Mr. McCloskey viewed this transaction as a "huge risk." See id. D-4.

Before closing on the deal, Dare was aware, via its counsel, that in the Action, the Moccos were challenging some of the assets in which Dare was seeking a security interest. See Williams 6/20/07 Tr. at pp. 18 & 19. In particular, Mr. Williams knew that the Moccos claimed to own the Sayreville Property free and clear of the Mortgage, which was a "concern" to Mr. Williams. See id. at pp. 37-38. After having reviewed the Moccos' state court proceedings, Mr. Williams was aware that in effect Dare was buying litigation with Peter Mocco. See id. at p. 74. He did not disclose this information to Horizon. See id. at p. 75.

George W. Pratt, Esq.
August 14, 2007
Page 20

Mr. Williams, moreover, was aware prior to the deal closing of the first of the Vermont Bankruptcy Decisions and of its pending appeal. See Williams 6/20/07 Tr. at pp. 67-70. He testified as to his understanding of the effect of this decision:

> This certainly supported [Mocco's lawyer] Jim Scarpone's allegations on behalf of Peter Mocco, his client in the state court proceedings, which he had provided me with. This certainly drew into question the value of any of the assets of First Connecticut in the bankruptcy proceeding in Connecticut. And it was the position of SWJ through their spokesperson and attorney, Dale Schreiber, that, one, this was a very, very poorly reasoned opinion and it would be appealed and that they were confident they would overturn it on appeal.

Id. at pp. 70-71.

When asked what he thought of SWJ's position that it owned the Mortgage, Mr. Williams replied "I didn't believe it." Id. at 72. He "further felt that just because the Connecticut bankruptcy court was blessing a transaction [referring to the Connecticut Bankruptcy Sale], that they weren't necessarily vouching for the underlying value of the assets." Id. Similarly, with regard to Mr. Schreiber's analysis concerning EMP (DI 151), Mr. Williams believed that Mr. Schrieber was incorrect and was trying to obfuscate the issue concerning EMP: "The original mortgage was assigned to EMP, period. The second -- the amended mortgage stands on its own and probably is not a viable document." See id. at pp. 112-113, 119-125, & 181-182; see also id. at p. 207 & D-16 (having "grave questions" about a Schreiber analysis). Mr. Williams was also "very concerned" about New Jersey state actions. Id. at 74. In short, Mr. Williams had "serious doubts" about the validity of the Mortgage, see id. at pp. 125-126, and had a "big question" about whether there was any debt due on the mortgage, see id. at p. 129. Accordingly, based on the aforementioned, coverage is precluded under Exclusions 3(a) and (b).

Coverage may be reduced or completely precluded by a reduction of the principal of the indebtedness secured by the Mortgage. See ¶¶ 2(c)(ii), 7 & 9 of the Conditions and Stipulation Section. The Moccos claim in the Action that the underlying debt on the Mortgage has been extinguished or, alternatively, is only $74,000 (not $15 million). Dare's reliance on Exception 9 of Schedule B in the Policy to cover such a claim is misplaced. The language in Exception 9

George W. Pratt, Esq.
August 14, 2007
Page 21

merely states that the Company "can verify" that the amount currently due and owing is no less than $15 million. That choice of language is not by error and is not mere semantics.

During at least one conversation with Dare's counsel, Dave Cohn of Horizon stated that Chicago Title was not in fact insuring that a minimum amount was currently due on the Mortgage. Indeed, early on in the process, stronger language was presented and rejected by Horizon, which only agreed to provide the "can verify" language. This language remained unchanged since it was first proffered until the final policy was issued, despite Dare's counsel raising concerns that Dare would not be able to establish a minimum amount due under the Mortgage as needed for a foreclosure, see Williams 6/20/07 Tr. at pp. 144-145, and Horizon explaining that Chicago Title was not insuring that a minimum amount was due under the Mortgage.

Dare's interpretation of Exception 9 is, by its own accounts, an anomaly. Mr. McCloskey, who has been involved in real estate for about 10 or 15 years and has loaned millions of dollars for real estate transactions, could not identify one instance in which a title policy was provided that insured the amount due on the underlying debt. See McCloskey 6/8/07 Tr. at pp. 103-104. Similarly, his counsel, Mr. Williams, in his 39 years of practicing, has never seen a title company insure a minimum amount due on an underlying debt. See Williams 6/20/07 Tr. at p. 44. Indeed, within the State of New Jersey, providing such insurance would require modification of the title policy jacket, which the insurer may not unilaterally do. See N.J.S.A. 17:46B-11 ("A title insurance company shall not, in any manner whatsoever, guarantee the payment of the principal or the interest of bonds or other obligations secured by mortgages upon real property."); N.J.S.A. 17:46B-12 ("A title insurance company shall not transact, underwrite or issue any kind of insurance other than title insurance"); Gerrold v. Penn Title Ins. Co., 271 N.J. Super. 50, 53 (App. Div. 1994) (discussing cases that have held that "a title insurance contract insures only the title to the land securing the debt and not the debt itself"); see also Fidelity Nat'l Title Ins. Co. v. Consumer Home Mortgage, Inc., 272 A.D.2d 512, 514 (N.Y. App. Div. 2000) ("[W]here there is no underlying debt, there is no valid mortgage, and [] the loan policies purportedly insuring said mortgages [are] not valid or enforceable.").

The Trustees in the bankruptcy proceeding have obtained a judgment against SWJ and are seeking to foreclose on or otherwise liquidate the assets SWJ obtained through the Connecticut Bankruptcy Sale. Dare is asserting its priority over the Trustees with regard to any proceeds resulting from this

George W. Pratt, Esq.
August 14, 2007
Page 22

process. See, e.g., McCloskey 6/8/07 Tr. at pp. 110-111. It is our understanding that a sale of those assets has been scheduled for September 11, 2007, to the extent SWJ does not pay off or otherwise settle its outstanding debt. As a result of the aforementioned, the Mortgage and other assets may be sold, Dare may purchase some or all of them, or any combination thereof. Accordingly, Dare may recoup all or some of the monies it loaned to SWJ, coverage may otherwise be reduced or extinguished, or both. See Exclusion 3(c) & ¶¶ 7, 9 & 10 of the Conditions and Stipulation Section. In any event, coverage under the Policy is limited to "actual monetary loss or damage sustained or incurred by the insured claimant," and thus, to the extent that Dare's claimed loss was or is covered by sources other than the Policy, such as from guarantors or via the aforementioned sale, then coverage under the Policy may be denied. See Exclusion 3(c) & ¶ 7 of the Conditions and Stipulation Section.

Dare's excessive interest and fees charged on its loan to SWJ may result in coverage being denied. Mr. McCloskey testified that while Dare loaned SWJ $5 million, the deal was structured such that SWJ gave Dare a note for $12 million that was due in 90 days. Mr. McCloskey came up with the note amount by taking the total face amount of the money he borrowed to make the Dare loan – which face amount was approximately $5.5 million – and then essentially doubled it. Mr. McCloskey also obtained an immediate 10% interest in SWJ, and if the note were not repaid in 90 days, he would get an additional 5% interest in SWJ, 5% would be added to the outstanding principle balance of the note, and an 18% interest rate would kick in. If the note were not repaid within 90 days thereafter, another 5% interest in SWJ would be provided and an additional 5% added to the outstanding principle balance on the note. If the note were not repaid approximately 90 days thereafter (December 15, 2006), then default provisions would kick in. See McCloskey 6/8/07 Tr. at pp. 44-45, 50-54 & 74; see also Williams 6/20/07 Tr. at pp. 47-50. If the liens are invalidated or unenforceable based on usury or any consumer credit protection or truth in lending law, coverage may be denied pursuant to Exclusion 5 of the Policy. See also Williams 6/20/07 Tr. at pp. 50-51 ("In New Jersey that transaction would probably not be enforceable because of our usury law, our criminal usury law.").

In addition, coverage for certain equitable subrogation and fraudulent conveyance claims may be barred under Exclusions 7(i) and (ii) in the Policy. Moreover, if the Mortgage were found unenforceable due to Dare's failure to comply with New Jersey's doing business laws, then coverage may be precluded under Exclusion 4 of the Policy.

George W. Pratt, Esq.
August 14, 2007
Page 23

Finally, Dare's request for coverage may be declined based on fraud. Dare's deal with SWJ also provided for Dare to immediately obtain a 10% ownership interest in SWJ (and potentially an additional 10% if SWJ did not repay the loan within six months). See supra. Dare did not disclose to Horizon this self-interest in the entity to which it was loaning money. Indeed, Dare did the deal against the advice of both its counsel and knowing the substantial risk involved. See McCloskey 6/8/07 Tr. at pp. 84-85. Mr. Williams viewed this as a risky transaction. See Williams 6/20/07 Tr. at p. 33. Dare nonetheless went through with the deal, as explained by Mr. McCloskey, with the belief that it would be repaid in 60-90 days via the Bangkok Bank guarantees – the same guarantees that failed to come to fruition in prior deals with Mr. Mournes – none of which was disclosed to Horizon. See McCloskey 6/8/07 Tr. at pp. 84-85. Moreover, McCloskey knew that in entering into this transaction, Dare was at least assuming a litigation potential with the Moccos. He was advised by Mr. Mournes and his counsel, Gordon Duval, however, that this litigation was not expected to last and that there would be some type of settlement to resolve everything. Id. at 123-124. It is apparent that Dare knew it was not obtaining a valid and enforceable Mortgage, but nonetheless did the deal based on this ulterior, undisclosed motive.

On February 28, 2006, prior to the closing, Dare's counsel received information concerning Mr. Mournes's possible involvement in a Caribbean Bank fraud. See McCloskey 6/8/07 Tr. at pp. 118-119 & D-24. Mr. Williams recalled talking to Mr. Galante of his office about this article, and his words – it "appear[ed] as if Mr. Mournes [wa]s a con artist." See Williams 6/20/07 Tr. at p. 168. Thus, in light of the apparent fraud associated with the underlying transaction, coverage may be denied. Alternatively, Chicago Title will permit rescission of the Policy and offer Dare the return of its premium paid.

As set forth above, it is Chicago Title's position that Dare was aware at the time it submitted its claim for coverage that it did not have the type of coverage it asserted. To the extent this is found, Chicago Title will deny coverage.

\* \* \*

In sum, for the reasons detailed above, Chicago Title will deny Dare's claim for coverage at this time. To the extent Dare wishes to accept the alternative of rescission, Chicago Title will refund its premium paid.

George W. Pratt, Esq.
August 14, 2007
Page 24

Please feel free to contact me if you wish to discuss this any further or there is anything else you wish to bring to Chicago Title's attention.

Thank you.

Very truly yours,

Michael R. O'Donnell
3781335.2