# Exhibit 1

# IN THE SUPERIOR COURT

## PINAL COUNTY, STATE OF ARIZONA

### DATE: 12/12/2008

**Filed** in Court Record

Date Filed: 12/12/2008

Time Filed: 3:15 p.m.

THE HON WILLIAM J O'NEIL
Division: 1

By, Judy Gossman Judicial Assistant

|  |  |  |
|---|---|---|
| THE FUNDING GROUP, | ) | CV200701884 |
| Plaintiff(s) | ) | |
| vs. | ) | **RULING ON MOTIONS/ISSUES** |
| RONALD DEEN, et al., | ) | |
| Defendant(s). | ) | |

A Motion to Extend for Defendants to Make Rule 26.1 Disclosure and Respond to All Outstanding Discovery was submitted;

IT IS HEREBY ORDERED the motion is granted.

Further, this Court notes it failed to rule upon a Motion for Determination of Counsel. This Court previously assumed that such an issue was reserved for the State Bar. However, it is clear in Arizona that it is proper for a court to rule on such motion.

The Arizona Supreme Court has developed factors for the court to weigh when it is faced with a motion to disqualify opposing counsel. *Alexander v. Superior Court*, 141 Ariz. 157, 685 P.2d 1309 (1984). (1) Whether the motion is being made for the purpose of harassment. (2) Whether the moving party will be damaged if the motion is denied. (3) Whether there is an alternative solution or whether the proposed solution is the least damaging possible under the circumstances; and (4) Whether the possibility of public suspicion will outweigh any benefits that might accrue due to continued representation. It is only in extreme circumstances that the Court should permit the attorney/client relationship of an opponent to be interfered with. The burden rests entirely upon the moving party to show sufficient reason why that counsel should be disqualified. It is with this perspective this Court rules.

The Court finds as a matter of fact that on August 22, 2006, Peter Strojnik drafted and arranged for execution of a joint venture agreement between Silver King Mining Company of America, LLC (Silver King), and Arizona Precious Metals, Inc. (APM). Silver King is an Arizona limited liability company whose members are Ronald Deen, Sr. and Jack San Felice, Defendants herein. APM is a corporation of which Peter Strojnik is corporate counsel. This joint venture agreement was entered into for the purpose of mining, concentrating, refining,

5003 **OFFLINE**                    CV200701884                        Page 1 of 5

and hallmarking precious metals which might exist as a result of Silver King owning mining and/or mineral rights in the area of Superior, Arizona. Pursuant to the agreement, a Policy Committee was established. The management as a result of the joint venture would be conducted solely pursuant to policy established by that policy committee. The agreement provided Silver King and APM could appoint two members each, however, one permanent member of the policy committee was appointed who had the power to break tie votes between those four individuals. That permanent member was Peter Strojnik.

Under paragraph 11 entitled **Policy Committee**, subparagraph b), is the sole disclosure that the joint venturers recognize that the permanent member, Peter Strojnik, is the general counsel to APM and was thereby appointed as the general counsel for the joint venture. The disclosure is followed by, "The parties recognize that a company owned by his wife is a minority member in APM." As the permanent member he is the only person who could not be replaced under any circumstance except by his death or resignation. The agreement precluded action occurring by a majority of those present at any meeting. By way of example, the agreement precluded in the event three members attended a meeting that two would be a majority. Instead, a majority vote always meant three votes.

The Court further finds under paragraph 15, a covenant was entered for the joint venturers agreeing confidential information existed between the parties and that each joint venturer acknowledged that the ownership of confidential information and any derivative thereof provided by any other joint venturer would remain with the joint venturer providing such confidential information, and the other joint venturer waived any rights, title or interest in and to such confidential information. Confidential information is extensively defined under paragraph 1(e) and included "any research; any banking arrangement or relationships; any financial or other past, present or future transaction, summary or description; any financial information; any agreement or contract; any other information concerning the business of the disclosing contracting party or any current or future business relationship between the contracting parties. Or any report, memorandum or other document or communication prepared by either contracting party or any authorized person which is based upon, refers to, summarizes or contains an evaluation of other confidential information." The Non Disclosure--Non Circumvention Covenant under paragraph 15 extended to and inured to the benefit of each of the joint venturers, including their representatives and authorized persons. Peter Strojnik was a representative of the joint venture and a representative of APM and, as a result, was bound to the Non Disclosure--Non Circumvention Covenant.

Thereafter Peter Strojnik, as general counsel of the joint venture and counsel for APM, prepared an agreement which ultimately was entered into on November 27, 2006 between APM, Silver King and TCMS Investments, Inc., an Arizona corporation, as well as Hans Huning. That agreement was drafted as a result of APM's inability to perform under the earlier joint venture agreement.

The Court finds contained within this second agreement are mutual releases between APM, Silver King and the joint venture, including an apparent release of the prior violation of the joint venture agreement by APM's failure to fund under the agreement and an apparent release of all actions known or unknown. Likewise in the following release paragraph, APM, Silver King and the joint venture released TCMS Investments, Inc. from all actions or claims, whether

known or unknown, whether suspected or not which may have arisen by reason of the relationship of Campbell, TCMS and Huning to any of the other parties. The release drafted by Mr. Strojnik included releasing general counsel Peter Strojnik from any claims arising from the funding of the reclamation bond of the funding group. Both Peter Strojnik and his wife Tanya Strojnik were designated as third party beneficiaries of the release. Peter Strojnik represented the joint venture as well as APM during this time. Silver King was not represented by counsel during the time of the entry of these agreements.

The Court also finds Peter Strojnik in his Response and Opposition to Defendant's Motion to Disqualify stated, "Ms. Strojnik is not an attorney, nor is she the owner of TCMS Investments, Inc." This note was in direct response to the statement made by Matthew Ritter in his Motion for Determination of Counsel wherein he stated in footnote 1 on page 2 that TCMS Investments, Inc. was owned by the wife of Peter Strojnik, namely Tanya Strojnik. That Peter Strojnik's following comment in his footnote is that TCMS is owned by the Tanya C. Strojnik Separate Property Trust dated February 21, 2001. The Court further finds that as a matter of fact that Tanya C. Strojnik's Separate Property Trust dated February 21, 2001 could not have owned TCMS at the time of the entry of the agreements. Further, the original agreement of August 22, 2006 provided that "the parties recognize that a company owned by his wife (Tanya Strojnik) is a minority member in APM."

The Court makes the following conclusions of law. As a matter of law, the Court finds that absent case law to the contrary Arizona follows the *Restatement of Law*. *Keck v. Jackson*, 122 Ariz. 114, 593 P.2d 668 (1979). The Court finds that a lawyer may represent a client notwithstanding a conflict of interest if each affected client gives informed consent to the lawyer's representation. Informed consent requires that the client have reasonably adequate information about the material risks of such representation to that client or former client. *Restatement (Third) of the Law Governing Lawyers, Section 122.* Further, pursuant to that Restatement, "Notwithstanding the informed consent of each affected client or former client, a lawyer may not represent a client if (a) the representation is prohibited by law; (b) one client will assert a claim against the other in the same litigation; or (c) in the circumstances it is not reasonably likely that the lawyer will be able to provide adequate representation to one or more of the clients." Under comment (b), this prohibition against lawyer's conflicts of interest is intended to assure clients that a lawyer's work will be characterized by loyalty, vigor and confidentiality.

In this case, Peter Strojnik had an absolute duty of loyalty, vigor and confidentiality to the joint venture itself, including advising the joint venture of what legal action to take regarding the defaulting action of one of its members. Mr. Strojnik in his response and declaration does not address the issue at all of his duty in that regard. Nor in preparing the second agreement is there any informed consent of Silver King regarding that representation. It was likely that the venture itself would raise claim against one of its members but the attorney representing the joint venture and the defaulting member are one and the same. Any policy decision regarding that issue was kept resolute by the drafting of the agreement keeping Mr. Strojnik as a tie breaking member.

The Court concludes unless all affected clients consent to the representation under limitations and conditions set forth in Section 122, a lawyer may not represent both an organization and

an owner associated with the organization if there is a substantial risk that the lawyer's representation of either would be materially and adversely affected by the lawyer's duties to do so. *Restatement (Third) of the Law Governing Lawyers, Section 131*.

The Court further concludes that a lawyer may not use or disclose confidential client information if there is a reasonable prospect that doing so will adversely affect the material interest of the client. Further, a lawyer must take steps reasonable in the circumstances to protect confidential client information against impermissible use or disclosure by the lawyer, his associates or agents. Further, a lawyer who uses confidential information of a client for the lawyer's pecuniary gain, other than in the practice of law, must account to the client for any profits made. *Restatement (Third) of the Law Governing Lawyers, Section 60*.

Here the agreement itself provided for confidentiality broadly enough that it included Peter Strojnik. The Court finds Mr. Strojnik's statements regarding his wife's ownership of TCMS to be misleading. It is not relevant that a separate property trust was created on February 21, 2001. The issue is who owned TCMS, Investments, Inc. at the time of the agreement. The Court finds as a matter of law that the two sentence disclosure in the August 22, 2006 agreement between the parties cannot act as a disclosure from Mr. Strojnik as he is not a signatory to it.

The Court finds the motion is not brought for the purpose of harassment. The moving party would be damaged if the motion is denied. The Court cannot determine any alternative solution other than removal due to the clear and unequivocal conflicts of interest that arose even at the time of the entry of the agreements, and further this Court believes the possibility of public suspicion far outweigh any benefits that might accrue to continued representation. To the contrary, the failure to formally disclose the intertwined relationships and obtain conformed consent of the representation is blatant and compounded by the second agreement where the waiver of claims against Mr. Strojnik himself and his wife appear to have no consideration and the waiver of claims against the members necessarily required Mr. Strojnik as general counsel for the joint venture to clearly outline the benefits and hazards to each of those entities through their named representatives. It is unlikely any information would be sufficient to avoid and resolve the clear conflict of Mr. Strojnik acting as a policy making tie breaker and counsel for APM while advising the other member, Silver King, to waive any claims against APM. There would be more than a possibility of public suspicion from such action. There may well be outrage.

IT IS HEREBY ORDERED granting the Motion to Disqualify Counsel. Further time is granted for Plaintiff to respond to the Motion for Summary Judgment pending the retention of new counsel. This matter is set for Review on <u>Monday, January 12, 2009 at 1:30 p.m. In Division 1 before the Honorable William J. O'Neil</u>.

DATED this _____12____ day of December, 2008.

_____
JUDGE OF SUPERIOR COURT

12/18/2008 THU 11:11 FAX                                                                        ☒005/005

**Mailed/distributed copy:** 12/15/2008

**cc:**

PETER STROJNIK

MATTHEW A RITTER

5003  OFFLINE                          CV200701884                          Page 5 of 5

# Exhibit 2

1  Peter Kristofer Strojnik, 026082
2  3030 North Central Avenue, Suite 1401
   Phoenix, Arizona 85012
3  Phone: 408-655-0984
4  Fax: 602-264-1441
   Attorney for Petitioner The Funding Group

JAN 2 6 2009

5

## IN THE COURT OF APPEALS FOR THE STATE OF ARIZONA

6

## DIVISION 2

7

8  The Funding Group, an unincorporated   )
   association consisting of Hans Hüning    )  2 CA-SA 2008-0089
9  and TCMS Investments, Inc.,              )
                                            )  Pinal County Superior Court Cause No.   CV
10                        Petitioner,        )  2007-01884
                                            )
11            vs.                            )
                                            )  **PETITIONER'S REPLY TO REAL**
12  Hon. William J. O'Neil, Judge of the    )  **PARTY IN INTEREST'S ANSWER TO**
    Pinal County Superior Court,            )  **VERIFIED PETITION  FOR SPECIAL**
13                                          )  **ACTION**
                          Respondent.       )
14            and                           )
                                            )
15                                          )
    THE ESTATE OF FREDDY JOE                )
16  DEEN, deceased; RONALD DEEN             )
17  a/k/a RON DEEN a/k/a RONALD             )
    DEEN SR, a/k/a/ RON DEEN SR. and        )
18  JANE DOE DEEN, his wife; JACK           )
19  SAN FELICE and JANE DOE SAN             )
    FELICE, his wife; SILVER KING           )
20  MINING COMPANY OF ARIZONA,              )
    LLC, an Arizona limited liability       )
21  company; SAN FELICE CRIMINAL            )
22  SYNDICATE, an Arizona organization,     )
                                            )
23                  Real Parties in Interest. )
                                            )
24

25

# REPLY

## 1) There is Substantial Agreement Regarding Underlying Facts

The underlying facts remain undisputed: Silver King Mining Company of Arizona ("SKM") entered into a joint venture agreement with Arizona Precious Metals, Inc. ("APM"). SKM's contribution to the Joint Venture was the Silver King Mine ("Mine"). (Answer at ¶¶25, 28) But the Mine was not owned by SKM; it was owned by (Freddy) Joe Deen, Ron Deen Jr. and Gary Deen. (Id. ¶37)

When the Forest Service demanded payment of a $138,790.00 reclamation bond to keep the Mine in operation, neither SKM nor APM had the money to pay it. Believing that the Mine had been transferred to the Joint Venture, the Funding Group paid the $138,790.00 in exchange for an equity interest in the Joint Venture. (Id. at ¶¶34, 35)

SKM Parties do not deny that in August of 2006, Campbell (APM's Officer and Shareholder) and San Felice (SKM's Managing Member) met at the Dos Hermanos restaurant in Superior, Arizona. SKM Parties offer no denial that San Felice asked Campbell to sign the "grantee" line on a blank form Quit Claim Deed which San Felice would complete and record, thus transferring the Mine from SKM to the Joint Venture.

Likewise, SKM Parties do not deny that San Felice and Deen completed the Quit Claim Deed signed in blank by Campbell. There is no denial that the Quit Claim Deed purported to transfer only 50% of the Mine. There is no denial that the Quit Claim Deed

-2-

was signed by Ronald Deen Sr. – who, according to the SKM Parties, never owned the Mine. Id. at ¶37 and footnote 3. There is no denial that the Quit Claim Deed was executed in favor of Campbell and not the Joint Venture.

Likewise, there is no denial that on April 18, 2007, Ronald Deen Sr. (who never owned the Mine) purported to transfer the remaining 50% of the Mine to Campbell. SKM does not deny that Campbell's "grantee" signature on the April 18, 2007 Deed was a crude forgery. SKM does not deny that in exchange for $138,790.00, the Funding Group received nothing but a worthless interest in a worthless Joint Venture.

## 2) There is Agreement Regarding Strojnik's Involvement

SKM Parties agree that Strojnik prepared the Joint Venture Agreement (Id. at ¶ 25); that he prepared the Modification Agreement (Id. at 31); that he was general counsel for APM and the Joint Venture and that he was a member of the Joint Venture Policy Committee (Id. at ¶40). There is agreement that Strojnik never represented any of the SKM Parties directly. (Id. at ¶56.) SKM Parties do not dispute that Strojnik's wife, Mrs. Strojnik, holds a separate property interest in TCMS Investment, Inc. SKM Parties agree that TCMS is a member of the Funding Group.

## 3) SKM's Position in its Answer

SKM's position in this Special Action remains consonant with its position in the trial court: SKM argues that "Strojnik suffers from a conflict of interest because he formerly represented the Defendants, RONALD DEEN and JACK SAN FELICE, by

virtue of being general counsel for the Joint-Venture between APM and the Silver King (of which both RONALD DEEN and JACK SAN FELICE were the only member-directors)". (Id. at ¶56.) According to the SKM Parties, this creates a "brazen conflict of interest...exacerbated through the complicity of his wife". (Id. at ¶ 42.)

SKM Parties' Answer does not offer any legal basis for these bold conclusions.

**4) SKM Offers No Proof Of The Use, Or Potential Use, Of Any "Confidential" Information.**

Despite a repetitious reference to a "conflict", SKM Parties does not identify any attorney-client relationship between Strojnik and any of the SKM Parties.  SKM Parties do not identify any "confidential" information that Strojnik may have.  SKM does not deny the ultimate irony that would result from Strojnik's knowledge of "confidential" information: Had Strojnik known that the Funding Group was paying $138,790.00 in exchange for a worthless interest in a worthless Joint Venture, he would have advised the Funding Group to keep their money and run. Had Strojnik been the attorney for the SKM Parties, he would have (1) advised SKM not to commit the fraud or, alternatively, (2) reported the fraud to the proper authorities pursuant to E.R. 1.6 (c) and (d).

**5) SKM's "Statement of the Law" Is Inapposite**

SKM's legal principles embodied in ¶¶ 47-50 largely repeat The Funding Group's introductory legal observations. The Funding Group agrees with general legal principles stated in ¶¶ 50 (ethical rules may provide guidance in disqualification matters), ¶51 (general conflict rules); ¶52 (acquiring a possessory interest adverse to the client); ¶ 53

(confidentiality); ¶54 (lawyer as witness); and ¶55 (confidentiality and privileged information).

With respect to the lawyer-witness matter, Strojnik is not listed in the List of Witnesses in The Funding Group's Rule 26.1 Disclosure Statement (Exhibit 2 to Petition). Since SKM Parties never filed their Rule 26.1 Disclosure Statement, Strojnik is obviously not listed by the SKM Parties either. Strojnik is not a witness, a potential witness, or a "necessary witness".

The Answer does discuss the *Cottonwood* decision (*Cottonwood Estates, Inc. v. Paradise Builders, Inc.*, 128 Ariz. 99, 624 P.2d 296 (1981) where the Supreme Court cautioned that an attorney should not be permitted to name his adversary as a witness as a tactical contrivance to trigger disqualification. The court stated:

> When an attorney is to be called other than on behalf of his client, a motion for disqualification must be supported by a showing that the attorney will give evidence material to the determination of the issues being litigated, that the evidence is unobtainable elsewhere, and that the testimony is or may be prejudicial to the testifying attorney's client.

Id. at 105, 624 P.2d at 302. SKM Parties offer no showing necessitated by *Cottonwood*.

## 6) SKM Fails to Address Applicable Law

SKM Parties' "Discussion" portion of the Answer (¶¶56-58) is a verbatim repetition of SKM's Motion for Determination of Counsel. (Exhibit 9 to Petition, pp 8 - 10) The "Discussion" part of the Answer does not address any of the issues raised in the Petition itself. It is silent on the all applicable principles of law raised in the Petition.

Instead, the Answer repeats SKM's mantra that "Strojnik suffers from a conflict of interest", but never identifies any attorney-client relationship or any "confidential" information. (Id. at § 56) The Discussion, indeed SKM Parties' Answer as a whole, offers no legal support for SKM Parties incorrect and unsupportable legal position.

## CONCLUSION AND PRAYER FOR RELIEF

The Funding Group prays that the Court issue a mandate reinstating Strojnik as its counsel for the Funding Group. Further, the Funding Group requests an award of attorneys fees pursuant to Rule 4 (g) of the Rules for Special Action insofar as the SKM Parties claim that the attorney-client relationship is based on various Agreements. A.R.S. § 12-341.01.

RESPECTFULLY SUBMITTED this 22nd day of January, 2009.

THE LAW FIRM OF
PETER STROJNIK

By: Peter K. Strojnik
Attorney for Petitioner

-6-

# Exhibit 3



**STATE BAR OF ARIZONA**

Assistant's Direct Line:  (602) 340-7247

Marcch 10, 2009

**Personal and Confidential**

Peter Strojnik
Attorney at Law
3030 North Central Avenue, Suite 1401
Phoenix, Arizona 85012-2720

Re:    File No. 09-0314
        William R. Richardson, Complainant

Dear Mr. Strojnik:

Information concerning your professional conduct has come to the attention of the State Bar. Rule 51(b)(1), Ariz.R.Sup.Ct. requires Bar Counsel to investigate all information coming to the attention of the State Bar that, if true, would be grounds for discipline. This includes information from any source, whether or not they were a party to the underlying action or conduct. There is no standing requirement to submit information or initiate a disciplinary charge.

At this point, the matter is not considered a formal complaint, but rather a "bar charge" that is being investigated through a "screening investigation." Your participation in the screening investigation is extremely important, as Bar Counsel will make a recommendation at the end of the investigation as to whether the matter should be dismissed, resolved via informal means, or referred for formal disciplinary action. Pursuant to ER 8.1(b) and Rule 53(d) & (f), Ariz.R.Sup.Ct., you have a duty to cooperate with this investigation. Failure to fully and honestly respond to, or cooperate with, the investigation is, in itself, grounds for discipline. I also refer you to Rule 48(g) Ariz.R.Sup.Ct. regarding non-abatement in disciplinary matters.

A copy of the information received by the State Bar has been included with this letter. Please submit a written response to the enclosed information, directed to my office, within 20 days of the date of this letter. Do not send your response or a copy of your response directly to the Complainant. If you cannot file a timely response, you should contact my office immediately. Please also include the above-referenced file number on all correspondence concerning this matter. You must submit **an original and one copy** of your written response. If you do not submit a copy with your response you will be charged $.20 per page for copying your response.

The ethical rules that should be addressed in your response include, but are not limited to:  ERs 1.9, 3.3, 4.1, and 8.4(c) and (d).

Peter Strojnik
March 10, 2009
Page 2

A copy of your response will be sent to the Complainant and will become public record upon
disposition of the matter. You may make a request that certain information in your response remain
confidential pursuant to Rule 70(g) Ariz.R.Sup.Ct.  **Any such request must be made in a letter
separate from your response** and must set forth the factual and legal basis therefore. You must
specify whether you want to keep the information from the public, but not the complainant, or from
both the public <u>and</u> the complainant. At the time you make such a request, you must submit the
information for which confidentiality is requested as part of your request. You should also submit a
redacted copy to remain in the public portion of the file, as the rules require some type of response
to remain in the public portion of the file. Requests for confidentiality are only granted sparingly
and only upon good cause shown. If your request for confidentiality is denied, the information or
documents in question will not be returned to you, but will become public upon disposition of the
matter.

The State Bar has a diversion program that, in some cases, may provide an alternative to traditional
discipline. Diversion is a rehabilitative program available to lawyers whose ethical misconduct is of
a non-serious nature and who may benefit from one or more of the State Bar's remedial programs,
such as the Member Assistance Program (MAP) or the Law Office Management Assistance
Program (LOMAP).  Diversion is not available in cases of serious misconduct or for conduct
involving dishonesty, self-dealing, or breach of a fiduciary duty. Participation in diversion is
voluntary. If you would like more information about the State Bar's diversion program, you may
review the Diversion Guidelines on-line at:
http://www.myazbar.org/LawyerRegulation/DiversionGuidelines2004.pdf or you may request a
hard copy by contacting me at the number above. If, after reviewing the guidelines, you believe
your case may qualify for diversion, please submit a written request with a statement of why you
believe diversion is appropriate along with your response.

Thank you for your anticipated cooperation.

Sincerely,

Roberta L. Tepper
Senior Bar Counsel

RLT/ rtb

# Exhibit 4

THE LAW FIRM OF

# PETER STROJNIK
### ATTORNEY AT LAW



March 12, 2009

Roberta L. Tepper, Esq.
Senior Bar Counsel
4201 N. 24th Street, Suite 200
Phoenix, Arizona 85016-6288

    Re:    File No. 09-0314
           William R. Richardson, Complainant

Dear Ms. Tepper:

Mr. Richardson and his client, Mr. Reynoso, are in the habit of filing suits against indigent defendants as a means of legal extortion. First, Mr. Richardson filed suit against Mr. Reynoso's former friend and confidant, Mr. Uribe, in order to cower Mr. Uribe into silence. Then, Mr. Reynoso and Mr. Richardson filed a defamation action against Mr. Gatyas for having the audacity to sign an Affidavit that was used in the Uribe lawsuit against Mr. Reynoso's and Mr. Richardson's interests. Mr. Uribe was represented *pro bono* by Strojnik in the first suit. Mr. Gatyas is represented without charge in the second suit. Apparently, Mr. Richardson's tactic has shifted from extorting indigent defendants to extorting their lawyers; hence the bar charge.

   1) HISTORICAL PERSPECTIVE

The following Historical Perspective is needed to supplement the facts intentionally omitted from Mr. Richardson's bar charge.

   a) The Underlying Bankruptcy Proceeding

The underlying adversary proceeding was brought by Mr. Richardson's client, AR Utility Specialists, Inc. ("ARUSI") under Bankruptcy Cause number 05-10489-PHX-GBN. Mr. Richardson represented the debtor (ARUSI) and debtor's principal, Mr. Reynoso.

At the time relevant to this matter, Mr. Richardson did *not* represent the Bankruptcy Trustee. The following conversation between Mr. Richardson and Honorable Bankruptcy Judge Nielson illustrates Mr. Richardson's understanding:

**RECEIVED**

MAR 1 3 2009

STATE BAR OF ARIZONA
LAWYER REGULATION

3030 NORTH CENTRAL AVENUE - SUITE 1401 - PHOENIX - ARIZONA - 85012-2712
TEL: 602.297.3019 - FAX: 602.296.0135 - CELL: 602.524.6602 - EMAIL: STROJNIK@AOL.COM
WEBSITE: WWW.STROJNIK.COM

Peter Strojnik                          Page 2                                    3/12/2009

**THE COURT [to Mr. Richardson]:** Why don't you -- why don't -- why don't you retain your files and retain your position as long as you're willing to work for the debtor in -- in this case and --and we'll see what trustee's appointed by the US Trustee and we'll see what that individual wants to do about counsel. If that individual for that matter even wants to **appoint special counsel** for certain matters as well. That's -- I think we've had a lot -- enough of quick decisions in this matter, let's -- let's spend some little time considering the next thing that happens in this case.

**MR. RICHARDSON:** I appreciate that, Your Honor, I'm just at a loss. I've never been in a case where a trustee's been appointed and quite frankly I don't know what I can do at this point. **I can't do anything without a trustee's approval as far as I can tell.** (Emphasis supplied)

(Doc 366 Transcript of Proceeding P. 31 l. 18 to p. 32 l. 7 (*Judicial Notice*))

But Mr. Richardson did not wait until his appointment as special counsel for the Trustee. He filed three unauthorized adversary proceedings naming the Trustee - a non-client - as the Plaintiff. Notably, one of the suits filed by Mr. Richardson was filed against his own client Mr. Reynoso:

| Case No. | Date Filed | Plaintiffs | Defendants |
|---|---|---|---|
| 2:07-ap-00342-GBN | 06-11-07 | AR Utility Specialists, Inc., Debtor and Dale Ulrich, Chapter 11 Trustee | Alejandro Reynoso, Cynthia Reynoso, Chris Reynoso, Michael Reynoso, Stephanie Reynoso, Felice Leyva, Jose Louis Bernal Valenzuela |
| 2:07-ap-00338-GBN | 06-11-07 | AR Utility Specialists, Inc., Debtor and Dale Ulrich, Chapter 11 Trustee | Thomas L. Kummer, Peter Strojnik, Tanya Strojnik, CSK Partnership, Eduardo Alonzo, Reuben Hinojos, Cynthia Reynoso |
| 2:07-ap-00341-GBN | 06-11-07 | AR Utility Specialists, Inc., Debtor and Dale Ulrich, Chapter 11 Trustee | MCC Technologies, Inc., Edmundo Uribe, Denise Uribe |

(*Judicial Notice*) The third of the above adversaries, *Ulrich v. Uribe et al,* is the Adversary Proceeding in issue here.

b) The Adversary Proceeding against Uribe

The unauthorized Adversary Complaint filed by Mr. Richardson against Mr. Uribe sought repayment of $823,479.24 under various bankruptcy theories of recovery. Strojnik represented Mr. and Mrs. Uribe *pro bono. See* attached Affidavit of Mr. Uribe.

Uribe's Answer and Counterclaim offered a careful and detailed debunking the entirety of Mr. Richardson's (unauthorized) Adversary Complaint. (Doc 7, *Judicial Notice*) It provided a thorough financial analysis of the dealings between the parties. It documented the purpose for each and every payment exchanged between the parties, the

consideration received for each such payment, and a complete accounting of each and every dollar ever advanced by ARUSI to Uribe and MCC. It soon became clear that Mr. Richardson conducted absolutely no due diligence prior to filing the (unauthorized) sham Adversary Complaint.

Strojnik then filed a Motion to Dismiss the Adversary Complaint for Failure to State a Claim. (Doc 4 *Judicial Notice*) In the Summary portion of the Motion, Strojnik argued:

> The present action is brought by Mr. Richardson as the attorney for the Debtor and ostensibly as the attorney for the Chapter 11 Trustee, Mr. Dale Ulrich. Since the Debtor does not have standing to bring this action, and since Mr. Dale Ulrich is not represented by Mr. Richardson, the entire action is a nullity. See *Meredith v. The Ionian Trader*, infra.  The adversary proceeding brought against the Defendants by a non-retained attorney prejudices the Defendants because any judgment in their favor on the principal claims, any judgment in their favor on their counterclaims, any award of costs and attorney's fees, and any award of sanctions in their favor would likewise be a nullity. *Meredith*. This is not an attorney created prejudice: Mr. Stephen M. Gatyas, ARUSI's trusted former CFO issued an Affidavit, Exhibit 1, in which he fairly and independently states a basis for an abuse of process counterclaim, a Rule 11 Motion, and a request for costs and attorney's fees:
>
> > Alex personally told me on numerous occasions that the relationship with Uribe and  MCC were joint venture relationships that he had developed with Uribe and MCC in case ARUSI ever got into financial problems so that he [Mr. Reynoso] "….. would have a place to go." Secondly, since his separation from his spouse, "he now had a vehicle to hide money from his wife," for he had no intentions of sharing anything with her.
>
> Defendants are fully aware that neither the honorable Chapter 11 Trustee, Mr. Ulrich, nor his learned counsel, Mr. Dake, have any knowledge of this abuse. Nonetheless, Defendants request that the Court dismiss the adversary proceeding or, in the alternative, appoint special counsel to represent the Estate and the Trustee in the prosecution thereof.

All parties in the Uribe case realized that the entire Adversary Proceeding was a sham[1] and that it was brought by Mr. Richardson to cower Mr. Uribe into silence[2]. Therefore,

---

[1] At the time of Mr. Richardson's filing of the underlying adversary by Mr. Richardson on behalf of the Trustee. Mr. Richardson filed the Adversary Complaint at the time when he did not represent the Trustee – therefore, the entire Complaint was a sham and a nullity. *Meredith v. Trader*, 279 F.2d 471 (2nd Cir. 1960).   The following statement from *Dkbp v. Dorr, Bentley & Pecha*, 841 P.2d 811 (Wyo.1992) explains:

> The commencement of the Campbell County District Court action seeking a declaration of the nature and extent, or even the existence, of D & A's interest in either the partnership of DKBP, or in the arbitration award, was an unauthorized representation. Even if the action had been commenced after the June 25, 1990 order granting relief from stay, it would have still been void as an unauthorized representation. See *Pueblo de Santa Rosa v. Fall*, 273 U.S. 315, 47 S.Ct. 361, 71 L.Ed. 658 (1927). *A suit instituted without authority from the party named as plaintiff is a nullity, and any judgment obtained in*

the Trustee and Mr. Uribe agreed to dismiss the case with prejudice. On October 29, 2007, Honorable George B. Nielsen, Jr. signed the Order dismissing the case. But the case was not dismissed prior to the filing of the Motion to Disqualify Counsel. (doc 24)

2) **THE MOTION TO DISQUALIFY FILED IN THE ADVERSARY 2:07-AP-00341-GBN (DOC 24 JUDICIAL NOTICE).**

a) Strojnik's Prior Representation of ARUSI

Once the Trustee's true attorney, Mr. Terry Dake, took over the case, he filed the Motion to Disqualify. The Motion urged a disqualification based on Strojnik's 2½ month association with ARUSI between May 9, 2005, and July 22, 2005. The Motion argued that Strojnik's actions in the prior representation-- which were completely unrelated to the adversary proceeding - disqualify him from representation of the Uribes. Trustee's detailed account of Counsel's 2½ month association with the Debtor, and the attached Exhibits 1 through 25, disclosed the following:

1. Strojnik's representation never concerned a matter that was "the same" or "substantially related" to any claim in the Adversary Proceeding against Mr. or Mrs. Uribe; and

2. Strojnik's representation never concerned a matter that was "the same" or "substantially related" to any claim against Uribe's co-defendants.

Strojnik timely responded to the Motion to Disqualify. (Doc 27, *Judicial Notice*) Strojnik issued an Affidavit in which he related to the Court the extent of previous representation; the review of the potential conflict issues; and his conclusion that no conflict existed. See Attached Affidavit. Strojnik also analyzed the issue thus:

---

*such a suit is void. Meredith v. The Ionian Trader,* 279 F.2d 471 (2nd Cir. 1960) (Emphasis supplied).

*See also State v. Reese,* 78 N.M. 241, 430 P.2d 399 (N.M. 07/24/1967) [That a court obtains no jurisdiction to proceed and render judgment in an action brought without authority has been held under a number of circumstances. See *Pueblo of Santa Rosa v. Fall,* 273 U.S. 315, 47 S. Ct. 361, 71 L. Ed. 658 (1927); *Sutherland v. International Ins. Co. of New York,* 43 F.2d 969 (2d Cir. 1930); *Courtney v. Campbell,* 143 Okla. 5, 286 P. 872 (1930); *Howard v. Boyce,* 254 N.C. 255, 118 S.E.2d 897 (1961); *Kennington-Saenger Theatres v. State,* 196 Miss. 841, 18 So.2d 483, 153 A.L.R. 883 (1948). Prohibition is properly utilized to prevent a court from proceeding without jurisdiction. *State ex rel. Townsend v. Court of Appeals,* 78 N.M. 71, 428 P.2d 473 (1967); *State ex rel. Board of County Com'rs of Grant County v. Burks,* 75 N.M. 19, 399 P.2d 920 (1965); *State ex rel. Prince v. Coors,* 52 N.M. 189, 194 P.2d 678 (1948).

[2] Mr. Uribe was aware of a kickback scheme and insurance fraud committed by Mr. Reynoso. It is unclear whether Mr. Richardson was involved in that scheme.

The Standard for Disqualifying Opposing Counsel

In *Research Corp. Techs. V. Hewlett-Packard Co.*, 936 F. Supp. 697 (D.Ariz. 1996), the Court denied a similarly filed motion to disqualify opposing counsel noting that:

> The burden is on the moving party to show "sufficient reason why an attorney should be disqualified from representing [a] client," and, "whenever possible the courts should endeavor to reach a solution that is least burdensome upon the client or clients." *Alexander*, 141 Ariz. at 161, 685 P.2d at 1313. Disqualification can result in increased expenses, delay in resolution of the proceedings and deprivation of choice of counsel. See *SWS Financial Fund A v. Salomon Bros. Inc.*, 790 F. Supp. 1392, 1400 (N.D.Ill. 1992). Thus, "only in extreme circumstances should a party to a lawsuit be allowed to interfere with the attorney-client relationship of [an] opponent." *Alexander*, 141 Ariz. at 161, 685 P.2d at 1313.

Notably, the Motion to Disqualify did not point to any actual, imagined, or potential conflict of interest. Instead, the Motion relied on *Foulke v. Knuck*, 784 P.2d 723, 162 Ariz. 517 (App. 1989) for the proposition that the Court will assume that "during the course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation".

In *Foulke*, the question was whether a divorce attorney should be disqualified from representing the Wife in a divorce action in which the attorney had previously consulted with the Husband. The divorce attorney admitted that she had been paid for her services provided to the Husband, but denied that any confidential information was disclosed during consultations. The Husband claimed that he divulged certain confidences and secrets, specifically recalling that he commented during their meeting that there was an attorney-client privilege with regard to their discussion. In light of the fact that both parties agreed that the representation was of the "same" or "substantially the same matter" *see* ER 1.9, the Court correctly concluded that there was a conflict of interest.

The Trustee correctly stated that pursuant to ER 1.9, "a lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the *same* or a *substantially related matter* in which that person's interests are materially adverse to the interests of the former client". *See* ER 1.9.

However, this Adversary Proceeding is not a divorce case in which one attorney seeks to represent the interests of both parties. This Adversary Proceeding is one in which there are no common elements, no common issues, no common information and no common facts with anything related to the prior representation. As stated in the attached letter of resignation dated July 22, 2005, Exhibit 1, the matters of previous representation were completely unrelated to the present representation. The guidance necessary to determine what constitutes the "same" or a "substantially related" matter may be found in the Definitional Section of the Ethical Rules[3] and in the Comments to ER 1.9. For example, there is Comment 1 to ER 1.9 which elucidates:

---

[3] *See* ER 1.0. (l) ["'Substantial' when used in reference to degree or extent denotes a material matter of clear and weighty importance"].

[1] After termination of a client-lawyer relationship, a lawyer has certain continuing duties with respect to confidentiality and conflicts of interest and thus may not represent another client except in conformity with this Rule. Under this Rule, for example, a lawyer could not properly seek to rescind on behalf of a new client a contract drafted on behalf of the former client. So also a lawyer who has prosecuted an accused person could not properly represent the accused in a subsequent civil action against the government concerning the same transaction. Nor could a lawyer who has represented multiple clients in a matter represent one of the clients against the others in the same or a substantially related matter after a dispute arose among the clients, unless all affected clients give informed consent. See Comment [9]. Current and former government lawyers must comply with this Rule to the extent required by ER 1.11.

The representation in this Adversary Proceeding is not akin to an attorney seeking to "rescind on behalf of a new client a contract drafted on behalf of a former client". Nor is the present representation akin to "a lawyer who has prosecuted an accused person" thereafter "representing the accused in a subsequent civil action against the government concerning the same transaction". The representation here is one where the attorney provided services completely unrelated to the present representation. *See also* Comment 3 to ER 1.9 which clarifies:

[3] *Matters are "substantially related" for purposes of this Rule if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter.* For example, a lawyer who has represented a businessperson and learned extensive private financial information about that person may not then represent that person's spouse in seeking a divorce. Similarly, a lawyer who has previously represented a client in securing environmental permits to build a shopping center would be precluded from representing neighbors seeking to oppose rezoning of the property on the basis of environmental considerations; however, the lawyer would not be precluded, on the grounds of substantial relationship, from defending a tenant of the completed shopping center in resisting eviction for nonpayment of rent. *Information that has been disclosed to the public ordinarily will not be disqualifying.* Information acquired in a prior representation may have been rendered obsolete by the passage of time, a circumstance that may be relevant in determining whether two representations are substantially related. *In the case of an organizational client, general knowledge of the client's policies and practices ordinarily will not preclude a subsequent representation; on the other hand, knowledge of specific facts gained in a prior representation that is relevant to the matter in question ordinarily will preclude such a representation.* ....

The Declarations of Edmundo Uribe and Peter Strojnik filed in the bankruptcy adversary clearly stated that no confidential information was used, consciously or unconsciously, in the matter. As indicated in Comment 3 to ER 1.9, publicly

available information – such as information available through discovery or directly from the client in defense of a claim - is not disqualifying. Additionally, the Trustee fails to indicate what "specific facts" (none) were gained during previous association that are claimed to be "relevant to the matter in question" (none). Nor does the Trustee address Comment 8 to ER 1.9 which explains further:

> [8] Paragraph (c) provides that information acquired by the lawyer in the course of representing a client may not subsequently be used or revealed by the lawyer to the disadvantage of the client. However, the fact that a lawyer has once served a client does not preclude the lawyer from using generally known information about that client when later representing another client.

*See* e.g. *Research Corp. Techs. V. Hewlett-Packard Co.,* 936 F. Supp. 697 (D.Ariz. 08/15/1996) [Tax matters and patent law "totally unrelated"]. There is a plethora of information available about ARUSI, from monthly Operating Reports to all documentation that ARUSI will have to provide during the discovery portion of this litigation. *See also* Ethics Opinion 92-3, attached hereto as Exhibit 1. There is no reason to utilize any information which may have come to light from previous matters totally unrelated to the issues at hand in the Adversary Proceeding.

b)  Outcome of the Motion to Disqualify

Federal Courts have the duty and the responsibility of supervising the conduct of attorneys who appear before it. In *Xcentric Ventures, LLC v. Stanley*, No. CV-07-00954-PHX-NVW (D.Ariz. 07/27/2007) (Honorable Neil V. Wake), stated:

> "The district court has the duty and responsibility of supervising the conduct of attorneys who appear before it." *Erickson v. Newmar Corp.,* 87 F.3d 298, 300 (9th Cir. 1996). However, in carrying out this duty it must be "solicitous of a client's right freely to choose his counsel and . . . wary of disqualification motions interposed for tactical reasons." Jamieson v. Slater, 2006 WL 3421788, at *3 (D. Ariz. Nov. 27, 2006) (internal quotation marks omitted). "Only in extreme circumstances should a party to a lawsuit be allowed to interfere with the attorney-client relationship of his opponent." *Alexander v. Super. Ct.,* 141 Ariz. 157, 161, 685 P.2d 1309, 1313 (1984). A motion from opposing counsel to disqualify an attorney based upon an alleged conflict of interest is therefore to be "view[ed] with suspicion." *Gomez v. Super. Ct.,* 149 Ariz. 223, 226, 717 P.2d 902, 905 (1986). (Emphasis supplied)

Judge Nielsen, fully cognizant of his duty and responsibility of supervising the conduct of the attorneys appearing before him – including Strojnik - declined to disqualify Strojnik; instead, the Court accepted Strojnik's continued representation of Uribe and permitted Strojnik to conclude the case through a dismissal with prejudice. Clearly, Judge Nielsen was of the view the Motion to Disqualify was not sustainable; had it been sustainable,

Judge Nielsen would not have permitted Strojnik to complete his representation of this indigent client.

### c) Duty to Indigent Client

There is a greater issue at play here. Here, Mr. Richardson filed suit against a defendant that Mr. Richardson *knew* could not afford legal representation *unless* such representation were provided *pro bono*. As a lawyer, Strojnik has an affirmative moral if not ethical duty to provide *pro bono* representation in the interest of justice. *See* ER 6.1. It is well established that "a client always is entitled to be represented by counsel of his own choosing. The attorney-client relationship is consensual, highly fiduciary on the part of counsel, and the attorney may do nothing that restricts the right of the client to repose confidence in any counsel of his choice. No concept in the practice of law is more deeply rooted" *See* Ariz. Op. 01-01. (Exhibit 6)  *See also* Ariz. Op. 95-04 at 3 "restrictive covenants among lawyers will diminish the public's ability to employ counsel of choice, which interest outweighs a lawyer's interest in the potential unfair competition for existing clients." Mr. Uribe and MCC Technologies, Inc. are entitled to be represented by counsel of their choosing in this complex litigation which they cannot otherwise afford to defend.

### 3) ALLEGED MISREPRESENTATION TO THE COURT

As indicated above, at the time of the filing of the Adversary Proceeding, Mr. Richardson knew that "I can't do anything without a trustee's approval as far as I can tell." But this did not keep him from filing the sham adversary complaint.

Mr. Richardson now complains that Strojnik alerted the Court to the obvious fact that Mr. Richardson had *not* been appointed to represent the Trustee or the Estate. Perhaps Mr. Richardson can bring to the State Bar a copy of the Order appointing him special counsel for the Trustee. *See* 11 U.S.C. §§ § 327, § 1103, or § 1114 and Rule 2014 of the Rules of Bankruptcy Procedure. Notably, Mr. Richardson admits – by quoting from a June 13, 2007 e-mail[4] that that he was *not* the attorney for the Debtor or the Trustee on the date of the filing of the sham adversary proceedings. It should also be noted that the Court – not Mr. Dake – appoints special counsel pursuant to the Bankruptcy Code.

### 4) CONCLUSION

Mr. Richardson's bar charge is brought at a time when Strojnik represents another victim of Mr. Richardson's and his client's vendetta, Mr. Gatyas. Mr. Gatyas is the witness in the Uribe case who testified, through Affidavit, in support of the Motion to Dismiss. Strojnik represents Mr. Gatyas at no charge to him because of the egregious misuse of the

---

[4] "…we anticipate that Mr. Richardson will have on file shortly his application to be formally retained as counsel for the debtor"

Peter Strojnik                    Page 9                    3/12/2009

court process by Mr. Richardson and his client Mr. Reynoso. Messrs. Richardson's and Reynoso's misuse of the process continues through this spurious bar charge.

Please let me know how else to assist in a resolution of this matter.

Sincerely,

Peter Strojnik

PS: pjs

# Exhibit 5



Assistant's Direct Line:  (602) 340-7247

June 12, 2009

**Personal and Confidential**

Peter Strojnik
*Peter Strojnik PC*
3030 North Central Avenue, Suite 1401
Phoenix, Arizona 85012-2720

Re:    File No. 09-0314
        William R. Richardson, Complainant

Dear Mr. Strojnik:

The State Bar is continuing to investigate this matter and should have a final determination in the near future.  In order to complete our evaluation of the case, we require additional information:

1.  Please explain your interests in and connections to Binary Mass Propulsion Systems (BMP). Please explain why BMP merged with AR Utilities Systems (AR Utilities).  Please further explain your role in the merger.  Please refer to Rule 42, ERs 1.7 and 1.8(a), Ariz.R.Sup.Ct. in your response.
2.  Please explain your interests in and connections to CSK Consulting (CSK).  Please explain the nature of the relationship between CSK and AR Utilities.  Please further explain your role in creating the relationship between CSK and AR Utilities.  Please refer to Rule 42, ERs 1.7 and 1.8(a), Ariz.R.Sup.Ct. in your response.
3.  Please explain your interests in and connections to Niaski Environmental (Niaski).  Please explain the nature of the relationship between Niaski and AR Utilities.  Please further explain your role in creating the relationship between Niaski and AR Utilities.  Please refer to Rule 42, ERs 1.7 and 1.8(a), Ariz.R.Sup.Ct. in your response.
4.  It appears from your billing records that you helped prepare AR Utilities for filing bankruptcy.  Please clarify your involvement in preparing AR Utilities for its subsequent bankruptcy filing.  Please explain, in detail, any meetings or advice you provided to AR Utilities regarding the bankruptcy proceedings.
5.  Please clarify when you stopped representing AR Utilities and why.  Please provide a specific date when your attorney/client relationship with AR Utilities was severed.
6.  Please clarify how Mr. Uribe is a creditor to AR Utilities.
7.  You stated that you represent Mr. Uribe *pro bono*.  Please provide a copy of the writing containing your scope of representation of Mr. Uribe.  Please refer to Rule 42, ER 1.5(b), Ariz.R.Sup.Ct.
8.  Please clarify your relationship to Mr. Kummer and whether you represented him in any capacity.

Peter Strojnik
June 12, 2009
Page 2

9.  Please clarify why Mr. Gatyas left AR Utilities.

Please provide this information <u>no later than June 26, 2009</u>.  **Failure to provide the above requested information could, in and of itself, provide grounds for discipline pursuant to Rule 42, ER 8.1 and Rules 53(d) and (f), Ariz.R.Sup.Ct.**  If you have any questions, please feel free to contact me at 602-340-7247.  Thank you in advance for your assistance in this matter.


Sincerely,


Russell J. Anderson
Staff Bar Counsel


RJA/ rtb

# Exhibit 6

THE LAW FIRM OF
# PETER STROJNIK
### ATTORNEY AT LAW



June 23, 2009

Russell J. Anderson, Esq.
Staff Bar Counsel
4201 N. 24th Street, Suite 200
Phoenix, Arizona 85016-6288

Re:     File No. 09-0314
        William R. Richardson, Complainant

Dear Mr. Anderson:

This addresses your bullet points in the June 12, 2009, correspondence.  Let me start with the ER's you reference:

## REFERENCED ER's:

**ER 1.7    Conflict of Interest:  Current Clients**
(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest.  A concurrent conflict of interest exists if:
(1) the representation of one client will be directly adverse to another client or
(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.
(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if each affected client gives informed consent, confirmed in writing, and:
(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client
(2) the representation is not prohibited by law and
(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal.

See Comment in the endnote[i].

**ER 1.8.    Conflict of Interest:  Current Clients:  Specific Rules**
(a)        A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:

(1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing in a manner that can be reasonably understood                        by                        the                        client;

(2) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction; and

RECEIVED
JUN 2 4 2009
STATE BAR OF ARIZONA
LAWYER REGULATION

Peter Strojnik                          Page 2                          6/23/2009

(3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction.

See Comment in the endnote[ii].

**ER 1.5.    Fees**
(b) The scope of the representation and the basis or rate of the fee and expenses for which the client will be responsible shall be communicated to the client in writing, before or within a reasonable time after commencing the representation, except when the lawyer will charge a regularly represented client on the same basis or rate. Any changes in the basis or rate of the fee or expenses shall also be communicated in writing.

## ANSWERS TO SPECIFIC BULLET POINTS:

1. Please explain your interest in and connections to Binary Mass Propulsion Systems (BMP). Please explain why BMP merged with AR Utility Systems (AR Utilities). Please further explain your role in the merger. Please refer to Rule 42, ERs 1.7 and 1.8(a), Ariz.R.Sup.Ct, in your response.

   **Response:**
   At the time relevant to this inquiry, BMPS was a shell corporation with no assets. The owners were me and my wife Tanya. As I recall, I was also the named officer and *probably* the statutory agent for the corporation. In May of 2005, the corporate shell was transferred to Mr. Reynoso. My wife and I resigned as officers. Mr. Reynoso then elected himself as the sole director, convened a meeting of the board of directors, and elected Raymond Cabreja as President; Thomas Kummer as treasurer, and me as secretary and counsel for the corporation.

   My role in the merger was procedural more than substantive; the merger proposal was reached between Messrs. Reynoso and Mr. Kummer. As I recall, the merger proposal was based in part on a need to quantify the minority interest in ARUSI. See attached July 22, 2005, letter to Mr. Reynoso. There could have been a secondary tax reason for the merger, but I am presently unclear. The decision to enter into a merger was reached by Mr. Reynoso to achieve his business and [tax] objectives in consultation with Mr. Kummer and others.

2. Please explain your interests in and connections to CSK Consulting (CSK). Please explain the nature of the relationship between CSK and AR Utilities. Please further explain your role in creating the relationship between CSK and AR Utilities. Please refer to Rule 42, ERs 1.7 and 1.8(a), Ariz.R.Sup.Ct, in your response.

   **Response:**
   CSK was a consulting group consisting of Raymond Cabreja and Thomas Kummer. It was retained by AR Utilities to assist the company in its restructuring and financing efforts. The relationship between CSK and ARUSI was negotiated between Messrs.

Cabreja and Kummer on one hand and Mr. Reynoso on the other. I prepared the paperwork at the direction of Messrs. Reynoso, Cabreja and Kummer.

3. Please explain your interest in and connection to Niaski Environmental (Niaski). Please explain the nature of the relationship between Nisaki and AR Utilities. Please further explain your role in creating the relationship between Niaski and AR Utilities. Please refer to Rule 42, ERs 1.7 and 1.8(a), Ariz.R.Sup.Ct, in your response.

**Response:**
Corporation Commission records indicate that Niaski is/was an Arizona corporation. The officers and directors were Edmundo Uribe, Alejandro Reynoso and Eduardo Alonzo. I was under the impression that Edmundo Uribe was the sole shareholder. I do not know who currently owns the stock or who the current officers and directors are. I am currently unaware of the relationship, if any, between Niaski and ARUSI, although there could have been an agreement of some sort between them in which I was not involved. I recall a matter involving the payment of the maintenance fee for certain patents belonging to Niaski; however, my present memory is not sufficiently clear to make affirmative representations regarding that matter.

4. It appears from your billing records that you helped prepare AR Utilities for filing bankruptcy. Please clarify your involvement in preparing AR Utilities for its subsequent bankruptcy filing. Please explain, in detail, any meetings or advice you provided to AR Utilities regarding the bankruptcy proceeding.

**Response:**
I represented ARUSI between May 9, 2005 and July 22, 2005. My involvement in the bankruptcy matter was substantively limited to the selection of counsel and the negotiation of the fee. While I sat in on several meetings, ARUSI's interests were discussed primarily between by Mr. Reynoso, Mr. Cabreja, Mr. Kummer and Lewis & Roca attorneys who ultimately took the case.

5. Please clarify when you stopped representing AR Utilities and why. Please provide a specific date when your attorney/client relationship with AR Utilities was severed.

**Response:**
See attached letter dated July 22, 2005.

6. Please clarify how Mr. Uribe is a creditor of AR Utilities.

**Response:**
AR Utilities owed Uribe for wages and on quantum meruit, as alleged in the counterclaim (Doc 7, 2:07 –ap- 00341-GBN)

Peter Strojnik                              Page 4                                          6/23/2009

7.  You stated that you represent Mr. Uribe *pro bono*. Pleased provide a copy of the
    writing containing your scope of representation of Mr. Uribe.  Please refer to Rule 42,
    ER 1.5(b), Ariz.R.Sup.Ct.

    **Response:**
    The scope and the *pro bono* nature of the representation was communicated to the Mr.
    Uribe in writing as required by ER 1.5(b).   The scope of representation was the
    defense and counterclaim in the adversary proceeding 2:07 –ap– 00341-GBN.

    The written fee agreement was lost in a catastrophic fire at my home on July 29, 2008.

8.  Please clarify your relationship with Mr. Kummer and whether you represent him in
    any capacity.

    **Response:**
    My relationship with Mr. Kummer is social and, sometimes, business and legal.

9.  Please clarify why Mr. Gatyas left AR Utilities.

    **Response:**
    My understanding why Mr. Gatyas left AR Utilities was that he, as the company
    bookkeeper, discovered that Mr. Reynoso and ARUSI were (i) defrauding their
    insurance company; (ii) defrauding the bankruptcy court, and (iii) defrauding the
    domestic relations court.  Mr. Gatyas wanted no part of Mr. Reynoso's and ARUSI's
    frauds and chose to leave the company.

Please feel free to contact me with any additional queries.

                                        Sincerely,

                                        Peter Strojnik

PS: pjs
Encls. *as indicated*

---

[1] **Comment**

**General Principles**

[1] Loyalty and independent judgment are essential elements in the lawyer's relationship to a client.  Concurrent conflicts of interest can arise from the lawyer's responsibilities to another client, a former client or a third person or from the lawyer's own interests.  For specific Rules regarding certain concurrent conflicts of interest, see ER 1.8.  For former client conflicts of interest, see ER 1.9.  For conflicts of interest involving prospective clients, see ER 1.18.  For definitions of "informed consent" and "confirmed in writing," see ER 1.0(e) and (b).

[2] Resolution of a conflict of interest problem under this Rule requires the lawyer to:  1) clearly identify the client or clients 2) determine whether a conflict of interest exists 3) decide whether the representation may be undertaken despite the existence of a conflict, i.e., whether the conflict is consentable and 4) if so, consult with the clients affected under paragraph (a) and obtain their informed consent, confirmed in writing.  The clients

affected under paragraph (a) include both of the clients referred to in paragraph (a)(1) and the one or more clients whose representation might be materially limited under paragraph (a)(2).

[3] A conflict of interest may exist before representation is undertaken, in which event the representation must be declined, unless the lawyer obtains the informed consent of each client under the conditions of paragraph (b). To determine whether a conflict of interest exists, a lawyer should adopt reasonable procedures, appropriate for the size and type of firm and practice, to determine in both litigation and nonlitigation matters the persons and issues involved. See also ER 5.1, Comment [2]. Ignorance caused by a failure to institute such procedures will not excuse a lawyer's violation of this Rule. As to whether a client-lawyer relationship exists or, having once been established, is continuing, see ER 1.3, Comment [4] and Scope.

[4] If a conflict arises after representation has been undertaken, the lawyer ordinarily must withdraw from the representation, unless the lawyer has obtained the informed consent of the client under the conditions of paragraph (b). See ER 1.16. Where more than one client is involved, whether the lawyer may continue to represent any of the clients is determined both by the lawyer's ability to comply with duties owed to the former client and by the lawyer's ability to represent adequately the remaining client or clients, given the lawyer's duties to the former client. See ER 1.9. See also Comments [5] and [28].

[5] Unforeseeable developments, such as changes in corporate and other organizational affiliations or the addition or realignment of parties in litigation, might create conflicts in the midst of a representation, as when a company sued by the lawyer on behalf of one client is bought by another client represented by the lawyer in an unrelated matter. In these circumstances, the lawyer may withdraw from one of the representations in order to avoid the conflict. The lawyer must seek court approval where necessary and take steps to minimize harm to the clients. See ER 1.16. The lawyer must continue to protect the confidences of the client from whose representation the lawyer has withdrawn. See ER 1.9(c).

### Identifying Conflicts of Interest: Directly Adverse

[6] Loyalty to a current client prohibits undertaking representation directly adverse to that client without that client's informed consent. Thus, absent consent, a lawyer may not act as an advocate in one matter against a person the lawyer represents in some other matter, even when the matters are wholly unrelated. The client as to whom the representation is directly adverse is likely to feel betrayed, and the resulting damage to the client-lawyer relationship is likely to impair the lawyer's ability to represent the client effectively. In addition, the client on whose behalf the adverse representation is undertaken reasonably may fear that the lawyer will pursue that client's case less effectively out of deference to the other client, i.e., that the representation may be materially limited by the lawyer's interest in retaining the current client. Similarly, a lawyer acts directly adversely to a client if it will be necessary for the lawyer to cross-examine a client who appears as a witness in a lawsuit involving another client. On the other hand, simultaneous representation in unrelated matters of clients whose interests are only economically adverse, such as representation of competing economic enterprises in unrelated litigation, does not ordinarily constitute a conflict of interest and thus may not require consent of the respective clients.

[7] Although directly adverse conflicts arise most frequently in litigation, they also arise in transactional matters. For example, if a lawyer is asked to represent a seller in negotiations with a buyer represented by the lawyer, not in the same transaction but in another, unrelated matter, the lawyer could not undertake the representation without the informed consent of each client.

### Identifying Conflicts of Interest: Material Limitation

[8] Even where there is no direct adverseness, a conflict of interest exists if there is a significant risk that a lawyer's ability to consider, recommend or carry out an appropriate course of action for the client will be materially limited as a result of the lawyer's other responsibilities or interests. For example, a lawyer asked to represent several individuals seeking to form a joint venture is likely to be materially limited in the lawyer's ability to recommend or advocate all possible positions that each might take because of the lawyer's duty of loyalty to the others. The conflict in effect forecloses alternatives that would otherwise be available to the client. The mere possibility of subsequent harm does not itself. The critical questions are the likelihood that a difference in interests will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or forecloses courses of action that reasonably should be pursued on behalf of the client.

### Lawyer's Responsibilities to Former Clients and Other Third Persons

[9] In addition to conflicts with other current clients, a lawyer's duties of loyalty and independence may be materially limited by responsibilities to former clients under ER 1.9 or by the lawyer's responsibilities to other persons, such as fiduciary duties arising from a lawyer's service as a trustee, executor or corporate director.

### Personal Interest Conflicts

[10] The lawyer's own interests should not be permitted to have an adverse effect on representation of a client. For example, if the probity of a lawyer's own conduct in a transaction is in serious question, it may be difficult or impossible for the lawyer to give a client detached advice. Similarly, a lawyer may not allow related business interests to affect representation, for example, by referring clients to an enterprise in which the lawyer has an undisclosed financial interest. See ER 1.8 for specific Rules pertaining to a number of personal interest conflicts, including business transactions with clients. See also ER 1.10 (personal interest conflicts under ER 1.7 ordinarily are not imputed to other lawyers in a law firm).

[11] When lawyers representing different clients in the same matter or in substantially related matters are closely related by blood or marriage, there may be a significant risk that client confidences will be revealed and that the lawyer's family relationship will interfere with both loyalty and independent professional judgment. As a result, each client is entitled to know of the existence and implications of the relationship between the lawyers before the lawyer agrees to undertake the representation. Thus, a lawyer related to another lawyer, e.g., as parent, child, sibling or spouse, ordinarily may not represent a client in a matter where that lawyer is representing another party, unless each client gives informed consent. The disqualification arising from a close family relationship is personal and ordinarily is not imputed to members of firms with whom the lawyers are associated. See ERs 1.8(i) and 1.10.

[12] A lawyer is prohibited from engaging in sexual relationships with a client unless the sexual relationship predates the formation of the client-lawyer relationship. See ER 1.8(j).

### Interest of Person Paying for Lawyer's Service

[13] A lawyer may be paid from a source other than the client, including a co-client, if the client is informed of that fact and consents and the arrangement does not compromise the lawyer's duty of loyalty or independent judgment to the client. See ER 1.8(f). If acceptance of the payment from any other source presents a significant risk that the lawyer's representation of the client will be materially limited by the lawyer's own interest in accommodating the person paying the lawyer's fee or by the lawyer's responsibilities to a payer who is also a co-client, then the lawyer must comply with the requirements of paragraph (b) before accepting the representation, including determining whether the conflict is consentable and, if so, that the client has adequate information about the material risks of the representation.

**Prohibited Representations**

[14] Ordinarily, clients may consent to representation notwithstanding a conflict. However, as indicated in paragraph, some conflicts are nonconsentable, meaning that the lawyer involved cannot properly ask for such agreement or provide representation on the basis of the client's consent. When the lawyer is representing more than one client, the question of consentability must be resolved as to each client.

[15] Consentability is typically determined by considering whether the interests of the clients will be adequately protected if the clients are permitted to give their informed consent to representation burdened by a conflict of interest. Thus, under paragraph (b)(1), representation is prohibited if in the circumstances the lawyer cannot reasonably conclude that the lawyer will be able to provide competent and diligent representation. See ER 1.1 (competence) and ER 1.3 (diligence). In determining whether a multiple-client conflict is consentable, one factor to be considered is whether the representation will be provided by a single lawyer or by different lawyers in the same firm.

[16] Paragraph (b)(2) describes conflicts that are nonconsentable because the representation is prohibited by applicable law. For example, in some states substantive law provides that the same lawyer may not represent more than one defendant in a capital case, even with the consent of the clients, and under federal criminal statutes certain representations by a former government lawyer are prohibited, despite the informed consent of the former client. In addition, decisional law in some states limits the ability of a client, such as a municipality, to consent to a conflict of interest.

[17] Paragraph (b)(3) describes conflicts that are nonconsentable because of the institutional interest in vigorous development of each client's position when the clients are aligned directly against each other in the same litigation or other proceeding before a tribunal. Whether clients are aligned directly against each other within the meaning of this paragraph requires examination of the context of the proceeding. Although this paragraph does not preclude a lawyer's multiple representation of adverse parties to a mediation (because mediation is not a proceeding before a "tribunal" under ER 1.0(m)), such representation may be precluded by paragraph (b)(1).

**Informed Consent**

[18] Informed consent requires that each affected client be aware of the relevant circumstances and of the material and reasonably foreseeable ways that the conflict could have adverse effects on the interests of that client. See ER 1.0(e) (informed consent). The information required depends on the nature of the conflict and the nature of the risks involved. When representation of multiple clients in a single matter is undertaken, the information must include the implications of the common representation, including possible effects on loyalty, confidentiality and the attorney-client privilege and the advantages and risks involved. See Comments [29] and [30] (effect of common representation on confidentiality).

[19] Under some circumstances it may be impossible to make the disclosure necessary to obtain consent. For example, when the lawyer represents different clients in related matters and one of the clients refuses to consent to the disclosure necessary to permit the other client to make an informed decision, the lawyer cannot properly ask the latter to consent. In some cases the alternative to common representation can be that each party may have to obtain separate representation with the possibility of incurring additional costs. The cost benefits of common representation may be considered by the affected client in determining whether common representation is in the client's interests.

**Consent Confirmed in Writing**

[20] Paragraph (b) requires the lawyer to obtain the informed consent of each client, confirmed in writing. Such a writing may consist of a document executed by the client or oral consent that the lawyer promptly records and transmits to the client. See ER 1.0(b). See also ER 1.0(n) (writing includes electronic transmission). If it is not feasible to obtain or transmit the writing at the time the client gives informed consent, then the lawyer must obtain or transmit it within a reasonable time thereafter. The requirement of a writing does not supplant the need in most cases for the lawyer to talk with the client, to explain the risks and advantages, if any, of representation burdened with a conflict of interest, as well as reasonably available alternatives, and to afford the client a reasonable opportunity to consider the risks and alternatives and to raise questions and concerns. Rather, the writing is required in order to impress upon clients the seriousness of the decision the client is being asked to make and to avoid disputes or ambiguities that might later occur in the absence of a writing. The writing need not take any particular form it should, however, include disclosure of the relevant circumstances and reasonably foreseeable risks of the conflict of interest, as well as the client's agreement to the representation despite such risks.

**Consent to Future Conflict**

[21] Whether a lawyer may properly request a client to waive conflicts that might arise in the future is subject to the test of paragraph (b). The effectiveness of such waivers is generally determined by the extent to which the client reasonably understands the material risks that the waiver entails. The more comprehensive the explanation of the types of future representations that might arise and the actual and reasonably foreseeable adverse consequences of those representations, the greater the likelihood that the client will have the requisite understanding. Thus, if the client agrees to consent to a particular type of conflict with which the client is already familiar, then the consent ordinarily will be effective with regard to that type of conflict. If the consent is general and open-ended, then the consent ordinarily will be ineffective, because it is not reasonably likely that the client will have understood the material risks involved. On the other hand, if the client is an experienced user of the legal services involved and is reasonably informed regarding the risk that an unforeseen conflict may arise, such consent is more likely to be effective, particularly if the client is independently represented by other counsel in giving consent and the consent is limited to future conflicts unrelated to the subject of the representation. In any case, advance consent cannot be effective if the circumstances that materialize in the future are such as would make the conflict nonconsentable under paragraph (b).

**Conflicts in Litigation**

[22] Paragraph (b)(3) prohibits representation of opposing parties in the same litigation, regardless of the clients' consent. On the other hand, simultaneous representation of parties whose interests in litigation may conflict, such as co-plaintiffs or co-defendants, is governed by paragraph (a)(2). A conflict may exist by reason of substantial discrepancy in the parties' testimony, incompatibility in positions in relation to an opposing party or the fact that there are substantially different possibilities of settlement of the claims or liabilities in question. Such conflicts can arise in criminal cases as well as civil. The potential for conflict of interest in representing multiple defendants in a criminal case is so grave that ordinarily a lawyer should decline to represent more than one co-defendant. On the other hand, common representation of persons having similar interests in civil litigation is proper if the requirements of paragraph (b) are met.

[23] Ordinarily a lawyer may take inconsistent legal positions in different tribunals at different times on behalf of different clients. The mere fact that advocating a legal position on behalf of one client might create precedent adverse to the interests of a client represented by the lawyer in an unrelated matter does not create a conflict of interest. A conflict of interest exists, however, if there is a significant risk that a lawyer's action on behalf of one client will materially limit the lawyer's effectiveness in representing another client in a different case for example, when a decision favoring one client will create a precedent likely to seriously weaken the position taken on behalf of the other client. Factors relevant in determining whether the clients need to be advised of the risk include: where the cases are pending, whether the issue is substantive or procedural, the temporal relationship between the matters, the significance of the issue to the immediate and long-term interests of the clients involved and the clients' reasonable expectations in retaining the lawyer. If there is significant risk of material limitation, then absent informed consent of the affected clients, the lawyer must refuse one of the representations or withdraw from one or both matters.

[24] When a lawyer represents or seeks to represent a class of plaintiffs or defendants in a class-action lawsuit, unnamed members of the class are ordinarily not considered to be clients of the lawyer for purposes of applying paragraph (a)(1) of this Rule. Thus, the lawyer does not typically need to get the consent of such a person before representing a client suing the person in an unrelated matter. Similarly, a lawyer seeking to represent an opponent in a class action does not typically need the consent of an unnamed member of the class whom the lawyer represents in an unrelated matter.

**Nonlitigation Conflicts**

[25] Conflicts of interest under paragraphs (a)(1) and (a)(2) arise in contexts other than litigation. For a discussion of directly adverse conflicts in transactional matters, see Comment [7]. Relevant factors in determining whether there is significant potential for material limitation include the duration and intimacy of the lawyer's relationship with the client or clients involved, the functions being performed by the lawyer, the likelihood that disagreements will arise and the likely prejudice to the client from the conflict. The question is often one of proximity and degree. See Comment [8].

[26] For example, conflict questions may arise in estate planning and estate administration. A lawyer may be called upon to prepare wills for several family members, such as husband and wife, and, depending upon the circumstances, a conflict of interest may be present, as when one spouse owns significantly more property than the other or has children by a prior marriage. In estate administration the identity of the client may be unclear under the law of a particular jurisdiction. Under one view, the lawyer is the fiduciary under another view, the client is the estate or trust, including its beneficiaries. In order to comply with conflict of interest rules, the lawyer should make clear the lawyer's relationship to the parties involved.

[27] Whether a conflict is consentable depends on the circumstances. For example, a lawyer may not represent multiple parties to a negotiation whose interests are fundamentally antagonistic to each other, but common representation is permissible where the clients are generally aligned in interest even though there is some difference of interest among them. Thus, a lawyer may seek to establish or adjust a relationship between clients on an amicable and mutually advantageous basis for example, in helping to organize a business in which two or more clients are entrepreneurs, working out the financial reorganization of an enterprise in which two or more clients have an interest or arranging a property distribution in settlement of an estate. The lawyer seeks to resolve potentially adverse interests by developing the parties' mutual interests. Otherwise, each party might have to obtain separate representation, with the possibility of incurring additional cost, complication or even litigation. Given these and other relevant factors, the clients may prefer that the lawyer act for all of them.

**Special Considerations in Common Representation**

[28] In considering whether to represent multiple clients in the same matter, a lawyer should be mindful that if the common representation fails because the potentially adverse interests cannot be reconciled, the result can be additional cost, embarrassment and recrimination. Ordinarily, the lawyer will be forced to withdraw from representing all of the clients if the common representation fails. In some situations, the risk of failure is so great that multiple representation is plainly impossible. For example, a lawyer cannot undertake common representation of clients where contentious litigation or negotiations between them are imminent or contemplated. Moreover, because the lawyer is required to be impartial between commonly represented clients, representation of multiple clients is improper when it is unlikely that impartiality can be maintained. Generally, if the relationship between the parties has already assumed antagonism, the possibility that the clients' interests can be adequately served by common representation is not very good. Other relevant factors are whether the lawyer subsequently will represent both parties on a continuing basis and whether the situation involves creating or terminating a relationship between the parties.

[29] A particularly important factor in determining the appropriateness of common representation is the effect on client-lawyer confidentiality and the attorney-client privilege. With regard to the attorney-client privilege, the prevailing rule is that, as between commonly represented clients, the privilege does not attach. Hence, it must be assumed that if litigation eventuates between the clients, the privilege will not protect any such communications, and the clients should be so advised.

[30] As to the duty of confidentiality, continued common representation will almost certainly be inadequate if one client attempts to keep something in confidence between the lawyer and that client, which is not to be disclosed to the other client. This is so because the lawyer has an equal duty of loyalty to each client, and each client has the right to be informed of anything bearing on the representation that might affect that client's interests and the right to expect that the lawyer will use that information to that client's benefit. See ER 1.4. The lawyer should, at the outset of the common representation and as part of the process of obtaining each client's informed consent, advise each client that information will be shared and that the lawyer will have to withdraw if one client decides that some matter material to the representation should be kept from the other. In limited circumstances, it may be appropriate for the lawyer to proceed with the representation when the clients have agreed, after being properly informed, that the lawyer will keep certain information confidential. For example, the lawyer may reasonably conclude that failure to disclose one client's trade secrets to another client will not adversely affect representation involving a joint venture between the clients and agree to keep that information confidential with the informed consent of both clients.

[31] When seeking to establish or adjust a relationship between clients, the lawyer should make clear that the lawyer's role is not that of partisanship normally expected in other circumstances and, thus, that the clients may be required to assume greater responsibility for decisions than when each client is separately represented. Any limitations on the scope of the representation made necessary as a result of the common representation should be fully explained to the clients at the outset of the representation. See ER 1.2(c).

[32] Subject to the above limitations, each client in the common representation has the right to loyal and diligent representation and the protection of ER 1.9 concerning the obligations to a former client. The client also has the right to discharge the lawyer as stated in ER 1.16.

**Organizational Clients**

[33] A lawyer who represents a corporation or other organization does not, by virtue of that representation, necessarily represent any constituent or affiliated organization, such as a parent or subsidiary. See ER 1.13(a). Thus, the lawyer for an organization is not barred from accepting representation adverse to an affiliate in an unrelated matter, unless the circumstances are such that the lawyer will avoid representation adverse to the client's affiliates, or the lawyer's obligations to either the organizational client or the new client are likely to limit materially the lawyer's representation of the other client.

[34] A lawyer for a corporation or other organization who is also a member of its board of directors should determine whether the responsibilities of the two roles may conflict. The lawyer may be called on to advise the corporation in matters involving actions of the directors. Consideration should be given to the frequency with which such situations may arise, the potential intensity of the conflict, the effect of the lawyer's resignation from the board and the possibility of the corporation's obtaining legal advice from another lawyer in such situations. If there is material risk that the dual role will compromise the lawyer's independence of professional judgment, the lawyer should not serve as a director or should cease to act as the corporation's lawyer when conflicts of interest arise. The lawyer should advise the other members of the board that in some circumstances matters discussed at board meetings while the lawyer is present in the capacity of director might not be protected by the attorney-client privilege and that conflict of interest considerations might require the lawyer's recusal as a director or might require the lawyer and the lawyer's firm to decline representation of the corporation in a matter.

ᵇ **Comment**

**Business Transactions Between Client and Lawyer**

[1] A lawyer's legal skill and training, together with the relationship of trust and confidence between lawyer and client, create the possibility of overreaching when the lawyer participates in a business, property or financial transaction with a client, for example, a loan or sales transaction or a lawyer investment on behalf of a client. The requirements of paragraph (a) must be met even when the transaction is not closely related to the subject matter of the representation, as when a lawyer drafting a will for a client learns that the client needs money for unrelated expenses and offers to make a loan to the client. The Rule applies to lawyers engaged in the sale of goods or services related to the practice of law, for example, the sale of title insurance or investment services to existing clients of the lawyer's legal practice. See ER 5.7. It also applies to lawyers purchasing property from estates they represent. It does not apply to ordinary fee arrangements between client and lawyer, which are governed by ER 1.5, although its requirements must be met when the lawyer accepts an interest in the client's business or other nonmonetary property as payment of all or part of a fee. In addition, the Rule does not apply to standard commercial transactions between the lawyer and the client for products or services that the client generally markets to others, for example, banking or brokerage services, medical services, products manufactured or distributed by the client, and utilities services. In such transactions, the lawyer has no advantage in dealing with the client, and the restrictions in paragraph (a) are unnecessary and impracticable.

[2] Paragraph (a)(1) requires that the transaction itself be fair to the client and that its essential terms be communicated to the client, in writing, in a manner that can be reasonably understood. Paragraph (a)(2) requires that the client also be advised, in writing, of the desirability of seeking the advice of independent legal counsel. It also requires that the client be given a reasonable opportunity to obtain such advice. Paragraph (a)(3) requires that the lawyer obtain the client's informed consent, in a writing signed by the client, both to the essential terms of the transaction and to the lawyer's role. When necessary, the lawyer should discuss both the material risks of the proposed transaction, including any risk presented by the lawyer's involvement, and the existence of reasonably available alternatives and should explain why the advice of independent legal counsel is desirable. See ER 1.0(e) (definition of informed consent).

[3] The risk to a client is greatest when the client expects the lawyer to represent the client in the transaction itself or when the lawyer's financial interest otherwise poses a significant risk that the lawyer's representation of the client will be materially limited by the lawyer's financial interest in the transaction. Here the lawyer's role requires that the lawyer must comply, not only with the requirements of paragraph (a), but also with the requirements of ER 1.7. Under that Rule, the lawyer must disclose the risks associated with the lawyer's dual role as both legal adviser and participant in the transaction, such as the risk that the lawyer will structure the transaction or give legal advice in a way that favors the lawyer's interests at the expense of the client. Moreover, the lawyer must obtain the client's informed consent. In some cases, the lawyer's interest may be such that ER 1.7 will preclude the lawyer from seeking the client's consent to the transaction.

[4] If the client is independently represented in the transaction, paragraph (a)(2) of this Rule is inapplicable, and the paragraph (a)(1) requirement for full disclosure is satisfied either by a written disclosure by the lawyer involved in the transaction or by the client's independent counsel. The fact that the client was independently represented in the transaction is relevant in determining whether the agreement was fair and reasonable to the client as paragraph (a)(1) further requires.

# Exhibit 7




# STATE BAR OF ARIZONA

Assistant's Direct Dial 602-340-7241

June 30, 2009

**Personal and Confidential**

Peter Strojnik
Attorney at Law
3030 N. Central Ave., Suite 1401
Phoenix, Arizona 85012-2720

Re:     File No. 09-0314
        William R. Richardson, Complainant

Dear Mr. Strojnik:

The State Bar is continuing to investigate this matter and should have a final determination in the near future. In order to complete our evaluation of the case, we require additional information.

In your response dated June 23, 2009, you stated that your fee agreement with Mr. Uribe was destroyed in a fire. Please provide a copy of the police report, or other similar report, documenting the fire. In addition, please provide Mr. Uribe's contact information. Further, please provide a copy of the written consent waiver required for Mr. Uribe's representation pursuant to Rule 42, ER 1.9(b), Ariz.R.Sup.Ct.

The first entry of your billing records to AR Utilities includes a 2.8-hour charge addressing the merger between AR Utilities and Binary Mass Propulsion Systems, dated May 9, 2005. It therefore appears that AR Utilities was your client at the time of this merger. Please disclose any financial benefit you received during the merger. Additionally, please provide a copy of the written consent waiver required pursuant to Rule 42, ER 1.8(a), Ariz.R.Sup.Ct.

In his Motion to Disqualify Attorney, dated August 15, 2007, Mr. Dake alleges that you are a member of CSK Consulting, and were acting as such a member at the time you drafted the May 12, 2005 agreement between CSK Consulting and AR Utilities.

1.  Please respond to Mr. Dake's claim.

2.  If you are or were a member of CSK Consulting, please explain your membership status in the partnership.

3.  If you are or were a member of CSK Consulting at the time you drafted the May 12, 2005 agreement between CSK Consulting and AR Utilities, please provide a copy of the written informed consent waiver required by Rule 42, ER 1.8(a), Ariz.R.Sup.Ct.

Peter Strojnik, Esquire
June 30, 2009
Page 2

Included in Mr. Richardson's initial complaint against you, dated February 19, 2009, is an agreement between yourself, Niaski Environmental, MCC Technology, and Mr. Uribe, dated July 31, 2005, where you agree to help Mr. Uribe "bring current" the maintenance payments of two patents and the each of the two companies in exchange for a 49% interest in the two companies. Though the agreement does advise Mr. Uribe and the two corporations to consult independent counsel, the agreement does not otherwise meet the required disclosures pursuant to Rule 42, ER 1.8(a), Ariz.R.Sup.Ct.

1. Please advise if another writing was used to comply with Rule 42, ER 1.8(a), Ariz.R.Sup.Ct. and, if so, please provide a copy of the writing.

2. Please clarify whether you also obtained any interest in the two patents as a result of the agreement.

Please provide this information <u>no later than July 10, 2009</u>. **Failure to provide the above requested information by the requested deadline can, in and of itself, be grounds for discipline pursuant to Rule 42, ER 8.1(b), and Rules 53(d) and (f), Ariz.R.Sup.Ct.** If you have any questions, please feel free to contact me at 602-340-7241. Thank you in advance for your assistance in this matter.

Sincerely,

Russell J. Anderson
Staff Bar Counsel

RJA/cam

# Exhibit 8

Peter Strojnik                          Page 1                                    7/6/2009



THE LAW FIRM OF
# PETER STROJNIK
ATTORNEY AT LAW

July 6, 2009

Russell J. Anderson, Esq.
Staff Bar Counsel
4201 N. 24ᵗʰ Street, Suite 200
Phoenix, Arizona 85016-6288

     Re:    File No. 09-0314
              William R. Richardson, Complainant

Dear Mr. Anderson:

In your letter dated June 30, 2009, you request a copy of the police report evidencing the fire. I attach a copy of the fire department report for your file. I also attach a copy of the estimate of repairs of the home in the amount of $1,204,881.01. I am, frankly, quite preoccupied with this loss at the present time.

I note that your latest correspondence shifts the focus to my relationship with Mr. Uribe. Have you received a complaint from Mr. Uribe that has not been shared with me? If so, it would be supportive if you would send me a copy. Are there any credible indications that I have failed to follow any particular ER in my relationship with Mr. Uribe? I do not have any information indicating that there was any possible, potential or imagined violation of the ER's based on my relationship with Mr. Uribe.

You request that I provide you with Mr. Uribe's contact information. I attempted to solicit Mr. Uribe's consent to provide you with the information you requested. Unfortunately, Mr. Uribe views this information as confidential and private; therefore, he has declined to give me the authority to disseminate this information to you. See attached.

The remaining comments relate to your numbered paragraphs on page 1 of your letter:

RECEIVED

JUL 0 7 2009

STATE BAR OF ARIZONA
LAWYER REGULATION

3030 NORTH CENTRAL AVENUE · SUITE 1401 – PHOENIX · ARIZONA · 85012-2712
TEL: 602.297.3019 – FAX: 602.296.0135 – CELL: 602.524.6602 – EMAIL: STROJNIK@AOL.COM
WEBSITE: WWW.STROJNIK.COM

Peter Strojnik                          Page 2                                    7/6/2009

1. I have no comment on Mr. Dake's claim other than previously disclosed. I provided my best memory of the events in my response to bullet point number 2 in my 05-23-09 correspondence. I stated:

> **Response:**
> CSK was a consulting group consisting of Raymond Cabreja and Thomas Kummer. It was retained by AR Utilities to assist the company in its restructuring and financing efforts. The relationship between CSK and ARUSI was negotiated between Messrs. Cabreja and Kummer on one hand and Mr. Reynoso on the other. I prepared the paperwork at the direction of Messrs. Reynoso, Cabreja and Kummer.

I have no additional information.

2. Please refer to my response to your bullet point #2 above.

3. Please refer to my response to your bullet point #2 above.

With respect to the agreement you reference in your first paragraph on page 2, you may be assured that all formalities were fully performed as required by the ER's. At present, I do not remember what the patents were, where they are, who owns them or what happened to them.

If you have any questions relating to your investigation, do not hesitate to call on me.

Sincerely,

Peter Strojnik

PS: pjs
Encls:
   1. FD Report
   2. Mendelhsohn Letter
   3. Uribe e-mail

# Exhibit 9



Assistant's Direct Dial: (602) 340-7244

August 18, 2009

**Personal and Confidential**

Peter Strojnik
Peter Strojnik, PC
3030 N. Central Avenue, Suite 1401
Phoenix, Arizona 85012-2720

Re:    File No. 09-1451
       Jack San Felice, Complainant

Dear Mr. Strojnik:

Information concerning your professional conduct has come to the attention of the State Bar. Rule 51(b)(1), Ariz. R. Sup. Ct. requires Bar Counsel to investigate all information coming to the attention of the State Bar that, if true, would be grounds for discipline. This includes information from any source, whether or not they were a party to the underlying action or conduct. There is no standing requirement to submit information or initiate a disciplinary charge.

At this point, the matter is not considered a formal complaint, but rather a "bar charge" that is being investigated through a "screening investigation." Your participation in the screening investigation is extremely important, as Bar Counsel will make a recommendation at the end of the investigation as to whether the matter should be dismissed, resolved via informal means, or referred for formal disciplinary action. Pursuant to ER 8.1(b) and Rule 53(d) & (f), Ariz. R. Sup. Ct., you have a duty to cooperate with this investigation. Failure to fully and honestly respond to, or cooperate with, the investigation is, in itself, grounds for discipline. I also refer you to Rule 48(g) Ariz. R. Sup. Ct. regarding non-abatement in disciplinary matters.

A copy of the information received by the State Bar has been included with this letter. Please submit a written response to the enclosed information, directed to my office, within 20 days of the date of this letter. Do not send your response or a copy of your response directly to the Complainant. If you cannot file a timely response, you should contact my office immediately. Please also include the above-referenced file number on all correspondence concerning this matter. You must submit **an original and one copy** of your written response. If you do not submit a copy with your response you will be charged $.20 per page for copying your response.

The ethical rules that should be addressed in your response include, but are not limited to: 1.7 and 8.4(d).

Peter Strojnik
August 18, 2009
Page 2

A copy of your response will be sent to the Complainant and will become public record upon disposition of the matter. You may make a request that certain information in your response remain confidential pursuant to Rule 70(g) Ariz. R. Sup. Ct. **Any such request must be made in a letter separate from your response** and must set forth the factual and legal basis therefore. You must specify whether you want to keep the information from the public, but not the complainant, or from both the public and the complainant. At the time you make such a request, you must submit the information for which confidentiality is requested as part of your request. You should also submit a redacted copy to remain in the public portion of the file, as the rules require some type of response to remain in the public portion of the file. Requests for confidentiality are only granted sparingly and only upon good cause shown. If your request for confidentiality is denied, the information or documents in question will not be returned to you, but will become public upon disposition of the matter.

The State Bar has a diversion program that, in some cases, may provide an alternative to traditional discipline. Diversion is a rehabilitative program available to lawyers whose ethical misconduct is of a non-serious nature and who may benefit from one or more of the State Bar's remedial programs, such as the Member Assistance Program (MAP) or the Law Office Management Assistance Program (LOMAP). Diversion is not available in cases of serious misconduct or for conduct involving dishonesty, self-dealing, or breach of a fiduciary duty. Participation in diversion is voluntary. If you would like more information about the State Bar's diversion program, you may review the Diversion Guidelines on-line at:
http://www.myazbar.org/LawyerRegulation/DiversionGuidelines2004.pdf or you may request a hard copy by contacting me at the number above. If, after reviewing the guidelines, you believe your case may qualify for diversion, please submit a written request with a statement of why you believe diversion is appropriate along with your response.

Thank you for your anticipated cooperation.

Sincerely,

Harriet M. Bernick
Staff Bar Counsel

HMB/myb

Enclosure