# Exhibit 10

THE LAW FIRM OF

# PETER STROJNIK
A T T O R N E Y   A T   L A W

August 31, 2009

Harriett M. Bernick, Esq.
Staff Bar Counsel
4201 N. 24th Street, Suite 200
Phoenix, Arizona 85016-6288

        Re:    File No. 09-1451
               Jack San Felice, Complainant

Dear Ms. Bernick:

This responds to your letter dated August 18, 2009. Since I am not certain where this matter is leading, I will respond to it in two sections:   I. Case History and II. Disqualification of Counsel.

## I.
## CASE HISTORY

1. Jack San Felice is a retired Police Captain from a 30-year career in law enforcement in Prince George's County, Maryland, and Washington, DC. He is the author of the 2006 authoritative book on the Silver King Mine titled *When Silver Was King -- Arizona's Famous 1880's Silver King Mine.*

2. The El Medico 2052 Mining Claim is a 20 acre ± mining claim located near Superior, Arizona; it is commonly referred to as the Silver King Mine.

3. San Felice is a member of the Silver King Mining Company of Arizona, LLC. ("SKM")

4. In early 2006, Richard Campbell and Dr. Hans Hüning entered discussions with San Felice, his partner Ron Deen and SKM regarding a possible investment in the Silver King Mine.

5. During the investment discussions, San Felice held himself out as the Chief Executive Officer of SKM. For example:

RECEIVED
SEP 0 1 2009
STATE BAR OF ARIZONA
LAWYER REGULATION

3030 NORTH CENTRAL AVENUE - SUITE 1401 - PHOENIX - ARIZONA - 85012-2712
TEL: 602.297.3019 - FAX: 602.296.0135 - CELL: 602.524.6602 - EMAIL: STROJNIK@AOL.COM
WEBSITE: WWW.STROJNIK.COM

A. In the June 5, 2006 Letter of Intent San Felice represented himself as:

Silver King Mining Company of Arizona

By: *[signature]*

Title: *[signature]*

B. In the June 5, 2006, Letter of Intent One Page Summary, San Felice held himself out as:

*[signature]*

Jack San Felice, CEO Silver King Mining Co. of Arizona

6. During the investment discussions, San Felice as the CEO of SKM represented that the Silver King Mine was owned by SKM.

7. In the Letter of Intent signed on June 5, 2006, San Felice as the CEO of SKM made the following material statement of fact:

> 2) **Silver King** owns mining rights and properties in the State of Arizona, including a mine commonly known as the "El Medico" mining claim.

8. In the Joint Venture Agreement dated August 22, 2006, Deen on behalf of SKM, made the following material statement of fact:

> WHEREAS, Silver King owns a working precious metals mine and a known precious metals ore body in the environs of Superior, Arizona, commonly known as the Silver King Mine and the El Medico mining claims and operations ("Mining Operations").
>
> ***
>
> m) "**Silver King Mine**" shall mean the Silver King Mine, the Mining Operations and the Unexplored Ore Bodies owned by Silver King in the environs of Superior, Arizona.
>
> n) "**Unexplored Ore Bodies**" shall mean the ore or ores to which Silver King or its Affiliates has(ve) mining rights, located in the area of Superior, Arizona, consisting of 20 acres, more or less.

9. Throughout the investment discussions with Mr. Campbell and Dr. Hüning, San Felice held himself out as having superior knowledge of the Silver King Mine. As proof of his superior knowledge, San Felice referenced a book titled *When Silver Was King, Arizona's Famous 1880's Silver King Mine*, a 371 page volume authored by San Felice describing the Silver King Mine.

Peter Strojnik                                   Page 3                                   8/31/2009

10. During the investment discussions between the representatives of Defendant SKM and Mr. Campbell and Dr. Hüning, San Felice, Deen and SKM made representations that Silver King Mine contained 62,000,000+ ounces of silver valued at $900,000,000.00.

11. In its Executive Summary 2006, prepared by San Felice and Deen in contemplation of nationwide marketing of the Silver King Mine, they made the following material statement of fact:

> ***Value Proposition:*** Based on published historical information found from old mine records, charts and underground maps that have been located, it was estimated that the mine ore body is 80 feet buy 300 feet wide and goes downward 700 plus feet. This would mean that there is 16.8 million cubic feet of ore down to the 700-foot level. It is calculated that 13 cubic feet equal a ton of ore. The ore body of the Silver King Mine before any mining of ore was determined to be 1,292,307 tons. Reviewing mine records and other official reports, it was determined that 510,700 cubic feet or 39,284 tons of ore was removed from the mine during the 1870s and 1880s until it was closed. There is still a reserve of 1,253,023 tons of ore left in the mine. At 50 ounces of silver per ton of ore mined, using 1,292,307 tons left in reserve at today's spot price of $6.00 per ounce, there would be a potential cash value reserve of $387,692,100 dollars.  (Note: as of 5-11-06 the spot price of silver per ounce was about $15 per ounce. The potential cash reserve would change to about $900 million.) This cash value will change upon the daily spot price of silver and the quantities of silver that come from high grade or low-grade ore found in the mine. The cash value does not include any income from any other precious metals (like gold, which is contained in the mine also) that would be mined from the site.

12. The Executive Summary 2006, was offered by San Felice on behalf of SKM as inducement for Mr. Campbell and Dr. Hüning to invest in the Silver King Mine.

13. The Executive Summary 2006 makes a representation of material fact that the Silver King Mine is owned by the Deen family:

> ***The Company:*** Silver King of Arizona Mining, L.L.C., was formed in 1996 to mine, process and refine precious metals, principally silver.  The Company was founded by the Deen family, who are the current owners of the El Medico Claim to the Silver King Mine. Over the years the Deen's

14. On May 12, 2006, San Felice, Deen and SKM issued a Summary of Costs to Reopen the Mine which projected the income as follows:

Peter Strojnik                          Page 4                          8/31/2009

## Silver King Mine, Superior / Arizona

| | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 |
|---|---|---|---|---|---|
| **Gross Income (silver only @ $ 10/oz)** | | | | | |
| 1.) 500 t highgrade ore ( already mined and being stored underground on the 117 foot level) silver content 1000 oz/t = $ 10000/t | 5t | 500000 | 1000000 | 1000000 | 1000000 |
| 2.) Re-processing of old dump/tailings on site: Silver content t 2o oz/t = $ 200/ t | 100000 | 200000 | 200000 | 200000 | 200000 |
| 3.) New Undergroun Mining silver content 50 oz/t = $ 500/t | | 100000 | 200000 | 200000 | 300000 |
| | 100000 | 800000 | 1400000 | 1400000 | 1500000 |
| less: Cost of Operation (details see enclosed list) | -96400 | -65900 | -55700 | -75700 | -76400 |
| less: Refining Costs 25% of market value | -25000 | -200000 | -350000 | -350000 | -375000 |
| Net Income (before taxes) of the Silver King Mine | -21400 | 534100 | 994300 | 974300 | 1048600 |

| Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 | Total |
|---|---|---|---|---|---|---|---|
| 1000000 | 500000 | | | | | | 5000000 |
| 200000 | 200000 | 200000 | 100000 | | | | 1600000 |
| 300000 | 400000 | 600000 | 600000 | 800000 | 800000 | 800000 | 5100000 |
| 1500000 | 1100000 | 800000 | 700000 | 800000 | 800000 | 800000 | 11700000 |
| -76700 | -63900 | -76700 | -63200 | -76400 | -75700 | -76400 | -877100 |
| -375000 | -275000 | -200000 | -175000 | -200000 | -200000 | -200000 | -2925000 |
| 1049300 | 761100 | 524300 | 461800 | 523600 | 524300 | 523600 | 7897900 |

15. The Summary of Costs to Reopen the Mine was offered by San Felice, Deen and SKM to Mr. Campbell and Dr. Hüning as inducement to invest funds into the Silver King Mine.

16. During investment discussions it was agreed that Dr. Hüning would attempt to obtain financing for the reopening of the Silver King Mine from certain Berlin, Germany investors.

17. Mr. Campbell and Dr. Hüning chose to organize a company named Arizona Precious Metals, Inc. ("APM") for the purpose of contracting with SKM.

18. On June 5, 2006, APM and SKM, entered into a letter of intent which provided, in relevant part:

> b) **APM's contribution** to NewCo shall be the costs of updating the El Medico/Silver King Mine to bring it to operational status.
>
> c) **SKM's contribution** to NewCo shall be the El Medico Mine and SKM's mining rights in Superior, Arizona.
>
> d) **The ownership of NewCo** will be 60% by APM and 40% by SKM.

19. APM entered into the Letter of Intent in reliance on verbal and written material representations of the fact referenced above.

20. In July of 2006, Dr. Hüning was meeting in Berlin with a Berlin Investor Group in order to secure financing. The July 11, 2006, meeting in Berlin was summarized as follows:

> **Meeting in Berlin on July 11, 2006:**
>
> between
> Mr. Karl-Heinz Rauball
> Access Gruppe ("Access")
> Heerstr. 24-26, D 14052 Berlin                          Tel. + 49-30-30209953
> and
> Mr. Dr. Hans (John) Huening                            Tel. + 49-1702406777
> Arizona Precious Metals LLC ("APM")
> 8686 West Morten Ave, Phoenix/Glendale, Arizona 85305
>                                                        Phone/Fax +1-623-7720376
> in the presence of
> Mr. Kurt Schaller,                                     Tel. +49-1734750593
> Sckellstr. 6, D 81667 Muenchen
> From the Access Gruppe, Kurt got a proposal as their Managing Director of their Department "Natural Resources and Renewable Energies"
>
> 1. The Access-Gruppe is ready, willing and able to finance APM's following projects and investment opportunities, described in the " Kurz-Info" (memo) dated June 25, 2006:
>    a) Silver King Mine ("SKM") at Superior, Arizona,
>    b) Black Sand Concentration und Zircon Production at Guinea/West Africa, of the American Guinea Mining Corporation ("AGMC") and
>    c) Golden Anvil S.A. de CV ("GA") at Tepic, Nayarit, Mexico, as well as
>    d) further projects to be determined and jointly selected
>
> 2. The agreed capital amounts to be financed are
>    Payable until August 15, 2006:        US $    500.000,00
>    Payable until December 2006            US $  1.500.000,00    $ 2.000.000
>    Access will do its best efforts to make, if possible, all payments either in whole or in partial amounts according to the payment schedule below prior to the above mentioned due dates.
>
> 3. The following payments have to be financed and the proposed payment schedule is
>    SKM:          immediately              US $    300.000,00
>                  until 09/30/2006         US $    200.000,00    $ 500.000
>    AGMC:         as soon as possible      US $    200.000,00
>                  4 weeks after 1st payment US $   200.000,00
>                  8 weeks after 1st payment US $   100.000,00    $ 500.000
>    Golden Anvil: immediately              US $    100.000,00

|  |  | until 09/30/2006 | US $ | 300,000.00 |  |  |
|--|--|------------------|------|-----------|--|--|
|  |  | until 12/31/2006 | US $ | 400,000.00 | $ | 800,000 |
|  | Working capital for APM: immediately | | US $ | 100,000.00 |  |  |
|  |  | until 09/30/2006 | US $ | 100,000.00 | $ | 200,000 |
|  |  |  |  |  |  | $2,000,000 |

At the discretion of the Board of APM the payment schedule above may be changed to accommodate the needs of the certain projects.

4. If needed by APM to get the extension from 07/20/06 until 08/15/2006 for the SKM investment option, Access will provide to APM a proof of availability of the capital.

5. For the capital supply of US$ 2,000,000 by Access Mr. Rauball and Mr. Schaller will receive 25 % ( twenty five percent) of all presently issued and outstanding shares of APM Arizona Precious Metals LLC, e.g. 2,500,000 shares of a total of 10,000,000 outstanding shares.

If Access only comes up with a part of that promised US$ 2,000,000, the afore mentioned percentage of 25% of the shares for Mr. Rauball and Mr. Schaller will be reduced proportionately.

Mr. Rauball and Mr. Schaller will split the received shares equally.

6. As soon as one or more of APM's investments become profitable, APM plans to get its shares listed on a recognized Stock Exchange. It is envisaged to have such a listing on the London Stock Exchange (AIM Market) with parallel listings in Frankfurt ( Kerb Market) and eventually in Dubai in the beginning of 2007.

Berlin, July 11, 2006

21. Based on the agreement reached in Berlin, Germany, on July 11, 2006, Richard Campbell secured an extension of the 06-05-06 Letter of Intent.

22. On July 29, 2006, Richard Campbell advised San Felice and SKM of Dr. Hüning's progress:

rcampbell@azpreciousmetals.com <rcampbell@azpreciousmetals.com>        Sat, Jul 29, 2006 at 6:51 PI
To: Jack San Felice <azjack212@yahoo.com>
Cc: John Huening <hhhuening@gmail.com>

Dear Jack,
I just received an email from John this afternoon, the Erste Rohstoff Beteiligungs KG" ("Access") is not in existence yet due to bureaucratic formelities with the "BAFIN" ( an agency similar to the SEC). They have now completed all the paperwork and the "ok" by the BAFIN has been verbally given and the written confirmation has to come into law within 10 days of last Friday . On 08/08/06 will be the formal incorporation of Access at the Notary Public in Berlin, and then all legal contracts can be signed, and the Access bank account opened, since they currently have a huge sum of money in accounts in both Germany and Switzerland waiting for transfers to be made! We will have a slight delay, as the different transfers take time. But the money should be in APM's account latest by 08/31/06. I will make sure that the insurance reclamation bond is in the works so that it won't cause any further consternation on the Forestry or the Insurance company. We are making excellent progress in all areas of bring this to fruition as soon as is humanly possible. Other than Monday what day is best for us to come to the mine? Regards, D PS when do I need to get you some $$$ for the night watchman?

23. On August 4, 2006, San Felice advised Mr. Campbell that one Bob Stambach is "an advisor of ours" and that it was OK to "to send him what he wants".

Peter Strojnik                    Page 7                    8/31/2009

Subject: Re: Bob Stambach
From:    "j s" <azjack212@yahoo.com>
Date:    Fri, August 4, 2006 10:08 pm
To:      rcampbell@azpreciousmetals.com

----------------------------------------------------

Dick

   Bob is an associate who is an advisor of ours. He is OK so send him what
he wants.

   Jack

rcampbell@azpreciousmetals.com wrote:
   Hi Jack,
   Just got an email from Bob, don't know why but if he is your attorney, I can
   send him the agreement by email. Let me know. He is in Glendale so if
   necessary we can meet. Regards, Dick

24. In or about July of 2006, APM's counsel, Peter Strojnik, began preparing the Joint
Venture Agreement that was circulated to Defendants Jack San Felice and SKM's
advisor, Bob Stambach. All - including San Felice – agreed that the documentation
was "most professional that [he] had seen in all [his] dealings with the Silver King
mine situation".

rcampbell@azpreciousmetals.com <rcampbell@azpreciousmetals.com>    Sun, Aug 6, 2006 at 2:04 PM
To: Jack San Felice <azjack212@yahoo.com>
Cc: John Huening <hhhuening@gmail.com>, Peter Strojnik <strojnik@aol.com>

Hi Jack,
Good to talk with you today. Good also to hear that there were very few
questions regarding the agreement and that it was the most professional
document that you all have seen in all your dealings with the Silver King
Mine situation. This is good news and shows our overall intent to deal with
you in a honest and straight forward manner. Besides all that, we do have
excellent corporate counsel who is also part of our company.

To confirm our situation with the payment to the Deens of the $250K that was
part of the LOI, and not in the agreement, we will provide you with an
additional document of our intent to provide the $250K to the Deens before
the end of the current year. I'll have our attorney put something together
for the Deens. We, as you know didn't want to include that in the actual
agreement. But, consider it done. Then let me know where they live, cause
I need to borrow some money!!! ha. Take care, Dick

25. Several days prior to August 22, 2006, in anticipation of entering the Joint Venture
Agreement by which SKM agreed to transfer the entire Silver King Mine into the
Joint Venture ("Silver King Contributions To The Joint Venture shall be ...The
rights, title and interest in and to the Silver King Mine and the Unexplored Ore
Bodies"), Richard Campbell and San Felice met at the Los Hermanos restaurant in
Superior, Arizona. At the meeting, San Felice asked Mr. Campbell to sign the
"grantee" line on a Quit Claim Deed so that San Felice could complete it and record
it with the Pinal County Recorder. Mr. Campbell signed the "grantee" line without
the remainder of the Quit Claim Deed completed. Defendant Jack San Felice advised
Mr. Campbell that he – Jack San Felice – would get the grantor signature and record
the Quit Claim Deed pursuant to the Joint Venture Agreement.

Peter Strojnik                    Page 8                              8/31/2009

26. On August 22, 2006, based on the agreement reached in Berlin on July 11, 2006, and the representations of material fact made by Defendants Jack San Felice, Ron Deen and SKM described above, APM entered into a Joint Venture Agreement with Silver King Mining Company of Arizona.

27. Pursuant to the Joint Venture Agreement, SKM agreed to make the following contributions:

    b) Silver King Contributions To The Joint Venture shall be:

        i) The rights, title and interest in and to the Silver King Mine and the Unexplored Ore Bodies.

        ii) The rights, title and interest to the Equipment listed in Exhibit "A".

28. Also on August 22, 2006, Deen executed a quit claim deed to 50% of the Silver King Mine to Richard Campbell individually; this Quit Claim Deed contains Mr. Campbell's signature from the meeting at the Los Hermanos restaurant in Superior, Arizona referenced above.

Peter Strojnik                    Page 9                         8/31/2009

29. The Quit Claim Deed was recorded on August 30, 2006, but the recorded document was returned to San Felice:



30. San Felice did not disclose or give a copy of the August 22, 2006, Quit Claim Deed to Mr. Campbell or to APM.  Mr. Campbell continuously inquired whether the Quit Claim Deed had been recorded, and requested on numerous occasions that Defendant Jack San Felice provide a copy of the Quit Claim Deed to the Joint Venture so that its files would be complete.  San Felice always responded that the matter had been taken care of and that the Silver King Mine had been transferred as agreed.

31. Richard Campbell did not see the Quit Claim Deed until mid July, 2007, when he was asked by APM's counsel about the August 22, 2006, QCD, and the April 18, 2007, Mining Quit Claim Deed, which had been discovered by APM's legal counsel.

32. On September 5, 2006, APM and Accept entered into a loan agreement.

33. On September 12, 2006, the JV Policy Committee met and issued minutes.

34. In October 2006, San Felice issued income projections for the first three years of operations:

| SILVER KING MINE Description | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Fees** | | | | | | | | | | | | |
| Federal Safety Requirements | $5,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Forest Services Bond | $25,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| De Watering Equipment | $25,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Timber for Shaft Rehab | $20,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Permits | $10,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Sub-total | $85,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Labor** | | | | | | | | | | | | |
| Working Mine Supervisors (1) | $4,200 | $4,200 | $4,200 | $4,200 | $4,200 | $4,200 | $4,200 | $4,200 | $4,200 | $4,200 | $4,200 | $4,200 |
| Working Mine Forman (1) | $4,200 | $4,200 | $4,200 | $4,200 | $4,200 | $4,200 | $4,200 | $4,200 | $4,200 | $4,200 | $4,200 | $4,200 |
| Miners (1) w/$400 per month | $17,000 | $17,000 | $20,400 | $23,800 | $27,200 | $27,600 | $27,600 | $27,600 | $27,600 | $27,600 | $27,600 | $27,600 |
| Security Guards (1) | $3,500 | $3,500 | $3,500 | $3,500 | $3,500 | $3,500 | $3,500 | $3,500 | $3,500 | $3,500 | $3,500 | $3,500 |
| Bookkeeper (1) | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 | $2,400 |
| Mine Manager (1) | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 |
| Officers (2) | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 |
| Sub-total | $47,800 | $47,550 | $50,750 | $54,100 | $54,100 | $54,100 | $57,500 | $57,500 | $57,500 | $57,600 | $57,600 | $57,600 |
| **Chemicals** | $0 | $1,000 | $1,000 | $1,000 | $1,500 | $1,500 | $1,500 | $2,000 | $3,000 | $3,000 | $3,000 | $3,000 |
| Fuel for Generators | $1,700 | $1,700 | $1,700 | $1,700 | $1,700 | $2,000 | $2,000 | $2,000 | $3,000 | $3,000 | $3,000 | $3,000 |
| Core Drilling | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 |
| Assay Reports | $500 | $500 | $500 | $750 | $750 | $750 | $750 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 |
| Environmental Testing | $700 | $700 | $700 | $700 | $700 | $700 | $700 | $700 | $700 | $700 | $700 | $700 |
| Equipment Maintance | $500 | $500 | $500 | $500 | $750 | $750 | $750 | $1,000 | $1,000 | $1,200 | $1,500 | $1,500 |
| Sub-total | $15,400 | $16,400 | $16,400 | $16,650 | $17,400 | $17,400 | $17,700 | $18,700 | $19,700 | $19,900 | $19,900 | $19,900 |
| **Total** | $147,700 | $63,700 | $67,100 | $67,100 | $71,500 | $71,500 | $74,900 | $76,200 | $76,900 | $77,400 | $77,400 | $77,400 |
| Cost of Operation | $245,100 | | | | | | | | | | | |
| **Gross Income** | | | | | | | | | | | | |
| Silver Ore at market .95 per oz | $0 | $100,000 | $200,000 | $300,000 | $400,000 | $400,000 | $400,000 | $600,000 | $600,000 | $800,000 | $800,000 | $800,000 |
| Total Income | $5,600,000 | | | | | | | | | | | |
| **Refining Fee** | | | | | | | | | | | | |
| 25% of market value | $0 | $25,000 | $50,000 | $75,000 | $100,000 | $100,000 | $100,000 | $150,000 | $150,000 | $200,000 | $200,000 | $200,000 |
| Total Refining Cost | $1,525,000 | | | | | | | | | | | |
| **Income** | ($147,700) | $11,300 | $82,900 | $82,950 | $228,500 | $228,500 | $225,100 | $373,800 | $373,800 | $522,600 | $522,600 | $522,600 |
| Net Income for the Year | $3,026,800 | | | | | | | | | | | |

Peter Strojnik                                    Page 10                                    8/31/2009

**SILVER KING MINE**

| Description | Month 13 | Month 14 | Month 15 | Month 16 | Month 17 | Month 18 | Month 19 | Month 20 | Month 21 | Month 22 | Month 23 | Month 24 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Fees** | | | | | | | | | | | | |
| Federal Safety Requirements | $5,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Forest Services Bond | $25,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Timber for Shaft Rehab | $10,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Permit Renewal | $2,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Sub-total | $42,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | |
| **Labor** | | | | | | | | | | | | |
| Working Mine Supervisors (1) | $4,300 | $4,300 | $4,300 | $4,300 | $4,300 | $4,300 | $4,300 | $4,300 | $4,300 | $4,300 | $4,300 | $4,300 |
| Working Mine Foreman (1) | $4,300 | $4,300 | $4,300 | $4,300 | $4,300 | $4,300 | $4,300 | $4,300 | $4,300 | $4,300 | $4,300 | $4,300 |
| Miners (1) @$3500 per month | $28,000 | $28,000 | $28,000 | $28,000 | $28,000 | $28,000 | $28,000 | $28,000 | $28,000 | $28,000 | $28,000 | $28,000 |
| Security Guards (1) | $2,600 | $2,600 | $2,600 | $2,600 | $2,600 | $2,600 | $2,600 | $2,600 | $2,600 | $2,600 | $2,600 | $2,600 |
| Bookkeeper (1) | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 |
| Mine Manager (1) | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 |
| Officers (2) | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 |
| Sub-total | $58,700 | $58,700 | $58,700 | $58,700 | $58,700 | $58,700 | $58,700 | $58,700 | $58,700 | $58,700 | $58,700 | $58,700 |
| | | | | | | | | | | | | |
| Chemicals | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 |
| Fuel for Generator | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 |
| Core Drilling | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 |
| Assay Reports | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 |
| Environmental Testing | $700 | $700 | $700 | $700 | $700 | $700 | $700 | $700 | $700 | $700 | $700 | $700 |
| Equipment Maintence | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 |
| Sub-total | $19,900 | 19900 | 19900 | 19900 | 19900 | 19900 | 19900 | 19900 | 19900 | 19900 | 19900 | 19900 |
| | | | | | | | | | | | | |
| Total | $120,600 | $78,600 | $78,600 | $78,600 | $78,600 | $78,600 | $78,600 | $78,600 | $78,600 | $78,600 | $78,600 | $78,600 |
| | | | | | | | | | | | | |
| Cost of Operation | $458,200 | | | | | | | | | | | |
| | | | | | | | | | | | | |
| **Gross Income** | | | | | | | | | | | | |
| Silver Ore at market $6 per oz | $800,000 | $800,000 | $800,000 | $800,000 | $800,000 | $800,000 | $800,000 | $800,000 | $800,000 | $800,000 | $800,000 | $800,000 |
| | | | | | | | | | | | | |
| Total Income | $9,600,000 | | | | | | | | | | | |
| | | | | | | | | | | | | |
| **Refining Fee** | | | | | | | | | | | | |
| 25% of market value | $200,000 | $200,000 | $200,000 | $200,000 | $200,000 | $200,000 | $200,000 | $200,000 | $200,000 | $200,000 | $200,000 | $200,000 |
| | | | | | | | | | | | | |
| Total Refining Cost | $2,400,000 | | | | | | | | | | | |
| | | | | | | | | | | | | |
| Income | $478,400 | $521,400 | $521,400 | $521,400 | $521,400 | $521,400 | $521,400 | $521,400 | $521,400 | $521,400 | $521,400 | $521,400 |
| | | | | | | | | | | | | |
| Net Income for the Year | $6,216,000 | | | | | | | | | | | |

**SILVER KING MINE**

| Description | Month 25 | Month 26 | Month 27 | Month 28 | Month 29 | Month 30 | Month 31 | Month 32 | Month 33 | Month 34 | Month 35 | Month 36 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Fees** | | | | | | | | | | | | |
| Federal Safety Requirements | $5,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Forest Services Bond | $25,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Timber for Shaft Rehab | $12,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Permit Renewal | $2,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Equipment Allowance | $200,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Sub-total | $244,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | |
| **Labor** | | | | | | | | | | | | |
| Working Mine Supervisors (1) | $4,400 | $4,400 | $4,400 | $4,400 | $4,400 | $4,400 | $4,400 | $4,400 | $4,400 | $4,400 | $4,400 | $4,400 |
| Working Mine Foreman (1) | $4,400 | $4,400 | $4,400 | $4,400 | $4,400 | $4,400 | $4,400 | $4,400 | $4,400 | $4,400 | $4,400 | $4,400 |
| Miners (1) @$3500 per month | $28,000 | $28,000 | $28,000 | $28,000 | $28,000 | $28,000 | $28,000 | $28,000 | $28,000 | $28,000 | $28,000 | $28,000 |
| Security Guards (1) | $2,700 | $2,700 | $2,700 | $2,700 | $2,700 | $2,700 | $2,700 | $2,700 | $2,700 | $2,700 | $2,700 | $2,700 |
| Bookkeeper (1) | $2,600 | $2,600 | $2,600 | $2,600 | $2,600 | $2,600 | $2,600 | $2,600 | $2,600 | $2,600 | $2,600 | $2,600 |
| Mine Manager (1) | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 |
| Officers (2) | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 |
| Sub-total | $59,100 | $59,100 | $59,100 | $59,100 | $59,100 | $59,100 | $59,100 | $59,100 | $59,100 | $59,100 | $59,100 | $59,100 |
| | | | | | | | | | | | | |
| Chemicals | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 |
| Fuel for Generators | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 |
| Core Drilling | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 | $12,000 |
| Assay Reports | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 |
| Environmental Testing | $700 | $700 | $700 | $700 | $700 | $700 | $700 | $700 | $700 | $700 | $700 | $700 |
| Equipment Maintence | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 |
| Sub-total | $19,900 | 19900 | 19900 | 19900 | 19900 | 19900 | 19900 | 19900 | 19900 | 19900 | 19900 | 19900 |
| | | | | | | | | | | | | |
| Total | $323,500 | $79,500 | $79,500 | $79,500 | $79,500 | $79,500 | $79,500 | $79,500 | $79,500 | $79,500 | $79,500 | $79,500 |
| | | | | | | | | | | | | |
| Cost of Operation | $1,201,600 | | | | | | | | | | | |
| | | | | | | | | | | | | |
| **Gross Income** | | | | | | | | | | | | |
| Silver Ore at market $6 per oz | $800,000 | $800,000 | $800,000 | $800,000 | $800,000 | $800,000 | $800,000 | $800,000 | $800,000 | $800,000 | $800,000 | $800,000 |
| | | | | | | | | | | | | |
| Total Income | $9,600,000 | | | | | | | | | | | |
| | | | | | | | | | | | | |
| **Refining Fee** | | | | | | | | | | | | |
| 25% of market value | $200,000 | $200,000 | $200,000 | $200,000 | $200,000 | $200,000 | $200,000 | $200,000 | $200,000 | $200,000 | $200,000 | $200,000 |
| | | | | | | | | | | | | |
| Total Refining Cost | $2,400,000 | | | | | | | | | | | |
| | | | | | | | | | | | | |
| Income | $276,500 | $520,500 | $520,500 | $520,500 | $520,500 | $520,500 | $520,500 | $520,500 | $520,500 | $520,500 | $520,500 | $520,500 |
| | | | | | | | | | | | | |
| Net Income for the Year | $5,998,400 | | | | | | | | | | | |

Peter Strojnik                          Page 11                              8/31/2009

35. On November 17, 2006, the United States Forest Service issued a Cease and Desist Order against the Silver King Mine, and demanded the payment of a remediation bond.

36. On November 21, 2006, San Felice authorized Mr. Campbell to handle the remediation bond matter.

**Silver King Mining Company**                                          **Ronald R. Deen**
A Limited Liability Corporation                                          Presiding Officer
Jack San Felice CEO                                                      56389 E. Simmons Way
6237 E. Mallory St.                                                      Kearny, AZ 85237
Mesa, AZ 85215                                                          520-363-5692
480-830-2727

November 21, 2006

Ms. Karyn B. Harbour
Forest Geologist
Tonto National Forest
2324 E. McDowell Rd.
Phoenix, AZ 85010

This letter authorizes Mr. Richard Campbell of the Arizona Precious Metals Company to act as a designated agent of the Silver King Mining Company, in order to execute the required documents and remit proper payment for the Reclamation Performance Bond in behalf of the Silver King Mine.

Sincerely,

*Jack San Felice*

Jack San Felice
CEO
Silver King Mine

Sincerely

37. Unfortunately, neither SKM, APM, the Joint Venture nor the Defendants had the money to pay the bond. Therefore, the Joint Venture approached Richard Campbell, Dr. Hüning and TCMS individually to try and obtain funds for the bond.

38. Richard Campbell, Dr. Hüning and TCMS were not willing to fund the bond individually unless the parties entered into a new agreement that would grant them an interest in the Joint Venture.

39. In order to raise the money necessary to pay the bond, Richard Campbell and his wife Sondra sought and obtained a loan in the amount of $107,000.00 from Ditech; the loan was secured by their personal residence.

40. TCMS secured funding for the additional $30,000.00.

41. On November 27, 2006, the parties entered into Agreement modifying the Joint Venture Agreement. The salient part of the 11-27-06 Agreement are:

Peter Strojnik           Page 12           8/31/2009

3) **FUNDING GROUP'S ACCEPTANCE INTO THE APM-SKM JV AND INTEREST IN THE APM – SKM JV:**

     a) Funding Group is hereby accepted as a new member of the APM-SKM JV.

     b) APM, SKM and the APM-SKM JV hereby amend Paragraph 7(a) of the APM – SKM JVA relating to the Joint Venture Interests as follows:

         i)    Silver King:        40%

         ii)    APM:            30%

         iii)   Funding Group:    30%

4) **REPAYMENT OF RECLAMATION BOND:**

     a) In the event that, on or prior to June 30, 2007, Accept or any other third party lender/financier/funding entity funds the operations of the Silver King Mine, then and in that event the first funding moneys from Accept or such other third party shall be used to repay to the Funding Group the $140,000.00 advanced by the Funding Group for the Reclamation Bond *and* the Previous Contributions by Campbell and Hüning, plus a 10%

         interest thereon; the interest of 10% shall be due irrespective of the actual repayment date.

     b) In the event that Accept or any other third party lender/financier/funding entity does not fund the operations of the Silver King Mine prior to June 30, 2007, and the $140,000 advanced by the Funding Group and the Previous Contributions are not repaid as contemplated in Paragraph 4(a) above, then APM shall forfeit all its interest in the JV. Contemporaneously with the forfeiture of the APM interest in the Joint Venture, the SKM's interest in the Joint Venture shall be increased to FIFTY FIVE PERCENT (55%) and the Funding Group's interest shall be increased to FORTY FIVE PERCENT (45%).

42. The November 27, 2006 Agreement was signed by all interested parties:

IN WITNESS WHEREOF, the Parties hereto have executed and delivered this Agreement, and it will be effective as of the Effective Date.

**SKM-APM JV**

_____
Richard Campbell
CEO and Executive Committee Member

_____
Jack San Felice
COO Executive Committee Member

_____
Hans Hüning
Executive Committee Member

**ARIZONA PRECIOUS METALS, INC.**

_____
Hans Hüning
CEO and Chairman of the Board
Authorized Representative

**SILVER KING MINING COMPANY OF ARIZONA, LLC**

_____
Jack San Felice
CEO and Authorized Representative

**FUNDING GROUP**

_____
T(MS) Investments, Inc.
Tanya Strojnik President

_____
Richard Campbell
Personally

_____
Hans Hüning
Personally

43. As agreed, the Funding Group made payment to the Forest Service.

Peter Strojnik                    Page 13                                    8/31/2009



44. On November 29, 2006, the Forest Service accepted the bond.

45. On January 2, 2007, Bob Stambach, Silver King Mining Company of Arizona's accountant, issued income projections:

| Description | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 | Annual |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income** | | | | | | | | | | | | | |
| Silver @ $12.00 per ounce | 0 | 200,000 | 400,000 | 400,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 7,000,000 |
| Copper | | | | | | | | | | | | | |
| Lead | | | | | | | | | | | | | |
| Gold | | | | | | | | | | | | | |
| Zinc | | | | | | | | | | | | | |
| Platinum | | | | | | | | | | | | | |
| Misc | | | | | | | | | | | | | |
| **Gross Income** | 0 | 200,000 | 400,000 | 400,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 7,000,000 |
| **Cost of Goods Sold** | | | | | | | | | | | | | |
| Wages | | | | | | | | | | | | | |
| Working Mine Supervisor | | | | | | | | | | | | | |
| Working Mine Foreman | | | | | | | | | | | | | |
| Miners | | | | | | | | | | | | | |
| Security Guard | | | | | | | | | | | | | |
| Mining Labor Sub-total | 32,000 | 32,000 | 32,000 | 35,700 | 39,100 | 39,100 | 83,000 | 83,000 | 83,000 | 83,000 | 83,000 | 83,000 | 707,900 |
| Financial | | | | | | | | | | | | | |
| Mine Manager | | | | | | | | | | | | | |
| Officers | | | | | | | | | | | | | |
| Operation Labor Sub-total | 13,000 | 13,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 166,000 |
| Insurance - WC | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 38,400 |
| Labor Sub-total | 48,200 | 48,200 | 49,200 | 52,900 | 56,300 | 56,300 | 100,200 | 100,200 | 100,200 | 100,200 | 100,200 | 100,200 | 912,300 |

Peter Strojnik                              Page 14                              8/31/2009

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Mining Expenses** | | | | | | | | | | | | | |
| Powder mag/C Container rents | 450 | | | | | | | | | | | | 450 |
| Chemicals | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 36,000 |
| Explosives | 6,000 | 7,000 | 7,000 | 7,000 | 10,600 | 10,600 | 10,600 | 10,600 | 10,600 | 10,600 | 10,600 | 10,600 | 111,000 |
| Core Drilling & Assaying | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 120,000 |
| Fuel - generator | 8,400 | 9,000 | 9,000 | 8,000 | 13,500 | 13,500 | 13,500 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 150,000 |
| Environmental testing | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 8,400 |
| Equipment Maintenance | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 24,000 |
| Refining expense | | | | | | | | | | | | | |
| **Mining Expenses Sub-total** | 30,550 | 31,700 | 31,700 | 31,700 | 39,700 | 39,700 | 39,700 | 41,200 | 41,200 | 41,200 | 41,200 | 41,200 | 450,750 |
| **Start Up Costs** | | | | | | | | | | | | | |
| Generator Rehab | 5,000 | | | | | | | | | | | | 5,000 |
| Shaker Table Rehab | 1,000 | | | | | | | | | | | | 1,000 |
| Equipment Rehab - General | 5,000 | | | | | | | | | | | | 5,000 |
| Timber for mine | 6,000 | | | | | | | | | | | | 6,000 |
| Water Purification System | 3,000 | | | | | | | | | | | | 3,000 |
| Mobile Office | 12,000 | | | | | | | | | | | | 12,000 |
| Laptop Computer & Phone Sys | 2,000 | | | | | | | | | | | | 2,000 |
| Misc start up expenses | 7,000 | 7,000 | 6,000 | | | | | | | | | | 20,000 |
| **Start Up Costs Sub-total** | 40,000 | 7,000 | 6,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 53,000 |
| **Fees, Permits, Training** | | | | | | | | | | | | | |
| MSHA Safety Training | 800 | | | | | | | | | | | | 800 |
| ADEQ Permits | 7,500 | | | | | | | | | | | | 7,500 |
| Small Miners Association Fee | 2,500 | | | | | | | | | | | | 2,500 |
| BATF & Pinal County Permits | 400 | | | | | | | | | | | | 400 |
| **Fees, Permits, Training Sub** | 11,200 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 11,200 |
| **Capital Expenses** | | | | | | | | | | | | | |
| Front End Loader | 12,000 | | | | | | | | | | | | 12,000 |
| Shaker Table (new unit) | 2,800 | | | | | | | | | | | | 2,800 |
| **Capital Expenses Sub-total** | 14,800 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 14,800 |
| **Operating Expenses** | | | | | | | | | | | | | |
| Insurance - Liability | 20,000 | | | | | | | | | | | | 20,000 |
| **Operating Expenses Sub-tot** | 20,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20,000 |
| **Total Expenses** | 184,750 | 88,900 | 88,900 | 84,600 | 98,000 | 98,000 | 139,900 | 141,400 | 141,400 | 141,400 | 141,400 | 141,400 | 1,482,050 |
| **Income/Loss** | -184,750 | 113,100 | 313,100 | 315,400 | 504,000 | 504,000 | 660,100 | 658,600 | 658,600 | 658,600 | 658,600 | 658,600 | 5,537,950 |

Notes: The following assumptions were made in developing these numbers -
Silver is at $12.00 per ounce
$2,000,000 is invested into the SKMJV the first twelve months of operations at the minimum rate of $500,000
    at the beginning of months 1, 4, 7 and 10
The mine will be operating two shifts with fifteen employees within three months of startup
Only silver is factored into the revenue due to the uncertainty at this point of the recovery of other metals
All assumptions are based upon rehab of the 114' and 256' levels and are subject to change as exploration
    and development of these two levels and levels below continue

46. On February 5, 2007, the Policy Committee of the JV held a meeting and issued minutes. The relevant part provided:

> The Committee discussed the intent of both APM and SKM to have the Silver King Mine succeed and open as quickly as possible, and that the success of the Mine dependent on the good faith of all parties. Upon Motion made, seconded, and the vote taken thereon, it was unanimously:

>> RESOLVED, that the terms of Paragraph 5 of the APM-SKM JV Agreement shall remain unchanged.

The Chairman thereafter brought up the question whether the confidentiality agreement existing between the parties to the APM-SKM JV prohibits any party from seeking funding from independent third sources. Following discussion, and upon Motion made, seconded, and the vote taken thereon, it was unanimously:

> RESOLVED, that any party to the APM-SKM JV has the right to seek independent funding, provided, however, that the acceptance of any funding would be subject to the acceptance by the Policy Committee.

47. On April 18, 2007, Deen quitclaimed to Richard Campbell the remaining 50% of the Silver King Mine.

## MINING QUITCLAIM DEED

THIS INDENTURE, made and given this date of _18 APRIL 2007_, by and between:

The Grantor (name and address) and The Grantee (name, address and phone)
Ronald R. Deen                          Richard Campbell
56389 E. Simmons Way                     8686 Wingaten Ave.
Kearny, AZ 85237                         Glendale, AZ 85237

Phone:

WITNESSETH:
That the Grantor, in consideration of $1.00, and other valuable considerations, hereby convey quitclaim unto the Grantee the following: 50% of Cl Medico 2052

| Name of Claim(s) | ADL No. | Claim(s) is/are situated in Meridian, Township, Range, Section |
|---|---|---|
| EL MEDICO 2052 | AMC #349183 | Pinal Co.  1S , 12E, 24 |
| EXEMPT | | |
| ARS 11-1134 | | |
| Sec. A6. | | |

Located within the Pinal Co.              Recording District.

IN WITNESS WHEREOF, the Grantors have hereunto set their hands.

_____ 09/18/07                  _____ 8/18/07
Signature                                  Signature

UNITED STATES OF AMERICA     )            UNITED STATES OF AMERICA     )
STATE OF ~~ALASKA~~ ARIZONA  ) SS         STATE OF ~~ALASKA~~          ) SS
Judicial District            )            Judicial District           )

The foregoing Quitclaim Deed was acknowledged    The foregoing Quitclaim Deed was acknowledged
before me by Ronald R. Deen      on      before me by
this  18th  day of April ,20 07          this       day of        , 20

Signature of Notary: _____     Signature of Notary: _____
My commission expires: 5-1-09            My commission expires on:

[OFFICIAL SEAL - MARJORIE PAGE NOTARY PUBLIC-STATE OF ARIZONA PINAL COUNTY My Comm. Expires Nov 1, 2009]

Return Originals to:                      Name: _____
                                          Mailing Address: _____
                                          Mailing Address: _____

48. The recorded Mining Quit Claim Deed – as was the August 22, 2006 quit claim deed – was also sent to jack San Felice upon recording:



49. The signature on the Mining Quit Claim Deed, purporting to be that of Richard Campbell, is a crude forgery; yet, for the purposes of consideration of Plaintiff's Motion for Partial Summary – *and only for the purposes of consideration of Plaintiff's Motion for Partial Summary Judgment* - Campbell waives his claim of forgery against Defendants.



Signature

50. On June 18, 2007, San Felice forbade the Joint Venture from distributing information about the Silver King Mine.

51. On June 19, 2007, representatives of Super Nova Minerals, Dr. Stewart Jackson and Mr. Wolf Wiese, visited the Silver King Mine. Dr. Stewart, Mr. Wiese, Mr. Campbell, Dr. Hüning and San Felice were present. Dr. Stewart opined that in his view, the value of the mine based on the Defendants' Executive Summary 2006, were overstated by a factor of 10.

52. On June 22, 2007, the Joint Venture issued an Update Memorandum. Relevant part states:

> As you know, Mr. Wolf Wiese, the president and CEO of Super Nova Minerals Corp. and Dr. Stewart A. Jackson visited the mine on June 19, 2007. Jack gave Dr. Stewart a tour of the mine while John and Dick discussed Super Nova's interests with Mr. Wiese.
>
> The visit and the subsequent discussions were instructive in one major respect: Dr. Stewart's opined that the figures and projections first received by APM from SKM may be incorrect by factor of as much as 10. The genesis of these figures is traced back to the initial Executive Summary received by APM1. During his conversations with Mr. Jackson, Jack verbally confirmed that Super Nova should not rely on such information. I am reminded of Scott Donaldson's vigilant concern regarding the potential for misrepresentation

expressed during our last meeting in my conference room. Dr. Jackson's comments coupled with Scott's expression of extreme concern and my independent judgment lead me to conclude that any further attempts by APM to raise funds on the basis of those faulty figures and projections must cease immediately, lest the JV members expose themselves to a legal claim for misrepresentation.

53. Ultimately, Accept did not make payment and, consequently, APM could not fund the Joint Venture; therefore, pursuant to the terms of the 11-27-06 Agreement, APM's interest in the Joint Venture was forfeited, but the Funding Group's interest in the Joint Venture increased to 45%.

54. On July 5, 2007, the Joint Venture held a Meeting of the Policy Committee. San Felice was invited to appear by telephone, and so appeared, but later chose to remove himself from the meeting. The Policy Committee entered the following resolutions:

1. That the Joint Venture continue its efforts to obtain funding and place the Silver King Mine in operation through negotiations with (i) Accept Erste Rohstoff Beteiligungs Kg; (ii) the Florida Investor Group; and (iii) SuperNova.

2. That, based on the false information, statement and projections received from Silver King Mining Company of Arizona, LLC as indicated in the 06-22-07 Update Memorandum, the Joint Venture shall immediately cease and desist from making any statements to any current or prospective investor based on that false information, statements and projections.

3. That Silver King Mining Company of Arizona, LLC shall immediately forward to the Joint Venture the entirety of its documentation relative to the Silver King Mine, including mining inspection reports, drilling reports, operational plans and any other documentation dealing with the presence of metals in the Silver King Mine.

4. That Silver King Mining Company of Arizona, LLC, shall immediately comply with the Joint Venture Agreement, particularly paragraph 5(b) and shall immediately transfer to the Joint Venture the contributions stated therein.

5. By virtue of the misrepresentation regarding the value of the mine as stated in the 06-22-07 Update Memorandum, the

forfeiture provision of Paragraph 4(b) of the November 27, 2006 Agreement is waived.

6. All joint venturers shall cooperate with the efforts of the Joint Venture to put the Silver King Mine in operation, and none of them shall act obstructionist. Any joint venturer is welcome to engage counsel of its choice; however any joint venturer who engages counsel shall clearly identify to the Joint Venture who such counsel is; the contact information of such counsel; and the extent of such counsel's authority.

7. Joint Venture General Counsel, Peter Strojnik, is authorized to initiate suit to enforce the terms of the Joint Venture Agreement and any Policy Committee Resolutions. (Footnote omitted)

55. On or about July 25, 2007, Richard Campbell discovered that Defendants completed the Quit Claim Deed that he, Campbell, had signed as a grantee on behalf of the Joint Venture at the Los Hermanos restaurant previously, to Campbell individually. Richard Campbell also discovered that on April 18, 2007, Defendants executed a Mining Quit Claim Deed for the other 50% of the mine to him individually.

56. On July 25, 2007, Richard Campbell quitclaimed his entire interest in the Silver King Mine to the Funding Group.

57. Also on July 25, 2007, TCMS made a maintenance payment for the claim with the United States Forest Service.

58. On July 31, 2007, APM issued a §12-1103 demand to disclaim interest.

59. On September 17, 2007, Richard and Sondra Campbell filed for the protection of Chapter 7 Bankruptcy in the United States Bankruptcy court for the District of Arizona (Phoenix) under cause number 2:07-bk-04683-RTB. The filing of the bankruptcy was a direct result of Richard Campbell's inability to repay the $108,790.00 he contributed toward the reclamation bond.

## II.
## DISQUALIFICATION OF COUNSEL

In a subsequent Pinal County Superior Court Proceeding captioned *The Funding Group v. Deen, San Felice et al*, Strojnik, representing the funding group, sought to recover the reclamation bond and other damages as a direct result of San Felice's mining fraud. In the Pinal County action, the Court ordered a removal of Strojnik as counsel for the Funding Group. The Funding Group filed a Petition for Special Action in the 2nd Division of the Court of Appeals then in the Supreme Court. Both courts declined to accept jurisdiction.

"Only in extreme circumstances should a party to a lawsuit be allowed to interfere with the attorney-client relationship of his opponent." *Alexander v. Super. Ct.*, 141 Ariz. 157, 161, 685 P.2d 1309, 1313 (1984). A motion from opposing counsel to disqualify an attorney based upon an alleged conflict of interest is therefore to be "view[ed] with suspicion." *Gomez v. Super. Ct.*, 149 Ariz. 223, 226, 717 P.2d 902, 905 (1986). "To call for the disqualification of opposing counsel for delay or other tactical reasons, in the absence of prejudice to either side, is a practice which will not be tolerated." *Cottonwood Estates v. Paradise Builders*, 128 Ariz. 99, 105, 624 P.2d 296, 302 (1981).

TRIAL COURT ABUSED ITS DISCRETION IN DISQUALIFYING STROJNIK FROM REPRESENTING A CLIENT AGAINST A NON-CLIENT TO WHOM STROJNIK OWES NO DUTY.

There is a broad consensus that Strojnik never represented SKM. The Court found that "Peter Strojnik represented the joint venture as well as APM. Silver King was not represented by counsel during the time of the entry of these agreements". 12-12-08 Order at 3.

Yet, the Court disqualified Strojnik for a conflict with SKM.

The "attorney-client" relationship is fundamental to the existence of a "conflict". *See* ER's 1.6 through 1.13. ("A lawyer who has formerly represented a **client** in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client" (emphasis supplied).) *See* ER 1.9. Were it otherwise, the attorney would be unable to represent anyone about whom he has any knowledge or information. It is therefore well entrenched in the Arizona history that a lawyer has no duty to the opposing party. *Linder v. Brown & Herrick*, 189 Ariz. 398, 943 P.2d 758 (App.1997) A contrary finding would necessarily create an automatic conflict of interest between a lawyer and client which would dilute if not destroy the lawyer's duty of aggressive and exclusive representation; a lawyer cannot serve his own client and at the same time refuse to use the information about the other. Id.

Since Strojnik never represented any SKM Party, Strojnik owes them no duty of confidentiality upon which a conflict may be based.

THE TRIAL COURT ABUSED ITS DISCRETION IN DISQUALIFYING STROJNIK ON THE BASIS THAT A DUTY OWED TO A CLIENT (JOINT VENTURE) TRANSCENDED TO A DUTY TO A MEMBER OF THE JOINT VENTURE (SKM).

It is unclear from the 12-12-08 Order whether the Court held that the attorney-client relationship between Strojnik and the Joint Venture *ipso facto* created a derivative attorney-client relationship between Strojnik and SKM. Other than the claim by counsel for SKM Parties, no one has made this assertion, and the Court specifically found that Strojnik represented only APM and the Joint Venture – SKM was not represented by counsel. Nonetheless, the issue was raised as a fundamental premise of law by SKM in their Motion to Disqualify. It is therefore addressed here.

The attorney-client relationship arises only when: (1) a person manifests to a lawyer the person's intent that the lawyer provide legal services for the person; and the lawyer manifests to the person consent to do so. Restatement (Third) Of The Law Governing Lawyers § 14, quoted with approval by the Arizona Supreme Court in *Paradigm Insurance Co. v. Langerman Law Offices, P. A.*, 200 Ariz. 146, 24 P.3d 593 (2001). Indeed, comment c to § 14 indicates that either intent or acquiescence may establish the relationship. As a practical matter, "an attorney is deemed to be dealing with a client when 'it may fairly be said that because of other transactions an ordinary person would look to the lawyer as a protector rather than as an adversary.'" *In re Pappas*, 159 Ariz. 516, 522, 768 P.2d 1161, 1167 (1988) (quoting *In re Neville*, 147 Ariz. 106, 111, 708 P.2d 1297, 1302 (1985)).

There is no indication that SKM, San Felice or Deen ever looked at Strojnik as their or SKM's lawyer. In the ill-advised *ex parte* Applications for Injunctions against Harassment, both San Felice and Deen referred to Strojnik as their "partner", not "lawyer". In his Bar Complaint, San Felice claims that the Attorney-Client relationship was derivative only. In their Affidavits, both San Felice and Deen recognize that Strojnik represented APM and the Joint Venture only.

A lawyer representing an entity represents only the entity, not its officers, directors, or shareholders, and not any related entities such as parents, subsidiaries or sister companies. Restatement (Third) of the Law Governing Lawyers § 131 cmt. b (2000); *Boyd v. Second Judicial District Court*, 51 Nev. 264, 269-70, 274 P. 7, 8-9 (1929) (dismissing challenge to disqualification of lawyer who had worked for company with its former officer from representing the officer against the company); *Waid v. Eighth Judicial District Court of the State of Nevada*, 119 P.3d 1219, 121 Nev. 605 (Nev. 2005); *Bobbitt v. Victorian House, Inc.*, 545 F. Supp. 1124 (N.D. Ill. 1982); *BNYCP v. Superior Court (Parsons Corp.)*, 70 Cal. Rptr. 2d 419 (Ct. App. 1997); *Jesse v. Danforth*, 485 N.W.2d 63 (Wis. 1992)

Even in the absence of the broad consensus that Strojnik never represented SKM, the law is firm that an attorney-client relationship is not created with the individual partner simply because the partner discusses matters with the lawyer that are relevant to both the individual's and the partnership's interests. *Hopper v. Frank*, 16 F.3d 92, 95 (5th Cir. 1994) See also American Bar Association ("ABA") Opinion 91-361 ("[L]awyer who represents a partnership represents the entity rather than the individual partners unless the specific circumstances show otherwise....") The consensus of all parties – and the Court below – is that SKM was at all times represented by San Felice, its managing member with an advanced degree, a sophisticated negotiator of multi-billion dollar union deals. SKM was variously represented by Mr. Donaldson (from 04-12-07 to 07-05-07) Mr. Behm (from 07-05-07 to 11-07-07) and Mr. Ritter thereafter, but never by Strojnik.

**THE TRIAL COURT ABUSED ITS DISCRETION IN DISQUALIFYING COUNSEL WHERE - EVEN IF THE NON-CLIENT HAD BEEN A CLIENT - THERE WAS NO PROOF OF THE USE, OR POTENTIAL USE, OF ANY "CONFIDENTIAL" INFORMATION.**

It is a complete parody to claim that Strojnik had knowledge of SKM Parties' fraud at the time of the Funding Group's payment of $138,790.00. No one here claims that Strojnik was in a conspiratorial agreement with SKM to defraud the Funding Group. No one claims that Strojnik had any knowledge of the fraud perpetrated by SKM. No one claims that SKM *ever* confided to Strojnik *any* confidential information about its fraudulent intent. All information about SKM's

fraud was found through diligent research of public records and documents – e.g. the Pinal County Recorder, and, ironically, through SKM Parties own Affidavits

So, if SKM had been Strojnik's client – which it was not - how does the conflict rule work?

Clearly, the attorney who represented a client cannot thereafter represent another "in the same or substantially related matter" where the interest of the current client are "materially adverse to the interests of a former client". ER 1.9. Comment 3 explains:

> [3] *Matters are "substantially related" for purposes of this Rule if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter.* For example, a lawyer who has represented a businessperson and learned extensive private financial information about that person may not then represent that person's spouse in seeking a divorce. Similarly, a lawyer who has previously represented a client in securing environmental permits to build a shopping center would be precluded from representing neighbors seeking to oppose rezoning of the property on the basis of environmental considerations; however, the lawyer would not be precluded, on the grounds of substantial relationship, from defending a tenant of the completed shopping center in resisting eviction for nonpayment of rent. *Information that has been disclosed to the public ordinarily will not be disqualifying.* Information acquired in a prior representation may have been rendered obsolete by the passage of time, a circumstance that may be relevant in determining whether two representations are substantially related. *In the case of an organizational client, general knowledge of the client's policies and practices ordinarily will not preclude a subsequent representation; on the other hand, knowledge of specific facts gained in a prior representation that is relevant to the matter in question ordinarily will preclude such a representation.* …. (emphasis supplied)

At the risk of being overly repetitive, "Strojnik represented the joint venture as well as APM. Silver King was not represented by counsel during the time of the entry of these agreements". 12-12-08 Order. Therefore, the attorney-client relationship must arise from a different set of transactional facts. What these facts are is unclear.

What is clear, however, is that Strojnik could not have had any "knowledge of specific facts gained in a prior representation that is relevant to the matter in question". The "matter in question" is SKM Parties' successful scheme to defraud the Funding Group out of $138,790.00. If the Court were to find that Strojnik had knowledge of "the matter in question", Strojnik would be – and should be – thrown in jail along with San Felice and Deen.

Equally plain is that Strojnik has no confidential information from SKM that could create "a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter". No claim of such misuse of confidential information was made by SKM or found by the Trial Court. The documentation in this case was obtained from publicly available documents and

from SKM Parties' Affidavits. Clearly, the knowledge of these documents is not disqualifying. Comment 3 to ER 1.9.

Therefore, even if the Court were to conclude that Strojnik and SKM were engaged in a derivative attorney-client relationship, Strojnik was completely unaware of any confidential information relating to SKM Parties' successful scheme to defraud the Funding Group.

## ISSUE OF FIRST IMPRESSION

The disqualification of counsel in this matter is one of first impression: Does the attorney's involvement in transactions that form the subject matter of a subsequent litigation create an appearance of impropriety where the attorney never represented any of the opposing parties?

The representation of a current client by an attorney of client's choice does not become a problem unless representation of the current client becomes adverse to a former client. *Alexander v. Superior Court*, 141 Ariz. 157, 163, 685 P.2d 1309, 1315 (1984). The first inquiry, therefore, is whether "the attorney client relationship existed". Id., 141 Ariz. at 162, 685 P.2nd at 1314. Here, the trial judge specifically found that there was no former attorney-client relationship between Petitioner's chosen counsel and the Respondents. Still, the Court ruled that to permit Petitioner to be represented by its chosen counsel would create the "appearance of impropriety". The question then is whether a party may be denied the choice of counsel where counsel's representation violates no express ethical rule; there is no prior representation of adverse parties; and there is no potential for the misuse of any client "confidences".

## NO ARIZONA DECISION CONTROLS THE POINT OF LAW IN QUESTION

There is no Arizona decision determining whether the "appearance of impropriety" standard, weakened by case law and its omission in the new Rules of Professional Conduct, *Gomez v. Superior Court*, 149 Ariz. 223, 225, 717 P.2d 902, 904 (1986), may be used to disqualify counsel in the absence of current or former representation of the opposing party. The trial court found that Petitioner's chosen counsel never represented the adverse parties; therefore – at least by implication – the trial court concluded that the existence of a current or former attorney-client relationship between Petitioner's chosen counsel and any of the adverse parties is unnecessary. There is no legal precedent for this proposition.

The Supreme Court has previously recognized that the "appearance of impropriety" is "simply too slender a reed on which to rest a disqualification order except in the rarest of cases." *Gomez v. Superior Ct.*, 149 Ariz. 223, 225, 717 P.2d 902, 904 (1986), quoting *Board of Education v. Nyquist*, 590 F.2d 1241, 1247 (2d Cir.1979). But human nature is such that no matter how slender a reed, and no matter how rare the case for disqualification, motions to disqualify will continue to clog trial courts and the Courts of Appeal until the High Court simply removes "appearance of impropriety" as a standard. Current ethical rules defining "conflict" are clear and adequate.

## FUNDAMENTAL RIGHT TO COUNSEL OF CHOICE

Civil litigants have a fundamental right to counsel of their choice. *Strongback Corp. v. N.E.D. Cambridge Avenue Development Corp.*, No. 8897 (N.Y.App.Div. 09/28/2006). This right

springs generally from the protections of the Due Process Clause. See generally *Robinson v. Boeing Co.*, 79 F.3d 1053 (11th Cir. 1996); *McCuin v. Texas Power & Light Co.*, 714 F.2d 1255 (5th Cir. 1983) The Court should recognize this fundamental constitutional right with full due process protections accorded to it, including the standard that such right can be attached only upon a showing of a "compelling reason". *McCuin* at 1262, 1263. Such clarification will guide both the parties and chosen counsel and, more importantly, will dissuade opposing parties from submitting unnecessary motions to disqualify.

### IMPORTANT ISSUES OF LAW WERE INCORRECTLY DECIDED IN PINAL COUNTY

The following issues of law have been incorrectly decided by the Pinal County Court:

i) Disqualifying Petitioner's chosen counsel who never represented any of the opposing parties for "conflict of interest" is improper. *Alexander v. Superior Court*, 141 Ariz. 157, 685 P.2d 1309 (1984)

ii) There is a recognized presumption that "[a]s between joint clients ordinarily there is no expectation of confidentiality." *Alexander v. Superior Court*, 141 Ariz. 157, 163, 685 P.2d 1309, 1315 (1984) (quoting from Udall & Livermore, Arizona Practice, Law of Evidence § 74 at 142. and citing cases) Therefore, basing the disqualification of Petitioner's chosen counsel on counsel's previous representation of a joint venture to which one of the opposing parties was a member is unsustainable.

iii) Disqualifying Petitioner's chosen counsel where - even if the non-client had been a client - there was no use, or potential use, of any "confidential" information is unsustainable. *Alexander*.

I feel I should disclose that Mr. San Felice is a defendant in a malicious prosecution case captioned *Strojnik v. San Felice*, Maricopa County Superior Court CV 2009-000117. It should also be noted that once the Pinal County Superior Court matter becomes final, the Court of Appeals will be asked to reinstate Strojnik as the chosen counsel for The Funding Group.

Please let me know if there are any other issues I can address.

Sincerely,

Peter Strojnik

PS: pjs

# Exhibit 11



## STATE BAR OF ARIZONA

Assistant's Direct Dial: (602) 340-7386

September 16, 2009

**<u>Personal and Confidential</u>**

Peter Strojnik, Esq.
3030 N. Central Ave., Suite 1401
Phoenix, AZ 85012-2720

Re:    File No. 09-0314
       William R Richardson, Complainant

Dear Mr. Strojnik:

The State Bar is continuing to investigate this matter and should have a final determination in the near future. In order to complete our evaluation of the case, we require additional information.

Specifically, you represented Mr. Uribe who was a creditor to AR Utilities in the bankruptcy proceedings. You were general counsel for AR Utilities and, according to Mr. Reynoso, suggested bankruptcy proceedings and took part in early strategizing of the bankruptcy. As general counsel for AR Utilities, you were privy to confidential financial information related to the bankruptcy.

- Please advise whether you obtained written informed consent from AR Utilities pursuant to Rule 42, ER 1.9(a), Ariz. R. Sup. Ct. that would have allowed you to represent Mr. Uribe in the adversary proceedings. Please provide a copy of the consent form.

To address your question in your letter dated July 6, 2009, the State Bar has not obtained a bar complaint against you from Mr. Uribe. The State Bar is concerned that your representation of Mr. Uribe was in conflict with your duties to AR Utilities.

Please provide this information <u>no later than September 23, 2009</u>. **Failure to provide the above requested information by the requested deadline could, in and of itself, be grounds for discipline pursuant to Rule 42, ER 8.1 and Rules 53(d) and (f), Ariz. R. Sup. Ct.** If you have any questions, please feel free to contact me at 602-340-7386. Thank you in advance for your assistance in this matter.

Sincerely,

Russell J Anderson
Staff Bar Counsel

RJA/cml

# Exhibit 12

 **STATE BAR OF ARIZONA**

Assistant's Direct Dial 602-340-7241

September 18, 2009

**Personal and Confidential**

Peter Strojnik
Attorney at Law
3030 N. Central Ave., Suite 1401
Phoenix, Arizona 85012-2720

Re:   File No. 09-0314
        William R. Richardson, Complainant

Dear Mr. Strojnik:

The State Bar is continuing to investigate this matter and should have a final determination in the near future. In order to complete our evaluation of the case, we require additional information.

Specifically, please answer the following question:

1.  Where you ever, or are you currently, a member, owner, employee, or associate of any kind with CSK Consulting?

    a.  If yes, please provide the dates of your membership, ownership, employment, or association with CSK Consulting and explain exactly what CSK Consulting does as a business.

Please provide this information <u>no later than September 23, 2009</u>. You may submit this information with your response to the State Bar's prior request for information dated September 16, 2009. **Failure to provide the above requested information by the requested deadline could, in and of itself, be grounds for discipline pursuant to Rule 42, ER 8.1 and Rules 53(d) and (f), Ariz. R. Sup. Ct.** If you have any questions, please feel free to contact me at 602-340-7241. Thank you in advance for your assistance in this matter.

Sincerely,

Russell J. Anderson
Staff Bar Counsel

RJA/cam

# Exhibit 13

THE LAW FIRM OF

# PETER STROJNIK
### ATTORNEY AT LAW

September 22, 2009

Russell J. Anderson, Esq.
Staff Bar Counsel
4201 N. 24th Street, Suite 200
Phoenix, Arizona 85016-6288

     Re:   File No. 09-0314
          William R. Richardson, Complainant

Dear Mr. Anderson:

This responds to your letters dated September 16, 2009, and September 18, 2009. In your September 16, 2009 you ask me to "advise whether you obtained written informed consent from AR Utilities pursuant to Rule 42, ER 1.9(a), Ariz. R. Sip. Ct. that would have allowed you to represent Mr. Uribe in the adversary proceeding. Please provide a copy of the consent form". In your supplemental September 18, 2009, letter you ask whether "you ever, or are you currently, a member, owner, employee, or associated of any kind with CSK Consulting? If yes, please provide the dates of your membership, ownership, employment, or association with SCK Consulting and explain what CSK does as a business".

1) **Written Consent Form.** Your question makes a wrong assumption. You assume that my prior representation of ARUSI was (i) the same or substantially related (ii) matter in which Mr. Uribe's interests are materially adverse to the interests of ARUSI.

    The faulty assumption appears to be an extrapolation of Mr. Reynoso's statement to you or your investigators that I "suggested bankruptcy proceeding".

    As you know, I am not a bankruptcy attorney and I was not involved in the preparation of schedules or other information that was – or became – publicly available after the filing of the proceeding. As a non-bankruptcy lawyer, I did not *suggest* the filing of the bankruptcy; what I *suggested* was that ARUSI consult a bankruptcy attorney. In fact, I suggested that ARUSI discuss this matter with Lewis & Roca. In my 07-22-05 resignation letter I confirmed:

RECEIVED
SEP 2 3 2009
STATE BAR OF ARIZONA
LAWYER REGULATION

> Mrs. Reynoso responded to my request for an "amiable response" by filing a Motion for Contempt. At this time the Company had no choice but to file for the protection of the United States Bankruptcy Code. The Company retained Lewis and Roca for this purpose. It is my belief that Mr. Taylor of L & R has done an admirable job of guiding the Company through the maze of bankruptcy regulations and statutes.

You have a copy of the 07-22-05 letter in your file. It clearly and unequivocally discusses the scope of my representation of ARUSI. The resignation letter confirms that I did not represent ARUSI as special counsel in the Bankruptcy Proceeding. I also previously sent a letter to Ms. Tepper dated March 12, 2009, in which I thoroughly analyzed the entire issue.

ER 1.9(a) states:

### ER 1.9.    Duties to Former Clients

(a) A lawyer who has formerly represented a client in a **matter** shall not thereafter represent another person in **the same** or a **substantially related matter** in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

The question here is whether my prior representation of ARUSI in the Superior Court is the "same or substantially related matter" to my *pro bono* representation of Mr. Uribe in the subsequent adversary proceeding. Comments to ER 1.9(a) explain:

[2] The scope of a "matter" for purposes of this Rule may depend on the facts of a particular situation or transaction. The lawyer's involvement in a matter can also be a question of degree. When a lawyer has been directly involved in a specific transaction, subsequent representation of other clients with materially adverse interests clearly is prohibited. On the other hand, **a lawyer who recurrently handled a type of problem for a former client is not precluded from later representing another client in a wholly distinct problem of that type even though the subsequent representation involves a position adverse to the prior client.** Similar considerations can apply to the reassignment of military lawyers between defense and prosecution functions within the same military jurisdictions. **The underlying question is whether the lawyer was so involved in the matter that the subsequent representation can be justly regarded as a changing of sides in the matter in question.**

[3] **Matters are "substantially related" for purposes of this Rule if they involve the same transaction or legal dispute or if there otherwise is**

a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter. For example, a lawyer who has represented a businessperson and learned extensive private financial information about that person may not then represent that person's spouse in seeking a divorce. Similarly, a lawyer who has previously represented a client in securing environmental permits to build a shopping center would be precluded from representing neighbors seeking to oppose rezoning of the property on the basis of environmental considerations; however, the lawyer would not be precluded, on the grounds of substantial relationship, from defending a tenant of the completed shopping center in resisting eviction for nonpayment of rent. **Information that has been disclosed to the public ordinarily will not be disqualifying.** Information acquired in a prior representation may have been rendered obsolete by the passage of time, a circumstance that may be relevant in determining whether two representations are substantially related. **In the case of an organizational client, general knowledge of the client's policies and practices ordinarily will not preclude a subsequent representation;** on the other hand, knowledge of specific facts gained in a prior representation that is relevant to the matter in question ordinarily will preclude such a representation. A former client is not required to reveal the confidential information learned by the lawyer in order to establish a substantial risk that the lawyer has confidential information to use in the subsequent matter. A conclusion about the possession of such information may be based on the nature of the services the lawyer provided the former client and information that would in ordinary practice be learned by a lawyer providing such services.

Here, the "underlying question" (whether I was so involved in the ARUSI representation that the subsequent representation can be justly regarded as a changing of sides in the matter in question) must be answered with a resounding no!

Additionally, the two matters are not "substantially related" for purposes of this Rule 1.9(a) because they did not "involve the same transaction or legal dispute" and because there was not "otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter". To shorten the discussion, I learned *no* "confidential information" in the prior representation of ARUSI that could be used in the subsequent representation of Mr. Uribe.

2) **CKS.** In response to your inquiry regarding CSK, I refer you to my 06-23-09 and 07-06-09 correspondence where I disclosed:

Peter Strojnik                          Page 4                          9/22/2009

CSK was a consulting group consisting of Raymond Cabreja and Thomas Kummer. It was retained by AR Utilities to assist the company in its restructuring and financing efforts. The relationship between CSK and ARUSI was negotiated between Messrs. Cabreja and Kummer on one hand and Mr. Reynoso on the other. I prepared the paperwork at the direction of Messrs. Reynoso, Cabreja and Kummer.

I hope the above answers your questions.  Feel free to contact me if you need any further information.

Sincerely,

/Peter Strojnik

PS: pjs

# Exhibit 14



## STATE BAR OF ARIZONA

Assistant's Direct Dial 602-340-7244

April 7, 2010

**<u>Personal and Confidential</u>**

Peter Strojnik
Peter Strojnik, PC
3030 N. Central Avenue, Suite 1401
Phoenix, Arizona 85012-2720

Re:    File No. 09-1451
        Jack San Felice, Complainant

Dear Mr. Strojnik:

I am preparing to summarize your file and need additional information. Please respond to these questions within 10 days after you have received this letter. Please type out each question and put your answer underneath.

1) Did Silver King Mine have counsel when the Joint Venture was signed on August 22, 2006? If so, who was Silver King Mine's counsel?

2) If Silver King Mine did not have counsel on August 22, 2006 then who was protecting their interests?

3) Did Ronald Deen or Jack San Felice consult with an attorney before the Joint Venture was signed on August 22, 2006? If so, whom did they consult with?

4) What did you tell Ronald Deen or Jack San Felice about consulting with independent counsel before signing the Joint Venture Agreement in August of 2006? If you told them to consult with an attorney, what date did you tell them this? Did you document this in writing? If not, why not. If so, please provide a copy of the letter.

5) Did Silver King think that you represented them because you represented the Joint Venture? Please explain.

6) Was the Joint Venture a separate entity? Please explain.

7) Did you have a fee agreement for drafting the August 22, 2006 and the November 2006 Agreements? If so, please provide it. If not, please explain why not.

8) Did you explain to Ronald Deen or Jack San Felice that you had a conflict of interest since you were also a permanent member of the policy committee who had the ability to break tie votes when you drafted the Joint Venture, you were general counsel to APM, and your wife was a minority member in APM?

9) Did you have Ronald Deen or Jack San Felice sign a conflict of interest waiver for the August and November 2006 Agreements? If so, please provide it. If not, please explain why not.

Peter Strojnik
April 7, 2010
Page 2

10) Did Silver King Mine have counsel when the November 27, 2006 Agreement was signed?  If so, who was Silver King Mine's counsel?

11) Did Ronald Deen or Jack San Felice consult with an attorney before the Joint Venture signed on November 27, 2006 was signed?  If so, whom did they consult with?

12) Did you tell Ronald Deen or Jack San Felice that they should consult with independent counsel before they signed the agreement?  If so, when?  Is this documented in writing?  If so, please provide a copy of it.

13) Did you explain the releases of liability of TCMS Investments to Silver King and/ or Jack San Felice and Ronald Deen before the signed the agreement on November 27, 2006.

14) Did you explain the release from liability for yourself to Silver King and/or Jack San Felice and Ronald Deen?  If so, when was this explained in writing or orally.  If it was explained in writing, please provide a copy of it.

15) In the November 27, 2006 agreement, you designated yourself and your wife third party beneficiaries of the release.  Please explain.

16) Did you explain the significance of being a third party beneficiary to Silver King and/or Ronald Deen and Jack San Felice.  If so, when was it explained in writing or orally.  If it was explained in writing, please provide a copy of it.

17) When the November 27, 2006 agreement was signed did you act as the attorney for the Joint venture and the APM?

18) Did Silver King and or Ronald Deen and Jack San Felice know you represented the Joint Venture and APM?  If so, explain how they knew this information.

19) Did you have a duty of loyalty and confidentiality to the clients of the Joint Venture including advising the Joint Venture of what legal action to take regarding the defaulting action of one of its members?

20) Did you think there was a substantial risk that your representation of the Joint Venture and the defaulting members would be materially limited by your responsibilities to others in violation of ER 1.7(a)(2)?  Please explain.

21) Did you violate ER 1.6 when you used information learned as counsel for the Joint Venture to sue Ronald Deen, Jack San Felice and or Silver King Mine?  Please explain.

22) Did you violate ER 1.6 when you provided SKM management reports to parties other than APM ?  Please explain.

23) The Court found your statements regarding your wife's ownership of TCMS investments misleading.  What did you tell the court about your wife's ownership in TCMS?

Peter Strojnik
April 7, 2010
Page 3

24) Please explain why you provided the information you did to the Court regarding your wife's ownership in TCMS?

25) Who owned TCMS at the time of the agreements in 2006?

26) Please explain why you did not violate ER 1.4(a)(1), 1.7, 1.6, 1.8, 1.9, 3.3, 4.1, 4.3, 8.4(c) and 8.4(d). Please address each ER separately.

27) Please provide a copy of all pleadings you submitted to Judge O'Neil regarding the Determination of Counsel issue and the pleadings you filed in the appeal of this issue to the court of Appeals and Supreme Court.

28) Was Silver King mine an entity in the Funding Group? Please explain.

29) Have you attempted to speak with Mr. Ritter about the Silver King Mine lawsuit even though you are no longer the attorney of record due to the conflict of interest found by the Judge O'Neil?

30) Are you assisting your son with the litigation involving Silver King Mine?

31) Did you advise Silver King or Ronald Deen or Jack San Felice that they did not need a lawyer when they signed the August and November 2006 Agreements? Please explain.

32) When you represented the Joint Venture, did you have legal duties to Silver King as part of the Joint Venture. Please explain.

33) Did you tell Silver King that they were represented as part of the Joint Venture?

34) Did Silver King, Ronald Deen and/or Jack San Felice agree that you should be the tie breaker?

35) Isn't the tie breaker suppose to be a neutral third party? Were you a neutral third party when you acted as tie breaker?

Sincerely,

Harriet M. Bernick
Staff Bar Counsel

HMB/myb

# Exhibit 15

THE LAW FIRM OF

# PETER STROJNIK
### ATTORNEY AT LAW

Peter Strojnik
Arizona Bar No 006464
Arizona Insurance Producer License
L169: 951512
Direct Dial: 602-524-6602

April 13, 2010

Harriett M. Bernick, Esq.
Staff Bar Counsel
4201 N. 24th Street, Suite 200
Phoenix, Arizona 85016-6288

Re:    File No. 09-1451
         Jack San Felice, Complainant

Dear Ms. Bernick:

This responds to your questions raised in the April 7, 2010 correspondence.   The
numbered paragraphs correspond to the numbered questions in your correspondence.

1. Silver King Mine ("SKM") is an entity separate from Silver King Mining Company,
   LLC, ("SKMC").   At various times, either or both of them, or their individual
   members, had attorneys, including  Scott Donaldson, Matthew Ritter and Doug Behm.

2. SKMC's primary representative was Jack San Felice. I do not know whether he
   consulted with independent counsel prior to executing the Joint Venture Agreement,
   although he had access to one. Obviously, I could not give him advice other than to
   get an attorney.  See ER 4.3. I made quite certain that no-one misunderstood my role
   in the matter, and I made doubly sure to not give legal advice to any non-clients. See ¶
   5 below.

3. SKM, SKMC, San Felice and/or Deen, or altogether jointly or in any combination
   thereof, were represented by counsel.  I believe that counsel could have been Scott
   Donaldson, but I am not certain. Jack San Felice's common retort to suggestion of
   counsel was that he had negotiated billion dollar deals and that he needed no lawyer. .

4. See above. Perhaps Messrs. Deen and San Felice would be in a better position to
   respond to this question.

5. No. SKM had no reason to believe that I represented SKM, or SKMC, or San Felice
   or Deen. I made all required disclosure in the body of the Joint Venture Agreement:

3030 NORTH CENTRAL AVENUE  - SUITE 1401 - PHOENIX, ARIZONA 85012
TEL: 602.297.3019 - FAX: 602.296.0135
E-MAIL: PS@STROJNIK.COM - WEB: WWW.STROJNIK.COM

In addition to the designation of the representatives by each Joint Venturer, the Joint Venturers establish one permanent member of the Policy Committee. The Permanent Member shall act as a deadlock breaking member. **The Joint Venturers recognize that the Permanent Member is the General Counsel to APM and is hereby appointed as the General Counsel for the Joint Venture. The parties recognize that a company owned by his wife is a minority member in APM.** Permanent Member has no right to cast a vote on any proposal other than a proposal which is in deadlock. The Permanent Member cannot be replaced by agreement or otherwise; Permanent Member shall act in such capacity until his death or resignation. **The Parties hereby acknowledge and waive and real, potential or imaginary conflict of interest arising from this appointment.** The day to day operations shall not be conducted by the Policy Committee but by the Officers of the Joint Venture. The Joint Venturers agree to the following Permanent Member:

Permanent Member: Peter Strojnik

6. Yes.  A Joint Venture is a separate legal entity. A joint venture differs from a partnership because usually, although not necessarily, a joint venture is limited to a single transaction. *Rubi v. Transamerica Title Ins. Co.,* 131 Ariz. 403, 406, 641 P.2d 891, 894 (App. 1981).

7. Yes.  See attached.

8. A conflict of interest in this context arises only in dual representations.  See ER 1.7 *et seq.* I never represented Ron Deen, Jack San Felice, SKM or SKMC.  Therefore, since there was no dual representation involving any of the complaining parties, there could have been no conflict of interest with any of them.  There was no need to explain anything to Deen, San Felice or SKMC.  If there were a conflict – which there was not – it could only exist in my dual representation of the Joint Venture and APM. Neither the Joint Venture nor APM claims a conflict.

Deen, San Felice and SKMC always knew the precise parameters of my relationship with the Joint Venture and APM, and waived any actual or imaginary conflict, as it was fully disclosed in the Joint Venture Agreement. The disclosures and waivers were made in accordance with ER 1.7 and 1.8, but, in reality, only applied to the potential conflict between the Joint Venture and APM - which did not exist.

9. Again, a conflict of interest – and correspondingly the need for a waiver - arises only in the context of dual representation. I never represented Ron Deen, Jack San Felice, SKM or SKMC.  Therefore, since there was no dual representation involving any of

the complaining parties, there could have been no conflict of interest requiring a waiver.

But even so, I made full disclosure of my relation to the transaction (sorry for the poor quality of the cut, but this is the only signed copy I have. A better reading is in ¶5 above, but without the text box containing the initials.)

> b) In addition to the designation of the representatives by each Joint Venturer, the Joint Venturers establish one permanent member of the Policy Committee. The Permanent Member shall act as a deadlock breaking member. The Joint Venturers recognize that the Permanent Member is the General Counsel to APM and is hereby appointed as the General Counsel for the Joint Venture. The parties recognize that a company owned by his wife is a minority member in APM. Permanent Member has no right to cast a vote on any proposal other than a proposal which is in deadlock. The Permanent Member cannot be replaced by agreement or otherwise; Permanent Member shall act in such capacity until his death or resignation. The Parties hereby acknowledge and waive and real, potential or imaginary conflict of interest arising from this appointment. The day to day operations shall not be conducted by the Policy Committee but by the Officers of the Joint Venture. The Joint Venturers agree to the following Permanent Member:
>
> SKM: [initials]  APM: [initials]
>
> Permanent Member: Peter Strojnik

10. See ¶¶ 2-5 above.

11. I do not know. See ¶¶ 2-5 above.

12. It is my practice to tell adverse parties to get independent counsel. In this case, Ron Deen and/or Jack San Felice and/or SKM and/or SKMC actually retained counsel, to wit, Doug Behm, Scott Donaldson, Matthew Ritter.

13. I was under the affirmative obligation to *not* give non-clients Deen, San Felice and SKMC *any* legal advice relating to the meaning and effect of the 11-27-06 Modification. See ER 4.3 ("The lawyer shall not give legal advice to an unrepresented person...") I gave them no explanation other than what is included in the body of the Modification, including, without limitation, the following sections:

> WHEREAS, as inducement for Campbell, Hüning and TCMS to finance the Reclamation Bond, the Parties desire to mutually, collectively and reciprocally waive any conflict of interest, any commercial or civil tort, any breach of contract, or any other breach of duty, that may arise out of this Agreement, and to release one another from any claim whatever for conduct occurring to the Effective Date of this Agreement.

In addition, the parties entered into a mutual release written in a clearly understood language:

6) **MUTUAL RELEASES:**

   a) APM, SKM and the APM-SKM JV hereby forever release and discharge one another from all actions, claims, demands, damages, obligations, liabilities, controversies and executions of any kind or nature whatsoever, whether known or unknown, whether suspected or not, which have arisen, or may have arisen, or shall arise or may arise in the future by reason of any act, omission to act, breach of duty, breach of contract, express or implied, but only to the extent the act or omission giving rise to such claim arose prior to the Effective Date of this Agreement, and specifically waive any claim or right to assert any cause of action or alleged case of action or claim or demand which has, through oversight or error intentionally or unintentionally or through a mutual mistake, been committed by any Party against any other Party.

   b) APM, SKM and the APM-SKM JV hereby forever release and discharge Campbell, TCMS and Hüning from all actions, claims, demands, damages, obligations, liabilities, controversies and executions of any kind or nature whatsoever, whether known or unknown, whether suspected or not, which arise, may arise, have arisen, or may have arisen, or shall arise or may arise in the future by reason of the relationship of Campbell, TCMS and Hüning to any of the other Party(ies) as a result of this Agreement and the performance hereunder. This Release includes (1) any breach of any fiduciary duty; (2) any tort; (3) any breach of contract; and/or (4) any other claim in law or in equity, actual or imagined, against Campbell, TCMS, Hüning, Tanya Strojnik or Peter Strojnik arising from the funding of the Reclamation Bond by the Funding Group. Tanya Strojnik and Peter Strojnik, although not Parties to this Agreement, are specifically designated as the third party beneficiaries of this release.

14. Again, I was under the affirmative obligation to *not* give non-clients Deen, San Felice and SKMC *any* legal advice relating to the meaning of the Modification. See ER 4.3 ("The lawyer shall not give legal advice to an unrepresented person...") See also ¶ 13 above.

15. The Arizona rule is that in order for a person to recover as a third party beneficiary of a contract, an intention to benefit that person must be indicated in the contract itself. *Irwin v. Murphey* because Maricopa County Superior Court in the past issued attorneys a badge to permit them bypassing security. I believed that Mr. Ritter's "badge" was a similar device, 81 Ariz. 148, 302 P.2d 534 (1956); *Basurto v. Utah Construction & Mining Company*, 15 Ariz. App. 35, 485 P.2d 859 (1971). The contemplated benefit must be both intentional and direct, *Irwin*, supra, *Treadway v. Western Cotton Oil Etc. Co.*, 40 Ariz. 125, 10 P.2d 371 (1932), and "it must definitely appear that the parties intend to recognize the third party as the primary party in interest," *Irwin*, supra, at 154, 302 P.2d at 538.

16. Again, I was under the affirmative obligation to *not* give non-clients Deen, San Felice and SKMC *any* legal advice relating to the meaning of the Modification. See ER 4.3 ("The lawyer shall not give legal advice to an unrepresented person...") See also ¶¶ 13, 14 above.

The release was in the body of the document; it was in writing; it was unambiguous; it was not subject to more than one reasonable interpretation; and its clarity required no explanation. I was not SKM's or SKMC's attorney, and had no direct obligation to them.

17. I acted as the general counsel for the Joint Venture at the direction of the Joint Venture officers. I acted as a scrivener, not a negotiator.

18. Deen, San Felice and SKMC knew the scope of my representation by virtue of the disclosure in the Joint Venture Agreement. As clearly stated there, I represented the Joint Venture and APM. I did not represent Deen, San Felice, SKM or SKMC. See ¶¶ 4, 9 and 17 above.

19. I assume you ask whether I had obligations to the members of the Joint Venture, that is, to APM and to SKMC and, transcendentally, to Deen and San Felice. The answer is "no". A lawyer representing an entity represents only the entity (Joint Venture in this case), not its officers, directors, or shareholders, and not any related entities such as parents, subsidiaries or sister companies. Restatement (Third) of the Law Governing Lawyers § 131 cmt. b (2000); *Boyd v. Second Judicial District Court*, 51 Nev. 264, 269-70, 274 P. 7, 8-9 (1929) (dismissing challenge to disqualification of lawyer who had worked for company with its former officer from representing the officer against the company); *Waid v. Eighth Judicial District Court of the State of Nevada*, 119 P.3d 1219, 121 Nev. 605 (Nev. 2005); *Bobbitt v. Victorian House, Inc.*, 545 F. Supp. 1124 (N.D. Ill. 1982); *BNYCP v. Superior Court (Parsons Corp.)*, 70 Cal. Rptr. 2d 419 (Ct. App. 1997); *Jesse v. Danforth*, 485 N.W.2d 63 (Wis. 1992)

20. No. There was never a substantial risk – or any risk - of a conflict between APM and the Joint Venture. Both parties had the precise same motive: To put the Mine in operation. Thus, no conflict could, or ever did, develop between them. The only conflict that developed was between my clients (Joint Venture and APM) – and the non-clients Deen, San Felice, SKM and SKMC based on the breach of the Joint Venture Agreement by SKMC (failure to contribute the mine) and Deen's, San Felice's and SKMC's fraudulent inducement to pay $140,000.00.

21. No. I learned *no* confidential information as counsel for the Joint Venture. Even if I did, the question is not whether I used such information to sue non-clients Deen, San Felice and/or SKMC; the question is whether I used Joint Venture confidential information against the Joint Venture. I never did.

22. I am unclear what "management reports" you reference. Nonetheless, I never represented SKMC, and owed it no obligation of confidentiality or secrecy. Therefore, if SKMC provided me with any information not subject to a confidentiality agreement

– which there was none - I was free to use it in any manner benefitting my clients, the Joint Venture, APM or The Funding Group.

23. I find the Court's statement confounding.   In the Petition for Special Action, I explained my bewilderment as follows:

> Lastly, the Court focuses on Strojnik's wife once again:
>
>> The Court finds Mr. Strojnik's statements regarding his wife's ownership of TCMS to be misleading. It is not relevant that a separate property trust was created on February 21, 2001. The issue is who owned TCMS, Investments, Inc. at the time of the agreement. The Court finds as a matter of law that the two sentence disclosure in the August 22, 2006 agreement between the parties cannot act as a disclosure from Mr. Strojnik as he is not a signatory to it.
>
>> The court does not explain how "Mr. Strojnik's statement regarding his wife's ownership of TCMS is misleading". The Court does not explain how Mrs. Strojnik's ownership of TCMS is pertinent to Strojnik's "conflict" with SKM, a non-client.  The Court does not explain why the disclosure of Mrs. Strojnik's separate property interest "cannot act as a disclosure from Mr. Strojnik as he is not a signatory to [the Joint Venture Agreement]" or how any of this is significant[1] (footnote in original).

> To this day I have not been able to figure out how a truthful disclosure of Mrs. Strojnik's ownership of TCMS can be misleading.

24. In his Motion, Mr. Ritter made a specific, ad hominem attack against Mrs. Strojnik, calling her "complicit". In order to make a complete and unrestrained disclosure of Mrs. Strojnik's ownership interests, I made a full disclosure.

25. I believe in 2006, Tanya C. Strojnik was the sole shareholder. Later, Tanya C. Strojnik Separate Property Trust became the sole shareholder. The change was made, to my understanding, following discussions between Mrs. Strojnik and her trust counsel. I never had any interest in TCMS, not a community property interest, not an equitable interest and not a legal interest.

---

[1] Judge's fascination with Mrs. Strojnik is curious and alarming; is it so incredible that a married woman can have separate property? Women have owned property separately from their husbands for years. Mrs. Strojnik has owned property in her own name at least since April 24, 1989, when Mr. and Mrs. Strojnik, in recognition of equal rights for women, entered into agreement designating all property held by Mrs. Strojnik in her own name as her sole and separate property. See Maricopa County Recorder at 89-19443. One should be alarmed with the sexist underpinning of the Trial Court's decision.

26. Each of the ER's is addressed separately:

a. ER 1.4(a)(1) was not violated because I never represented Deen, San Felice, SKM or SKMC and owed them no duty pursuant to ER 1.4(a)(1).  On the other hand, I promptly informed my clients, the Joint Venture and APM, of any decision or circumstance which respect to their informed consent, that is, I communicated to the Joint Venture and APM adequate information and explanations about the material risks, if any, and the reasonable alternatives to the proposed action, if any. Neither the Joint Venture nor APM claim otherwise.

b. ER 1.7 was not violated because I never represented Deen, San Felice, SKM or SKMC. I fully complied with ER 1.7 in my dealings with the clients, the Joint Venture and APM.

c. ER 1.6 was not violated because I never revealed confidential information relating to the representation of a client (the Joint Venture or APM).  For that matter, I never had any confidential information regarding Deen, San Felice, or SKMC.

d. ER 1.8 was not violated because ER 1.8 simply does not apply. *I* did not enter into a business transaction with San Felice, Ron Deen, SKM or SKMC, *APM* did. I did not acquire any ownership, possessory, security or other pecuniary interest adverse to my clients, the Joint Venture or APM.

e. ER 1.9 was not violated because I did *not* formerly represented Deen, San Felice, SKM or SKMC in any matter and thereafter represent another person in the same or a substantially related matter.

f. To this day I am unaware of any basis for this allegation.  If there were false statements, someone needs to come forward and (i) identify the statement and (ii) show that it is false. No one has come forward with any such information, and I am aware of none. Nevertheless, ER 3.3 was not violated because I never knowingly:

    i. made a false statement of fact or law to a tribunal or failed to correct a false statement of material fact or law previously made to the tribunal;

    ii. failed to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel; or

    iii. offered evidence that I knew to be false.

g. The Court's statement about the disclosure of Mrs. Strojnik's interest to be misleading confounds me to this day. See ¶ 23 above. It would be helpful to know the basis of this allegation. Nevertheless, ER 4.1 was not violated because I did not knowingly:

  i. (a) make a false statement of material fact or law to a third person; or

  ii. (b) fail to disclose a material fact when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless disclosure is prohibited by ER 1.6.

h. ER 4.3 was not violated because at no time did I state or imply to the non-clients Deen, San Felice, SKM and SKMC that I was disinterested. In fact, I fully and completely disclosed my role in the transactions as well as those of Mrs. Strojnik. I did not give legal advice to Deen, San Felice, SKM or SKMC or any other unrepresented person, other than the advice to secure counsel.

i. I am unaware of any allegation of dishonesty, fraud, deceit or misrepresentation other the yet to be explained allegation of "misleading" disclosure of Mrs. Strojnik's interest. Nevertheless, ER 8.4(c) was not violated because I never engaged in conduct involving dishonesty, fraud, deceit or misrepresentation.

j. I am unaware of any allegation of any conduct that is or may be prejudicial to the administration of justice. Nevertheless, ER 8.4(d) was not violated because I did not engage in any conduct that is prejudicial to the administration of justice.

27. I am no longer in possession of the file; the file has been transferred to The Funding Group's new counsel. However, it is my understanding that the complainants have the entire file.

28. No.

29. No. I did not communicate with Mr. Ritter about the Silver King Mine lawsuit following the disqualification. However, in the interest of full disclosure, on July 10, 2009, I made a direct inquiry to Mr. Ritter as follows:

Dear Mr. Ritter:

Can you please disclose what relationship, if any, you, your office or your family have with the Pinal County Superior Court?

Thank you in advance for your courtesy.

I made this inquiry because Mr. Ritter had privileges within the Pinal County Superior Court not available to other counsel or litigants. For example, he had access to the judges' chambers, including chambers of judges before whom he appeared as an attorney. During my involvement as counsel for The Funding Group, I noticed Mr. Ritter coming out of the Court's private chambers just prior to the Judge. It appeared to me that Ritter and the Judge had a discussion just prior to entering the courtroom. I asked Mr. Ritter what gave him the authority to access judge's chambers. Mr. Ritter pointed to what appeared to be a laminated ID card hung around his neck and responded, "I have this badge". Mr. Ritter did not disclose that he was a judge pro tem, and that the reason he had "this badge" was because of his special "pro tem" status with the court. I accepted Mr. Ritter's statement[2].

Mr. Ritter never respond to my 07-10-09 inquiry.

I later found Mr. Ritter's appointment as a judge pro tem on the Supreme Court website. I requested documentation regarding Mr. Ritter's role with the Pinal County Superior court from the presiding judge Olson pursuant to the Arizona version of the Freedom of Information Act, §39-121 *et seq*. It was my intent to ascertain the scope of Mr. Ritter's undisclosed relationship with the Pinal County Judges and the reason for keeping his role as a judge pro tem secret. I felt that this was an important issue that required close judicial and ethical inquiry, see *Kay S. v. Mark S.*, 213 Ariz. 373, 142 P.3d 249 (App. 2006).

30. No.

31. No.

32. No. See Answer to 19.

33. No.

34. SKMC agreed through Ron Deen. Since Deen and San Felice were not individually parties to the Joint Venture Agreement, they had no say in the matter.

35. A tie breaker is what the parties agree a tie breaker to be. A tie breaker's function is not adjudicative. There is no requirement of independence that I am ware of. Both parties to the Joint Venture Agreement consented to my role as a tie breaker following full disclosure.

---

[2] I accepted Mr. Ritter's representation as fact because Maricopa County Superior Court in the past issued attorneys a badge to permit them bypassing security. I believed that Mr. Ritter's "badge" was a similar device.

Please let me know if there are any other issues I can address.

Sincerely,

/s/
Peter Strojnik

PS: pjs
Encls. *as indicated*