

Peter Strojnik
**STROJNIK, P.C.**
Arizona Bar No 006464
Direct Dial: 602-524-6602

Peter K. Strojnik
**THE STROJNIK FIRM, LLC**
Arizona Bar No 026082
California Bar No 242728
Of Counsel

January 11, 2012

Michael O'Donnell, Esq.
Derrick Freijomil, Esq.
Riker, Danzig, et al
Headquarters Plaza
One Speedwell Avenue
Morristown, NJ 07962-1981
*By e-mail only modonnell@riker.com*
*dfreijomil@riker.com*

      Re:   *Dare Investments, LLC v. Chicago Title*
            NO. 2:10-cv-06088-DRD-MAS

Dear Messrs. O'Donnell and Freijomil:

Let me take this opportunity to thank Mr. Freijomil for the instructive conference earlier today. We have confirmed that we have provided each and every document in our possession, voluntarily waived the attorney-client privilege and instructed Dare's former attorneys to provide each and every document relative to this litigation to Chicago Title. At CT's request, Dare Investments' Richard McCloskey has made himself available for a deposition. Dare Investments' former attorneys have made themselves available for depositions. We stand ready to provide, clarify, or expound on any question, issue or subject matter that CT wishes to examine further.

**Judge Debevoise's 06-29-11 and 11-10-11 Opinions Delineate the Coverage Issue**

Judge Debevoise's orders and opinions limit the scope of this case and clearly outline the issue as a simple one: Whether it was Dare Investments reasonable expectation that the CT Policy was intended to cover Mocco Claim. See Opinion dated 06-29-11. (Attached.) As the Court has indicated, this issue shall be decided by extrinsic evidence of intent. See Opinion dated 11-10-11, Doc 60. (Attached.)

The question of Dare's reasonable expectations can be resolved rather simply by reference to the FCCG Bankruptcy Court record.

2415 EAST CAMELBACK ROAD · SUITE 700 · PHOENIX, ARIZONA 85016
TEL: 602.553.1112 · FAX: 602.296.0135
E-MAIL: PS@STROJNIK.COM · WWW.STROJNIK.COM

**The Policy was Specifically Made Subject to the FCCG Bankruptcy Proceeding; These Proceedings Show That Mocco's Claim Was The Only Claim Remaining After the 363 Sale**

In our earlier discussions, Mr. Freijomil again referred us to CT's denial letters of 08-14-07 and 11-19-10 "Denial Letters") (attached) as evidence of the intent of the parties. See Denial Letters, attached. Perhaps unwittingly, the 08-14-07 Denial Letter confirms that the only possible claim that remained outstanding after the 363 sale was the Mocco Claim. The Denial Letter admits that the Policy is…

> 7. Subject to the terms, conditions, covenants, court orders, etc[.], as set forth in the United States Bankruptcy Court, District of Connecticut, Bridgeport Division Case No. 02-50851 (AHWS), and the Asset Purchase Agreement thereunder.

On June 21, 2005, the FCCG Bankruptcy Court entered an order approving the sale of Assets <u>clear of liens, claims and encumbrances</u> to SWJ pursuant to 11. U.S.C. § 363. (FCCG Bankruptcy Doc . No. 716, attached.) The Orders forecasts the ruling, specifically confirming that the "(2) Sale of Acquired Assets of the Debtors [to SWJ was] **Free and Clear of Liens, Claims, and Encumbrances**".(emphasis supplied) in the body of the Order, Judge Shiff states, in relevant part:

"FOUND AND DETERMINED" that:

a. The sale of the Assets "will vest to Purchaser [SWJ] with all right, title and interest of the Sellers [FCCG Bankruptcy Estate] to such assets, and contracts free and clear of all claims and interests…".

b. The "Sellers may sell the [Assets] free and clear of all claims, liens, encumbrances and interest of any kind or nature whatsoever because, in each case, one or more of the standard set forth in Section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied".

"ORDERED, ADJUDGED AND DECREED that:

Pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code, the Acquired Assets (and good, clear, and marketable title thereto) shall be transferred, conveyed, and assigned to the Purchaser upon consummation of the Transaction…<u>free and clear of all Encumbrances, liens, claims, liabilities, causes of action, chooses of action, pledges, offsets, set-offs,</u>

recoupments, right, title and interest of any kind, type, description or nature whatsoever. Id. at 6. (Emphasis added.)

This the effect of this Order was that Dare's collateral interest in the Sayreville Mortgage would be completely free of any possible claims, liens or encumbrances by any party. See 11 U.S.C. § 363.

So then why purchase title insurance at all?

On October 12, 2005, the terms of the FAAPA were amended by a Consent Order. (Attached.) The Consent Order did not modify previous orders authorizing the sale "free and clear of all claims, liens, encumbrances and interests of any kind or nature whatsoever…" (FCCG Bankruptcy Doc 844, attached.)

The reason for the Title Policy covering Mocco Claim became apparent when Mr. Scarpone, the attorney for Mr. Mocco, demanded that the claim by his client, Peter Mocco, be excluded from the "free and clear language" of Doc 716. Therefore, on November 16, 2005, the FCCG Bankruptcy Court signed further <u>Order Authorizing And Approving The Sale Of Acquired Assets Of The Debtors Free And Clear Of Liens, Claims, And Encumbrances To Enterprise Asset Management, Inc. Pursuant To The Terms Of The Asset Purchase Agreement And Certain Related Relief</u> (FCCG Bankruptcy Doc 866, attached.) ("Sale Order").

At the insistence of Mr. Scarpone, the Sale Order confirmed that the Assets were to be sold "free and clear of all claims and interests"[1] <u>except</u> the Mocco Claim[2]. Thus, the only

---

[1] T. The Sale to the Purchaser will be a legal, valid, and effective transfer of such assets and contracts and will vest the Purchaser with all right, title, and interest of the Debtors to such assets, and contracts free and clear of all claims and interests, including, without limitation, those (i) that purport to give to any party a right or option to effect any forfeiture, modification, right of first refusal, or termination of the Debtors' or the Purchaser's interest in such assets or contracts, or any similar rights and (ii) relate to taxes arising under or out of, in connection with, or in any way relating to the operation of the Debtors and their affairs prior to the date of the closing of the Amended FAAPA.

[2] 17. In the event the Purchaser acquires the Acquired Assets pursuant to the Amended FAAPA, notwithstanding anything to the contrary contained in this Order and the Sale Order,: (i) this Order and the Sale Order are not intended to adjudicate or resolve any of the claims, defenses or issues that have been and continue to be disputed between the Moccos and their affiliated entities (the "Mocco Parties"), and James and Cynthia Licata and their affiliated entities (the "Licata Parties"); (ii) the Purchaser is acquiring all claims, defenses, and interests of the Licata Parties subject to all existing claims, defenses and interests of the Mocco Parties; and (iii) to the extent that the Purchaser and the Mocco Parties continue to be in disagreement as to their respective claims, defenses and asserted interests in the various entities and properties set forth in the FAAPA at Exhibit A, those disputes shall either be resolved in the pending State Court proceedings or the proceedings now on appeal to the United States District Court for the District of Vermont, however this Order shall not prohibit any party from bringing any proceedings or motions before this Court which may be properly venued in this Court.

possible reason for the Title Policy was to cover Mocco Claim. All other claims were extinguished through the scrub down provision of 11 U.S.C. § 363.

The Sale Order was further amended on February 2, 2006 to permit SWJ to be substituted in as the "Purchaser" in lieu of Enterprise Asset Management, Inc. The amendment did not affect the right to transfer the Assets free and clear of all claims and interests other than the Mocco Claim. (FCCG Bankruptcy Doc. 897, attached.)

Contrary to the FCCG Bankruptcy Orders, the August 14, 2007 Denial Letter claims that, "whatever interest the bankruptcy debtor held was eventually assigned to Dare, and to the extent the bankruptcy debtor held no interest, Dare received nothing" Id. at 19. This was an unfortunate misrepresentation of the FCCG Court Proceedings. Dare received its collateral interest in the Sayreville Mortgage "free and clear of all claims and interests" **subject only to the Mocco Claim**.

Mr. O'Donnell's conclusion that Dare only received whatever interest was held by the Debtor is troubling. It suggests that the Policy was purchased to cover other possible claims, not just Mocco Claim. This is clearly not true and quite impossible. With the solitary exception of the Mocco Claim, the Sayreville Mortgage was collateralized to Dare free and clear of all claims, known or unknown, matured or unmatured, contingent or liquidated. **Thus, there was no need to purchase title insurance for coverage of any claim except the Mocco Claim.**

In early February 2006, Dare Investments and SWJ agreed to the material terms of a $5M loan by Dare to SWJ. They agreed, in part, that as security for Dare's loan, Dare would accept a first position security interest in the Assets (which included the Sayreville Mortgage). They also agreed that the Sayreville Mortgage would be fully insured by Horizon Title against Mocco Claim. See Master Loan Agreement, attached.

## Title Commitment

SWJ selected Horizon Title to provide title insurance because SWJ had previously used Horizon Title in connection with other title matters. On or about February 9, 2006, Mr. Cohn prepared a Commitment for Title Insurance. (Attached.) On February 14, 2006, Dare Investments and SWJ entered into a Master Loan Agreement. The Master Loan Agreement addressed the acquisition of Assets and the title policy requirement:

> 5. **Title to Assets.** Prior to granting Dare's Security Interest to Dare, SWJ shall acquire the Assets free and clear of all adverse liens, interests and

encumbrances within the meaning of 11 U.S.C. Section 363, as provided in the February 2, 2006, bankruptcy court order.

***

8. **Conditioned Upon Delivery of Commitment to Issue Policy of Title Insurance.** All of Dare's obligations hereunder, and any disbursement of the Disbursement to the Debtor or its creditors, are expressly conditioned upon receipt, by Dare, of a commitment to issue a lender's policy of title insurance from Chicago Title Insurance Company, issued by its agent, Horizon Title Agency, in the amount of $5,500,000, with respect to the mortgagee's interest of First Connecticut Consulting Group, Inc. ("FCCG") under the Mortgage from Lorraine Mocco to FCCG, pledging Lot(s) in Blocks 249, 250, and 251, as shown on the Tax Map of the Borough of Sayreville, New Jersey, which commitment shall be in a form acceptable to Dare.

On February 15, 2006, Mr. Cohn sent a copy of the Commitment and Invoice to Dare's attorney, Mr. Pratt. (Attached.) On February 23, 2006, Mr. Scarpone wrote a letter to Mr. Brody of Buchanan Ingersoll (FCCG Creditors' Committee lawyers) summarizing the Mocco Claim. (Attached.) Mr. Scarpone claimed that the Sayreville Mortgage had been fully paid off and was no longer valid. SWJ, Horizon Title and Dare Investments all became aware of this letter.

As a result of Mr. Scarpone's letter, Dare's attorneys insisted that Horizon Title provide insurance as required by ¶8 of the Master Loan Agreement and to provide coverage over Mocco's Claim as required by the Master Loan Agreement.

Scarpone Letter also claimed that only $74,212.34 remained due on the Mortgage. Therefore, Dare further insisted that the Policy verify that $15M remained unpaid on the Sayreville Mortgage. Mr. Cohn complied with this request and included the following provision:

9. The Policy to Dare Investments will affirmatively insure that the said mortgage that is the subject of the Collateral Assignment of Mortgage hereinbefore referred to, was given pursuant to a Federal Bankruptcy Court Order of September 25, 1996, as amended or modified. Also that the original principal balance of said mortgage was $15,000,000.00.

This Company, through its due diligence, can verify that the amount currently due and owing on the said mortgage being insured hereunder, at the date of this Commitment, is no less that $15,000,000.00.

In his 08-17-07 Denial Letter, Mr. O'Donnell acknowledges this provision of the Policy, and specifically admits that the choice of language "can verify" **is not by error and is not mere semantics**.(Emphasis supplied) See Id. at 21.

**Dare's Need for Disclosure by Chicago Title**

CT's claim investigation was demonstrably thorough. Regrettably, CT has declined to disclose Horizon Title's file documents or the recorded, documented or otherwise memorialized statements made by David Cohn, Dino Cancellieri and others. Further, CT's disclosure fails to disclose any agreements, releases, or other deals between Cohn, Cancellieri and CT arising out of Horizon Title's issuance of the Policy. Lastly, CT has refused to disclose its own claim investigation file.

As you know from your own detailed investigation, there were many conversations between Messrs. Duval (SWJ), Podell (SWJ), Mournes (SWJ), Schreiber (SWJ's attorney), Pratt (Dare's Attorney), Knuth (Dare's Attorney) and Williams (Dare's Attorney) regarding title insurance. During these conversations Mr. Cohn displayed a high degree of familiarity with the FCCG Bankruptcy, Mocco's Claim in the FCCG Bankruptcy, the State Court quiet title proceedings, and the Sayreville Mortgage. In these conversations, the parties explicitly discussed the need to insure Dare's collateral interest in the Sayreville Mortgage specifically against Mocco Claim since all other claims had been extinguished by the FCCG Bankruptcy Court Orders.

One such conversation took place on or about February 20, 2006. SWJ invited Mr. McCloskey to New Jersey to view the Assets, and to meet with Mr. Cohn. The Mocco Claims was specifically discussed and agreed to.

The depth of Mr. Cohn's familiarity with the various proceedings is evidenced by his April 17, 2006 Invoice to Mr. Duval showing $218,651.00 worth of investigations, title searches, historical analysis and due diligence. (Attached.) We also produced to you the 02-09-06 Invoice from Mr. Cohn to Mr. Duval demanding payment of $41,087.50; this Invoice is specific to the insurance of the Sayreville Mortgage. The amount billed represents $26,987.50 to cover investigations over and beyond the Policy premium of $14,100.00. (Attached) We understand that these invoices have been paid in full.

We believe that the discussions and interviews of discussions referenced above have been documented in Horizon Title's Sayreville file and in the CT's claim file. Please produce these files, records and documents.

In 2007, Mocco asserted his Claim against Dare Investments in the New Jersey Chancery Division under consolidated cause number ESX-C-280-98 ("State Court Litigation"). This was precisely the type of claim for which Chicago Title Policy was intended to provide coverage. CT denied the claim.

In 2009, Dare filed a claim against Chicago Title under the Policy. Dare claimed that the Sayreville Mortgage was unmarketable by virtue of Mocco's State Court Litigation. This is precisely the type of claim that the Title Policy was intended to cover. Again, CT denied the claim.

This leads us back to our discovery discussions earlier today. We noted that CT's answers to Interrogatories and Requests for Production of Documents were quite inadequate. The Discovery Responses fail to produce any information about CT's interviews, files or documents. They fail to provide any communications regarding the intent of the Policy. The Answers to Interrogatories fail to relate the content of the interviews. The Responses to Requests for Production fails to contain any notes, memoranda, or statements by Mr. Cohn or Mr. Cancellieri or other interviewed persons. Perhaps we can agree that a full and unrestrained disclosure of these interviews is necessary.

In light of the issue in this case, that is, whether the Policy intended to cover Mocco Claim, it is important for us to see Horizon Title's entire Sayreville file[3]. The file should include all communications, e-mails, notes and memoranda regarding the Commitment, the discussions regarding the Policy, the reason why Mocco Claims were not excluded in Schedule B-II, the reason why all Schedule B-II exceptions were deleted from the final Policy, CT's findings, etc. In other words, the entire file.

In addition, CT's claim investigation file must be disclosed. The Answers to Discovery fail to disclose CT's own conclusions about coverage. Again, all such factual conclusions need to be disclosed.

We need Horizon Title's and CT's file to determine the extent and the scope of Horizon Title's and CT's knowledge and investigation. This will confirm that Horizon Title reviewed the FCCG Bankruptcy Orders and its own understanding that the Policy was intended to cover Mocco Claim. We need to know whether these files contain the FCCG Bankruptcy Court Orders, particularly as they relate to the sale of the Sayreville Mortgage free and clear of all claims other than Mocco Claim. Only if we have this

---

[3] The entire Horizon File has been transferred from Horizon Title to Mr. O'Donnell.

information can we adequately prepare for the depositions of Messrs. Cohn, Cancellieri, Duval, and CT.

To reiterate, we need to see the entire file compiled by Riker Danzig in its claim investigation. Again, this file will, or should, contain notes of interviews, statements, positions, and discussions regarding coverage. We also need a full and complete narrative of the investigations whether or not they were documented in the file.

We further request that CT correct its misrepresentation in the 2007 Denial Letter regarding Dare's acquisition of the interest in the Mortgage. Mr. O'Donnell's 24 page denial letter does not disclose that his statement is actually controverted by the very Bankruptcy Orders addressed in  letter.  O'Donnell's denial letter admits that the Policy is subject to the FCCG Bankruptcy Orders, Id. at 18.   The letter specifically references the Policy language. In light of the 363 language in the sale order, the statement is patently untrue and misleading. As Mr. O'Donnell acknowledged in his Denial Letter, he was familiar with the FCCG Bankruptcy Orders, including Docs 716 and 866, when he falsely claimed that "if the bankruptcy debtor held no interest, Dare received nothing".

CT has never corrected this misrepresentation; in fact, it propagated it in this litigation. For example, in providing Answers to Interrogatories, CT regularly references the Denial Letter without making a correction.  See, e.g., Interrogatory Answers to 1, 2, 6. In order to further perpetuate the misrepresentation, CT refuses to produce documents that Horizon Title and/or Chicago Title reviewed prior to the Date of Policy regarding the Mortgage (RPD 3), refuses to provide the pre-policy investigation file ( RPD 7), refuses to provide its post-policy and post-claim investigation file (RPD 8), fails to produce relevant communications between Chicago Title, Horizon Title, SWJ and David Cohn ( RPD 9), refuses to provide any agreements between the parties (RPD 10), and declines to produce their statements (RPD 11). In specific response to request to produce documents relating to the "the terms, conditions, covenants, court orders, etc as set forth in [the FCCG Bankruptcy] which CT claims were the reason for the loss or damage to Dare, CT simply advises Dare to look up the documents between June 2005 and March 2006 without identifying *which* documents are referred to in the Policy. In fact, in its Answer to Request to Admit 41, Chicago Title simply denies that there the Policy language referring to the "terms, conditions, covenants, court orders, etc" even applies to the FCCG Bankruptcy!

Additionally, CT has not provided any factual or narrative information relative to its defenses. Please provide this information at your earliest convenience. We request that Chicago Title supplement its Answers to Requests for Admissions, Interrogatories and Requests for Production of Documents.

We will provide you with the information you requested in the December 13, 2011 correspondence. I suggest that we exchange information at the same time. May I suggest January 27, 2012 as the time for exchange of information?

You brought up the waiver of the attorney-client privilege. We previously waived it based on your representation that such information was both "relevant and material" to the case. You have now changed your position regarding relevancy and materiality. Regardless, we waive the privilege.

Lastly, you brought up the question of extension of discovery deadlines. You indicated that you intend to take the depositions of David Cohn, Dino Cancellieri, CT, Rick McCloskey, Gordon Duval, Dare 30(b)(6), Ken Williams, Todd Galante, George Pratt, Rick Knuth and Clark Real Estate. I have no objections to any of these depositions. However, this means that the discovery deadline should be extended to the end of February, the deadline for filing Motions to Amend should be extended to the end of March, and the dispositive motions filed by the end of April. Let me know if this outline fits within your calendar.

Thank you in advance for your continued cooperation. I am forwarding a copy of this letter to Messrs. Drobbin and Pratt to affirm that the attorney-client privilege has been waived.

                                          Very Truly Yours,

                                          Peter Strojnik

PJS: ps  
CC:  
PKS *by e-mail only*  
Chris Humphrey *by e-mail only*  
Rick Dare McCloskey *by e-mail only*  
Paul Drobbin *by e-mail only*  
George Pratt *by e-mail only*  
Attachments as indicated.